AUG 1 0 2001

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

---

Court File No. 00-CV-785 DSD/SRN

Holden Farms, Inc., a Minnesota Corporation; Rod Garness; Eugene C. Ward; Randy Swanson; Rick Anderson d/b/a Circle A Farms; Tim Sanborn; AJ Farms, a Minnesota General Partnership; Dennis Kofstad; Marlin Kruckeberg; and Pork Avenue, LLP, a Minnesota Limited Liability Partnership,

Plaintiffs,

-vs-

Hog Slat, Inc., a North Carolina Corporation; BCM Manufacturing, Ltd., a Canadian Corporation; and Double L Group, Ltd., an Iowa Corporation,

Defendants.

---

Deposition of: BARRY HOLDEN

Taken at: Holden Farms
401 South Division Street
Northfield, Minnesota

Date: July 25, 2001

Commencing at: 9:00 a.m.

by MARTHA M. RIVARD, COURT REPORTER

12151 Gantry Lane
Apple Valley, Minnesota 55124
800-844-6420 * 952-431-1252

LITIGATION SUPPORT--COLOR VIDEOTAPING SERVICE



EXHIBIT B

Deposition of BARRY HOLDEN, taken pursuant to Notice to Take Oral Deposition, under the Rules of Civil Procedure, for the U.S. District Courts of Minnesota, at Holden Farms, 401 South Division Street, Northfield, Minnesota, commencing at approximately 9:00 a.m., on the 25th day of July, 2001, before Martha M. Rivard, Notary Public, in and for the State of Minnesota.

\- * -

APPEARANCES:

DUSTAN J. CROSS, Esq., of the law firm of Gislason & Hunter, 2700 South Broadway, P. O. Box 458, New Ulm, Minnesota 56073-0458 appeared for and on behalf of Plaintiff.

PAUL R. DIESETH, Esq., of the law firm of Dorsey & Whitney, Pillsbury Center South, 220 South Sixth Street, Minneapolis, Minnesota 55402 appeared for and on behalf of Defendant Hog Slat.

RICHARD W. SOBALVARRO, Esq., of the law firm of Rajkowski Hansmeier, 11 Seventh Avenue North, P. O. Box 1433, St. Cloud, Minnesota 56302-1433 appeared for and on behalf of Defendant BCM.

JOSEPH F. LULIC, Esq., of the law firm of Hanson, Lulic & Krall, 920 Second Avenue South, Suite 500, Minneapolis, Minnesota 55402, appeared for and on behalf of Defendant Double L Group.

Also present, Kent Holden and George Kasper.

\- * -

Examination:

By Mr. Dieseth . . . . . . . . . . . . 3, 136
By Mr. Lulic . . . . . . . . . . . . . 89, 142
By Mr. Sobalvarro . . . . . . . . . 125

Page 3

BARRY HOLDEN,
called as a witness,
having been duly sworn,
was examined and testified as follows:
EXAMINATION
BY MR. DIESETH:
Q. Mr. Holden, would you state your name for the record, please?
A. **Barry W. Holden.**
Q. My name is Paul Dieseth. I'm from Dorsey & Whitney. We represent Hog Slat, one of the defendants in this case. I'm going to be asking you some questions today that relate to the lawsuit. Have you ever been deposed before?
A. **Once.**
Q. What was that in relation to?
A. **A car accident.**
Q. How long ago was that?
A. **That was 20 years ago.**
Q. Well, although I don't think things have changed in the deposition world, let me go over a couple ground rules before we begin. I'm going to, as I said, ask you questions that arose out of a lawsuit. I'll try to be as clear as possible. However, it may happen that you don't understand one or more of my questions. If

Page 4

that happens, let me know. Let me know if you're having trouble understanding what I'm asking you. If you don't ask me to clarify my question, I'll assume that you understood what I'm asking you. Can we operate under those rules?
A. **Yes.**
Q. Let me finish my question before you answer, I'll let you finish your answer before I ask my next question. That way, the court reporter won't have difficulty keeping up with what we're saying. Please don't speculate. If you don't know an answer, just say "I don't know" and we'll move on. If you want to respond to a question that I ask you with a yes or no answer, say yes or no. Try to avoid saying uh-huh or huh-uh, because that's difficult for the court reporter to transcribe. If at anytime you want to take a break, let me know, or let your attorney know and we'll do that.
Are you taking any medications or are you under any disability that would prevent you from giving clear and accurate testimony today?
A. **No, I'm not.**
Q. Were you involved, Mr. Holden, in collecting documents to produce to the defendants in this case?
A. **Yes.**

Page 5

Q. What did you do?
A. **I had a list of stuff that I had to produce and I either photocopied it or gave it to our attorney and they photocopied it and returned it to us.**
Q. Did the list that you looked at, was that from your attorneys or was that something that was put together by the defendants, or don't you know?
A. **I'm not sure.**
Q. Did you review any documents in preparation for today's deposition?
A. **Yes.**
Q. Did any of those refresh your recollection?
A. **Yes.**
Q. Which ones refreshed your recollection?
A. **I hadn't thought about the case for awhile so just in general it refreshed my memory. Nothing specific.**
Q. Nothing stands out?
A. **No.**
Q. What is your educational background?
A. **Graduated high school, graduated from St. Olaf College.**
Q. When did you graduate from St. Olaf?
A. **Class of '72.**
Q. What did you do after you graduated from St.

Page 6

Olaf?
A. **Worked on the Holden Farms.**
Q. Monday your brother Kent said that in 1991, you and he assumed half ownership each of the company; is that right?
A. **That's correct.**
Q. How do you and Kent split responsibilities and duties in the company? Is there a clear line of responsibility between you two?
A. **There's general lines. We do have cross-over of course, because there's just two of us. So we know something about what everybody does, but generally speaking, Kent takes care of hog production, and that can be all the way from the feed side, nutrition, all the way to marketing.**
**I have a role in the marketing and then the feed purchase, more the cost side of it and my role is treasurer of the company, produce the books, and also we raise a few turkeys. I have to do the turkey production, and also in charge of the physical plant crew, repairing buildings and building buildings, brand new buildings.**
**When we've been building, the latter few years as far as getting contract growers, different farmers in southern Minnesota, I've been the primary**

contact in getting those people, getting financing done for them, getting the construction contracts signed and growing agreements.

Q. In working with Hog Slat and in negotiating with Hog Slat that relate to the ten nursery buildings, were you primarily involved in that as opposed to Kent?

A. We both were involved in that because it was kind of a new venture. It wasn't something we had done before. Kent was involved a lot in the design of it, particularly the ventilation, more the production aspects of it: sizing of the pens, number of feeders, number of waters, that kind of thing, ventilation, the flooring. I was more involved in the costing of it and how it was laid out. He didn't have too much say as far as -- or expertise or know-how as far as the ventilation, feeding, that kind of thing.

Q. And actually building the ten nursery buildings, were you principally in charge of that?

A. Right. Myself was principally in charge and George Kasper was our physical plant man, was the actual hands-on, was the daily contact running the nursery projects. But I would follow up with him on a daily or every couple days' basis on it.

Q. Monday I was asking your brother whether you belonged to any associations. He mentioned several: the



National Pork Producers Council, Minnesota Pork Producers Association, and he had indicated that he periodically goes to those meetings. Did you also go to meetings?

A. No, I did not.

Q. How about any hog conventions. Do you go to those?

A. No, I do not.

Q. Kent Holden also mentioned some periodicals that you receive from time to time: Feed Stuffs, National Hog Farmer, Pork Today. Do you read those when they come in?

