EXHIBIT
C

EXHIBIT
Borcherding
# 1

EXHIBIT B

DISTRIBUTOR AGREEMENT

THIS AGREEMENT made by and between BCM MANUFACTURING LTD., an Alberta Company (hereinafter called"BCM") and LONG LASTING FARM EQUIPMENT INC., an Iowa corporation with its principal offices in Garnaville, Iowa, U.S.A. (hereinafter called "DISTRIBUTOR");

WHEREAS, BCM manufactures and sells a hog flooring, known as Filter-Eeze (hereinafter referred to as "the product"); and

WHEREAS, BCM is desirous of establishing a distributorship with DISTRIBUTOR for the marketing, sale and distribution of the product in the United States of America; and

WHEREAS, DISTRIBUTOR desires to accept such appointment to market the product in the U.S.A. for the agricultural industry.

NOW THEREFORE, in consideration of the premises and of the mutual covenants and conditions herein contained, it is hereby agreed by and between the parties hereto as follows:

1. APPOINTMENT

1) BCM hereby appoints DISTRIBUTOR, and DISTRIBUTOR accepts said appointment as the exclusive distributor of BCM to promote and to sell the product in the agricultural industry in the United States of America except in the states of Oregon, Washington, Idaho and Montana in which BCM presently has established a distributor and in which territories DISTRIBUTOR shall be a non-exclusive distributor.

2) BCM further grants to DISTRIBUTOR the right, in the above described territory, so long as this Agreement shall remain in force, and subject to the terms, conditions and limitations thereof to use, with BCM's presently established dealers, BCM's trademarks, insignia, advertising material, labels, decals, designs, slogans, and materials required for the conduct of a marketing effort, provided, however, that DISTRIBUTOR shall not use and BCM trademarks, or confusingly similar trademarks on any products or in any manner not authorized by BCM.

3) The term of this Agreement shall be as follows:

A) The term of this Agreement shall begin on the date of execution hereof, and shall continue for a period of five (5) years from such date, subject, however, to earlier termination as hereinafter set forth.

B) Such rights granted herein shall be automatically renewed and continue for a period of one (1) year after termination of each preceding term, unless terminated by written notice of such by either party to the other within ninety (90) days prior to the expiration of the said preceding term.

4) It is represented by DISTRIBUTOR to BCM as an inducement which BCM

relies upon for it to enter into this Agreement, that DISTRIBUTOR'S marketing efforts will be confined to the United States of America.

A) DISTRIBUTOR shall not make any sales or distribution agreements outside of the United States of America and shall use its best efforts not to make sales within said territory for resale outside said territory.

B) Any inquiries received by DISTRIBUTOR regarding sale of BCM products outside the United States of America shall be referred forthwith to BCM.

C) Any inquiries received by BCM regarding sales of BCM products within the United States of America shall be referred forthwith to DISTRIBUTOR.

II. DISTRIBUTOR COVENANTS AND AGREES

1) To make the following minimum purchases from BCM at BCM's applicable prices and terms, and according to the following schedule:

[illegible handwritten initials] January 14/80

For the period of November, 1979 to March 31, 1980 . . . . . ~~84,000 Sq~~. Ft of the produc

from April 1, 1980 to March 31, 1981 . . . . . 500,000 Sq. Ft.of the produc

from April 1, 1981 to March 31, 1982 . . . . . 625,000 Sq. Ft. of the produ

from April 1, 1982 to October 31, 1982 . . . . 390,000 Sq. Ft. of the produ

AND THEREAFTER such minimum annual purchases as shall be agreed upon by the parties hereto. BCM'S current applicable prices and terms are those shown on Exhibit "B" attached hereto; such prices and terms being subject to changes provided in Article IV.

2) To furnish BCM a forecast of square foot purchases expected to be made from BCM for each quarter of each year during the life of this Agreement, which forecast shall be in writing.

