UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

-----------------------------------

Court File No.
00-CV-785 DSD/SRN

Holden Farms, Inc., a Minnesota Corporation; Rod Garness; Eugene C. Ward; Randy Swanson; Rick Anderson d/b/a Circle A Farms; Tim Sanborn; AJ Farms, a Minnesota General Partnership; Dennis Kofstad; Marlin Kruckeberg; and Pork Avenue, LLP, a Minnesota Limited Liability Partnership,

Plaintiffs,

-vs-

Hog Slat, Inc., a North Carolina Corporation; BCM Manufacturing, Ltd., a Canadian Corporation; and Double L Group, Ltd., an Iowa Corporation,

Defendants.

-----------------------------------

Deposition of: NORBERT BORCHERDING

Taken at: Hanson, Lulic & Krall
920 Second Avenue South
Suite 500
Minneapolis, Minnesota

Date: May 15, 2001

Commencing at: 10:00 a.m.

by MARTHA M. RIVARD, COURT REPORTER

12151 Gantry Lane
Apple Valley, Minnesota 55124
800-844-6420 * 612-431-1252

LITIGATION SUPPORT--COLOR VIDEOTAPING SERVICE



EXHIBIT
D

Deposition of NORBERT BORCHERDING, taken pursuant to Notice to Take Oral Deposition, under the Rules of Civil Procedure, for the U.S. District Courts of Minnesota, at Hanson, Lulic & Krall, 920 Second Avenue South, Suite 500, Minneapolis, Minnesota, commencing at approximately 10:00 a.m., on the 15th day of May, 2001, before Martha M. Rivard, Notary Public, in and for the State of Minnesota.

\- * -

APPEARANCES:

DUSTAN J. CROSS, Esq., of the law firm of Gislason & Hunter, 2700 South Broadway, P. O. Box 458, New Ulm, Minnesota 56073-0458 appeared for and on behalf of Plaintiff.

PAUL R. DIESETH, Esq., of the law firm of Dorsey & Whitney, Pillsbury Center South, 220 South Sixth Street, Minneapolis, Minnesota 55402 appeared for and on behalf of Defendant Hog Slat.

RICHARD W. SOBALVARRO, Esq., of the law firm of Rajkowski Hansmeier, 11 Seventh Avenue North, P. O. Box 1433, St. Cloud, Minnesota 56302-1433 appeared for and on behalf of Defendant BCM.

JOSEPH F. LULIC, Esq., of the law firm of Hanson, Lulic & Krall, 920 Second Avenue South, Suite 500, Minneapolis, Minnesota 55402, appeared for and on behalf of Defendant Double L Group.

Also present, BRAD BRADY, Esq., Brady & O'Shea, 2735 First Avenue Southeast, Cedar Rapids, Iowa 52402.

\- * -

Examination:

By Mr. Cross . . . . . . . . . . . . . 4, 213
By Mr. Dieseth . . . . . . . . . . . . 170, 215
By Mr. Sobalvarro . . . . . . . . . . 184, 218

Exhibits: First referred to on page:


| | |
|---|---|
| No. 1 - Distributor Agreement | 11 |
| No. 2 - BCM Sales by Year | 29 |
| No. 3 - 10/5/93 Letter Double L to Hog Slat | 31 |
| No. 4 - Holden Farms Presentation | 36 |
| No. 5 - Holden Farms Contract | 74 |
| No. 6 - Copy of Ad | 74 |
| No. 7 - Installation Bulletin | 78 |
| No. 8 - Double L FE Sales | 87 |
| No. 9 - Double L Invoices | 88 |
| No. 10 - Limited Warranty | 92 |
| No. 11 - 5-year Warranty | 115 |
| No. 12 - Filter-Eeze/Schonlau Warranty | 123 |
| No. 13 - 6/12/95 Letter Double L to Burge | 125 |
| No. 14 - 3/21/96 Fax Double to Burge | 126 |
| No. 15 - 4/3/96 Letter Double L to Burge | 126 |
| No. 16 - 11/26/98 Minutes | 127 |
| No. 17 - Memo/Faxes between Double L and BCM | 137 |
| No. 18 - 6/25/99 Fax Zittergruen to Orr | 139 |
| No. 19 - Replacement Upgrade Program | 140 |
| No. 20 - Filter-Eeze Specs | 140 |
| No. 21 - Mission Statement | 141 |
| No. 22 - FiberTruss Brochure | 142 |
| No. 23 - ValuCast Brochure | 143 |
| No. 24 - Double L Magazine Articles | 145 |
| No. 25 - Maxima Installation Instructions | 157 |
| No. 26 - Do's and Don'ts | 156 |
| No. 27 - Maxima Specs | 156 |
| No. 28 - Steel Support Systems Drawings | 160 |
| No. 29 - Double L Answers to Interrogatories | 162 |
| No. 30 - Photographs | 165 |
| No. 31 - Double L Answers to Interrogatories. | 176 |
| No. 32 - FiberTruss Specs | 185 |

(WHEREUPON, Borcherding Deposition Exhibits No. 1 - 21 marked for identification by the Reporter.)

NORBERT BORCHERDING,
called as a witness,
having been duly sworn,
was examined and testified as follows:

EXAMINATION

BY MR. CROSS:

Q. Mr. Borcherding, good morning. My name is Dustan Cross. I'm the attorney representing the plaintiffs in this lawsuit. Have you ever had your deposition taken before, sir?
A. **No.**
Q. Very briefly I'm going to explain to you some ground rules that I think most attorneys would agree apply in depositions. First of all, your testimony is being taken under oath today pursuant to the Federal Rules of Civil Procedure, and for that reason it is important that you give oral responses to the questions I ask. All right?
A. **Yes.**
Q. And if you don't understand a question I'm asking at any time, please, ask me to clarify it and I'll do my best to accommodate you. All right?



A. **Yes.**
Q. If you need a break at any time, please let me know and I'll also try to accommodate you in that regard. You do understand that your testimony today is being taken under oath and, therefore, subject to the penalties of perjury under the laws of the United States, don't you, sir?
A. **Yes.**
Q. All right. Could you please state your current address and age?
A. **2602 Hacienda drive, Dubuque, Iowa. Zip Code is 52002. And my age, I was born in 1947. I think that's 53.**
Q. When did you graduate from high school, sir?
A. **'65.**
Q. Where?
A. **Guttenberg, Iowa.**
Q. After high school, what did you do?
A. **I went -- from the farm, I went to Quaker Oats. I was a sheet metal worker at Quaker Oats.**
Q. How long were you a sheet metal worker at Quaker Oats?
A. **Approximately six to seven years, and I attended Kirkwood College and was a pattern -- sheet metal pattern drafter.**



Q. So you obtained a degree from Kirkwood?
A. **It was through a journeyman.**
Q. Union job?
A. **Yes.**
Q. Did you get your journeyman --
A. **Yes.**
Q. Did you become a master?
A. **Yes.**
Q. When did you become a master?
A. **I was, through Quaker Oats, a journey. Quaker Oats had a journeyman's program and I was a certified sheet metal worker at Quaker Oats.**
Q. What type of sheet metal did you work on at Quaker Oats?
A. **Galvanized stainless steel, mild steel.**
Q. After completing your work at Quaker Oats, what did you do next?
A. **I started my own business.**
Q. Is this Long Lasting Farm Equipment, Inc.?
A. **Yes.**
Q. When was that again? 1973?
A. **Approximately. I think something like that.**
Q. You incorporated that entity in about 1976; is that right?
A. **I started off as Garnavillo Sheet Metal and**



**then I turned it over to Long Lasting Farm Equipment.**
Q. And again, you incorporated approximately 1976?
A. **Approximately. I'm not sure.**
Q. At the time you corporated, who were the shareholders of Long Lasting Farm Equipment, Inc.?
A. **My wife and myself.**
Q. Who is your wife?
A. **Donna.**
Q. Since that time, have there been any other shareholders of Long Lasting Farm Equipment, Inc. and/or Double L Group? In other words, are you and your wife the only people that have an ownership interest in that corporation?
A. **Yes.**
Q. That's been true up through the present?
A. **No, there was some people that had stock in the company and then they were bought out, or --**
Q. They came and went.
A. **They came and went.**
Q. When did you change the name of the corporation from Long Lasting Farm Equipment, Inc. to Double L Group?
A. **I'm not sure.**
Q. Just roughly, as you can approximate.

A. Six, seven years ago maybe. Five. It's been longer than that.
Q. When you began Long Lasting Farm Equipment, Inc., and for convenient's sake would it be fair if I just used the term Double L, even though at some point I realize it was a different name, but if I just call it Double L, that would be fair?
A. Yes, that's fair.
Q. When Double L began, what kind of business did it do?
A. It started off with manufacturing of light equipment, which would mean bale feeders, and then it would start -- it made short-line equipment.
Q. Short-line equipment?
A. Well, and that would be a terminology in the industry for -- short-line equipment would be small things like for farm stores and stuff like --
Q. Could you give me some examples?
A. Of a big large, round bale, we would make racks or hay feeding equipment, the feeder for the big round bales.
Q. When Long Lasting, Double L Group was started, did you have anything to do with the construction of hog confinement facilities or livestock facilities, generally?



A. No.
Q. When did Double L Group begin moving into that line of business?
A. Five years, maybe three. Three to five years after we started that business, we started to do some hog equipment materials.
Q. Approximately in 1979-1980, that general time frame.
A. That would be correct.
Q. Was Double L Group, when it was founded, exclusively an equipment supplier as opposed to an installer or contractor?
A. It sold retail, and then it got into distribution. It sold directly to the farmers and then got into some distribution.
Q. Did Double L Group do any -- originally do any design work or contracting work itself?
A. No. I mean, not that I can remember. I'm not -- we did design some things for people, but it was not -- when we started off, if somebody would ask us to design something, we would do it and we would work with them, but I was not an engineer or I did not do design work. That was not -- it was a custom framing shop also.
Q. Did you hire a design engineer at some



point? Do you have a design engineer on staff today?
A. No.
Q. Have you ever had a design engineer on staff?
A. Yes.
Q. When?
A. Four years ago or so.
Q. Who was that?
A. There was a bunch of them. Kevin Goepke. Rob Brown, Matt Robert, J. B. Priest, Jim Hilein.
Q. Why don't you have design engineers on staff today?
MR. LULIC: I'll object to the form of the question, the relevance of it. But subject to that objection --
BY MR. CROSS:
Q. You can answer.
MR. LULIC: I'll tell him whether or not he can answer. Subject to that, you can answer. It's an awfully vague question. Engineers to do what? Okay?
MR. CROSS: Why don't you have design engineers on staff today? What's vague about that?
MR. LULIC: To do what? To design what?