A. No.

Q. Let me ask you this. We talked on Monday about the ten contracts between Hog Slat and Holden Farms, and in some cases, the plaintiff farmers, and in connection with that, I showed your brother a document called a Contract Assignment, Exhibit No. 88, and the assignment of one of these contracts from Hog Slat to Eugene Ward. Let me show you that.

A. Yes.

Q. In looking through all of the documents that have been produced by Holden Farms in this case, I was not able to find any other contract assignments. Do you know if there were others?



A. I think this is the only one. I dug out the -- produced these documents and that's the only one I could find. This is the third one we did the first year. The others, the first two were basically contracts with Holden Farms and I think they differentiated this one because it was right with, you know, different ownership.

Q. When you say "different ownership," what do you mean?

A. Well, the first two fellows that wanted to build nurseries, that we did build the nurseries, Ron Garness and Marlin Kruckeberg, were not able to obtain financing, so we entered into a lease agreement with Farm Credit and built the building on their property. And this fellow here, Eugene Ward, could afford the financing, actually did finance it all himself, but we wanted the nursery the same as the other ones. It was an identical nursery built within a few weeks after others. So it was the same exact contract, building contract, same specifications, same everything else.

Q. It just so happens that for the third contract you assigned it directly to Mr. Ward, but the first two you didn't assign to Mr. Garness or Mr. Kruckeberg?

A. No.



Q. And then the other, it would be seven -- well --

A. That's correct. Seven more.

Q. There are seven others. It's not correct to say that they were all with Holden Farms. There were some with some of the individual plaintiff farmers. Tim Sanborn's, I believe, was directly with him. Do you know -- well, let me back up and get through Mr. Garness and Mr. Kruckeberg's farms before I move on to Mr. Sanborn. You said they were not able to finance the buildings themselves.

A. That's correct.

Q. How were the buildings financed?

A. We obtained a Farm Credit lease, Holden Farms. When I say "we," Holden Farms.

Q. Right. And how did that work? What were the arrangements of that lease?

A. Well, the lease was right with Holden Farms. We built the property -- I mean, built the building on their property, and they gave us, you know, the whatever it is, assignment of the property rights. I don't know the legal terminology. Farm Credit took care of that business. It was kind of a standard thing that they had at that time where a contractor would build a barn on an individual's farm that couldn't afford it, couldn't

Page 11

afford the financing.
Q. Exactly.
A. But then they would not lose any rights to use that barn and could use the barn for the length of the contract.
Q. So Mr. Garness and Mr. Kruckeberg, then, were making lease payments for the barns.
A. We made the lease payments entirely. Our contract only paid for their labor and we subtracted the lease portion right out. We did not pass through that.
Q. When you say you subtracted it out, you subtracted it from the payments you would normally make to them under the grower contracts?
A. Yeah. Normally, we have -- if a person finances a barn himself, we'll have a contract amount.
Q. What do you mean you have a contract amount? In the contract with the builder?
A. That will pay for their labor, pay for their supplies and also to pay the building off. To amortize the building over a ten-year period of time. We subtracted the portion that would normally have gone for that and then just paid the lease payments ourselves to them.
Q. Okay. So there were periodic deductions from the amounts that would have been paid to Mr.

Page 12

Garness and Mr. Kruckeberg under the grower agreements?
A. We didn't even deduct it. We just wrote the contract amount just simply for their labor and supplies.
Q. I'm sorry. Maybe it's early in the morning. I'm just not following you when you say you wrote the amount for their labor and supplies.
A. That's all they provided for us. We provided the --
Q. "They" being Mr. Kruckeberg and Mr. Garness?
A. Uh-huh. They had no financial responsibility to pay for the building or the equipment in the building.
Q. So when you say there were amounts that you calculated with respect to the labor and supplies that were supplied by Mr. Garness and Mr. Kruckeberg, where did that amount figure in the calculation?
A. We would take the cost of the building, we'd amortize that building over a ten year period of time at a given interest rate, figure there was a certain value there, dollar amount.
Q. All right.
A. Divide that by ten years. That amount was not put onto their contract. The balance that was left was what they got paid, excluding the part for -- they

Page 13

didn't have to pay for the building. We owned the building. So we didn't pay them for the building. Is that clear at all or not clear?
Q. Maybe I'm not understanding. You would normally pay a grower for the building?
A. Say, for example, you built a building for us and you just said build a building.
Q. I'm a contract grower.
A. You're a contract grower. You built the building for us, you'd want us to include that in the contract so that you could pay for the building.
Q. Okay. In the grower contract.
A. In the grower contract.
Q. All right. I understand. So you would then include in that grower contract allowances over a ten year period for the cost of the building?
A. Cost of the building, for your return on your labor, supplies, insurance, taxes, that kind of stuff. All expenses. In the Garness-Kruckeberg --
Q. They really didn't contribute much, therefore, you paid them only for their labor and their materials?
A. Right. Insurance, taxes, yes.
Q. Was that over a ten year period of time?
A. Their contracts were a 12 year period. All

Page 14

the nursery contracts were 12 years, the grower contract portion.
Q. I assume to the best of your understanding Mr. Kruckeberg and Mr. Garness owned the buildings, or were they Holden Farms' buildings?
A. You know, you make improvements on somebody's property, the property becomes theirs.
Q. That's generally the way it works.
A. Does that answer your question?
Q. Well, okay.
A. They gave us rights to use that property for the balance of the contract term.
Q. Under the grower agreement.
A. Under the grower agreement, uh-huh.
Q. I think I understand the first three. Tim Sanborn, do you remember that contract?
A. The grower contract?
Q. No, no, the building contract with Hog Slat.
A. Be more specific.
Q. Well, I can show it to you, and I may have to, but I'm trying to short-circuit this.
A. Sure.
Q. That contract is one that Mr. Sanborn signed, unlike the first three which were only signed by Holden Farms' representatives. I believe, in fact, it

was you who would have signed those first three.
A. That's correct.
Q. You and Mr. Sanborn actually had signed his contract.
A. Yes.
Q. And the contract is written as a contract between Hog Slat and Mr. Sanborn.
A. Okay.
Q. Why was that structured differently than the first three? Do you know?
A. There really isn't any reason. The contracts, all ten of them, basically, were to Holden Farms. They were all the same. We directed what was going to be in it, Hog Slat agreed to what was going to be in it. Some growers would contact Hog Slat and be a little more proactive, even though they really couldn't decide what type of gating or what type of this or what type of that could be in the barn. We really decide that, Hog Slat and ourselves. And their names for some reason were put on the contract and signed, and some were not. And there is really no reason that I can think of why some were not.
We were responsible to pay Hog Slat if the grower didn't. I mean, many times that happened. "Well, so and so is not paying his bills. Get on him.