3) To maintain inventories of BCM products to provide adequate and timely service in the field of the BCM product line.

4) To not undertake any modification, change or alteration of a BCM product or component part thereof without first having obtained the written approval for such modification, change or alteration from an officer of BCM; that it will not undertake or cause to be undertaken any fabrication or manufacture of equipment, materials or component, or copying or imitation of same, of the BCM Hog Flooring system

5) To grant BCM the right, at reasonable times and upon reasonable notice to visit DISTRIBUTOR'S place of business to review and inspect the service facilities and equipment of DISTRIBUTOR to determine whether same are adequate for the adequate and timely servicing of BCM products.

6) To ensure that the product is sold together with BCM's offical installation and instructions and to obtain whenever possible, permission on behalf of BCM to visit and inspect installations made in the field by on behalf of DISTRIBUTOR of the product.

7) To make no use of BCM trademarks in advertising or otherwise, without

first submitting such material to BCM and obtaining BCM's written approval. Materials once having BCM's approval need not be submitted prior to subsequent use; however, BCM reserves the right to withdraw such approval upon giving reasonable notice.

8) To diligently and loyally promote and foster the increase of the use and acceptance of the BCM products by the public; to so conduct and maintain its business as not to detract from, interfere with, nor reflect upon the integrity of BCM or its products, nor lower the high standard of service and efficiency to the public, and the consumer acceptance now associated with the name of "BCM" and its said product line.

9) To indemnify and save harmless BCM from any claim made against it as a result of faulty installation, misinformation, or any other negligent conduct of the DISTRIBUTOR, its employees, agents, or dealers.

10) To cooperate with BCM in formulating sales promotion and operational plans for the benefit of the DISTRIBUTOR by supplying statistical and other related information that BCM may reasonably request from time to time.

11) To not sell the product to any industry other than the agricultural industry.

12) To use its best efforts to sell the BCM product line throughout its prescribed territory and industry.

13) To keep a sufficient inventory on hand of the product to enable the DISTRIBUTOR to promptly and efficiently fill the orders of its dealers.

14) To include in any contract with any dealer that BCM has the same righ[illegible] of inspection and quality control over the activities of a dealer as are set forth herein with regard to said DISTRIBUTOR, such that BCM may prohibit sales, installatio[illegible] and servicing of the BCM product line if said dealer does not perform the high standards of BCM.

15) DISTRIBUTOR agrees to maintain a quality of services as to goods sold under the names commensurate with the business positions of the parties involved agrees to use in advertising form the names commensurate with the quality standards of BCM as to such use; agrees to at all times in the advertising of the BCM products to use the names designated by BCM for use with such product; agrees that to the extent DISTRIBUTOR uses its own name in conjunction with the advertising and sale of the BCM products that all such reference to DISTRIBUTOR'S own name shall in all respect convey to the purchaser the fact that BCM is the manufacturer of such product and DISTRIBUTOR a distributor with respect to such product; and agrees at all times to use the part numbers in connection with the BCM parts which are specified for use by BCM.

16) To supply BCM with the name and address of each and every dealer with which DISTRIBUTOR contracts for the selling, installation and/or servicing of BCM product line, and to maintain said information current.

17) To comply with all laws, statutes, ordinances and regulations of governmental authorities within the prescribed territory of DISTRIBUTOR.

III. BCM COVENANTS AND AGREES

1) To refrain from appointing another distributor other than those listed on Exhibit "A" in the United States of America for the same industry as set forth hereinbefore.

2) To make all reasonable efforts to manufacture or to arrange for the manufacture of an adequate supply of BCM's product line to fill the requirements of DISTRIBUTOR.

3) To provide available information concerning advertising and technical know-how deemed pertinent to BCM to DISTRIBUTOR.

4) To permit DISTRIBUTOR, during the term of this Agreement only, to use the trade name, Filter-Eeze, and marks of BCM, along with the DISTRIBUTOR'S name and marks, upon the conditions set forth herein.