MR. CROSS: Okay. Well, you've made your objection for the record. Now I would like the witness to answer.
MR. LULIC: Go ahead.
THE WITNESS: Well, we hired engineers from Illinois and we paid them $45,000 a year, and the job market in Dubuque took to from 60 to 80,000 and I could not compete in the marketplace at those prices.
BY MR. CROSS:
Q. So who do you have do your design work? Do you contract that out?
A. We would use contract -- we use engineering or we would rely upon our suppliers to give us the design. And we have contracted out design work also.
Q. When did you begin your business relationship, when did Double L begin its business relationship with BCM Manufacturing, Limited of Canada?
A. I'm not sure of dates, but I think it's approximately 1979.
Q. I'll show you, Mr. Borcherding, what I've previously had marked as Exhibit No. 1. Would you identify what Exhibit No. 1 is for the record? Now, I will clarify for you, Mr. Borcherding, that there's actually, I believe, two separate documents that are stapled together. The first seven, eight pages are one



MARTHA M. RIVARD
612-431-1252 * 800-844-6420

Page 12

document and then there's a subsequent document. There's actually three documents.
MR. LULIC: There's three documents.
BY MR. CROSS:
Q. Yes. Why don't we talk about the first one marked Distributor Agreement first. Is that the initial business relationship document between BCM Manufacturing and your company?
A. **I think so.**
Q. Prior to this Distributor Agreement, did Double L sell or -- well, did it sell any BCM products in the United States or elsewhere, again, prior to this Distributor Agreement?
A. **No.**
Q. And this Distributor Agreement made you the exclusive distributor of BCM products in the United States, with the exception of, I believe, four states; is that right?
MR. LULIC: Well, if the document says that, it speaks for itself.
BY MR. CROSS:
Q. Look at paragraph I (1) on the front page.
A. **Yes.**
Q. Turn, Mr. Borcherding, to page six, Article IX of the Distributor Agreement. Why don't you take a

Page 13

moment and just read that paragraph for me, please.
MR. LULIC: What did you want him to do?
MR. CROSS: Read the paragraph.
THE WITNESS: Okay.
BY MR. CROSS:
Q. Under the relationship with BCM, was Double L authorized to extend an additional warranty over and above whatever BCM provided to Double L?
A. **No.**
Q. So in other words, you only would provide the warranty that BCM would give to you.
A. **Right.**
Q. Second sentence of paragraph IX refers to the fact that if Double L or its dealers "extend an additional warranty such as by enlarging the scope or period of warranty or undertaking a warranty of fitness for any particular purpose or any other obligation not encompassed expressly within BCM warranty, then in such case, BCM shall not be responsible therefore and distributor and its dealers shall, on such instance, have no recourse against BCM with respect thereto." Did that ever occur?
Did Double L or its dealers ever extend a warranty that was not authorized by BCM?

Page 14

A. **No, not that I can recall.**
Q. Have you ever been called upon by BCM, other than in the context, perhaps, of this lawsuit, to indemnify and hold BCM harmless from any claims for a breach of warranty that extended beyond the BCM warranty? Do you understand what I'm asking you?
A. **No.**
Q. Has BCM ever told you that Double L has to indemnify it because Double L extended a warranty beyond the scope of the BCM warranty?
MR. SOBALVARRO: I'm just going to object to the extent it calls for a legal conclusion. Go ahead and answer, if Mr. Lulic does not have a problem with that.
THE WITNESS: Let's go through it one more time.
BY MR. CROSS:
Q. All right. Have you ever received a phone call from anyone at BCM, or letter, in which they said Double L extended a warranty that BCM did not authorize and therefore, Double L has to be responsible to us if we're responsible for a breach of warranty?
MR. SOBALVARRO: Same objection.
THE WITNESS: Not that I can recall.
BY MR. CROSS:

Page 15

Q. At the time you entered into this Distributor Agreement, what types of BCM products did Double L begin selling? Was it simply the Filter-Eeze or was there other products?
A. **I think primarily it was Filter-Eeze. I can't remember or recall if there was something small.**
Q. Some other --
A. **I mean, they might have sent a product down that I could take a look at and I might have sold one or two, like a Christmas tree stand or something, but nothing that was major over $100. I don't know.**
Q. I appreciate that. Primarily it was Filter-Eeze.
A. **Right. That was our primary business.**
Q. What did you know about BCM? At the time you entered into this Distributor Agreement, what did you know about BCM or Filter-Eeze products. What was your experience with them?
MR. LULIC: Those are two questions.
BY MR. CROSS:
Q. Okay. Well, let's take the first one. What was your experience with Filter-Eeze products?
A. **I didn't have any. A person stopped in to call on me and showed me the product. At that point, I went to Canada, I took a look at the products, I went to**


MARTHA M. RIVARD
612-431-1252 * 800-844-6420

Saskatchewan, I saw the product in the field, I talked to customers that had the product. That's how I got acquainted with the product.
Q. Prior to 1979 when you became acquainted with the Filter-Eeze product, had you had any experience with plastic flooring?
A. There was -- no. I had experience with plastic-coated flooring, but that was a metal type, different type of material.
Q. It was a metal bar with a plastic coat around it or something like that?
A. Right.
Q. At the time you began marketing Filter-Eeze flooring, did you receive any instructions from BCM regarding installation of the product into facilities?
A. Yes.
Q. What kind of -- just generally, was it a training session where you went up to Alberta Canada, Calgary? Was it Calgary?
MR. SOBALVARRO: Yes.
THE WITNESS: We viewed how they did it, where the supports had to be, yes. They would tell us that we had to support a certain measurement and stuff, but they provided us with all that, yeah.
BY MR. CROSS:



Q. Did they take you out to a facility and show you literally how to install it?
A. Back then, I think there were about four or five facilities they toured me to, yes.
Q. While they were in construction?
A. I don't know if they were -- they had hogs in them. I don't know if I seen anything under construction of the support beams or the building or -- are you talking -- what are you talking about?
Q. The support beams.
A. The support beams. I seen them manufacture support beams in a plant that manufactured the support beams, but I did not see them. I don't --
Q. Throughout, let's just take the entire 1980s, and if it changed over time within that decade, you can certainly let me know that, but during the 1980s, was there specific recommendation that BCM provided to Double L regarding the support beams that were to be used with Filter-Eeze products?
MR. LULIC: Could you read that question back, please? I'm sorry.
(WHEREUPON, the reporter read from the record as requested.)
MR. LULIC: Go ahead and answer it.
MR. SOBALVARRO: I'm going to object as



vague.
MR. LULIC: I assume your time frame is intended to be flexible.
MR. CROSS: Yes. If it changed, tell me if it changed.
MR. LULIC: Well --
BY MR. CROSS:
Q. Well, I just want to get an understanding. Did they tell you anything about support beams right after you signed this distributorship?
MR. LULIC: That's a different question, and maybe a better question. Go ahead and answer that one.
MR. CROSS: I appreciate the comment.
THE WITNESS: We met with BCM; we -- yes, I mean, they knew how we were -- the support beams and, yes.
BY MR. CROSS:
Q. What was their original advice to you as to what support beams should be used with their product?
A. They had charts and things that we followed as what we had to do with -- if you go so much length, you have to go so deep with the beam; if you had -- there was even studies that came from, I think, Canada on the idea of universities or engineering universities



that we have, I think, that told us things about deflections and all that stuff, yes.
Q. When you talk about deflections, you mean the expansion of the plastic slats, or are you talking about the give in the beam?
A. The give in the beam.
Q. When you were working with Quaker Oats as a sheet metal worker, I take it you had familiarity with various kinds of steel.
A. Uh-huh.
Q. And there's galvanized steel, correct?
A. Uh-huh.
Q. Yes?
A. Yes. I'm sorry.
Q. And there is stainless steel?
A. Yes.
Q. They're not the same thing.
A. No.
Q. What is galvanized steel?
A. It's a material that's hot-dipped, or you can have hot-dipped or you have cold rolled, galvanized. It would be a coating that is put on steel products.
Q. What is the benefit of galvanized steel?
MR. LULIC: Relative to what?
BY MR. CROSS:

Page 20

Q. Why is galvanized steel used?
A. It would be for probably rusting or environmental circumstances where you would put it for soldering. If you had to solder a joint type, you would use a galvanized material.
Q. You say environmental circumstances?
A. That would be part.
Q. If you were in a corrosive environment, would it be preferable to use galvanized steel?
A. Probably not. Stainless steel probably would be.
Q. Why is stainless steel better than galvanized steel in a corrosive environment?
A. Well, this would be for food processing also. Contamination in food. That was a food processing plant and we were working with -- depending on where you would put certain materials and certain -- in certain departments, they had certain standards for food, for food contact with stainless steel versus a steel material or something like that.
Q. Have you ever heard the term "painted steel"?
A. Painted?
Q. Painted.
A. I have heard of that, yes.

Page 21

Q. What does that term mean to you?
A. It would be a steel product that would be painted.
Q. Does it necessarily mean it's galvanized?
A. You could paint on galvanized; you could paint on stainless.
Q. But it doesn't -- painted steel doesn't mean galvanized.
A. No.
Q. Painted steel does not mean stainless steel.
A. No.
Q. When steel rusts, will it expand?
MR. LULIC: Well, I'll object on foundation. Object to the form of the question.
THE WITNESS: In some cases it can deteriorate, in some cases it can expand, and I'm not a metallurgist. There's people that are that and can understand the characteristics of certain steels.
BY MR. CROSS:
Q. You were a sheet metal worker for six to seven years?
MR. LULIC: He's already told you that. You're not going to argue with him.
BY MR. CROSS:
Q. Did you have experience with steel rusting

Page 22

in the context of your work with Quaker Oats as a sheet metal worker?
MR. LULIC: Object to the form of the question.
THE WITNESS: Did I -- a sheet metal worker familiar with rust I don't think was in part of our trade. And what -- no.
BY MR. CROSS:
Q. Relative to the types of beams that were used with Filter-Eeze products beginning immediately after the distributorship agreement, was there any recommendation to BCM as to the type of beam to be used as opposed to support factors and engineering specifications?
MR. LULIC: Object to the form of the question as vague. Is your reference to size, or metal makeup, or --
BY MR. CROSS:
Q. Metal makeup.
A. Not that I can recall. I'm going back and I would answer the question, I seen it on different types of steel. That's what I had seen installed in Canada.
Q. What types of steel had you seen installed in Canada?
A. From the oil fields they use what is called

Page 23

sucker rod. It was a rod that was high in carbon, and they had used that. I had seen applications of flat steel, and I think that was the reason, but --
MR. SOBALVARRO: I didn't hear you. You saw applications on --
THE WITNESS: Flat steel.
MR. SOBALVARRO: And then you said --
THE WITNESS: Sucker rod, and then there was -- but there's a lot of different ways that it was -- what material was most cost-effective in a lot of applications is what we --
BY MR. CROSS:
Q. And that's my next question to you, Mr. Borcherding. Which materials can you recall today having been used with Filter-Eeze products? You've mentioned sucker rod and flat steel. Is there any other products, materials that you can recall?
MR. LULIC: What time frame are we talking about?
BY MR. CROSS:
Q. At any time.
A. Any time throughout the history of Filter-Eeze?
Q. Well, I realize we've moved into fiberglass at some point. Let's just say in the 1980s.

Page 24

A. I have stainless steel, galvanized, sucker rod. Some people even supported it on wood, treated lumber.
Q. Just so I'm clear, can you again tell me, what is sucker rod again, if you know?
A. I don't know. It's a terminology. But I think it would be -- it comes something from the oil fields of Alberta. That's where the product was developed, in Alberta, Canada and it was a by-product from the oil fields.
Q. To your knowledge, has that product ever been used in the United States?
A. Not to my knowledge.
Q. Nothing that Double L has been involved in distributing.
A. Nothing.
Q. You use the term "flat steel." Just clarify, what is flat steel? Is that just untreated steel or --
A. Flat steel is, yeah, it's flat steel. It would be a quarter-inch thick and could be four inches deep or five inches deep.
Q. Could flat steel also be galvanized?
A. Yes.
Q. So flat steel more refers to the dimensions

Page 25

of the steel rather than its treatment or whether or not it's been galvanized, whether or not it's stainless steel, right?
A. Uh-huh.
Q. Yes?
A. Yes. I'm sorry.
Q. As far as Double L was concerned, when it began distributing Filter-Eeze products in the United States, did it make any recommendations to its dealers as to what types of support beams were to be used with that product?
A. Yes.
Q. What was that recommendation?
A. We followed whatever the recommendations we had from BCM. I mean, we -- it was a product that we had. We would follow the manufacturer's recommendations.
Q. And at that time, what was BCM's recommendation for the type of material that was to be used in the support beams?
MR. SOBALVARRO: Sorry. "At that time," which years?
BY MR. CROSS:
Q. 1980.
A. Flat steel, the recommendations a lot were

Page 26

where you had to support the product, more the idea that they didn't tell you what to use, because they said, "Here's where you have to support the product," because that would vary with the length of the building, the depth of the steel, all of that stuff. So you would have to say we have to support every half inch end or something like that. That was kind of more the recommendation we took. To use the support, then you would say you could use this a quarter inch. There was a lot of different ways to use materials to use support, but we would follow the recommendations of telling -- they would tell us where it had to be supported and that's what we passed on to our people.
Q. But my question is, and if there was no recommendation or if you don't recall there having been a recommendation, those are fine answers, too. But my specific question to you, Mr. Borcherding, was in 1980, what recommendation did BCM give to you to pass along to dealers as to the material that should be used in the support beams?
A. I didn't describe it very well, but I said that --
MR. LULIC: He's asking you just about material.
THE WITNESS: Steel. I'm going to say

Page 27

steel, but --
MR. LULIC: Fine. You've answered his question.
BY MR. CROSS:
Q. In 1980, again, Filter-Eeze was the only kind of hog or slat flooring that you were selling, correct?
A. Uh-huh.
MR. SOBALVARRO: Was that yes?
THE WITNESS: Yes.
BY MR. CROSS:
Q. And you were not selling flooring for any other kind of livestock facility such as cattle or chickens or anything like that at that time.
A. The best of my knowledge.
Q. If you could, Mr. Borcherding, turn to the most recent, I believe, Distributor Agreement, which is the last three pages of Exhibit No. 1. This is entitled Exclusive Distributor Contract between Double L Group Limited and BCM Manufacturing Limited. It appears to be dated September 6, 1994. Is that your signature on the last page?
A. Yes.
Q. Is this the last distributor contract that exists between Double L Group and BCM Manufacturing?