Do something about it," or whatever. So we were, in a sense, they were Holden Farms' barns built by Hog Slat on Ron Garness' or Eugene Ward's or Mr. Sanborn's, and we didn't really have any significant difference why one name was on and one wasn't on.
Q. Did Mr. Sanborn finance his barn?
A. Yes, he did.
Q. So you included that in his grower agreement allowance over a ten year period of time payment back to Mr. Sanborn for the cost of the building?
A. Uh-huh.
Q. Yes?
A. Yes. And also we have a small -- we provided some of the financing as well for Mr. Sanborn. Several we did that way.
Q. What about Kofstad? Do you remember whether he financed his own building?
A. Yes, he did.
Q. A & T Farms?
A. A & J.
Q. I'm sorry. AJ. Did they finance their own building?
A. Yes, they did. Somebody provided them the primary financing. Almost every barn we took a second mortgage on and we provided the back end or the equity



portion of it, however you want to say it, to get it financed.
Q. Ron Garness-2, there were two nurseries on his farm?
A. There are two separate locations.
Q. Two separate farms?
A. Yep.
Q. On the second one that you built for him, do you know if he financed that?
A. (Witness nodded head in the affirmative.)
Q. He did?
A. (Witness nodded head in the affirmative.)
Q. Can you say yes?
A. Yes, sir. I was thinking when I was saying that, we financed it for awhile and then he did get financing later.
Q. How about Rick Anderson, Circle A?
A. Rick Anderson's financing is the same as Garness. We financed it 100 percent and then we did find a lender that took it.
Q. Mr. Swanson's barn?
A. Mr. Swanson, yes, his financing primary lender was not Holden Farms.
Q. And then finally, Pork Avenue?
A. Pork Avenue, primary lender was not Holden



Farms.
Q. Okay. So the only assignment that we've got is for Mr. Ward, Eugene Ward.
A. Right.
Q. Okay. Your brother indicated that there had been a relationship between Holden Farms and Hog Slat --
A. Yes.
Q. -- before these ten barns were built. Did you have any involvement with Hog Slat before these contracts?
A. As far as the building and, you know, getting some of the finishing barns constructed, we did some farrowing farms, farrowing with nursery, yes.
Q. Do you remember who you dealt with?
A. Well, originally, Wendell Burge, and then he had successors that followed him, Scott Bach, Kirk Brinks. I can't remember that Texan's name. That Gunsmoke character, what was his name?
MR. KASPER: Newly Spikes.
THE WITNESS: Newly Spikes.
BY MR. DIESETH:
Q. So who had the idea to expand your production with the decision to build ten new nursery barns?
A. It was a joint decision by my brother and

Page 19

myself.
Q. Why did you decide that?
A. We split up. There was four brothers originally in our organization. We ended up having a family squabble and split up the business. We ended up having to pay the lion's share or blue sky to the other brothers, to the two, and so we decided, well, let's expand. Let's do something. Let's not just pay that off. Let's make the business bigger and try to get back to where we were. So it was kind of like, let's do something. So then we decided we would do the hog business is what we decided to do.
Q. With respect to these ten nursery barns, did you ever consider a vendor other than Hog Slat?
A. The nursery barns?
Q. Yes.
A. No, we did not.
Q. Did you approach Hog Slat with the idea of building these ten nurseries?
A. Yes.
Q. Was it you, personally?
A. I wouldn't say personally. Joint decision, yeah.
Q. Do you remember when you first contacted Hog Slat?

Page 20

A. Well, we had been in contact with them right along. We had been buying equipment from them originally, and nurseries -- I mean farrowing barns and that kind of stuff. So it wasn't a clear, "Let's contact them and get that started."
Q. Now, did you understand that Hog Slat's primary business is selling hog equipment and equipment for raising animals?
A. Yes.
Q. And you understand their primary business is not selling barns.
A. Correct.
Q. Did you understand that Hog Slat's primary motivation for selling you these barns was to sell you the equipment that was installed in the barns and that was made by Hog Slat?
A. Yes.
Q. Now, originally when Holden Farms and Hog Slat were considering the construction of these nursery barns, it was originally contemplated that you would be using the wire flooring over steel runners, correct?
A. Yes.
Q. Now, who had the idea, who first brought up the idea of using plastic flooring?
A. Hog Slat.

Page 21

Q. Are you sure of that?
A. Uh-huh.
Q. Who was it at Hog Slat?
A. Wendell Burge.
Q. Do you know who was the manufacturer of the wire flooring that was originally specified for the building?
A. No, I don't know that.
Q. Did you ever find out why Mr. Burge brought up the idea of plastic flooring?
A. No, not until later. I mean, reading some of the documentation, you see some of these that BCM, Double L and Hog Slat were getting arrangements together and they had some quotas they were going to meet, and whether or not these agreements were ever consummated, I guess, is the question mark, but at least they were having discussions about it. And looking backwards on it, just from reading the information, I said, well, maybe they wanted to see if they could expand their business, and Wendell saw an opportunity, he knew we were going to build three nurseries that year, and we'd already had a contract written that had the wire spec in it, and maybe he saw that as an opportunity to, "Well, there were 60,000 square feet right now that maybe we could work into this deal." But that's after the fact.

Page 22

I didn't -- at the time, we just thought that he thought it was a good product.
Q. Your testimony about the arrangement between BCM and Hog Slat and Double L is based simply on your review of the documents?
A. Yes.
Q. And you don't have any personal knowledge of that, do you?
A. No.
Q. Do you remember when it was that Wendell Burge brought the idea of plastic flooring to your attention?
A. It was spring of '94.
Q. And the infamous April '94 meeting, which we all know about, how long before that meeting did Mr. Burge raise the issue with you?
A. As far as I can remember, it was just very shortly. I mean, we were thinking about these nurseries, already had a contract written. And so it was like, you know, within a month or two months, whatever. It was a short time period.
Q. Do you remember what he first said to you about plastic flooring?
A. That he had a good product and that it was something we should look at and he'd like to get a

Page 23

meeting together.
Q. And I assume you said yes.
A. Sure.
Q. So before you met, before this April '94 meeting, you had not looked at any other plastic flooring manufacturers?
A. No.
Q. Did you ever look at any other plastic flooring manufacturers, other than the Filter-Eeze Maxima flooring?
A. At what time?
Q. I'm sorry. In the 1994 time frame.
A. No.
Q. Did you receive any literature or did you look at any literature about Filter-Eeze Maxima flooring before this April '94 meeting?
A. No, I did not.
Q. Did you ever talk to anybody about the flooring before the meeting?
A. No, I did not.
Q. I'm assuming that -- well, why don't you tell me who you recall at that meeting.
A. Well, it was Kent and I and George Kasper and Darwin Tilstra, our organization, Wendell Burge from Hog Slat and Norb Borcherding.

Page 24

Q. How long did the meeting last?
A. I recollect a good part of the afternoon. A couple hours.
Q. It was here?
A. Yeah, it was in an office on the other side of the building, yes.
Q. Was that the first time that you'd met anybody from Double L?
A. Right.
Q. What do you recall about the meeting?
A. Well, I recall that Wendell brought this Mr. Borcherding up and they had a piece of flooring, and Norb came along, and that he had this product and this and that and it was a good deal for us. It was a little more expensive than what we were accustomed to paying, but it was going to pay off in the long run because it was going to be longer lasting, had a better warranty than Hog Slat had, and we wouldn't have to replace it. Because frankly, replacing the floor on nurseries is a lot of work, because there's so much stuff in there, so many pens and feeders and waters that have to be removed. It's not a simple task.
So we had been used to using that double-O or triple-O wire, whichever, and that's very hard to handle. It's really heavy. It's actually more than two

Page 25

people can handle. The sheets are four by eight and we weren't looking forward to replacing that every whatever, seven to ten years. So we thought, well, if this product is as good as they say it is, it holds up, we'll be good.
Q. You'd said in your answer that you thought that one of the reasons why you decided to go with the flooring was that it was longer lasting and had a better warranty than Hog Slat had.
A. Uh-huh.
Q. When you said it had a better warranty than Hog Slat, are you thinking about the one year warranty?
A. Yes. And then also on the experience of the replacement we had done with the wire. We had used that in nurseries, we've had to replace it. We knew how long it lasted, approximately.
Q. And that was seven years or so?
A. Yeah, guesstimating, depending how hard it got used. But we certainly wouldn't have to replace it within five and probably would have to for sure by ten.
Q. Is it the wire flooring itself was -- let me ask you. On the wire flooring that you're speaking of that you'd used before, were the metal runners that supported it a separate piece of that flooring or was it all one big piece?