5) To indemnify, defend and hold DISTRIBUTOR harmless from any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including attorney's fees, arising out of or connected with any claim under BCM's product warranty, as more particularly referred to in paragraph IX.

6) BCM has no knowledge of any patent in conflict with DISTRIBUTOR'S rights hereunder, but BCM has not made and does not make any representation or warranty to the DISTRIBUTOR as to the scope or validity of any patent which may issue for the product. It does not warrant that the product agreed to be distributed and sold by the DISTRIBUTOR hereunder will not infringe patents of others.

IV. PRICING

1) Prices shall be f.o.b. point of shipment, such shipments to be at DISTRIBUTOR'S risk from time of delivery to carrier. Terms for purchase shall be 5 % discount on receipt of total payment at the time of the order and 2 % discount if payment is received within Ten (10) days of the date of the order. All orders shall be paid for net Thirty (30) days with interest at the rate of 2 % per month on all payments due to BCM after Thirty (30) days. DISTRIBUTOR'S non-payment shall constitute an event of default under the Agreement. Prices shall be at standard prices from time to time fixed by BCM as specified on Exhibit "B" hereto; but shall be subject to change at any time effective upon Thirty (30) days written notice, which change shall be applicable to all articles not delivered to carrier at the time such price change becomes effective.

2) Any tax or change levied by any governmental authority for and in any manner affecting sale or delivery hereunder, shall be added to the purchase price and shall be paid by DISTRIBUTOR.

3) In the event this Agreement is terminated for any reason, it is agreed by DISTRIBUTOR that BCM shall have the option for a period of Thirty (30) days after the effective date of such termination, to repurchase the inventory of BCM product line, or portions thereof, held by DISTRIBUTOR upon the date of

such termination. The cost for such purchase shall be at DISTRIBUTOR'S cost with respect to all such items repurchased, less shipping expenses incurred by BCM in connection with the return of such repurchased inventory to a site of BCM's selection; provided however, that such shipping expenses shall not exceed the cost of reshipment of such goods from their location at date of termination to Calgary, Alberta, Canada.

V. TERMINATION

1) In the event DISTRIBUTOR shall become insolvent, make a general assignment for creditors, be adjudicated a bankrupt or suffer a receiver or trustee to be appointed, this Agreement shall, at the option of BCM, without advance notice, automatically terminate by its own force, together with cessation of all rights and interests of DISTRIBUTOR hereunder. If either party shall default in the performance of, or violate any of the covenants, conditions or obligations imposed by this Agreement, the other party shall (except as otherwise provided for) be entitled to give the defaulting party a written, certified or registered mail notice to the defaulting party's last known address, specifying the particulars of the default or violation and a date at least Thirty (30) days hence within which same is to be corrected; thereupon, if such default or violation is not remedied within said stated period, the party not in default may, at its option, terminate this Agreement by mailing to the defaulting party a further notice in the same manner as above, specifying any date of termination, upon which date the termination of this Agreement shall be deemed complete and all rights and interest of the defaulting party hereunder shall cease and terminate.

2) The termination of this Agreement shall not effect the obligations of either party required by this Agreement, to take action or abstain from taking action after such termination, as the case may be.

3) Except as otherwise provided herein, nothing herein shall be construed as an agreement for, or grant of, any right, title or interest, or license coupled with an interest, in and to any trade names, patents, designs, insignia or copyrights, respectively of BCM and DISTRIBUTOR hereby acknowledges the ownership of same in BCM. Upon termination of this Agreement for whatever cause, the rights and privileges granted hereby shall terminate, and DISTRIBUTOR shall immediately thereafter cease to use, by advertising or otherwise, the name BCM or any simulation thereof, either alone, or in any combination; cease to use any trademarks, trade names, emblems, copyrights, or pictorial representations of any kind which may now or hereafter be used by DISTRIBUTOR pursuant to this Agreement.