Page 28

A. I think so.
Q. If you turn to the second page of the distributor contract, Mr. Borcherding, paragraph 13 refers to a 10-year warranty. You see that?
A. Yes.
Q. Was this the warranty -- strike that. Had this warranty been modified at anytime between September 6, 1994 and whenever Double L Group discontinued its business relationship with BCM?
A. Go back to your --
Q. You understand what I'm saying?
A. Not really.
Q. In other words, is this the most recent warranty that existed, in writing anyway, between BCM and Double L Group? That's a better question I hope.
A. To the best of my knowledge.
MR. LULIC: I'll object to the form of the question.
BY MR. CROSS:
Q. Oh, I guess it wasn't better. What I'm asking is, has this warranty been changed in writing since the date of this contract?
A. Not that I know of. I do not know. I'm not sure.
Q. Showing you, Mr. Borcherding, what's been

Page 29

marked as Exhibit No. 2, can you identify what Exhibit No. 2 is?
A. BCM sales by year.
Q. Roughly for the time frames that are shown here, what percentage of Double L business was taken up with BCM products? What percentage of Double L's total sales consisted of BCM products? And if you want to limit it to one year for 1990, that's fine.
A. I don't have my sales. You're asking me what percentage of sales?
Q. Yes. Roughly. I understand you don't have your total sales figures in front of you.
MR. LULIC: He also doesn't have to speculate, if that's what it would be.
THE WITNESS: I would be just guessing, and I mean really guessing. I don't remember what my sales were for the whole year.
BY MR. CROSS:
Q. But is BCM the largest product manufacturer that you distribute or are there others that you do a large volume of business?
A. I think BCM was one of our larger accounts, yes, that we distributed.
Q. Going back to the fact that at some point Double L had design engineers on staff, I presume at

Page 30

some point Double L did begin doing more than simply sales of equipment. In other words, it did do some design work.
A. Yes.
Q. When did that happen?
A. Ask the question again.
Q. When did Double L begin doing design work?
MR. LULIC: For any product?
THE WITNESS: We did design work. We did design an office. I don't know what you're talking--
BY MR. CROSS:
Q. Let's take livestock facilities. At any time has Double L ever designed livestock facilities?
MR. LULIC: Or portions thereof?
BY MR. CROSS:
Q. Or portions thereof.
A. Yes. We did our whole livestock modular buildings. I think we have -- we did design maybe some -- and the engineers that worked with us maybe designed some ventilation inlet systems, but --
Q. Anything else relative to livestock confinement facilities? What types of design work did Double L do?
A. Very little.

Page 31

Q. When did Double L first begin doing business with Hog Slat, Incorporated?
A. I do not know.
Q. Showing you what has been marked Exhibit No. 3, it's a letter dated October 5, 1993. Is that your signature on the second page?
A. Yes, it is.
Q. Who is Tommy Herring?
A. Pardon?
MR. LULIC: Who is he?
THE WITNESS: He's the president of Hog Slats.
BY MR. CROSS:
Q. Did you know him before you had this meeting on September 22, 1993?
A. Yes.
Q. How did you know him?
A. We had sold them ventilation inlet products. We had sold some products to him.
Q. And this was a discussion relative to the pricing for Hog Slat of flooring; is that right?
A. Yes.
Q. Did this deal ever come to fruition?
A. No.
Q. Why not?

A. I cannot -- I do not know.
Q. One of the -- well, when did you first meet Wendell Burge?
A. I can't remember when I first met him.
Q. Well, before 1993, before this letter, had you been selling any type of flooring products to Hog Slat?
A. I think so. I'm not sure on that, but I do think we were.
Q. Were you dealing at all with Mr. Burge in that time frame?
A. I had talked to him. I maybe saw him at pork shows or something like that, but, no, I --
Q. But as best you can recall -- well, strike that. Would it be fair to say that the proposal that you offered to Mr. Herring included a minimum purchase order by Hog Slat in exchange for a discounted price?
A. That would be fair.
Q. And would it also be fair that a component of that proposal was that Hog Slat would use BCM products exclusively?
MR. SOBALVARRO: I'm going to object as misstating the record. It indicates Schonlau Cast Iron as well.
BY MR. CROSS:



Q. What is Schonlau Cast Iron, for the benefit of counsel?
A. It's a product that you use underneath the sow for farrowing. It's when the mother has its pigs. It's an alternative -- it's a cast iron product alternative to plastic.
Q. These are complimentary products. Would that be fair?
A. Yes, that's fair.
Q. Prior to 1994, did you have any contractual -- strike that. At any time, did you have any contractual relationship with Hog Slat, Inc., other than the sale of product on a sales basis?
A. I don't understand.
Q. Well, with exception of Hog Slat buying product, is there any kind of contract between Hog Slat and Double L?
A. No, not that I recall.
Q. Prior to 1994, did you have any dealings with Kent or Barry Holden?
A. Not that I can recall. I do not know that.
Q. Did you know who they were, prior to your meeting in Northfield --
A. Yes.
Q. -- in April of 1994?



A. Yes.
Q. How did you know them, or of them?
A. In the industry, they were putting up buildings. I just heard through contacts, and I think we met them at a show one time in Minnesota, at a trade show.
Q. And you understand what I'm talking about, the April 1994 presentation, right?
A. Right.
Q. Prior to that meeting, to your best recollection, had Double L ever sold any product to Kent Holden, Barry Holden or Holden Farms?
A. I can't answer. I don't know.
Q. Are you aware of whether or not Double L had sold any product, including BCM products, but other products too, to any of the plaintiffs in this action, prior to April 1994?
A. I can't answer that. I don't know.
Q. How did it come about that you made this April 1994 presentation?
A. I was in the area and I was making a presentation, was asked to make the presentation at this meeting.
Q. Who asked you to do that?
A. We had --



MR. LULIC: Who asked you to do it is his question.
THE WITNESS: Bailey Evans.
BY MR. CROSS:
Q. Bailey Evans was your marketing consultant?
A. Right.
Q. Out of North Carolina?
A. Right.
Q. What did Mr. Evans tell you about the Holdens?
MR. LULIC: You mean personally, or the deal, or what?
BY MR. CROSS:
Q. When he asked you to make this presentation, what did he say?
A. He said, "Could you make the presentation to Holdens" because he couldn't do it, if I remember right. And I don't know. It was something, I was in the area and could I make the presentation. I think there was a conflict in time. That was -- he had some conflict. I don't know for sure. I can't remember.
Q. Did you speak with Wendell Burge relative to the Holdens at all prior to making this presentation?
A. I can't recall. I can't recall if I -- we met in a coffee shop before. I don't even remember. I

Page 36

do not remember. Is that what you were -- the question you asked?
Q. Yes. Is it possible that you did meet with him prior and just don't remember or --
MR. LULIC: Meet him or meet with him on the job relative to this sale?
BY MR. CROSS:
Q. Meet with Mr. Burge prior to meeting with Kent and Barry Holden.
A. **It could have been possible, but I do not recall. Because I think the day we made the presentation, we went and it was in the bank, and I went upstairs and I think Wendell was there when we got there.**
Q. Showing you what has been marked as Exhibit No. 4, Mr. Borcherding, have you ever seen this document before?
A. **Yes.**
Q. What is it?
A. **It was a presentation that was gave to Holden Farms.**
Q. Who prepared this document?
A. **A combination of Bailey Evans and someone in my office. I'm not sure.**
Q. The "Presented by Wendell Burge, Jr.,"

Page 37

the Hog Slat and logo below that, do you know why that's on there.
A. **No. It -- no.**
Q. Who distributed this pamphlet to the Holdens?
A. **I took the presentation up there and we put it on the table and I was the one that delivered the presentation.**
Q. Was Mr. Burge present when you did that?
A. **Yes.**
Q. Did you enter the room at the same time?
A. **No.**
Q. You didn't arrive by the same car?
A. **No.**
Q. Did Mr. Burge speak at this presentation?
A. **Yes.**
Q. Did you speak?
A. **Yes.**
Q. What did Mr. Burge say?
A. **I do not recall.**
Q. What did you say?
A. **I'm sure I covered the presentation. And I don't remember every word that was said.**
Q. Do you remember the substance of what was said?

Page 38

A. **I think I do.**
Q. Would it be fair to say that you went through this presentation document and addressed or summarized what was in that pamphlet?
A. **Yes.**
Q. Do you recall having said anything of substance that was not in the pamphlet?
A. **No, I don't recall.**
Q. Do you recall anything that the Holdens said to either you or Mr. Burge during this meeting?
A. **I just don't recall.**
Q. Do you remember asking or discussing with the Holdens whether or not Holden Farms had any prior experience with plastic flooring?
A. **Repeat that.**
Q. Did you discuss or do you recall any discussions with the Holdens as to whether or not the Holdens had any prior experience with plastic flooring?
A. **That could have been said.**
Q. But you don't remember for sure if it was or wasn't discussed.
A. **It -- something, no, I don't. I just don't remember a hundred --**
Q. Do you know today whether or not the Holdens had any prior experience with plastic flooring before

Page 39

1994?
A. **I don't know that.**
Q. Where did the information that is contained in Exhibit No. 4 come from? For instance, there's a graph and a chart on the second page. Where did you get that?
A. **That came from BCM. And it was a study conducted at the University of Saskatchewan.**
Q. Would it be fair to say that the point of this is that you're reducing heat loss using plastic flooring as opposed to metal?
A. **Yeah, that would be fair.**
Q. And if we turn to the next page, again, there is the Hog Slat logo and name Wendell Burge on the bottom. You're not aware of how that particular logo came to be on this form?
A. **I'm not aware of how it came. I didn't prepare the presentation.**
Q. To the best of your knowledge, did Mr. Burge have any involvement in the preparation of this document?
A. **I do not know that.**
Q. Could he have and you just don't know?
A. **It could be.**
Q. You said that it was probably or possibly

Page 40

prepared by Bailey Evans and someone in your office. Who would that someone in your office have been?
A. **Annette Hager.**
Q. How do you spell Ms. Hager's last name?
A. **I don't know that either. You know, I don't even think it's Hager. I think she just got married. I know her as Annette Hager and I think she just got married. I do not know. She's worked for me for 16 years probably. Chaapel. Chaapel is her name.**
Q. Could it have been anyone else?
A. **I don't know. I don't know that. It could have been. It could have been.**
Q. Turning back again to the third page, it says "Filter-Eeze Maxima Nursing/Grower Flooring, low cost, new design. Consider these features: 1. Warranty-a full 10-year non-prorated." What does non-prorated mean, as you understood it?
A. **It would go back to the first year, a non-prorated warranty. That's the way I would interpret that.**
Q. You just used the same word to define non-prorated. You said non-prorated warranty is a non-prorated warranty. I'm not trying to be argumentative with you, Mr. Borcherding, but I'm just -- can you --

Page 41

A. **Well, a full 10-year non-prorated warranty would be if it was five years, you would get the free product. That would be --**
Q. As opposed to only one or a depreciated value of the product.
A. **Right.**
Q. Do you remember any discussion at this meeting in April of 1994 regarding the warranty, the full 10-year non-prorated warranty?
A. **I think it was talked about. I don't remember what part of that.**
Q. Do you have any understanding, Mr. Borcherding, relative to the average life or useful life of a nursery hog confinement facility?
MR. SOBALVARRO: Objection --
MR. LULIC: An old structure?
MR. CROSS: A new structure.
MR. SOBALVARRO: Objection, vague.
MR. LULIC: I'll join in the objection.
THE WITNESS: Do I have any knowledge?
BY MR. CROSS:
Q. Yes. Within the industry, what is the expected useful life of a nursery, a confinement facility?
MR. LULIC: Object on foundation.