Page 26

A. There was both, but in the nurseries, it was basically separate, but we did have some with actual metal frames that it sat on.
Q. Do you remember what the name of that product was, the name of the product?
A. Which product?
Q. The one that had metal frame as part of the structure?
A. Well, it was a Hog Slat frame. Blue steel frame. It was just constructed -- it was a welded frame, rectangular rather than being individual runners.
Q. And the other flooring, this wire mesh, other wire flooring that you were talking about that was supported by independent runners, was that also Hog Slat's product?
A. The wire part?
Q. Yes.
A. I think they bought that from somebody outside. It was a resale item for them.
Q. But the wire flooring, that was all one piece.
A. Well, I'm sorry. Maybe you misunderstood me.
Q. I might have.
A. The wire floor is the same regardless. It

Page 27

either sat on a welded frame or individual struts, individual straps.
Q. So the wire flooring itself was always independent of the support system?
A. Correct. You'd lay the floor in, you'd lay your structure in, not unlike a house. You'd put the joists in and then you'd put the plywood on top.
Q. So the difference between the two versions that you were talking about, one has just individual steel runners, the other one has a welded frame?
A. Correct.
Q. You had mentioned, I think, that one of those pieces somewhere was manufactured by Hog Slat. Was it the welded frame?
A. The blue steel. Yeah, the welded frame. Either one, uh-huh.
Q. And so the runners, the independent runners that supported the metal frame, not the welded frame -- let me start over again.
The welded frame, as you understand it, is blue steel that was supplied by Hog Slat, right?
A. Yes.
Q. The individual runners, was that also blue steel supplied by Hog Slat?
A. Yes.

Page 28

Q. And what you don't know is who made the wire framing that went on top of that.
A. Right. I think it was a resale item for Hog Slat.
Q. Now, do you remember, before you began talking about plastic flooring with Hog Slat, whether the product that was going to be going into the barns would have used the welded steel frame or the independent steel runners?
A. On the nursery barns?
Q. Yes.
A. The brochure they brought up --
Q. Okay.
A. -- are you asking me before the meeting? Is that what you said?
Q. Yes.
A. I'm sorry.
Q. That's fine. Before the meeting, we had talked about the fact that the spec -- that you'd written a spec and the spec called for wire flooring.
A. (Witness nodded head in the affirmative.)
Q. In your recollection, was that wire flooring going to be placed upon the welded steel frame?
A. No.
Q. -- or was it going to be placed on the

Page 29

individual steel runners?
A. My recollection is the way the barn was constructed, this barn was going to be wider and it wasn't going to have the smaller rooms. The welded frames usually were used on smaller applications under a farrowing crate or a smaller nursery room. This application really required some kind of structural support, you know, across the barn, the width, and my understanding or recollection would be that they were going to use the steel strapping.
Q. And those are the individual steel runners we've been talking about?
A. Right. The ones we ended up using.
Q. Okay. Now, when you -- you had talked again about the warranty being longer than Hog Slat's warranty. Going back to the April meeting.
A. Yes.
Q. You talked about the warranty being longer than Hog Slat's one year warranty.
A. Yes.
Q. What was your understanding of the length of the warranty?
A. Ten years non-prorated, ten years after that, prorated. A depreciated warranty.
Q. What company was giving you that warranty?

Page 30

A. Well, my impression was Hog Slat. It was Hog Slat -- Wendell had called the meeting and it was Wendell that was saying this and this and this, and he was actually running the meeting. Norb was kind of just adding the color commentary or whatever to the deal. So we thought the meetings with Hog Slat, this is what they were representing and this is what the warranty was.
Q. Okay. What do you remember Wendell saying at the meeting?
A. Just all of the above, that this was a good product, it was going to last us longer, it was, you know, like the brochure said, it was warmer for the pigs and better environment for them. The main concern with us is that if it was going to cost a little more, there's got to be some kind of benefit. The pig comfort would be one thing, but also these would be contract barns. We didn't want anymore to do with them with the grower. We didn't want to come in like we did and have to fix the barns.
Whenever we build something for a contract grower, we hope that's the end of that. We can just raise pigs after that. And we wanted something that was going to last at least the length of the contract. Our contract was 12 years long. And we were going to amortize the buildings over ten years and give them a 12


MARTHA M. RIVARD
952-431-1252 * 800-844-6420

year contract.
We thought that we're done with it then. We got set and the building would be paid for and if they need to replace the floor after that period, they could afford to do it themselves at their own convenience.
Q. Let me go back for a second to your history, your experience with wire flooring and the runners prior to this April '94 meeting.
A. Sure.
Q. You'd indicated that you'd normally expect to replace those floors every seven to ten years.
A. (Witness nodded head in the affirmative.)
MR. CROSS: Is that a yes?
THE WITNESS: Yes, it is.
BY MR. DIESETH:
Q. What was it that you needed to replace? Was it the wire flooring, was it the steel runners, was it both?
A. The wire flooring.
Q. The steel runners did not need to be replaced?
A. No, they didn't.
Q. How long did those normally last?
A. They still are in operation now in many of our locations after 20 years.



Q. What do you remember Norb Borcherding saying during that meeting?
A. Not too much. If you asked me what he looked like, if he was sitting in this room and I had to pick him out, I couldn't pick him out. The meeting, to me, Hog Slat was presenting the meeting and he was kind of along, but actually, I couldn't even pick him out if you asked me today.
Q. Did you ever talk to a guy named Bailey Evans?
A. No, I didn't.
Q. Do you recall anything that you or Kent or Darwin or George Kasper would have said during the meeting?
A. No, nothing -- I remember the meeting as informative and pleasant and Wendell sold us on the deal.
Q. Did you make the decision during the meeting?
A. We did a little follow-up after that meeting. I think George and Darwin went to look at the -- some barns that Double L had with the plastic flooring, just to check on pig comfort and that kind of thing, but we didn't decide that minute. But I think we were 90 percent there. We just wanted to check out a



couple things.
Q. It was Darwin and George who did the follow-up?
A. Yeah, they went and looked at some barns that Double L had in Iowa.
Q. Did you do any follow-up, other than that?
A. Not that I can recall, no.
Q. Can you take a look at Exhibit No. 4. The infamous Exhibit No. 4, Mr. Holden.
MR. LULIC: I'll object to the form of that. What's so infamous about it?
BY MR. DIESETH:
Q. It's the exhibit that's been identified --
A. Any certain page?
Q. I just want you to take a look at it. This exhibit has been identified as having been presented at that April '94 meeting. Can you take a look at it and confirm that?
A. Yes, it certainly looks like it.
Q. Did you read that through during your meeting, just glancing at it?
A. Yes.
Q. There's a letter there from Norb Borcherding. Did he talk about that letter?
A. Like I said before, I don't really remember



Norb. I don't remember him talking or whatever.
Q. Did each of you, the four of you who were from Holden Farms, get a copy of this, Exhibit No. 4?
A. I'm not sure of that.
Q. Do you remember taking a copy away with you after the meeting?
A. I ended up with one. I don't remember taking it away, but I did have one in the file, yes.
Q. In your file?
A. Uh-huh.
Q. When you collected documents in this case or tried to respond to the requests that you collect these documents, how many copies of that pamphlet did you find?
A. One or two.
Q. You found one in your file.
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Do you remember finding it anywhere else?
A. I believe George Kasper had one. George Kasper or Kent and maybe both of them had one, but there wasn't very many, but there was --
Q. Do you know whether you, at any time, gave copies of Exhibit No. 4 to any of the plaintiff farmers?