4) Upon termination of this Agreement, for any cause, DISTRIBUTOR agrees to remove any signs or decals from the DISTRIBUTOR'S premises and return to BCM all Price Books, Order Blanks, Advertising Literature and all other forms furnished or purchased through BCM.

5) Upon termination of this Agreement for any cause, BCM may at its option and without any liability cancel all unfilled orders accepted from DISTRIBUTOR

VI. EMPLOYMENT

During the term of this Agreement and any extension or renewal thereof and for a period of One (1) year thereafter, the parties agree not to employ or associate any person previously employed or associated with the other without the written consent of the prior employer of such person.

VII. SUBSIDIARIES AND AFFILIATES

It is agreed by the parties hereto that the terms and conditions of this Agreement shall be binding upon any subsidiary or associate form of either party hereto or any business or enterprise of which the principal stockholders or owners of either party hereto or their families hold or control more than Fifty (50) percent of stock outstanding or ownership is otherwise designated in such company.

VIII. DELIVERY AND FORCE MAJEURE

1) BCM agrees to deliver its products to DISTRIBUTOR without unreasonable delay.

2) BCM shall not be responsible or liable in any way for failure to sell or deliver any BCM products hereunder during any period in which such sale or delivery is prevented or hindered by any cause beyond BCM's reasonable control, including, but not limited to, fire, flood, war embargo, labor difficulties, car shortage, interruption of transportation, unavailability of materials, accident, explosion, riots, and laws, rules, regulations, instructions and orders of any governmental authority. No such failure shall terminate this Agreement.

IX. WARRANTIES OF BCM

DISTRIBUTOR understands and agrees that BCM extends only a specific and limited warranty in connection with its hog flooring system, and which may be changed from time to time by BCM. In the event DISTRIBUTOR or its dealers extend any additional warranty such as by enlarging the scope or period of warranty or undertaking a warranty of fitness for any particular purpose or any other obligation not encompassed expressly within BCM warranty, then in such case BCM shall not be responsible therefor and DISTRIBUTOR and its dealers shall on such instance have no recourse against BCM with respect thereto, and additionallly shall indemnify and hold BCM harmless from any and all costs and liabilities relating thereto. BCM has the right to investigate all documents and to interrogate any persons involved in the filing of a claim under warranty for the purpose of ascertaining the validity thereof; and, if any fraudulent claim is discovered it shall be the basis for termination of this Agreement at the option of BCM.

X. CONSTRUCTION, MODIFICATION AND ASSIGNMENT

1) This Agreement shall not be so construed as to constitute DISTRIBUTOR, the agent or employee of BCM for any purpose whatsoever, the DISTRIBUTOR agrees that he has no authority to assume or incur any obligation or responsibility, nor make any warranty, express or implied, for or on behalf of, or in the name of BCM, or to bind or attempt to bind, BCM in any manner or thing whatsoever.

2) The failure on the part of either party to perform any part of the within Agreement by reason of war, civil commotion, strike, fire, accident, governmental order or regulation, or any other contingency beyond either party's reasonable control, shall not constitute a breach of the within Agreement during the time and to the extent of such interference; provided that the party affected shall give notice to the other of the happening of any such event or contingency within a reasonable time of its occurence.

3) This Agreement contains a complete understanding of the parties and no modification or additional provisions shall be binding unless in writing and signed by both parties.

4) The rights and duties under this Agreement are neither transferable nor assignable by DISTRIBUTOR without the consent of BCM in writing.

5) No failure of a party to exercise any right given to it herein, or to insist upon strict compliance of any obligation hereunder, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of a party's right to demand exact compliance with the terms hereof. Waiver by a party of any particular default shall not affect or impair a party's right in respect to any subsequent default of the same or of a different nature, nor shall any delay or omission by a party to exercise any right arising from such default affect or impair a party's rights as to such default or any subsequent default.