Page 42

THE WITNESS: There's a lot of variables on that one. I don't know that. I can't answer that question.
BY MR. CROSS:
Q. This one says "20-year proven record of performance"?
A. **Uh-huh.**
Q. Yes?
A. **Yes.**
Q. What does that refer to?
A. **When I started to handle the product, I mean, the plastic flooring, we had the studies from Saskatchewan, the studies from where we had got our first documents from BCM, and we had seen -- that was the idea that we saw -- the performance we were seeing from universities, and there were universities that tested it in the United States also.**
Q. And these studies -- well, over to the right of that verbiage, there is a kind of a picture of one of the Filter-Eeze products standing upright, and above that it says "Slats overlap flat steel supports."
A. **Uh-huh.**
Q. Yes?
A. **Yes.**
Q. Would it be fair to say that when you made

Page 43

this presentation to the Holdens in April of 1994 that you recommended steel support beams be used in conjunction with the Filter-Eeze product?
MR. LULIC: Object to the form of the question.
MR. SOBALVARRO: I'll join.
THE WITNESS: Did I recommend it?
BY MR. CROSS:
Q. Yes.
A. **Yes, I did. I probably said, yes, I would recommend putting it on steel.**
MR. CROSS: What was wrong with the form of that question?
MR. LULIC: It was vague.
MR. CROSS: In what way?
MR. LULIC: It was vague as to time and when and under what circumstances.
MR. CROSS: April 1994 presentation, did he make a recommendation to the Holdens for steel support beams using Filter-Eeze products. He said yes.
MR. LULIC: And the vagueness is at what point in time was that recommendation made?
MR. CROSS: April 1994 at the presentation meeting.
MR. LULIC: And was his recommendation

Page 44

the initial recommendation or what was it?
MR. DIESETH: I would like, actually, the witness' answer read back.
(WHEREUPON, the reporter read from the record as requested.)
MR. CROSS: Does your objection stand?
MR. LULIC: Yes, it does.
MR. CROSS: I don't know how else to cure it, but if you want to show me how I can.
THE WITNESS: And the question, yes, we were -- we had the warranty from -- we were passing on the recommendation from BCM as it stood at that point. Did I say the recommendation for steel support system, we said steel strap. Who designed the strap? I did not design the strap, I did not put the steel down there, but just to say steel strap, there's different -- that goes into a question, another question.
BY MR. CROSS:
Q. Was the recommendation for steel support beams that you made to Holden Farms the recommendation that was provided to you by BCM at that time?
MR. SOBALVARRO: Objection, vague.
MR. LULIC: And form. Mischaracterizes.
THE WITNESS: Ask the question another

Page 45

time, or again.
BY MR. CROSS:
Q. You testified that you told the Holdens that they were to use steel support beams with Filter-Eeze products, right?
MR. SOBALVARRO: I object.
MR. LULIC: I'm going to ask --
MR. CROSS: I'm asking him.
MR. SOBALVARRO: He testified --
MR. CROSS: I'm asking him.
MR. SOBALVARRO: No, Mr. Cross, you said, "you said this."
MR. CROSS: And then I said "right." Is that correct?
MR. LULIC: Object to the form of the question.
MR. SOBALVARRO: Same objection.
THE WITNESS: A steel support, we did not design a steel support. If they used a steel support, I didn't even know the design of the building, I didn't know what the span of the building was, and I said, yes, I would use steel. I made the recommendation that, yes, steel, but there was a lot of -- I did not design the floor support system here. All I was doing was selling the plastic.

Page 46

BY MR. CROSS:
Q. You told the Holdens to use steel support beams. Yes or no?
MR. LULIC: Object to the form.
MR. SOBALVARRO: Object to the form of the question.
THE WITNESS: Yes or no, I'll say yes. But I would like -- no, go ahead.
BY MR. CROSS:
Q. Go ahead. You can clarify.
MR. LULIC: Yes.
THE WITNESS: I did not design the steel beam system.
BY MR. CROSS:
Q. I understand that. Was that statement consistent with recommendations that were given to you by BCM at the time of the April 1994 presentation?
MR. SOBALVARRO: Objection, vague.
MR. LULIC: Join. What statement? He's not testified to any statement, Dustan. He's not testified that he has made any statement.
MR. CROSS: Well, I'll let the record stand on what I've got right now.
MR. LULIC: Well, okay. But then I'm going to object to the question --

Page 47

MR. CROSS: Well, I've asked him three different times; did you say to the Holdens use steel supports? Should they use steel supports?
MR. LULIC: No.
MR. CROSS: And he said, yes.
MR. LULIC: No, that's false.
MR. SOBALVARRO: No, you didn't.
MR. CROSS: Well, what is he saying, then? Maybe I'm missing what he's saying.
MR. LULIC: All right. Go off the record and I'll tell you what he's saying.
MR. CROSS: Okay.
(Brief off-record discussion.)
BY MR. CROSS:
Q. This was prepared, Exhibit No. 4 was prepared by your office, correct?
A. Yes.
Q. And in here it says "Slats overlap flat steel supports," correct?
A. Yes.
Q. And turn to the next page and it says "Filter-Eeze Maxima flooring supported with" -- what does it say after that?
MR. LULIC: Where are you?
MR. CROSS: On the next page.

Page 48

MR. LULIC: Are you right here on this picture?
MR. CROSS: Yes.
THE WITNESS: "Steel beams."
BY MR. CROSS:
Q. And underneath that, there's a diagram with a blow-up of the Filter-Eeze product, and it says, "Slats hook over the steel beams," correct?
A. Yes.
Q. And it has over in the right-hand corner "Support data load factors." Where did you get that information?
A. BCM.
Q. Up in the top box of that page under number three, it says that there's a 15 to 20 year life expectancy, correct?
A. Yes.
Q. What is that based upon?
MR. SOBALVARRO: Objection, asked and answered.
MR. LULIC: Where are you?
MR. CROSS: Number three, 15 to 20 year life expectancy.
MR. LULIC: Oh, all right. Thanks. In other words, where did you get that information? Is

Page 49

that your question?
MR. CROSS: Yes.
THE WITNESS: Didn't I answer that before? That was with the test we got from the universities when we first started to handle the product with our experience and with the data that we had sent--
BY MR. CROSS:
Q. Through 19 --
MR. LULIC: Just a minute. Data sent from --
THE WITNESS: BCM.
BY MR. CROSS:
Q. Through 1994 had you heard of anyone having a problem with Filter-Eeze products and rusting of the steel beams?
MR. SOBALVARRO: Objection, vague. It's two questions. Filter-Eeze products and/or steel beams.
MR. LULIC: They're two different things.
MR. SOBALVARRO: They don't necessarily go together.
MR. LULIC: Is your question Filter-Eeze products --
MR. CROSS: Filter-Eeze products --

Page 50

MR. LULIC: -- installed over steel beams? Is that your question?
MR. CROSS: Yes.
MR. LULIC: That's a different question.
MR. CROSS: It is not a different question.
MR. SOBALVARRO: Yes, it is, Mr. Cross.
MR. CROSS: Well, fine.
MR. SOBALVARRO: And I'm going to object as vague.
MR. CROSS: Fine.
MR. LULIC: Okay. Can the question then be, "Do you have any experience with Filter-Eeze products having trouble or failing when installed over steel beams before 1994?" Is that the question?
MR. CROSS: That's the question.
MR. LULIC: Go ahead and answer that baby.
MR. SOBALVARRO: I'll object as vague, even if Mr. Lulic is asking it.
MR. LULIC: Mine is a good question.
THE WITNESS: No.
BY MR. CROSS:

Page 51

Q. Never heard of that happening.
A. **Never heard of that happening.**
Q. Have you ever had a problem with Filter-Eeze flooring buckling prior to 1994?
A. **I can't recall, but there could be.**
Q. Would it be fair to say that Double L was the first distributor of plastic flooring for hog floors in the United States?
A. **Yes.**
Q. Prior to that time, people didn't use plastic flooring in hog buildings, would that be fair, prior to 1979, 1980?
A. **I can't pin a date on it, but I think that sounds fair.**
MR. SOBALVARRO: Was that also in the United States?
MR. CROSS: Yes.
MR. SOBALVARRO: Okay.
BY MR. CROSS:
Q. Did you talk with Holden Farms -- I'm sorry. How long was the meeting between you and Holden Farms?
MR. LULIC: What meeting?
BY MR. CROSS:
Q. The April 1994 meeting.
A. **I have no idea on that. Could have been an**

hour, two hours. I have no idea.
Q. As best you can recall who was present at that meeting?
A. Wendell, Mr. Holden, I think there were some people from his staff there. I don't know if Wendell even had someone with him, and I had a guy by the name of Nigel Leucas was also with me. But that is --
Q. Who was Nigel Leucas?
A. He was an associate that we were traveling through Minnesota.
Q. Is he an employee of Double L?
A. No.
Q. What was his relationship to Double L?
A. He rents -- he was renting part of Double L's test farm.
Q. When you say Mr. Holden, are you referring to Kent Holden or Barry Holden, or both of them?
A. I don't know who was there.
Q. On the cover page, it indicates Kent Holden, Barry Holden, George Kasper and Darwin Tilstra. Do you remember is those gentlemen were present?
A. I think George was there, yes, and, yes, I do remember that now.
Q. You do believe that those four gentlemen on the cover were there, as best you can recall?



A. As best I can recall.
Q. And this meeting again occurred at Holden Farms' offices in downtown Northfield?
A. Yes, I think so, and I don't know where their offices are. This is the first time. It was in an old bank building or something like that.
Q. Did you make any notes of this meeting?
A. I don't have any notes of the meeting. I might have made notes, but I don't have them.
Q. But you have not been able to locate them?
A. Right.
Q. Were there any decisions made at this meeting? In other words, did the Holdens tell either you or Mr. Burge that they were going to do anything or had made any decisions relative to the construction of their nurseries?
MR. LULIC: I'll object to the form of the question.
THE WITNESS: I don't think there was no decision made at that meeting that I'm aware of.
BY MR. CROSS:
Q. That you can recall, right?
A. I don't think I walked away with an order.
Q. What is the next thing -- well, strike that. Did you talk with Mr. Burge at all in kind of a recap or



a debriefing of this meeting? In other words, after you got done with the Holdens, did you talk with him at all?
A. I went on to do more sales visits up here calling on customers, and I don't think that we ever -- I don't know if we recapped it. Bailey Evans maybe would have recapped it, but I did not recap it.
Q. Did you talk with Mr. Evans about this meeting?
A. I'm sure I would have, but I don't recall that, the conversation.
Q. What is the next thing you recall relative to the Holden Farms nurseries? In other words, when did the name Holden Farms next come up after this April 1994 meeting?
A. There was a problem at Holden Farms and I think we sent some people up to take a look at it.
Q. You talked about -- what year?
A. I do not know. I'm not good on years.
Q. This was after all of the construction had been completed?
A. The construction was complete and I think there was a complaint that some of the flooring was coming up, and I think we sent someone up to take a look at it.
Q. So would it be fair to say, Mr. Borcherding,



that you did not have any further direct involvement with the orders for Filter-Eeze flooring that were routed through Double L as they were coming in?
MR. SOBALVARRO: Object to the form of the question.
THE WITNESS: I think that's fair. I don't know -- no, I did not.
BY MR. CROSS:
Q. You didn't have any more conversations with either Wendell Burge or Hog Slat specific to the Holden's projects?
A. Me personally, no. Not that I know of. I don't recall.
Q. And just as a shorthand so the record is clear, Mr. Borcherding, I refer to the Holdens. In this particular situation there's actually 10 different nurseries all of which are owned by -- well, two of them were owned by one producer, but they're owned by different persons other than the Holdens. Are you aware of that? Well, that is what it is. I'm going to collectively refer to the plaintiffs as Holdens. Okay? Do you understand what I'm saying?
MR. LULIC: It doesn't matter.
MR. CROSS: Can we take a break?
(A brief recess took place.)