Page 35

A. No, I did not.
Q. Do you know if George or Darwin or Kent did?
A. Not to my knowledge.
Q. Do you recall any discussions during the April '94 meeting about the support system for the plastic flooring?
A. Only that we were going to use a similar support system, and they had pictures of it in here that we were going to use for the wire flooring.
Q. And they had pictures of it, you say, in the brochure?
A. Yeah, in the brochure. Like I said before, we had to use a different support system that we traditionally had used because of the width of the barn and how it laid out.
Q. Can you show me the picture in Exhibit No. 4 that you're referring to?
A. It's this one here.
Q. Now, that's at the bottom of the --
A. It's not numbered.
Q. -- of the fourth page of Exhibit No. 4, correct?
A. Counting the cover.
Q. Yes.
A. That's correct.

Page 36

Q. So you looked at the picture with Mr. Burge and Mr. Borcherding?
A. Yes.
Q. Did you talk about it at all?
A. We just -- because we were interested in just -- myself, anyway, I should talk just for myself, I was interested in how it was going to lay out and how we were going to put it together. So I just noted that, well, this -- you lay these the same way but they were going to interlock and they were snap on.
Q. There were tabs in the flooring that would lock in --
A. Yes, it says right on there, and that's how they were going to be secured.
Q. Did you talk about using fiberglass or galvanized steel supports?
A. No, we didn't. Just plain steel.
Q. Painted steel?
A. Yeah. Uh-huh.
Q. Now, did you ever talk to any of the -- and I've used the word plaintiff farmers. Do you understand that to mean the ten farmers who are also plaintiffs in this case?
MR. CROSS: Nine.
THE WITNESS: Yes, I do.

Page 37

BY MR. DIESETH:
Q. The contract growers?
MR. CROSS: There's only nine.
BY MR. DIESETH:
Q. There's only nine. When I use the term, I just want to make sure you and I are operating under the same understanding. Did you ever talk to any of the plaintiff farmers about the April '94 meeting?
A. At what time?
Q. Prior to the discovery of any buckling with the flooring.
A. Prior to any discovery, no, I did not.
Q. Do you know if Kent or George or Darwin did?
A. Not to my knowledge.
Q. Now, did you consult at all with the plaintiff farmers, or did anybody from Holden Farms consult with the plaintiff farmers about using plastic flooring before that decision was made?
A. Before the decision was made?
Q. To switch from the wire flooring to the plastic flooring.
A. No, we did not.
Q. Did anybody at Holden Farms have discussions with any of these nine farmers about the design of the building before the buildings were built on their

Page 38

property?
A. At what time?
Q. I'm trying to -- this is just a very general question. I'm trying to get some understanding of the interaction between Holden Farms and the farmers, the growers. With respect to the decisions that had been made about the design of the building, the width, the length the larger rooms and the flooring, were there discussions along those lines?
A. Well, we certainly talked to the farmer about how the building was going to be constructed, and I just don't know -- if you could be more specific.
Q. Was it generally the case that Holden Farms had made the design decisions and then presented those decisions to the contract growers?
A. Shoved them down their throat?
Q. Well, obviously, it wasn't that kind of relationship.
A. No. We basically did. That's basically what we wanted, some kind of a cookie cut or something we could depend on. The reason we went with Hog Slat, one vendor, we kind of wanted to keep the stuff simple. That kind of deal.
Q. Did any of the contract growers push back on any of the design decisions that you had made on these

Page 39

barns?
A. Well, later on, you know, after we had one or two growers or more, you know, were involved in what they wanted and this and that and the other thing.
Q. Who are those?
A. Well, if you're referring to like on the steel beam versus the fiberglass, we had one grower named Randy Swanson, and his testimony is there, or I gave a copy of that to you, but he thought maybe he wanted fiberglass beams and had done some discovery on his own.
Q. I'll ask you about that in a second. But you said you'd given us something about that?
A. Well, it's in one of the exhibits.
Q. What do you recall?
A. Well, I just recall that he asked me about it, whether he could do that, if that would be a possibility.
Q. Do you remember when that was?
A. That was -- he was not the very last barn, but the number nine barn, and that was August. I think we started his in August or July of '97.
Q. You're right. The contract was signed June 26th of '97. So it would have been shortly after that contract was signed?

Page 40

A. Right. I think we got started late summer. Could have been July or into August when we got started with the cement work.
Q. So Mr. Swanson came to you and you and he talked about the type of support.
A. Yeah, he called me and he's a very particular kind of farmer and really involved in his whole -- not just in the flooring, but in his whole barn. He questioned everything that was in it. He went and visited the other barns that had been built from the ventilation to everything. Not just the flooring. You know, how the layout was and how the service room was and how the washer and dryer -- he's very meticulous. Really a -- in a good way, but sometimes he can get a little overboard.
Q. Did he tell you what kind of research he had done with respect to the type of supports that had been used with the flooring?
A. He had done some research. I think he had talked to Hog Slat and to another vendor on having different support systems in his barn.
Q. Did he say who the other vendor was?
A. Not that I can recall, no.
Q. Did he tell you what Hog Slat or the other vendor had told him about supports?

Page 41

A. That they were available at that time, that was in '97, but the cost was -- I can't remember if it was twice as much as the steel beams. It was considerably more.
Q. Did he mention that to you?
A. Yes. He checked it out himself, checked out the pricing and what it would entail, whether he could do it or not.
Q. What did you say?
A. I said, "You know, we built the budget to pay you the contract fee based on a certain amount of dollars," and if he was going to spend more than that, that he'd have to finance it himself.
Q. So going back to where we started the deposition today, you had built into the grower agreement payments to the farmer that envisioned a certain cost for the barn.
A. Right.
Q. And if they were to install fiberglass runners, it would exceed that cost that you had in mind.
A. Correct.
Q. So you're saying you would still be willing to pay the contract grower the amount that was set forth in the contract, but you weren't going to pay him any extra to take into account for the fiberglass beams.

Page 42

A. Right. And this happened not only in regard to that, but as long as it wasn't going to change the nature of the way the pigs were going to be raised or the ventilation or this kind of thing, we weren't opposed to any different modifications to the barn, but then we had a certain budget that we were trying to live within and we had started out with -- we had already built eight of these and this was number nine, and we weren't going to change just for his.
Q. Did he say why he was attracted -- was he attracted to the idea of using a fiberglass beam?
A. He seemed to be. He seemed to think it was going to have a longer life and be a better product for him.
Q. Is that what he said?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Did you and he talk about the possibility of the steel beams corroding, rusting?
A. No.
Q. Did he mention anything at all about what he had been told by Hog Slat about any -- did he say that Hog Slat had mentioned to him that there were any problems with the steel beams?

Page 43

A. **No, his whole effort was to get something better.**
Q. And ultimately, Mr. Swanson decided to go with the painted steel beams.
A. **He did.**
Q. Did he tell you why?
A. **He couldn't afford it.**
MR. LULIC: He couldn't afford it --
BY MR. DIESETH:
Q. He couldn't afford the extra cost of paying for the fiberglass beams on his own?
A. **Uh-huh.**
Q. Yes?
A. **Yes. What he ended up doing is he ended up making his barn somewhat different in other ways and spending extra money, and he basically was over his budget, and when he got down to paying the difference in the fiberglass beams, he didn't have any extra money to pay.**
Q. Now, Mike Anderson and Pork Avenue was the last nursery barn built.
A. **That's correct.**
Q. And his barn was built after Mr. Swanson's barn?
A. **Right.**

Page 44

Q. Did you ever have any discussions with Mike Anderson about the use of fiberglass beams?
A. **No, I didn't.**
Q. Do you know if Mike Anderson mentioned that possibility to anybody else at Holden Farms?
A. **Not to my knowledge.**
Q. Between the April '94 meeting and the time you signed the first contracts for the nursery barns, did you have any further contact with Hog Slat or Double L or even BCM about the plastic flooring?
A. **No, I didn't myself. I think that maybe there was some, like George Kasper and Darwin Tilstra went to visit a barn, but not myself, no.**
Q. Who communicated the decision to Hog Slat that you wanted to go with the plastic flooring?
A. **Kent and I decided it, but I don't remember who contacted and said, "This is where we'll go. Let's make new contracts up." It was a joint decision.**
Q. Now, I already asked you whether or not there was any discussion during the '94 meeting about fiberglass or galvanized steel. Let me ask you just generally. Before you signed the first contracts with Hog Slat on these nursery barns, did you have any discussion with anybody about the use of fiberglass or galvanized steel supports for the nursery barns?