6) This Agreement shall be deemed to have been entered into in the Province of Alberta and is an Alberta contract. It shall be construed with and be governed by the laws of the Province of Alberta and the parties agree to submit any dispute to the Courts of the said Province exclusively.

7) Any notices by either party, as provided for in this Agreement shall be in writing and sent by certified mail, postage prepaid, and by telegraph or telex, to the other part at the address shown below, or at such other address as the parties may henceforth direct:

BCM MANUFACTURING LTD.
7703D - 30th St., S.E.
Calgary, Alberta
Canada T2C 1V4
403 - 279 - 8557

LONG LASTING FARM EQUIPMENT INC.
Box 128
Garnavillo, Iowa 52044
319 - 964 - 2644

8) This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except as otherwise provided herein.

9) If any clause, sentence, section, paragraph, provision or part of this Agreement is adjudged to be invalid or unenforceable, such adjudication shall not affect or invalidate the remainder of this Agreement, it being understood and agreed that such invalid or unenforceable clause, sentence, paragraph, provision or part, is and shall be severable from the remainder of this Agreement.

XI. CONFIDENTIAL INFORMATION

Any and all information either party hereto receives directly or indirectly from the other party which is identified by said other party in writing as being confidential and/or as being a trade secret shall, to the best efforts of the party receiving such information, be held in confidence and shall not be disclosed to a third party unless such information was in fact public at the time of disclosure or later becomes public through no fault of the party receiving such information.

IN WITNESS WHEREOF, the parties hereto, acting through their respective

authorized representatives have executed this Agreement this 14th day of January A.D., ~~1979~~ 80 HAM.

BCM MANUFACTURING LTD.

Attest: Floyd Eberhardt

By [signature]

Its Secretary-Treasurer

[signature]

PRESIDENT

LONG LASTING FARM EQUIPMENT, INC.

By Norbert R. Borchardt

Attest: Floyd Eberhardt

Its Pres.

REQUEST FOR EXTENSION OF DISTRIBUTOR AGREEMENT

THIS REQUEST for Extension is for review. It is to review the Distributor Agreement entered into on January 14, 1980 by BCM MANUFACTURING LTD. and LONG LASTING FARM EQUIPMENT INC.

WHEREAS, one year of marketing Filter-Eeze has elapsed and we feel it is necessary to inform and update BCM on any action taken by Double LL.

WHEREAS, it is our belief a close relationship between our companies must continue so as to efficiently market, sell and distribute Filter-Eeze hog flooring.

NOW THEREFORE, we present the following for consideration and agreement by BCM.

I. APPOINTMENT

1) We hereby request appointment to be the exclusive distribu[illegible] of BCM to promote and to sell the product in the agricultural industry in the United States of America including the states of Oregon, Washington, Idaho and Montana.

2) We have and will continue to establish an identification fo[illegible] Filter-Eeze in the agricultural industry in the United States of America, the area appointed by BCM, through the use of advertising material, labels designs, slogans and materials required for the conduct of marketing effo[illegible]

3) We at this time desire to renew such rights previously gra[illegible]

4) We have and will continue to direct our efforts to the confines of the United States of America. Any inquiries received by our company regarding the sale of BCM products outside of the United States have been and will be referred forthwith to BCM.

5) Be it known that all leads referred to our company from BC[illegible] have been followed up accurately and immediately and we will continue w[illegible] such action.

II. DISTRIBUTOR COVENANTS AND AGREES.

1) We agree to be the sole distributor for BCM in the U.S.A. and agree to try to the best of our power and effort to move at least 625,000 sq. ft. of product, if not to exceed this amount.

2) We would like to furnish BCM with a forecast of product estimated to be moved on a six month basis. Due to the rollercoaster economy we were faced with in the U.S.A. during 1980, we feel we must ma[illegible] these projection with BCM being in close contact with our company.