Page 56

BY MR. CROSS:
Q. Turning your attention, Mr. Borcherding, to the letter that is on the last two pages of Exhibit No. 4, who wrote that letter?
MR. LULIC: Which one are you looking at?
MR. CROSS: This one. He's got it.
THE WITNESS: Okay. Bailey Evans.
BY MR. CROSS:
Q. I presume you read through it before signing it?
A. Yes.
Q. First sentence it says, or in the first paragraph it says that you are a, "representative of BCM manufacturing and our product Filter-Eeze flooring." Do you see that?
A. Yes.
Q. What did you mean by representative of BCM manufacturing?
MR. SOBALVARRO: Objection. He just said he didn't write the letter.
BY MR. CROSS:
Q. You read through the letter and you signed the letter, right?
A. Uh-huh.

Page 57

Q. You gave the letter to Holden Farms, correct?
A. Uh-huh.
Q. Yes?
A. Yes. I'm sorry.
MR. LULIC: Well, I'll object to the form of the question. What don't you understand about the representing BCM Manufacturing?
BY MR. CROSS:
Q. Well, are you saying that you're an agent of BCM Manufacturing?
MR. SOBALVARRO: Objection, calls for a legal conclusion.
BY MR. CROSS:
Q. What did you mean by representative?
A. I just think what it -- representing him. I mean, I was selling BCM products I was selling at that meeting. I wasn't selling --
Q. Turn to the second page, second full paragraph on the second page of your letter. It refers to that, "There have been dozens of university or college research studies with Filter-Eeze plastic floorings demonstrating the value and benefits of our products." See that?
A. Yes.

Page 58

Q. Are you aware of what dozens of research studies are being referred to there?
MR. LULIC: In a general sense.
THE WITNESS: Yes, in a general sense.
BY MR. CROSS:
Q. Which dozens of studies are being referred to?
A. When we took on the product, we sent product out to universities to be tested, and I think there was around a dozen of them that we sent out and got studies back on the product.
Q. Did you produce those studies?
MR. LULIC: Did he what?
BY MR. CROSS:
Q. Did Double L produce those studies in this litigation? Have you made those available to your attorneys for production to the plaintiffs in this case?
A. I think they were all lost in a fire.
Q. When did that fire occur again?
A. I do not know. Ten years ago, or six, eight years ago. Something like that.
Q. Before this April 1994 meeting? Was the fire before then?
A. I don't know. I do not know.
Q. The third full paragraph on that letter,

Page 59

second page of that letter says, "Hog Slat's exclusive affiliation with Filter-Eeze plastic flooring represents their commitment to choosing proven products in order to best service the swine industry." What is the exclusive affiliation that you're referring to?
A. I don't think we were going to sell Filter-Eeze to Holdens without going through Hog Slat.
Q. This refers to affiliation between Hog Slat and Filter-Eeze.
A. I just -- I don't know.
MR. SOBALVARRO: I don't know that we got a verbal response.
THE WITNESS: I do not know.
BY MR. CROSS:
Q. When you say that you were not going to sell Filter-Eeze to Holdens without going through Hog Slat, was that -- what was that based upon? I mean, was there an agreement or some kind of understanding between Hog Slat and Double L to that effect?
A. I do not know that. But -- I do not know that.
Q. At the bottom of your letter it indicates there was a copy sent to Tommy Herring, president of Hog Slat. Do you know whether or not a copy was sent to Mr. Herring?

Page 60

A. I do not know that.
Q. But presumably, if you would indicate such on your letter, you would assume that it would have been done?
A. That would be fair.
Q. At the time in April 1994, Mr. Borcherding, was fiberglass, or were fiberglass beams available for use with Filter-Eeze products?
A. Yes.
Q. Were those beams manufactured by BCM or by whom?
A. We did not manufacture them. I think they--
MR. LULIC: He asked if they were manufactured by BCM.
THE WITNESS: No.
BY MR. CROSS:
Q. And obviously, they were not manufactured by Double L.
A. No.
Q. Who were they manufactured by that you were aware of?
A. Advanced Fiber. And I'm not sure of that.
Q. Is that a company out of Iowa?
A. I think it was out of Minnesota.
Q. At the time in 1994, did BCM sell support

Page 61

beams?
MR. SOBALVARRO: Objection, vague. Any type of support beams?
MR. CROSS: Support beams for its Filter-Eeze products.
MR. SOBALVARRO: But are you talking fiberglass, steel, galvanized?
MR. CROSS: Yes.
THE WITNESS: I don't know that.
BY MR. CROSS:
Q. You don't recall as part of your sale of Filter-Eeze products also selling support beams of one kind or another prior to 1994?
A. No, I don't recall.
Q. During this meeting April 1994, was there discussion of the use of fiberglass beams instead of steel beams?
A. I do not recall that. I do not -- I cannot remember.
Q. Was there discussion at that meeting relative to the use of a particular type of steel? In other words, galvanized steel as opposed to stainless, as opposed to just --
A. No. The primary function of that meeting was to sell flooring.

Page 62

Q. Prior to April 1994, do you recall having sold fiberglass beams for use with slats in livestock facilities, whether they be for BCM or another slat manufacturer?
A. The question, why?
Q. Did you sell fiberglass beams prior to April 1994?
A. I think so.
Q. Would that have been a product produced by this Advanced Fiber that you referred to?
A. I think so.
Q. Do you recall having sold Advanced Fiber fiberglass beams in conjunction with the sale of Filter-Eeze product prior to April 1994?
A. Yes.
Q. Do you remember, and if you don't, that's fine, but do you remember to whom those sales were made?
A. No, I don't remember.
Q. When did fiberglass beams for use in products such as the Filter-Eeze product first come on the market, if you know?
MR. LULIC: Your question, are you asking him about the Maxima product? Because --
MR. CROSS: Yes. Not the -- but the new one.

Page 63

MR. LULIC: Well --
MR. CROSS: Is that what you're talking about?
MR. LULIC: No. I mean, there's the Maxima product, there's different products and they're different. So, I mean --
BY MR. CROSS:
Q. The Maxima is the original one, right?
A. Huh-uh. No.
Q. It isn't. What's the original one?
A. There's L-2732. There's just -- there were a lot of different products that were out there.
Q. When did Maxima start?
A. I am not sure of that.
Q. In my recollection, I probably am wrong, but is that Maxima was the one that was used in the Holden Farms, the original facilities.
A. Right.
Q. And then they switched to Maxima II at some point.
A. Uh-huh.
Q. And then possibly even Excelerator?
A. That sounds familiar, yes.
Q. Let's talk about the Maxima product. When, as best as you can remember, did that come out on the

Page 64

market, the first Maxima flooring?
A. **I think it's around '93, '94. Somewhere in that time frame.**
Q. What was the difference between the Maxima flooring and the other floorings, plastic floors produced by BCM that came before it, if any?
A. **It was the way the product attached to a beam.**
Q. How did the product attach to the beam prior to the Maxima flooring?
A. **It sat on the beam. It was a self-supporting product.**
Q. So in other words, it did not clasp onto the support beam; is that correct?
A. **That's correct.**
Q. And the Maxima product did clasp onto the support beam; is that correct?
A. **That's correct.**
Q. And the Maxima product came out when?
A. **I'm not sure of that. I'm not sure. I think I said '93, '94. Somewhere in that range.**
Q. So when you're talking in your presentation about a 20-year proven record of performance, you're not referring to plastic floorings that don't clasp onto the support beams. Would that be fair? That was a new

Page 65

product.
A. **Rephrase the question. Or tell me the question again.**
Q. Double L did not have a 20-year proven record of performance with plastic flooring that clasped onto the support beam.
A. **That would be correct.**
Q. And the studies, the dozens of university studies that are referred to in your letter that is on the back page of Exhibit No. 1, none of those studies relate to flooring that clasps onto the support beam. Is that fair?
MR. LULIC: You mean specifically? Is that --
BY MR. CROSS:
Q. Specifically.
MR. LULIC: Because --
BY MR. CROSS:
Q. Okay. Specifically.
MR. LULIC: There wouldn't be any difference in heat loss.
THE WITNESS: It was the same materials. It was the same -- the Filter-Eeze --
BY MR. CROSS:
Q. But none of those studies involved product

Page 66

that clasped onto the support beam.
A. Yes.
Q. Would it be fair to say, then, that -- well, strike that. Are you aware of any studies that were performed relative to product that clasps onto the support beam as far as its durability or life expectancy? Do you know of any studies that were done for that?
A. **No. I'm not aware.**
Q. And just so I have it, Mr. Borcherding, and I realize that this is going to test your memory somewhat, but can you remember the names of the BCM products that pre-dated the Maxima flooring? If you could just remember as best you can what those names were.
MR. LULIC: He's given you a couple already.
MR. CROSS: Yes, I think you did mention one that was a bunch of letters and numbers.
THE WITNESS: They had a grower floor, they had a nursery floor, they would have L-2400, L-2430, they would have 4600. There was maybe 20 different product lines, or 10 different -- I don't know. I can't remember.
BY MR. CROSS:

Page 67

Q. So these didn't have kind of trade names like Maxima or something like that?
A. **Trade names were pretty much Filter-Eeze was the trade name, the overall. The overall blanket of all the products came under was Filter-Eeze.**
Q. But just so I'm understanding, Maxima is a Filter-Eeze. It's one of the Filter-Eeze overall kind of names, right?
A. **That's the way I interpret it.**
Q. Did Maxima replace these other lines or were they sold simultaneously?
A. **They were still sold simultaneously.**
Q. In other words, the older models or versions were also offered.
A. **Uh-huh.**
Q. And since we're on the topic, what was the design difference, if you know, between Maxima I and Maxima II?
A. **I know that it was an improvement that BCM designed into it. Do I -- no, I do not.**
Q. That's fine. And what is the difference again, if you know, between the Maxima I or II and the Excelerator?
A. **It's an issue of support beams I think. You know, it's an improvement of that. But I really don't**


MARTHA M. RIVARD
612-431-1252 * 800-844-6420

-- it's less support beams on Excelerator. It's a bigger piece.
Q. Just for the record, I think Excelerator is E-x-c-e-l-e-r-a-t-o-r. Is that right?
MR. LULIC: I think so.
BY MR. CROSS:
Q. Mr. Borcherding, what span was required for the Maxima flooring for the support beams?
A. One foot.
Q. And isn't it true that the Excelerator would allow two feet or --
A. Two feet.
Q. So you'd need less --
A. Right.
Q. -- beams. Do you know whether or not the Excelerator product clasps onto the support beam?
A. Yes.
Q. And do you know whether or not, subsequent to 1994, BCM ever advised you that steel support beams are not to be used with its Maxima flooring?
MR. LULIC: I'll object to the form of the question.
THE WITNESS: Please repeat it.
BY MR. CROSS:
Q. Have you ever been advised by BCM, after



1994, that steel beams are not to be used with Maxima products?
MR. SOBALVARRO: Object to the form.
THE WITNESS: I don't -- I can't recall that. I don't know the answer to that question.
BY MR. CROSS:
Q. You've had some discussions with BCM --
A. I have.
Q. -- relative to the beams that are used to support Maxima flooring, correct?
A. Right.
Q. And the topic of whether or not steel should be used was one of the topics discussed, wasn't it?
MR. LULIC: This is after '94?
BY MR. CROSS:
Q. After '94.
A. Yes, I think.
Q. And do you remember what BCM told you about that topic?
MR. SOBALVARRO: Objection, vague.
THE WITNESS: That a steel -- you know, and I don't know the content of the whole conversation. I don't even know, but it may be advised that we can go to a fiberglass and do not recommend steel. It would be something like that. But there -- something like that.