Page 45

A. **No.**
Q. Other than the discussions that we just talked about with Randy Swanson, had you talked to any of the contract growers about the type of flooring that was going to be installed in the buildings?
A. **No.**
Q. Now, the first five buildings that were built were Lester Building Systems buildings?
A. **They were -- I believe they came from Lester. They were panel barns.**
Q. When you say "panel barns," what is your understanding of that?
A. **The sidewalls are pre-manufactured panels, manufactured -- I think they were at Lester, four by eight sheets, and then they bring them down.**
Q. They were shipped to the site?
A. **They were shipped to the site, yeah.**
Q. And then they were erected by Hog Slat?
A. **Yep.**
Q. Now, we have Mr. Kasper here and we'll be asking him questions too about this next subject, but I want to get your recollection about it. Mr. Kasper not only works for you in supervising -- well, what is Mr. Kasper's responsibility in Holden Farms?
A. **He's in charge of our physical plant.**

Page 46

Q. So he not only has that responsibility, he's also a contract grower, isn't he?
A. **He is, yes.**
Q. And he would have built a nursery barn in the winter of '96-'97?
A. **I believe that's correct, yes.**
Q. Did you have any involvement in the design of that barn?
A. **No, I didn't.**
Q. Was that Mr. Kasper's responsibility?
A. **Yes, it was.**
Q. Did you have any input at all into his choice of flooring for that barn?
A. **No, I didn't.**
Q. Did you talk to him about his selection?
A. **Yes.**
Q. Did you talk to him about his decision to use fiberglass beams?
A. **Yes.**
Q. What did you talk about?
A. **He bought an existing farm, it had a small nursery on it. He wanted to expand his nursery. The prior nursery had some type of plastic flooring on it as well with fiberglass beams, and he wanted to expand his nursery and he was going to stay with the plastic**

Page 47

flooring, and there was discussion at that time that the BCM came out with the Excelerator, the two-foot wide tiles, and he thought he could afford to put the fiberglass runners in because there were only half as many fiberglass beams. Our runners on our barns were one foot on center and these were two foot. So it was half as many. And then plus he didn't have the span that we did. Our barns were built with almost a 12-foot span, 11.6 span and he ended up half that amount or eight foot, I think. I can't remember exactly. But he didn't have the spanning problems that we did.
Q. So the economics for him made a lot more sense.
A. Made a lot more sense, and it was a continuation of what he had already.
Q. Do you know who the manufacturer was of the plastic flooring that was in the barn that was on the property when he bought it?
A. He told me the name, but didn't strike a --
Q. You don't remember it?
A. No. He even told me this morning and I can't remember.
Q. Well, I'm sure he remembers. We'll ask him. So he bought the Excelerator flooring for that barn.
A. He did the two-foot tiles.

Page 48

Q. And he bought that from Double L?
A. I believe he bought it from Double L, right.
Q. And he bought the fiberglass beams from Double L as well?
A. I believe so.
Q. He told you that one of the reasons for deciding to go with the fiberglass beams is they would last longer?
A. I don't remember that so much. It was just that it was kind of the same as what he had. And the big deal was that the cost was going to be, you know, equal to or about the same as what we had planned with one foot center steel beams.
Q. But it obviously would have been cheaper had he used steel as opposed to fiberglass runners for his new nursery.
A. I think it would have been.
Q. Did he tell you why he decided, given that price difference, to go with the fiberglass?
A. No.
Q. Did you personally -- you mentioned Kirk Brinks before.
A. Yes.
Q. And he worked for Hog Slat.
A. Correct.

Page 49

Q. Did you ever talk to Mr. Brinks about the kind of support system that would be installed in the nursery barns?
A. No.
Q. So you have no recollection of talking to Mr. Brinks about problems with corrosion involving the steel runners? This is before they started buckling on your farm.
A. Before?
Q. Yes.
A. No.
Q. Why don't we turn to the discovery of the buckling on the flooring. When did you first become aware of that?
A. That would have been late '98.
Q. Which barn?
A. I think Marlin Kruckeberg was the first one that I knew of.
Q. Would this have been in the winter?
A. It could have been, yeah, winter of '98-'99.
Q. So what did you do when you saw this, or heard about it?
A. Actually, I never saw it myself. I just heard secondhand. At that point, once the barns became up and running, I don't have much to do with them.

Page 50

Q. You turned them over to the contract growers?
A. And Kent. That was his problem then. And then actually, I didn't have to really do anything about it until finally Kent said, "You've got to do something about this." And that wasn't until -- it was later into '99 after they had tried different things. I know that George, and he can probably tell you a lot better than I can, did some expansion joints and that kind of stuff, and Kent was actually more involved just in production then. They were trying to fix them on the fly kind of.
Q. So more fell into the production end of things than construction?
A. Right.
Q. But eventually Kent came to you and said, "You do something"?
A. Yeah.
Q. What did he say?
A. Well, I think he wanted some help. He wanted some support. He was like, "Nobody's going to help us fix this." Everybody's pointing the finger this kind of way, opposite directions and it's somebody else's problem, but we've got -- it was our problem. You know, we had to raise the pigs, and a few had fallen through the things I had heard about, and I know we had

Page 51

to do something about it. We couldn't ignore it anymore.
Q. Well, at the risk of getting side-tracked, let me ask you about those pigs. How many died, to your knowledge, as a result of falling through the flooring?
A. I heard 50, but again, I wasn't in the production thing and I don't know.
Q. Kent would know more about that than you?
A. Exactly.
Q. Okay. Then I didn't get really side-tracked.
A. No.
Q. When Kent came to you and said, "Barry we need to do something." What did you do?
A. I got involved with Hog Slat. That was about the time that Kent went down to World Pork Expo and talked to Tommy and the Double L people and the BCM people were there. And then I got involved with Wendell. Wendell came up, you had an exhibit on Monday, that Kent and Wendell had made this proposal to us. I got more involved in how many dollars it was going to be and how physically we were going to get this done. You know, just kind of the ramifications from the cost side and production side, how we were going to shut these barns down and how we were going to -- how we were going

Page 52

to do it.
Q. Okay. You didn't attend the World Pork Expo?
A. No, I didn't.
Q. Did Kent report back to you after it was over? Did he tell you what had happened?
A. He did.
Q. What did he say?
A. He said that, you know, Tommy Herring seemed receptive to wanting to help to get it done and promised that they were going to follow through and get going on it. And actually, I think he said even Norb wanted to help and figure out what we could do and how we could get it fixed. He was optimistic that we were going to -- because at that time, we were just getting a glimpse of how big of a problem it was going to be.
At first we thought, well, it's just the cheap tiles in the barn. Maybe these expansion joints, we'll take a few tiles out and replace them and we'll get this job handled without too much trouble. But we were just getting an idea it was going to be a big deal. And he came back with the sense that maybe they'll get this figured out.
Q. So you had mentioned an exhibit from Monday. Was that Exhibit No. 82?