3) We always have and will continue to maintain an extensi[illegible]

4) The modifications made to the product have been beneficial to its promotion.

5) Our doors are always open to BCM and we feel it is essential that they visit our place of business so as to better understand our marketing procedures and the U.S. market overall.

6) We request permission for our accounts to advertise the product under the trade name "Filter-Eeze."

7) During 1980 we have and will continue to promote Filter-Eeze as the best hog flooring on the market. Our belief in the product has lead us to over-write BCM's warranty to a 10 year guarantee. We have spent $120,000 in advertising and $50,000 in exhibiting the product at shows throughout the U.S.A.

8) [illegible] and will continue to promise to forward any data received through [illegible] universities and such to BCM. We request the same sort of in[illegible] be forwarded to our company.

9) [illegible] 1980 the [illegible] ion of TopLine Ltd., Norb Borcherding, President, Garnavillo, [illegible] established to better promote Filter-Eeze in the prescribed te[illegible] and industry.

10) We will only select accounts that meet the high standards set by BCM. These files are available and will always be available for BCM's inspection.

11) A list of our accounts is provided. Note Exhibit "A" attache[d]

III. BCM COVENTANTS AND AGREES

Informati[on] concerning advertising has been given to BCM and will continue to [illegible] to them.

IV. WARRANTIES [illegible]

1) [illegible] comp[any] [illegible] tended the period of warranty to ten yea[rs] on a pro-rated [illegible] to p[illegible] [com]pany in a more competitive light in the industry.

2) Identification o[f] t[he] product by year would be helpful in upholding our warranty. Any extended warranty of the product from your company would be greatly appreciated.

On January 14, 1980 Long Lasting Farm Equipment accepted the responsibility of distributing BCM's product in the United States of Ameri[ca]. It is our suggestion at this time to review the Distributor Agreement on an annual basis. During our first year of marketing Filter-Eeze we have promoted it to the best of our ability under uncontrollable circumstances. For the period April 1, 1981 to March 31, 1982 we agree to schedule 625,000 sq. ft. of product as put forth in our agreement. It is our sincere hope that after evaluating our performance you grant us our extension of said contract. We request permission to continue establishing Filter-Eeze as [a] reputable product in the agricultural industry.

We also request the Distributor Agreement be transferred over to TopLine Ltd., Norb Borcherding, President, Garnavillo, Iowa, and be binding thencefor. TopLine's formation was an essential factor in approaching Double LL's competitors with the product.

We believe our companies must continue to work together and make the promotion of Filter-Eeze a joint effort.

IN WITNESS WHEREOF, the parties hereto, acting through their respective authorized representatives have executed this Request for Extension this 12th day of February, A.D., ~~1980~~ 1981

BCM MANUFACTURING LTD.

By [signature]

Its Secretary - Treasurer

Attest: [signature]

LONG LASTING FARM EQUIPMENT INC.

By [signature]

Its President

Attest: Carol Groth

# EXCLUSIVE
# Distributor Contract

between

Double L Group Ltd.
107 North Page Street
PO Box L
Monona, IA 52159
-DL-

and

BCM Manufacturing Ltd.
#1, 115-28th Street S.E. Calgary, Alberta T2A 5K4
Canada
-BCM-

1 (a) BCM herewith grants to DL the exclusive right to sell BCM Filter Eeze and Red Rooster products defined as:

| | |
|---|---|
| Filter Eeze | 2" series |
| Filter Eeze | 1" L series |
| Filter Eeze | Maxima series |
| Eezy Feeders | |
| Red Rooster MKII & Classic | |
| Eezy Gating | |
| Filter Eeze - all metric sizes | |

in the exclusive territory which is defined as the United States of America.

1 (b) BCM also grants to DL the first right of refusal to sell any new products developed which are applicable to the exclusive territory.

2) All inquiries received by BCM during the Contract period shall be passed on directly to DL for immediate attention, providing any such inquiries emanate from the United States of America for final shipment into the USA.