Because galvanized steel would be used, or -- I don't know. I really don't know what the gist of the conversation was.
BY MR. CROSS:
Q. Who was that conversation with?
A. I don't recall.
Q. Do you recall whether it was with Mr. Hutchings?
A. It could have been. It could have been. It could have been with one of his associates, too.
Q. Could it have been with Mr. Orr?
A. That could have been.
Q. Do you recall when that conversation took place?
A. No.
Q. Do you recall whether it happened before or after this lawsuit was started?
A. I think it would have been after.
Q. Does Double L still sell BCM products?
A. Yes.
Q. BCM has since changed its name, correct?
A. Yes.
Q. It goes by -- what is it?
A. AFI, I think.
Q. Is Double L still the exclusive distributor



of BCM products in the United States?
A. No.
Q. When did that change?
A. Well, a few years ago the poultry flooring, we did not have exclusive on that. Three, four years ago, maybe. I don't --
Q. That's that Red Rooster product?
A. Yeah.
Q. Do you still have the exclusive distributorship for Filter-Eeze product for the hog industry in the United States?
A. I'm not sure of that.
Q. How many other facilities, if you know, had Maxima flooring installed in them in the United States prior to the Holden Farms nurseries?
A. I do not know how many had Filter-Eeze in them -- I mean, Maxima. I don't know.
Q. Had you had any kind of special meeting, gone up to Calgary, visited with BCM people relative to the introduction of Maxima into the United States?
A. I think we met with them at a trade show, or maybe Bailey Evans went up to see them. I know he went up to visit them. But I did not.
Q. Was there a special marketing effort done by Double L to promote Maxima when it began being available

for distribution in the United States?
A. Any special --
Q. Did you start running ads in the trade magazines or doing anything to get the word out that Maxima was now available?
A. **Uh-huh. We probably would have promoted the product, yes, I think.**
Q. Was there any discussion between you and BCM or -- well, between you and BCM relative to this clasping or locking of the Maxima flooring onto the support beams? Did you have any discussions about that at the time that Maxima was being introduced into the United States?
A. **I think it probably would have been covered in a meeting, yes.**
Q. If you know, why was that change made?
A. **To reduce the cost of the support beams.**
Q. How does it do that?
A. **By eliminating a beam. Compared to the way Filter-Eeze was -- you could eliminate support beams.**
Q. It required less beams --
A. **Right.**
Q. -- than the older models that did not interlock with the beams.
A. **Right, and there were -- yes.**



Q. Would it be fair to say that they're sturdier because they're locked into the beam, or is that not right? You tell me. Do you know what I'm saying? As opposed to just lying on top of something, if it's locked into the beams, does that make it sturdier or no?
A. **I'm not an engineer. I don't know that.**
Q. Do you recall whether or not you had any discussions with BCM about testing of the Maxima flooring, specifically related to the interlocking of the flooring with the beam?
A. **BCM had conducted their testing on the product and as a distributor, I was told that the product was ready to go to market and I took it to market.**
Q. Do you recall who you dealt with at BCM about the Maxima flooring and its introduction into the United States? Who was your principal contact at BCM on that subject?
A. **Warren Hutchinson, and I think there was a guy by the name Bob Slessor also up there that may have been.**
Q. Is that S-l-e-s-s-o-r?
A. **That could be.**
Q. You said Hutchinson. Are you referring to



Warren Hutchings?
A. **Yeah. I call him different names.**
Q. This one should be easy. I am showing you what has been marked as Exhibit No. 5. It was one of the contracts between Hog Slat and Holden Farms. Other than in the context of this litigation, had you seen these contracts at all?
A. **No.**
Q. No, right?
A. **No, I did not.**
Q. You weren't involved in their negotiation, you didn't review them, didn't see them at anytime prior to them being signed. Fair?
A. **That's fair.**
Q. That's all I wanted to know. Showing you what's marked Exhibit No. 6, it's a memorandum dated September 12, 1994 from a Sandy Landt, L-a-n-d-t, apparently your building department coordinator at the time to Warren Hutchings of BCM Manufacturing. You see that?
A. **Yes.**
Q. And Double L Group provided some type of news letter called a Hog Gazette; is that right?
A. **Yes.**
Q. Was that a quarterly or annual or whenever



you got around to it?
A. **Whenever we got around to it.**
Q. And who would you mail that out to?
A. **It was our show document. We took it to shows with us. It was primarily our main source of literature.**
Q. When you say "shows," Mr. Borcherding, obviously we're talking about the World Pork Expo in Des Moines that they have every year, right?
A. **Not this year.**
Q. Well, yeah. But in this time frame they had it every year.
A. **Yeah.**
Q. What other shows did you take it to?
A. **The major pork shows would be Minnesota, Iowa, maybe we've showed in South Dakota.**
Q. North Carolina?
A. **I think we had a show there a couple times, yes.**
Q. Where is Bailey Evans' office?
A. **In North Carolina.**
Q. What town?
A. **Fayetteville.**
Q. How far is -- Newton Grove? Is that where Hog Slat is from?

A. Yes.
Q. How far is that from Fayetteville?
A. **Thirty miles, 40 miles.**
Q. Do you know if Bailey Evans has any business relationship with Hog Slat?
A. **I have no knowledge of that.**
Q. How did you come about using a marketing consultant in Fayetteville, North Carolina?
A. **I attended the show and I needed sales help.**
Q. Is that in North Carolina?
A. Yes.
Q. When did you first begin to do business with Mr. Evans?
A. **I do not know the exact date. Probably six years ago maybe, seven years ago.**
Q. Do you know if this was an ad that was, in fact, run in your news letter?
A. **I think -- I do not know that for -- I think so. I -- it says right on the paper it was. '95 Hog Gazette.**
Q. There's an unrelated fax transmission that was mistakenly added to this exhibit. I intended it to be a separate exhibit, but the last page of Exhibit No. 6, Mr. Borcherding, is a fax from a Bob Slessor to Sandy at the Double L Group. Were you aware of any problems



with Maxima flooring relative to the weight of the pigs that were in the pens?
MR. LULIC: Object to the form of the question.
MR. SOBALVARRO: I'll join in the objection.
THE WITNESS: No, I'm not aware of it.
BY MR. CROSS:
Q. If you look at the ad on the right-hand side--
MR. SOBALVARRO: Which page are you looking at?
BY MR. CROSS:
Q. Bates LL 0865, the second page of Exhibit No. 6. It says on the third paragraph, "A major Canadian producer says, 'We have used Filter-Eeze for over 10 years and have put approximately 4,000 hogs a year through this farm and are just absolutely amazed at the feed conversion we get on this floor.'" You see that?
A. Yes.
Q. Did I accurately read that? I read what it says, right?
MR. LULIC: It says what it says.
BY MR. CROSS:



Q. It says what it says.
MR. LULIC: What's your question?
BY MR. CROSS:
Q. My question is, the 10 years of Filter-Eeze product he's referring to could not have been the Maxima flooring product, right?
A. **Right.**
MR. LULIC: What is it? Seven?
MR. CROSS: Exhibit No. 7.
BY MR. CROSS:
Q. Showing you what has been marked, Mr. Borcherding, as Exhibit No. 7, and on the second page of that exhibit, it has on the bottom right-hand corner June of 1996. You see that?
A. Yes.
Q. Do you know when this installation bulletin was sent to you?
A. **June of '96, I would guess. I'm not sure.**
Q. It refers to a report of Maxima nursery flooring buckling up or rise in a nursery barn installation in southeastern United States. You see that?
A. **Yes. No, I don't. I'm sorry, I don't.**
Q. I'm sorry. Turn to the first page, second paragraph.



A. **Okay.**
Q. Was this the first notice that you had of any kind of buckling problem for whatever reason related to Maxima flooring?
A. **I'm not sure on that question. I can't -- I don't know when the first case happened.**
MR. LULIC: In relation to this document?
MR. CROSS: Right. That's fair.
MR. LULIC: Do we know when this was sent out?
MR. CROSS: Well, I asked him. It's dated June 1996. I asked him if that --
MR. LULIC: So what?
MR. CROSS: Well, I asked him if that was when he got it and he said yes.
THE WITNESS: I don't know.
MR. LULIC: Why don't you say?
MR. SOBALVARRO: I thought he said yes and then "I don't know."
THE WITNESS: I didn't say it. I said--
MR. CROSS: He said he thought so. I mean, I'm not trying to hold him to it.
THE WITNESS: I just said I thought so.

I mean, June '96. I --
BY MR. CROSS:
Q. Your best recollection of when you began hearing problems from whatever source or whatever cause of buckling of Maxima flooring was when?
A. **Probably in this time frame.**
Q. Roughly in June of 1996?
A. **I do not know that.**
MR. SOBALVARRO: Could I ask one question?
MR. CROSS: Yes.
MR. SOBALVARRO: Do you know who provided the date on the second page of June 1996?
MR. LULIC: Your question is do you know who typed that?
THE WITNESS: No, I do not know that.
MR. SOBALVARRO: Okay.
BY MR. CROSS:
Q. Now, I'll summarize here, Mr. Borcherding, but this particular buckling incident apparently related to some heat difference between the time of installation and time of population of the barns. Is that accurate?
MR. LULIC: I don't think he has to interpret the document.
BY MR. CROSS:



Q. Well, okay. Where in the southeastern United States was this buckling problem occurring? Which farm?
A. **I do not know the farm.**
Q. It's obviously a customer of Double L, right?
MR. LULIC: I'll object to the form of the question.
THE WITNESS: I don't know.
MR. LULIC: What's obvious about it?
MR. CROSS: Well, they were the exclusive distributor of BCM products in the United States. So presumably, if it's in southeastern United States, it would be a product that went through Double L.
MR. LULIC: Well, it also is a product that was put in place before 1979.
MR. CROSS: Fifteen years it takes to install a nursery barn?
BY MR. CROSS:
Q. Do you know whose barn that was?
A. **No.**
Q. Beginning in 1996 did you begin hearing more and more reports of buckling?
A. **Uh-huh.**



Q. Is that a yes?
A. **Yes. I'm sorry.**
Q. Were they all related to the temperature expansion-related problems that is summarized in this installation bulletin?
MR. LULIC: Object to the foundation.
THE WITNESS: Repeat the question.
BY MR. CROSS:
Q. Do you know what the cause was of the buckling problems that you began receiving in 1996?
A. **No.**
Q. Did you do anything to attempt to determine what the cause was of these buckling problems?
A. **Yes.**
Q. What did you do?
A. **Talked to BCM and asked what -- and I think there would be -- what their recommendation was is temperature and stuff that could be causing this.**
Q. Did they make any recommendations as to how to correct the problem?
A. **In documents and cautions on installation, which you have in your documents here, some cautions about installation.**
Q. And did you pass this information along to the persons who had purchased Maxima flooring from



Double L?
A. **I do not know that question. I can't answer that question. I just can't answer that.**
Q. Do you recall at any time making an attempt to send out any general correspondence or document to all purchasers of Maxima flooring from Double L for any reason?
A. **Yes, we did, but I don't know the dates on when we sent that out. We did send out --**
Q. What was that correspondence or document?
A. **I do not know. I know there was something sent out. I do not know what was sent out.**
Q. The second page of Exhibit No. 7 talks about expansion joints. Have you ever heard the term expansion joint?
A. **Yes.**
Q. What is an expansion joint?
A. **Plastic will grow under -- in just expansion and contraction, and if the plastic grows too much, it will buckle and you need an expansion joint there.**
Q. So it's to allow stress?
A. **For movement of the flooring, yes.**
Q. Am I using the right term, stress? Is that a -- you may not know.
A. **I do not know.**

Page 84

Q. Do you know whether or not Double L made a recommendation to begin using expansion joints as a matter of course, when contractors are using Maxima flooring to include expansion joints as part of their planning? Did you ever make that recommendation?
MR. LULIC: Well, that's two questions.
THE WITNESS: First question.
BY MR. CROSS:
Q. Did you ever make the recommendation to contractors to use expansion joints?
**A. Yes.**
Q. When did that occur?
**A. I do not know the dates.**
Q. Did that solve the problem, the buckling problem?
MR. SOBALVARRO: Objection, vague.
THE WITNESS: For some, yes.
BY MR. CROSS:
Q. For some no, right?
**A. Yes.**
Q. Looking at the last page of Exhibit No. 4, dated November 1994 -- I'm sorry. Exhibit No. 7. See that last page?
**A. Yes.**
Q. Entitled "Some cautions about installation."