Page 53

A. Yes, it is.
Q. Not that it really matters all that much, but do you know why Wendell sent that to Kent instead of you?
A. No.
Q. I told you it didn't really matter all that much. Were you working with Wendell and Double L and BCM with respect to different options that could be used to try to solve the problem?
A. No, only with Wendell.
Q. You never had any contact with BCM or Double L --
A. No.
Q. -- at any point with respect to the installation of replacement flooring?
A. A little while later, after this was --
Q. Exhibit No. 82?
A. Pardon me?
Q. After Exhibit No. 82?
A. After Exhibit No. 82, when it turned out things weren't going to work out with Hog Slat, we had some direct dealings with BCM. I only talked to Nic Orr a couple of times, but basically, I didn't have too much to do with them.
Q. Was Kent the person who struck the deal with

Page 54

BCM about the materials that would be used as replacement flooring for the first three barns?
A. Yes, I believe that's right.
Q. You really didn't have much to do with that?
A. No.
Q. And just back up a second. You didn't have anything to do with the installation of the expansion joints in the barns?
A. No, I didn't. I didn't actually even go to a barn.
Q. Have you ever seen any of the barns that had the old flooring and old steel runners in them?
A. Only when we started taking it up.
Q. How many sites did you visit?
A. I've been on every site once we were in the process of replacing it.
Q. And George Kasper was supervising that work?
A. He was.
Q. So you had some conversations with Wendell Burge about replacement material, replacement flooring for the barns?
A. Yes.
Q. Were you the one who realized that it wasn't going to work out with Hog Slat? Did you tell that to Kent?

Page 55

A. **Well, I think we both figured it out about the same time.**
Q. What led you to that belief?
A. **Well, this Exhibit No. 82 showed we were looking at probably five to $600,000, and they offered $50,000. At that point, we figured that wasn't going to work out.**
Q. Okay. Well, do you have any recollection about the financial deal that was ultimately struck with BCM for the first three barns?
A. **In regard to the amount?**
Q. The pricing, yes.
A. **I knew what the price was, right.**
Q. Did you get a discount from BCM?
A. **Yes, the first three. That summer, the summer of '99 we did. Uh-huh.**
Q. And for those first three barns that were replaced, you used fiberglass beams?
A. **Yes.**
Q. And you used the BCM flooring?
A. **Yes.**
Q. Do you remember the product name of the BCM flooring that you bought for those first three barns?
A. **It was the Excelerator I think they call it, two-foot tiles.**

Page 56

Q. What did you do for the barns that you worked on the next summer, the summer after that?
A. **The summer after that -- we did three the first summer, we did five the next summer. One we replaced with the Excelerator, the two-foot tiles, one we replaced with a company called Southwest Plastics, and the other three were -- we reused as many tiles as we could, and we replaced with one-foot, is that called Maxima?**
Q. Maxima 2?
A. **Yeah. Yes.**
Q. Well, actually, you used the flooring that was in there before?
A. **Right. And then what we did, I kind of look at it as kind of like five and five. We replaced five floors completely. The second five we bought one barn's worth of floor, because we figured --**
MR. LULIC: For all five. Is that what you mean?
THE WITNESS: For all five we bought one -- because we figured there would be 20 percent wastage, breakage, whatever, and then we would replace with new and reuse as many old as we could, and that's what we eventually did on the second five.
BY MR. DIESETH:

Page 57

Q. Just to make sure I understand, the first three you used the Excelerator flooring and the fiberglass beams from BCM.
A. **Correct.**
Q. Of the next five -- I'm sorry. Of the next two --
A. **Correct.**
Q. -- one you used the Excelerator flooring again --
A. **Yes.**
Q. -- and for that particular barn -- do you remember which barn that was?
A. **That would be -- get my numbers straight here. That would have been Tim Sanborn.**
Q. And so for the Sanborn barn, you would have used the Excelerator flooring. Did you also get the fiberglass beams that were used for that flooring from BCM?
A. **They were bought through their -- I could be wrong on that. We could have bought them from somebody else. It was the same beam, but I think we bought them from somebody else.**
Q. And then there was one barn, you'd mentioned Southwest Plastics. Is that the Kofstad barn?
A. **That's correct.**

Page 58

Q. And he personally made the decision that he wanted to go with that vendor instead of Excelerator?
A. **He did.**
Q. And then for the last five -- have you done the last two this year?
A. **We have.**
Q. And so for the last five, you reused the old flooring to the extent possible?
A. **Correct.**
Q. And you bought replacement Maxima flooring for those that had broken or chipped or whatever in the replacement process.
A. **Uh-huh.**
Q. That's a yes?
A. **That's correct.**
Q. Who made the decision to begin reusing the old plastic flooring instead of buying all new Excelerator flooring or plastic flooring from some other manufacturer?
A. **It was a joint decision between myself and George Kasper and Kent.**
Q. Why did you make that decision? What's the basis for it?
A. **The flooring seemed to be in good shape. It seemed wasteful to throw it away. That was one part of**

Page 59

it. The second part was the barns were structured as such that we had to span 11-foot-six with a Maxima -- I mean --
Q. Excelerator?
A. With the two-foot tiles, it was a problem spanning that 11-foot-six and having enough structural support to hold them.
Q. Okay.
A. So we thought, well, it would be better to spend and buy -- it was double the number of beams to go at one foot on center rather than two foot on center. So we thought it would be better to double the number of beams, use as much flooring as we can, and then have enough replacement parts on hand of flooring to go from there.
Q. How much flooring did you have left over after completing all the construction?
A. As we speak you mean?
Q. Yes.
A. We have some left. I don't think -- we didn't use it all, but we used the bulk of that. I can't remember what I figured out. It was like I bought 20 percent replacement and I think we used 12 or 14 percent or something like that we ended up using. Some barns more, some barns less.

Page 60

Q. So you're ending up with about six to eight percent of the lot that you purchased?
A. Right.
Q. And you still have extra?
A. We just divided it up amongst the farmers that had that flooring left.
Q. And you gave that to them?
A. Yes.
Q. For eventual use as replacements?
A. Yeah. If they have a bad tile here and there that turns up, then they can snap that in and replace it.
Q. Why didn't you reuse the flooring in the first five barns?
A. It was destroyed. There was no salvage.
Q. It was warped?
A. The tabs on it had split, spread open, that it snaps onto and it was nonusable. There were too many that were bad.
MR. DIESETH: Why don't we take a break.
(A brief recess took place.)
BY MR. DIESETH:
Q. Mr. Holden, there are records on this, and I'm not going to go over this very long, but I want to

Page 61

make sure I have the sequence right. The first three barns that the flooring was replaced on, was that the Garness-1, the first Garness barn that was built, and Kruckeberg and Ward?
A. That's correct.
Q. And then the three that were done, or the five that were done the following summer in 2000 would have been Mr. Sanborn, Kofstad, and AJ Farms, Garness-2 and Rick Anderson?
A. That's correct.
Q. And then the two done this summer were the Swanson and Pork Avenue?
A. That's correct.
Q. And I believe Kent mentioned Monday that Holden Farms' crews did the labor on the replacement.
A. Right. We headed up the labor portion of it. We hired outside people --
Q. Temporaries?
A. Temps, kids and whoever was available.
Q. But they were on the Holden Farms' payroll?
A. Yeah, subcontracted some of them.
Q. I'm sorry. That's right. You were paying their wages?
A. Yeah.
Q. Yes?