3) BCM shall not make any direct shipments to US customers who would deliver products to a final US destination. The exception to the above would be for orders placed with BCM by DL where shipment is requested by DL directly to their customer.

4) In the event of other BCM distributors shipping product into the US, BCM shall when notified in writing by DL (giving full particulars) put forth our best efforts to have the outside distributor cease shipping into DL's exclusive territory.

5) Double L shall not have any distributor rights for BCM products in any country or territory other than United States of America.

6) DL shall not, either on its own or on behalf of any other party, directly or indirectly, sell distribute or manufacture plastic floor grates, plastic heating plätes and cast iron sow flooring which compete with any of the BCM Products other than Schonlau cast iron sow floor.

7) The products shall be sold by BCM to DL at the prices established from time to time by BCM and such prices shall be F.O.B. - BCM's manufacturing facilities in Calgary Alberta. If price adjustments become necessary, DL shall be notified 60 days in advance of the effective date of any such adjustment. Current prices are as per attached list effective January 2, 1994, revision 2 effective July 1/94.

8) Double L shall in its advertising promote the trade names of BCM products - Filter Eeze, Red Rooster, Maxima, Eezy Feeder and Eezy Gating.

9) <u>Purchases Projections</u>
BCM and DL shall meet on a semi annual basis and DL shall provide BCM with projected volume of purchases of product for the following 12 month period.

10) BCM shall exert its best efforts to ship all confirmed orders within 30 days or less. Processing & shipping of orders shall be carried out by following a procedure as agreed to between DL and BCM.

11 If BCM decides to consider a mold obsolete due to lack of sales or incorrect design then BCM and DL shall decide whether to retain the mold in an obsolete file or an inventory of molded parts for warranty purposes to cover a ten year period from the date the mold was considered obsolete.

12) Terms - 5% Discount if payment is received 15 days after ship date or Net 30

13) Manufacturer guarantees that this flooring will not fail by reason of structural defects or faulty workmanship for a full ten (10) years from date of purchase provided the flooring is used for the purpose for which it was intended. The warranty depends strictly on installation being properly carried out in accordance with our instructions. The warranty is not valid on slats that are not correctly supported.
Manufacturer will not be responsible for loss or damage which occurs by reason of improper installation or for any other reason beyond their control, such as fire, acts of God, misuse or abuse. The warranty is limited to the replacement of the component part only, and any costs with respect to the installation of either the original or the replacement component shall be borne by the purchaser. The company shall not be liable for consequential or incidental damages which might arise as a result of failure of the component part. The warranty is exactly as stated above, and excludes any other warranty, guarantee, or representation either expressed or implied. The warranty is available only to the original owner, and it cannot be assigned. All warranty flooring must be returned to Double L Group Ltd. All freight expenses for the return and replacement of damaged flooring will be borne by the customer. Each is slat is marked with date of manufacture.

14) The term of this Distributorship Contract shall be five (5) years from the date of signing. Both parties are entitled to give written notice of termination at the end of the 5th year with a term of one year. Failing delivery of such written notice,

this contract shall automatically be renewed for a further 5 year term.

15) This contract shall not constitute DL a partner or representative or agent of BCM and DL agrees that it shall not represent itself as such or represent itself as having any power or authority to incur any obligation of any nature, express or implied, on behalf of BCM.

16) The Seller and the Buyer agree that their rights and obligations shall be governed, in all respects, by the laws of the Province of Alberta and that any remedy which might be available under the present terms and conditions of sale shall be exercised in the judicial district of Alberta.

17) This Contract constitutes the entire Contract and understanding between the parties and no amendment or modification thereof shall be made except by agreement in writing signed by a duly authorized officer of each party.

WH
SEPT
Calgary, ~~August~~ .......6.. 1994

Double L Group Ltd.

BCM Manufacturing Ltd.