Page 85

**A. Uh-huh.**
Q. And the bottom left-hand corner has a date of November 1994?
**A. Yes.**
Q. Do you know, is that the date that you received this document?
**A. I don't know.**
Q. Do you know if this document was provided to purchasers of Maxima flooring by Double L?
**A. I do not know.**
Q. As I understand it, Mr. Borcherding, the process by which product would arrive at the farm site could vary. It could go through your warehouse facilities in Iowa, correct?
**A. Yes.**
Q. It could go directly to the contractor?
**A. Yes.**
Q. Or it could be shipped directly to the farm site.
**A. Yes.**
Q. And what determined which of those three variables would happen? Was there --
**A. It would go through whatever our distributor asked. I mean, we were -- whatever was asked, we did.**
Q. When you say "distributor," do you mean

Page 86

the--
**A. The distributor, builder, whoever was doing the site would ask that -- we followed whatever the purchase order trail would be.**
Q. And in the case of these facilities, do you know what that trail was? In other words, how did the product get to the nurseries from BCM?
**A. I think it was directly. I'm not a hundred percent sure.**
Q. Would it be fair to say in the case of direct shipments, would a purchase order be faxed from Double L up to BCM? Is that how you did it? How would you handle a shipment or order?
**A. I'm not sure what our procedures are, but that sounds --**
Q. You don't know?
**A. I do not know.**
Q. Would Ms. Zittergruen know that?
**A. Yes, she would know that answer.**
Q. All right. Do you know, for product that was shipped directly to the farm site, what warranty or installation information would accompany that product, if you know?
MR. SOBALVARRO: Objection, compound.
THE WITNESS: I do not know.

Page 87

BY MR. CROSS:
Q. Do you know if there was any installation information included with the Maxima flooring that was delivered to the plaintiff's farm sites?
**A. I do not know that.**
Q. Showing you what has been marked as Exhibit No. 8, Mr. Borcherding, what is that document?
**A. Double L Group Filter-Eeze sales.**
Q. Does this represent -- what does it represent? Maybe I should just ask you.
**A. It looks to me like the sales of Filter-Eeze.**
Q. During the year 1996?
**A. Right.**
Q. If you turn to the second page, those FE L3760, FE L3742, are those two of the older Filter-Eeze flooring products that we discussed previously?
**A. I can't -- where are you at?**
Q. On the second page of the exhibit.
**A. Yes.**
Q. Creep slat, what's a creep slat?
**A. It's for where the small pigs and the farrowing, when the mother has its little pigs, they go off to the side.**


MARTHA M. RIVARD
612-431-1252 * 800-844-6420

Q. Okay. On the third page, the reference to Excelerator, I take it those were just like test models or something like that? There's only three units that were sold. There was no price listed, so was that presumably still a prototype at that point?
A. **I'm not sure.**
Q. Showing you what has been marked, Mr. Borcherding, as Exhibit No. 9, these are a series of invoices that I will represent to you, I believe, represent the invoices relative to the plaintiffs' projects. You don't have to acknowledge that. That's my representation to you. I'm assuming that that's accurate. My only question is, do these appear to be invoices that were commonly used by Double L in this time frame?
MR. LULIC: Some of them have BCM Manufacturing, Limited on them.
MR. CROSS: Yes, I notice that.
MR. LULIC: So --
MR. CROSS: Well, I'll withdraw that question and start at the top.
BY MR. CROSS:
Q. What is the form that is LL 0804, the first page of Exhibit No. 9? Is that an invoice from Double L?



MR. LULIC: Do you know who generated this document?
THE WITNESS: I don't know. Bookkeeping did.
MR. LULIC: Your bookkeeping?
THE WITNESS: Yeah, we generated that, Double L Group.
BY MR. CROSS:
Q. And in this case, the product was sold to Hog Slat by Double L, right?
A. **Right.**
Q. And so would it be fair to say, Mr. Borcherding, that, regardless of whether the product was shipped directly to the farm site, that the chain of title, if you will, or the ownership of this product went -- BCM sold it to Double L, who sold it to Hog Slat, who installed it at the nurseries, correct?
A. **Yes.**
Q. In fact, the second page, what is that? It has a BCM logo at the top, but what is it?
A. **I'm not sure. I think it's for -- it's an invoice to BCM.**
Q. From BCM to Double L, right?
A. **Yes.**
Q. And then if you look, if you compare pages



one and two of Exhibit No. 9, you'll see that their date of order is the same, May 4, 1994, and the amount of product to be shipped, 10,250 of the Filter-Eeze Maxima flooring is the same. You see that?
A. **Yes.**
Q. So these two invoices kind of go together, right?
A. **It would seem that way.**
Q. And the BCM invoice shows that it's to be shipped to Holden Farms' site one, correct, the second page of this exhibit?
A. **Yes.**
Q. Who in your office was primarily responsible for handling or processing the invoices that would be Exhibit No. 9?
A. **Well, Linda would be the bookkeeper, and Jeanne would have been in the sales side of it.**
Q. And Linda is Linda who?
A. **Berns, B-e-r-n-s.**
Q. On the first page of your invoice, there is sales person, and then it's got BBZ?
A. **Uh-huh.**
Q. Who is that?
A. **Bailey Evans BBZ Marketing.**
Q. Oh, okay. So did he get a commission or



something? How did he get paid?
A. **He was on a commission.**
Q. Do you know, Mr. Borcherding, is there anything on the back side of your invoices that was not photocopied? I mean, I'll represent to you that these documents were produced in the order that I have them and I'm wondering, oftentimes you will find on invoices they have back pages. Do you know if your invoices have back pages?
A. **No, I don't know that.**
Q. As far as you know, relative to this sale, the invoice, the documentation from Double L to Hog Slat consisted of this invoice, the first page of Exhibit No. 9 for this particular sale. Would there be any other documentation from Double L to Hog Slat?
A. **I do not know that.**
Q. Who would know that?
A. **Someone in my company. Jeanne would probably know that or my bookkeeping would know that.**
MR. CROSS: Off the record.
(A brief recess took place at 12:45 p.m. Deposition convened at 1:00 p.m.)
BY MR. CROSS:
Q. Showing you, Mr. Borcherding, what's marked

Page 92

as Exhibit No. 10, it's a series of warranties and I'd just like you to start with the first one here, which is a five-year warranty. When was that warranty in effect, if you recall?
A. **I'm not sure, but I think it was the original warranty Filter-Eeze. I'm not sure.**
MR. LULIC: A better question might be -- or a question also might be where.
BY MR. CROSS:
Q. Where?
MR. LULIC: Geographically.
BY MR. CROSS:
Q. Okay. Where, geographically, was this warranty given for?
A. **Canada.**
Q. This was the warranty BCM used for its Canada.
A. **Yes.**
Q. The next page is another warranty, it's also a five-year warranty. Was that a warranty that was used in the United States?
MR. LULIC: I think you have to -- in order for the question to go, you have to ask him when and where and what terms.
BY MR. CROSS:

Page 93

Q. When and where and what terms?
A. **I can't answer that question. I don't know.**
Q. Have you ever seen this document before?
A. **I wish there was a date on it. I don't recall it.**
MR. SOBALVARRO: Could I interrupt? These are not Bates stamped. Who produced these?
MR. CROSS: They were attached as Exhibit A to the answers to interrogatories provided by Double L.
MR. LULIC: We did.
MR. SOBALVARRO: The reason I ask is that the other Double L documents have been Bates stamped and these haven't. Mr. Dieseth and I had a question, at one point in time, you produced documents, Mr. Lulic produced documents that were not Bates stamped. Both Mr. Dieseth and I had a conversation with your former associate, Mr. Gottschalk, about producing Bates stamped documents and it looks like some have been and some haven't; is that correct?
MR. CROSS: I believe, and again, I don't know for sure, but I think that the documents that were produced were not Bates stamped, my recollection, and my office Bates stamped the documents for identification purposes. I believe that those Double L

Page 94

identifications come from my office. I'm not sure of that a hundred percent, and I would suspect that because these were attached as exhibits to the answers to interrogatories instead of part of the document production, these were missed.
MR. SOBALVARRO: Thank you.
BY MR. CROSS:
Q. Turning to the next page of Exhibit No. 10, these are a Filter-Eeze warranty with the Double L Group logo down at the bottom right-hand corner, correct?
A. **Yes.**
Q. Do you know when and under what terms this warranty was in effect?
A. **No.**
Q. Do you know if this was the original warranty that was available from Double L back in 1979-1980?
MR. LULIC: From Double L?
MR. CROSS: Well, it says Double L.
MR. LULIC: Well, I'll object to the form of the question.
MR. SOBALVARRO: I'll object as vague.
MR. CROSS: Well, who's it from?
MR. LULIC: The manufacturer. Read the first word.

Page 95

MR. CROSS: Okay. It doesn't say who the manufacturer is.
THE WITNESS: We don't manufacture hog confinement.
BY MR. CROSS:
Q. I understand that, but in any event, from whomever, when was this warranty used?
A. **I do not know the question -- I do not know the answer to the question.**
Q. This now says there's a warranty for 10 years from the date of purchase. See that first sentence?
A. **Yes.**
Q. Do you recall when the warranty was switched, if it ever was, from five years to 10 years?
MR. SOBALVARRO: Objection, vague.
THE WITNESS: I don't know.
BY MR. CROSS:
Q. Originally in 1979-1980, how long was the warranty?
MR. SOBALVARRO: For which product?
BY MR. CROSS:
Q. For Filter-Eeze products.
A. **I don't know that. I know that there's dates that it has, but I do not know them dates.**

Q. At some point, is the warranty that was offered by Double L, either through BCM or on its own or whatever --

MR. LULIC: I'm already objecting to the form of the question.

MR. CROSS: Well, okay.

MR. LULIC: They passed along the manufacturer's warranty.

BY MR. CROSS:

Q. You switched to a 10-year warranty. Now I'm going to get an objection, "whose warranty?"

MR. LULIC: He didn't switch. Okay?

THE WITNESS: We didn't warranty the product. That was BCM's warranty.

MR. LULIC: What you want to know is when did BCM start offering a 10-year warranty on this stuff?

MR. CROSS: Sure.

MR. LULIC: Do you recall, roughly?

THE WITNESS: No, I do not know that. And it was right after we started marketing it sometime back in the deal, because they were giving a five-year warranty in Canada. There were people in America and they went to a 10-year. But it was somewhere in the early beginning of the marketing program.