Page 62

A. Yes.
Q. Do you have any recollection as to how long it took to do the replacement work in these barns?
A. Sure.
Q. Monday your brother testified that the first barns it took around ten days and the later barns, because you know how to do it, you reduced that time. I can't remember what he said. I think it was four to six days. I can't remember exactly what length of time it was, but it was considerably less. Is that your knowledge, too? Is that your recollection?
A. Some went faster and some went slower. There's no question about that. Some of the slower ones were at the beginning. Actually, a couple this summer when it was so hot, we weren't as efficient.
Q. You were not as efficient?
A. No. It depended on the size of the crew and the quality of crew and the temperature outside in the summer. When we had a couple of those hot days, people weren't very efficient.
Q. If I went through these barns one at a time, would you be able to tell me the size of crew and the length of time it took?
A. No.
Q. On an average basis, do you know the size of

Page 63

the crew?
A. The size of the crew?
Q. Yes.
A. We tried to have at least 30 people. We would try to work on both sides of the barn simultaneously. We tried to have about ten to 12 on each side and then we'd have to have a few people outside, you know, bring in the materials, carry materials out, that kind of stuff.
Q. Do you know if the number on the crew ever exceeded 30?
A. Yes, a couple of times we got too many people. At one time we had a crew of almost 50 and everybody was wasting their time. We found ideal, was, like I say, in the thirties.
Q. And when you found there were too many, I assume you terminated the extra pretty quickly?
A. Yeah, let them go the next morning and didn't have them come back.
Q. Did you ever have less than 30 working on these crews?
A. When we first started out, like Garness-1, we started out really slow and that's when we were trying to figure out what we needed to do and how we needed to do it, and we just had a small crew.

Page 64

Q. How big a crew initially?
A. It's like six or eight people, just mainly Holden Farms people down there trying to ascertain the length of time and the most expedient way to do it.
Q. Did you hire on extra temp workers for Garness-1?
A. I believe we did. I can't remember that one. That was way back.
Q. That was the very first one.
A. Right. But as we went along, we relied more and more on temporary people, neighborhood people. We'd ask the farmer if he knew some people who would help, we asked different close by guys.
Q. Do you remember at what point you arrived at this 30? I'm not saying it's a magic number, but how long did it take you to realize that 30 was about the right size for the crew?
A. After the first year, after we did the first couple, three.
Q. So you really don't have any clear recollection of the size of the crew at Garness or --
A. No, it fluctuated quite a bit from barn to barn, from time to time. We asked people to get people rounded up.
Q. You wouldn't follow up to see if they were

Page 65

going to come or weren't going to come?
A. Sometimes they did come and there would be some extra people or sometimes there wouldn't be quite enough. We found that we wanted to have more people rather than less, because you could ask people to leave rather than being short.
Q. Do you remember the crew size at Kruckeberg and Ward?
A. No.
Q. So I assume because you were still working out the crew sizes, the first three barns generally took longer than the last seven?
A. Yeah. Generally speaking, maybe. Certainly the first one or two, you know. I think Ward we did a little bit better, things went a little smoother. That was the third one of the first year. We got two under our belt already, and it seemed like it was --
Q. Let's exclude the first three from this next question. Let's talk only about the last seven, after you sort of got this experience under your belt and felt a little more comfortable about the best way to run the operation. For the last seven, do you have any idea how long on average it took you to replace the flooring?
A. The actual work of doing it or the preparation time?

Page 66

Q. Yes. Let's start from -- let's make this clear, because I know when Kent was testifying we sort of went through these various stages that you had to go through. I want to make sure you agree. You first had to clean the barn?
A. Well, first what we did is we would look on the schedule way back, you know, a couple months prior to the three months, because the nurseries, we call them turns or in and outs, ours turned six to six-and-a-half times a year, and we wanted to schedule the nursery floor replacement in between one of those turns, and we wanted to do it during the summer when we could get extra help.
So way back in March or February or whenever, April, we were looking ahead at the schedule. You could kind of predict when these were going to be. Well, Garness-1 will empty here, Garness-2 will empty here, and where can we get these pigs kind of shuffled around to make sure that we've got enough time to do it. So that's like step one.
Q. Who did that?
A. Our production people would give us an idea of when they could do it and then they would communicate that to myself and George Kasper.
Q. So generally, you were aiming to begin the

work at the time that the nursery pigs were ready to be moved to the finishing barn anyway.
A. Right. But we would pick a time. That would be a given. It would have to be during that particular time, because we knew we already had a minimum of probably three or four days. We would empty a nursery Tuesday, Wednesday, Thursday, Friday, wash it down, it would be ready to go the next week, starting either could be Monday, Tuesday, Wednesday, something like that. It would be just a matter of time for clean-up and downtime. So we were going to pick one of those times for sure.
Q. Okay. So normally you're saying there would be a period of three or four days between turns.
A. Yes.
Q. And then when you actually got on-site and you -- after the nursery pigs were moved out of the finishing barns and the nursery barns were empty, what would be the first thing you did in terms of replacing the flooring?
A. Well, even prior to that we'd make sure we got all of the materials lined up, get it ordered, stuff on hand, preferably on site, everything we need to do it. Make sure everybody was aware of when the time period was going to be, and we would allow a period of



time. I know this is what you were talking a little bit about Kent trying to get it whether it was 12 days or six days. But what we had to do on production schedule is pick, and we usually picked two to two-and-a-half weeks that that job had to be done. And we would start with the production side. This is when the barn has to be emptied; this is when you get the barn back.
We would allow, depending on what day they could empty out the barn, it might be a Thursday, might be a Friday or it might have been a Monday, and then we would allow two-and-a-half weeks, two to two-and-a-half weeks per barn to do the job. And then we would get the material ordered and then we would make sure that we coordinate with the production guy that the barn gets emptied in the proper time, let the farmer know long enough ahead of time that he's going to have to have help to start washing the barn, because we wanted the barn fairly clean, because, you know, all this hog manure and stuff like that, it just makes it really messy for everybody working. If the barns are clean, everybody is more happy with the situation. It's not that pleasant a job anyway.
Q. I understand.
A. So you get the feed out of the feeders and make the barn as pleasant as possible, get the fans in



there to dry it out.
Q. How long did that take?
A. It's a big job to wash the barn down. I think they did pretty good, but they would get them done in two to three days.
Q. And then what was the next step?
A. The next step is we would come in there and do preparatory work with just Holden Farms' crew, a small crew, and we would usually try to do that prior to the weekend. We'd come in there, we'd put stainless steel supports on the ends, get the barn kind of started, get some rows done. We would call them rows. We'd put stainless steel supports down and start building, start the project going from both ends of the barn.
Q. How many days would you spend doing that?
A. We'd spend two or three days doing that.
Q. What's the next step?
A. Then the next step, we would bring the big crews in and we would start the following week, preferably on Monday or Tuesday, and then we would try to get a crew going on each side with enough supervision and enough support, people carrying the new flooring out, we would have to remove all of the gating and stuff, move that back.



Q. So you'd generally try not to work on the weekend?
A. Right, not work on the weekend. And then we would hopefully get that job done by the following Friday, and that would mean complete job. The feeders would be back in place, the gates would be bolted down, the water should be hooked back up, and we would let the farmer be able to disinfect or wash the barn again.
Q. And then the new nursery pigs would --
A. And then let it sit empty over the weekend and then the next pigs would come in, depending on what exact schedule -- like I said, it would be two weeks to two-and-a-half weeks. They'd be starting on Monday, they could be coming in on Wednesday or Thursday, depending on when the schedule would be. But it took about two two-and-a-half weeks from the last pig until we got done to get in there.
Q. Is that generally the schedule that was followed for, I assume, the last seven barns?
A. Right. We took a little more time the first couple and then I know Ward, we got done -- we had allowed too much time, because we were used to how much time it took for the first two, and then we got pretty -- kind of set some standards for ourselves, what needed to be done.