BY MR. CROSS:

Q. Was this Filter-Eeze warranty given to the customer?

A. We --

MR. LULIC: Let me just, you can return to your question if you want, but you should understand this. These guys don't sell to farmers.

MR. CROSS: I understand that.

MR. LULIC: Okay. Then why are you asking that question?

MR. CROSS: Because they have customers, they have Hog Slat.

BY MR. CROSS:

Q. Did you give it to Hog Slat? Did you ever give this warranty to Hog Slat?

A. **I don't know that.**

Q. Did you ever give the warranty to the ultimate user of the product?

A. **I don't know if -- in the marketing of the product, I don't know. I do not know if Hog Slat provided it or if we provided it or who we provided it to. Did it get to the ultimate customer? Did every customer get -- I do not know that.**

Q. Are you aware of this warranty ever having been received by Holden Farms or any of the plaintiffs



in this lawsuit?

A. **I'm not aware of that.**

Q. Are you aware of whether this warranty was ever provided to Hog Slat relative to the purchase of product that was installed at the plaintiffs' facilities?

A. **I'm not aware of that.**

Q. If you turn not to the next page, but the one after that, it is a letter dated March 1, 2000. You see that?

A. **Uh-huh.**

Q. Entitled "Dear Valued Customer"?

A. **Uh-huh.**

Q. Yes?

A. **Yes. I'm sorry.**

Q. That is your signature at the bottom of the page, correct?

A. **Yes.**

Q. And it was signed by both you and Mr. Hutchings?

A. **Yes.**

Q. Second paragraph says, "The hog industry has changed greatly over the years and with those changes come new problems. Isolated cases have been reported by producers that the steel supporting the flooring has



been corroding and causing the plastic flooring to buckle and break." See that?

A. **Yes.**

Q. "We have only recently become aware of these problems and have not previously experienced any of these problems."

With the exception of the plaintiffs' facilities, are you aware of any other producers reporting a problem similar that is described in this paragraph?

A. **Yes.**

Q. Who are those other producers?

A. **I do not know all of them. I do not know who they are.**

Q. Can you tell me the names of any of them?

A. **I'm not definite of the corporations, the names, the firms, all that.**

Q. With that caveat --

MR. LULIC: Do the best you can.

BY MR. CROSS:

Q. Do the best you can.

MR. LULIC: Don't say caveat to him. He doesn't know what that is.

THE WITNESS: I think there is Oak Pork, I think there is a customer called Oak Pork, and I

do not -- I do not know any more.
BY MR. CROSS:
Q. The only one you can identify at this time is Oak Pork?
A. There is more. There's more. That's the only one I can identify that I -- yes.
Q. Is Double L in litigation anywhere in the United States involving similar claims?
MR. LULIC: Do you know what "in litigation" means? Somebody is sued.
BY MR. CROSS:
Q. It means being sued.
A. No.
MR. LULIC: Has somebody sued you, served you with a summons and complaint?
THE WITNESS: Yes. I think Oak Pork is the one.
BY MR. CROSS:
Q. Is that in Iowa?
A. Yes.
Q. Anyone else?
A. No.
Q. Would it be --
A. I don't know. I don't say no. I do not know. I can't answer that. To say is that the only



one, I -- that's what I know.
Q. Do you -- are there others you just cannot recall their names? Is that fair?
A. Yes. That would be fair.
Q. How many other producers are there?
A. In litigation?
Q. No, that you cannot recall that have made complaints that you've described in the second paragraph of this letter.
MR. LULIC: Approximately how many facilities you're asking, right?
MR. CROSS: Yes.
THE WITNESS: Ten. I don't know.
BY MR. CROSS:
Q. What states are those facilities located in?
A. Well, I don't know. We would have Minnesota, we would have Iowa, maybe North Carolina, maybe Missouri. I don't know. I don't even think Missouri. No, I don't know. And I'm not even sure if Iowa and North Carolina.
Q. When did you first become aware of this problem?
MR. LULIC: The rusting issue?
BY MR. CROSS:
Q. Steel supporting the flooring has been



corroding and causing the plastic flooring to buckle and break.
A. I'm going to guess '98, '97, but we did not -- no, that would probably be somewhere in that area that there must have been a complaint. Could have been -- I don't know. I can't pin a date on it.
Q. Who first made the complaint?
A. I think Holden Farms is where we really probably --
Q. You also state that, "We, along with BCM, have been studying these cases," and there appears a word that was not photocopied. I assume it's "do not know why this is happening." Is that -- see that?
A. Where are you?
Q. In the middle of the second paragraph.
A. Looks like there was something on it. I would assume that would be the word.
Q. Did you reach a determination as to why this is happening?
MR. LULIC: Object on foundation.
THE WITNESS: No.
BY MR. CROSS:
Q. What did you do to study these cases?
A. We had sent some people to the field to look at the problem. BCM had brought down people to go to



the field to look at the problem.
Q. Who did Double L send into the field to look at the problem?
A. Brian Eilers.
Q. Who else?
A. Mike Sullivan, myself.
Q. Anyone else?
A. Not that I know of.
Q. Who from BCM was sent --
A. Oh, no. Dick Stricker from our company.
Q. How do you spell Mr. Stricker's last name?
A. S-t-r-i-c-k-e-r, I think. Something like that.
Q. Are these persons all still employed by Double L?
A. Mike Sullivan is not.
Q. Do you know where Mr. Sullivan currently works or resides?
A. Dubuque, and he works for A-1 McDonald Plumbing.
Q. Which facilities did you personally observe?
A. The one that I saw, I think, was in -- I think it was in Seeboard Farms in, I'm going to guess, Oklahoma. And it was not our flooring that was at stake, it was the competition's flooring and they were

having a buckling problem, and they were asking me if we had experienced anything like it and I was looking at the competition's flooring that was buckling.
Q. Who was the competition?
A. Southwest.
Q. And they asked you if you had been experiencing anything --
A. I think I was in the buildings and I started looking at the flooring. I was in on ventilation or something -- I was in on ventilation, and then they were asking me, I was looking at their flooring.
Q. What did you tell them?
A. I don't recall what I said. I looked at it. I was looking for myself and then they asked if we were having problems that can be an expansion issue also.
Q. When they asked you if you were having problems, what did you say?
A. I don't recall what my exact words were.
Q. What was the substance of what you told them?
A. We had -- we were experiencing similar problems.
Q. Who from BCM was sent out into the field to look at the problem?
A. Bob Slessor, Warren Hutchings, and they had



an employee by the name of Joe, but I don't know his last name.
Q. Did you personally --
A. And also Bailey Evans also experienced a couple calls.
Q. Bailey Evans is not an employee of Double L.
A. No.
Q. He never has been, right?
A. No.
Q. Have you, Mr. Borcherding, since you became aware of this problem, personally been on site at any of the plaintiffs' facilities?
A. Yes.
Q. Which ones?
A. Holden Farms.
Q. But do you know which nursery?
MR. LULIC: By location or --
MR. CROSS: By any way he can identify it.
THE WITNESS: I was there with George and was looking at ventilation, but I was not on the site to look at flooring.
BY MR. CROSS:
Q. You were there for another issue?
A. Yes.



Q. When was that?
A. A year ago.
Q. Did you talk with Mr. Tilstra is it or George Kasper --
A. George Kasper.
Q. -- Mr. Kasper about this lawsuit at all?
A. No.
Q. Did you talk about the flooring problems at all?
A. No.
Q. Do you remember which facility that was?
A. No.
Q. Is that the only time you've been at one of the facilities which is the subject of this lawsuit, any of the ten nurseries?
A. No.
Q. When else have you been out there?
A. I mean, no. Yes. I'm sorry.
Q. That's okay.
A. Yeah.
Q. The only time you've been out there is this one time that you were out on ventilation.
A. That's what I can remember.
Q. Turning back to your letter of March 1, 2000, you asked a number of questions in the second



paragraph. The first one was, "Have production facilities changed, i.e., flushing systems to pull plug systems." You see that?
A. Yes.
Q. Why did you think that that might have some bearing on this issue?
A. I think it was between BCM and stuff is that when buildings have confinement, manure in there, it could do -- we were seeing a more continued problem, and that was just an observation of the manure system that is in the barn, because it was being corrosive.
Q. In other words, you recognize that manure, when it's stored underneath the slats, can present a corrosive environment?
A. Yes.
Q. And the flushing system, just so we're clear, that's a system where you flush out the manure on a much more regular basis.
A. Correct.
Q. And so one of the questions was, has the presence of manure increased the corrosion in the facility?
A. Uh-huh.
Q. Yes?
A. Yes.

Q. The next question you had was, "Are there environmental changes occurring in these barns?" What type of environmental changes were you thinking of?
A. **The amount of humidity they run in their barns.**
Q. Anything else?
A. **The feed ingredients that they put in their feeds, the chemicals they use for cleaning.**
Q. Did you ever obtain from the Holdens any information about these various issues?
A. **No.**
Q. The next concern you had was "Do bigger room sizes have an effect?" I assume is that just the cumulative combination of these environmental changes you're talking about in the manure storage, and then if it's bigger, it's obviously going to be possibly a bigger concern, or is there something inherent about a bigger room that might cause a problem?
A. **It could be air distribution, it could be bigger. Sometimes it has more complexity to it and it depends on how it is managed. When it is bigger, it's harder to manage.**
Q. The next question you asked is, "Has the steel itself changed?" What was your thought there as to what -- what was your question?



A. **I do not understand steel, but I do know that there are different compositions of steel: high carbon, low carbon, mild, cold rolled, but that is not -- I mean, that is something I do not understand.**
Q. And the next question you had is, "What kind of steel is used? Painted, galvanized, uncoated, stainless." I think we talked about this earlier in your deposition.
A. **Yes.**
Q. The term you have here is uncoated. I don't know that we talked about the term uncoated. What is uncoated steel?
A. **It would be, there's no preparation to it. It's just put in as steel.**
Q. Did you ever -- when the problems with the plaintiffs' barns came up, Mr. Borcherding, did you ever learn what kind of steel was used?
A. **I think it was cold steel, mild steel, and it was painted steel.**
Q. Was it galvanized?
A. **No.**
Q. Was it stainless steel?
A. **No.**
Q. And again, you did not supply that steel?
A. **Did not supply the steel. I don't know the carbon content of the steel. I do not know the painting process that was on the steel.**



Q. The next question you have is, "Are expansion and contraction a concern?" What is the problem that you're concerned with on that?
A. **There are people that build a building and they have it in a cold -- it's cold. They enclose the structure, they heat the building up and there's expansion there. It also can be that -- that would be my major concern is temperature of the expansion.**
Q. Would this be kind of similar to the issue that was raised in the southeastern United States, the construction of that nursery?
A. **Right. Well, I think in that instance, it was nothing to do with the construction. It was due to they cleaned a room out at 60 degrees, they turned the heaters on to dry the room out, and all of a sudden the heat got up to 110 degrees and it pushed the thing, and it was a -- that was a management thing.**
Q. The next one is, "Are nursery/grower rooms with larger pigs a problem?" What did you mean by that?
A. **If the weight loads go past the supporting structures, if a person -- and there are some farmers that do lie also. They would say they have 40-pound pigs and have 100 pound pigs. That can be a problem also. Because the products were designed for certain weight loads.**



Q. "Does an acidified diet stimulate corrosion?"
A. **There are, and that is a question with salts, with different minerals that are put in the diet. There are copper some people feed their pigs, and some people, I think, were even using citric acid in the water diets to combat scours, and if you were to do that, that would speed up all of your -- and then the ventilation rate with a combination of all of that stuff could create a lot of monsters.**
MR. CROSS: If you don't mind, why don't we take a break.
(A brief recess took place.)
BY MR. CROSS:
Q. In your March 1, 2000 letter to your valued customers, Mr. Borcherding, you inform them of an upgrade program to be jointly subsidized by BCM and Double L.
A. **Yes.**
Q. How many customers participated in that upgraded program, if any?
A. **I think there has been maybe -- I do not -- I'm just going to guess 24. A number between one and**