50, and I pick 24.
MR. CROSS: Off the record.
(Brief off-record discussion.)
BY MR. CROSS:
Q. Now, the upgrade program would then offer a limited five-year warranty, correct?
A. Yes.
Q. Was there a decision made at some point between 1994 when you had the presentation with Holdens and this letter of March 1, 2000 to reduce the warranty from 10 years to five years?
MR. LULIC: Object to the form of the question. Your reference is to an upgrade program and you use the words "reduce the warranty." From what I understand, there wasn't an upgrade program before that they had a 10-year warranty on.
BY MR. CROSS:
Q. Okay. Fine. On new Filter-Eeze products in 2000, what warranty is available?
A. Five.
Q. As to that new Filter-Eeze product, there was originally a 10-year -- or there was a 10-year warranty in effect in 1994, correct?
A. Yes.
Q. When did the warranty go from 10 years to



five years?
A. '96, '97. Somewhere in that range.
Q. Was that a decision made by Double L or was it a decision made by BCM?
A. BCM.
Q. Do you know why they did that?
A. They're the manufacturer. I'm the distributor. I do not know why, but that's what they did.
Q. Did you have any discussions with them relative to changing the warranty from a 10-year to a five-year warranty on new Filter-Eeze product?
A. Did I?
Q. Did you ever talk with anyone at BCM about that?
A. Yes, I had to. I had to. Someplace I had to.
Q. What do you recall of those discussions?
A. Just that if -- just that they were changing the warranty.
Q. Nothing beyond that?
A. Nothing beyond that.
Q. Now, attached to your March 1st letter is a limited warranty and then beyond that is a form that would be presumably filled out by the customer.



MR. LULIC: This is the last page now?
BY MR. CROSS:
Q. Last page of the exhibit.
A. Yes, I see the form.
Q. Prior to this replacement upgrade program, did Double L obtain any kind of form for acknowledgement from the ultimate purchaser of the Filter-Eeze products?
A. No.
Q. Obvious -- well, you did understand, Mr. Borcherding, that the product you would sell would be used by your customer in the installation of a facility for another party in most situations, correct?
A. Yes.
Q. In other words, your customers were people like Hog Slat and builders of facilities.
A. Yes.
Q. You did not have direct contracts or sales to the ultimate owner of that facility.
A. That is correct.
Q. And just so we're clear, you are not aware of any of the warranties that we have here in Exhibit No. 10 being given to any of the plaintiffs in this case, correct?
A. Best of my knowledge.
Q. And to the best of your knowledge, are you



aware of whether any of these warranties were given to Hog Slat?
A. I can't answer that but to the best of my knowledge -- I do not know if they have these warranties.
Q. You were not aware of Double L having provided either the warranties that are set forth in Exhibit No. 10 or something of similar nature, are you?
MR. LULIC: Object to the form of the question.
THE WITNESS: I don't understand the question.
BY MR. CROSS:
Q. Are you aware of any warranty, written warranty being given to Hog Slat by Double L?
A. I'm not aware of any written warranty that was given to them.
Q. Showing you what has been marked as Exhibit No. 11, Mr. Borcherding, this is another series of warranty documents. I'm interested in the third page of the exhibit which is a document entitled "Filter-Eeze Warranty Specifications April 1, 1986."
A. Okay.
Q. What was this document used for?
A. I'm not for sure, but I think this was just

Page 116

a draft of something that we were thinking about.
Q. Okay. To your knowledge, this was never actually implemented?
A. **No, I don't think it ever was. I think it was a draft.**
Q. The --
A. **I don't know that.**
Q. That's fine. There's a statement in a number of these warranties that, "Our warranty depends on installation being properly carried out in accordance with our instructions." That's in this draft here of April 1, 1986 in the first paragraph?
A. **Uh-huh.**
Q. Do you see that?
A. **Uh-huh.**
Q. Yes?
A. **Yes. I'm sorry.**
Q. And I think that words to that effect appear in most of the other warranties, if not all of them. Would that be fair?
MR. LULIC: Well, they say what they say.
BY MR. CROSS:
Q. Yes, they say what they say. What I'm getting at, Mr. Borcherding, is, are you aware of the

Page 117

installation of any of the plaintiffs' facilities having been performed in a way that was not in accordance with your instructions?
MR. LULIC: Object to the form of the question.
THE WITNESS: It wasn't our instructions. I mean, we passed on -- no, give me the question again.
BY MR. CROSS:
Q. Are you aware of any of the plaintiffs' facilities having been constructed, or the flooring installed -- let's take the flooring installed in a way that was contrary to your instructions?
MR. LULIC: Object to the form of the question. He already said he doesn't give instructions.
MR. CROSS: He just said in here he did.
MR. LULIC: That was --
MR. CROSS: Well, he did. What's wrong with that? He said it in his documents.
MR. LULIC: Keep going. It's a draft of something that was never issued to anybody.
MR. CROSS: We'll use something that was not a draft.
MR. LULIC: But it's not Double L.

Page 118

It's manufacturer's instructions.
MR. CROSS: We'll get to BCM in a minute. First we'll talk about Double L.
MR. LULIC: "First we'll talk about Double L" what?
BY MR. CROSS:
Q. Are you aware of plaintiffs' facilities having the flooring installed in a way which was contrary to any instructions you gave?
MR. LULIC: I object to the form of the question.
THE WITNESS: I did not give instructions.
BY MR. CROSS:
Q. So the answer would be no.
MR. LULIC: No, that is not -- no. That's not right.
MR. CROSS: Well, it wouldn't be yes if he didn't give it, would it?
BY MR. CROSS:
Q. Is that right?
MR. LULIC: No, object to the form of the question. He's answered the question.
BY MR. CROSS:
Q. You gave no instructions for the

Page 119

installation of this flooring.
A. **I don't know what was said. No. We had instructions in our -- maybe they were in the Hog Gazette or if they requested it, I provided it. But I did not have -- no.**
Q. Did BCM give instructions on how to properly install the flooring?
A. **We passed that on to -- we followed their lead.**
Q. So the answer is yes?
MR. SOBALVARRO: That's not what he said.
BY MR. CROSS:
Q. Did BCM give instructions for the installation of the flooring?
A. **Yes.**
Q. Are you aware of whether any of plaintiffs' barns were installed, the flooring was installed contrary to the instructions given by BCM?
MR. SOBALVARRO: Objection, calls for speculation.
MR. LULIC: Do you understand the question, Norm?
THE WITNESS: Not really.
MR. LULIC: I think what he's asking is

Page 120

are you aware of any improper installation in the Holden Farms contrary to the instructions given by BCM.

MR. SOBALVARRO: Same objection to Mr. Lulic rephrasing the question.

BY MR. CROSS:

Q. I'll take an answer to that question.

A. We had sent people up to look at it and there was straps that were bowed a little bit, and the flooring wasn't sitting on it, but it was a quarter-inch strap and it was -- but I don't remember the report. I wasn't the one that saw that installation.

Q. Who was that?

A. Mike Sullivan and Brian Eilers.

Q. And this is something -- what you're alluding to, or what you're referring to is improper installation in some fashion?

A. Sometimes, and it could be put down, and the other question is -- or misuse of the product that was designed for feed carts going down. I don't -- there could be other things that were even being done.

Q. In this draft of April 1, 1986, Mr. Borcherding, at the bottom there is a reference to a warranty registration card on the first page of -- the previous page.

MR. DIESETH: What page?

Page 121

MR. CROSS: LL 0825.

MR. LULIC: What's the question?

BY MR. CROSS:

Q. Do you see the warranty registration reference?

A. Yes, I see it.

Q. That was never implemented?

A. Never implemented, no.

Q. Immediately above that, it says, "Any questions regarding installation or warranty should be directed to Double L, Garnavillo, Iowa."

A. Right. And our office burned down. Is that what you're getting at?

Q. No, I'm not.

MR. LULIC: Why are you asking him questions -- this was never given to anybody. Why are you asking him questions about this?

MR. CROSS: I understand that. None of this was given to anybody. You want to start asking the questions?

MR. LULIC: Well, we might get the hell out of here --

MR. CROSS: Well, you might. And maybe I will, maybe I won't.

MR. LULIC: -- instead of wasting time.

Page 122

MR. CROSS: I don't think I'm wasting time. I think you're wasting time by the rolling of your eyes. Let me ask the questions and we'll get done with this.

MR. LULIC: Well, that's the problem.

BY MR. CROSS:

Q. Did you instruct your customers to contact Double L regarding installation of Filter-Eeze flooring?

A. I'm not aware of such a person calling up people and telling them, "If you have a problem with your installation, please call me." I did not. I don't--

Q. So if a customer had a problem with Filter-Eeze --

A. They would call Double L and ask, "We are having a problem installing this," and I would dispatch somebody out there. But I did not personally call and ask that question.

Q. Turning to LL 0827, two pages, it's a fax dated June 26, 1989 to you from Pierre A. Moreau.

A. Uh-huh.

Q. Who is Pierre Moreau?

A. He was the original founder of BCM Manufacturing.

Q. At the bottom of the fax page under item

Page 123

three, it says that, "We will apply five-year warranty against breakage beginning August 1 of this year on all our products and a 10-year warranty February 1, 1990." You see that?

A. Yes, I do.

Q. Is that the time frame in which the warranty was switched from a five-year to a 10-year warranty?

A. That's what it appears.

Q. The next page is LL 0828, which is a photocopy of an envelope. Why did you preserve the envelope?

A. I have no idea.

Q. Well, you produced it. It wasn't me.

A. I think we collect them.

Q. Didn't you have a discussion with BCM about whether or not a five or 10-year warranty was in effect?

A. No, no.

Q. Exhibit No. 12, "Filter-Eeze and Schonlau Cast Iron Warranty." What was that warranty for?

A. Two products made up a warranty of a product. It was the cast iron hog flooring and Filter-Eeze, and it was for sow flooring for a farrowing crate and these two products made up a product. So it was not that -- it was in -- it was a farrowing floor. We used the two products, we put them together.

Page 124

Q. Now, we've looked, Mr. Borcherding, at Exhibits No. 10, 11 and 12 which are a series of warranties. Did you use these warranties and give them to customers?

A. **If they asked, I'm sure that -- if they asked for the warranty we would send them the warranty. I'm not aware of what that procedure was.**

Q. It was not the practice of Double L to include a warranty with every purchase of a product?

A. **No.**

Q. It was not the practice of Double L to provide a warranty unless requested by the customer?

A. **Because the warranties went into the builders, or whoever our distributors were that sold them and upon their request, a warranty would be made available to them.**

Q. When you say the distributors who sold them, Who are you referring to?

A. **The distributors and builders that were -- we did not sell -- in this time period, we did not sell the product directly to the end user.**

Q. Right. But as to companies such as Hog Slat that were purchasing product from Double L, they did not receive these warranties unless requested; is that correct?

Page 125

MR. LULIC: Object, foundation.

THE WITNESS: I don't know.

BY MR. CROSS:

Q. Who would know?

A. **My staff would know, people on my staff would know. Jeannie would know.**

Q. There was no policy in effect at Double L to send out warranties when you had a new customer; is that fair?

MR. LULIC: Object to the form of the question.

THE WITNESS: I don't know the answer to that. That warranty would be provided upon request.

BY MR. CROSS:

Q. Showing you what has been marked as Exhibit No. 13, it's a letter dated June 12, 1995 to Wendell Burge and Bailey Evans. Mr. Evans is using Double L Group letterhead. Why was that?

A. **He was in charge of the marketing of the Filter-Eeze. It was under BBZ Marketing. We covered this.**

Q. Well, you indicated that he was not an employee of Double L Group, right?

A. **But he sold Double L product. He represented Double L in the field. He represented us.**

Page 126

Q. And you provided him with letterhead for his use in that context?

A. Yes.

Q. Exhibit No. 14 is a fax transmission from Jeanne to Mr. Burge dated March 21, 1996. Is Ms. Zittergruen the person primarily responsible for handling the pricing of sales of Filter-Eeze products to Hog Slat?

A. **She's sales coordinator. She works in the office. And at this time, she was under Bailey -- BBZ's direction as he was the one representing. I hired Bailey, Bailey took care of the marketing. He used my staff and my people.**

Q. And you were not directly involved with pricing. It was something others in your office handed?

A. **They would submit me an idea and I would approve it and say, "Here's what we're going to do," and then we would go with that.**

Q. Showing you what has been marked Exhibit No. 15, again, that's a letter from April 3 of 1996 to Wendell Burge from Jeanne Zittergruen referencing some pricing information. Again, you were not directly involved in the negotiations between Mr. Burge and your company relative to the pricing.

A. **That is correct.**

Page 127

Q. Showing you what has been marked Exhibit No. 16, the front page announces ECM's name change to Agra Flooring International, Limited, or AFI. The next page is a minutes of meeting dated November 26, 1998. Do you recall this meeting?

A. **I do not recall the meeting.**

Q. You are listed as being present at this meeting, correct?

A. **Yes.**

Q. Do you know who prepared these minutes?

A. **No.**

Q. This is a -- there's a discussion of buckling of flooring. Do you keep a calendar, Mr. Borcherding, of any kind?

A. **Yes.**

Q. How specific is that calendar?

A. **It's pretty loose. It changes a lot. I travel a lot. I have different entities in my company and when I put people -- that would be --**

Q. Do you have offices in Dubuque, Iowa?

A. **At that time, after our fire, our office was moved to Peosta, Iowa and then we were in the deal of building a new complex in Dyersville, Iowa. So we had, from Garnavillo, we went to Monona, from Monona we went to Peosta in temporary deals and then from there we went**

to Dyersville, Iowa.
Q. And so this sales meeting lists Dubuque, Iowa, it's Peosta.
A. It probably was, or it could have been at the Hoffman House in Dubuque, Iowa. I don't recall the meeting. Was it the one --
MR. LULIC: Don't ask any questions.
BY MR. CROSS:
Q. But you have no reason, Mr. Borcherding, to believe that this document is misdated, do you? In other words, that there was a meeting in November?
A. Yes, there was.
Q. And obviously, the reason for the meeting was -- well, again, the reason for the meeting was buckling of flooring, correct?
A. No.
Q. What was the reason?
A. I think it was an agenda. It was an agenda to have a meeting, or these were things that were talked about at a meeting, but it was not the reason for the meeting.
Q. But at least as of November 26, 1998, you were aware of this problem.
A. Yes.
Q. And one of the components that you talked



about in reaching a resolution of this problem would be to offer fiberglass beams to any affected customers at a special price, correct?
A. Yes.
Q. Was there any discussion as to why only fiberglass beams would be offered?
A. I don't -- I think we thought that that was the -- I think that was -- it was an agreement I think we both talked about.
Q. There was an agreement between who?
A. No. Agreement, I don't know -- or -- I do not know the answer to that question.
Q. If you turn, Mr. Borcherding, to the next page, it's a fax cover sheet from an R. H. Slessor at BCM to all BCM dealers, customers and suppliers. Do you recall receiving this fax dated January 13, 1999?
A. I don't recall. I don't recall.
Q. Well, what I'm more interested in is the next page. And there's a technical bulletin dated January 13, 1999.
A. Uh-huh.
Q. It deals with the effects of acidified weanling feeds on galvanized flooring?
A. Uh-huh.
Q. Yes?



A. Yes. I'm sorry.
Q. Do you recall receiving this article or bulletin?
A. Yes. No, I said before, no, I don't remember this. I do know that this was one thing that we had talked about on the phone, but I did not see the bulletin, but we had talked about this.
Q. If you know, what was Mr. Slessor's position with BCM?
A. He was their marketing manager or sales manager, I think, at that time.
Q. Did you or anyone at Double L do any further investigation into acidified feeds and its effect on flooring?
A. I think we started recommending fiberglass beams at that point. Somewhere in this area. Or we were -- yeah.
Q. The next page, there's a fax from Jeanne Zittergruen to Warren Hutchings dated November 24, 1999. At the bottom Ms. Zittergruen writes, "Enclosed is a copy of what Nic Orr e-mailed Dan Palmer on the steel support beams." Do you see that?
A. Yes, I do.
Q. Do you know what she's referring to?
A. No, I don't.



Q. You apparently had a meeting with your distributors in December of 1999. Is that something you did on an annual basis?
A. I didn't personally, but I do think somebody did.
Q. Does Double L typically have Distributor meetings?
A. We call on our distributors.
Q. But not -- you don't bring all of your distributors together?
A. No.
Q. The next sentence says, "Otherwise, you need to send me a fax on how you, as a manufacturer, want steel support beam issue handled. Right now, we will tell them no warranty on product laid down with steel supports."
A. I think this is referring to the --
MR. LULIC: Wait for a question.
BY MR. CROSS:
Q. You see that?
A. Yeah.
Q. Do you know what that's referring to?
A. No, I don't.
Q. Do you know whether or not BCM, from this point forward, excludes warranty of its Filter-Eeze

products that are laid down with steel supports?
A. I don't know that.
Q. If a customer were to call you tomorrow and say, "I want to buy 5,000 units of Filter-Eeze and I'm going to put them on steel supports," would you tell him that he doesn't have a warranty?
MR. SOBALVARRO: Objection, vague.
THE WITNESS: That would be -- I would tell him that we do not recommend him put it on steel, and if it was a warranty claim there and he was saying, "I'm going to put it down and I'm going to put it on stainless steel," I'd say, "Yeah, you have a warranty." But that would be his -- BCM or something, I would make sure they would say, "Would we warranty that?" But I cannot make a decision on what steel they put it on.
BY MR. CROSS:
Q. Why would you recommend that they not use steel?
MR. SOBALVARRO: Objection, vague.
THE WITNESS: Pardon?
BY MR. CROSS:
Q. Why would you recommend that they not use steel?
MR. SOBALVARRO: Same objection.
THE WITNESS: We would recommend



fiberglass.
BY MR. CROSS:
Q. Why?
A. Because that is what BCM has told us to recommend.
Q. Other than BCM telling you what to recommend, you have no independent --
A. I'm not -- I'm a distributor of the product.
Q. The next page, Mr. Borcherding, his a facsimile to Bob Slessor and Warren Hutchings from Bailey Evans of the BBZ Marketing Group, Inc., dated June 27, 1998. Now, Mr. Evans refers to a number of problems with the Maxima I product in this memorandum, including an Ricky Norris farm. You see that, the second sentence?
A. Yes, I do.
Q. What was the problem with the Ricky Norris farm?
A. I'm not familiar with this.
Q. With the Ricky Norris farm or this memorandum?
A. I'm not familiar with this memorandum on that farm.
Q. Have you ever heard of the name Ricky Norris before today?



A. I think I have. I just can't remember.
Q. Do you recall what the nature of his problem was?
A. No. I think it would be -- no.
Q. Marvin and Lucy Evans. Do you know what their problem was?
A. I'm just reading through it.
Q. Sure. Go ahead.
A. I think it says here in the memo what the problem was.
Q. Well, I'm saying, do you have an independent recollection?
A. No.
Q. Before today, have you heard the names Marvin and Lucy Evans?
A. No, I can't recall. I just can't recall.
Q. Do you know where Marvin and Lucy Evans reside or --
A. No.
Q. Do you know where Ricky Norris resides?
A. No.
Q. Marty Blizzard?
A. I would think it would probably be the south and I don't know why I would say that.
MR. LULIC: Then why would you say it?



THE WITNESS: That's stupid, I know. Yeah. You want me to take a guess, I'll guess.
BY MR. CROSS:
Q. No, that's fine. You don't have to guess. The Marty Blizzard farm, have you ever heard of Marty Blizzard?
A. No.
Q. You don't know what the nature of his problem was.
A. No.
Q. You don't know where his farm is.
A. No.
Q. Midwest Livestock apparently notified, at least Mr. Evans, that one of their customers was having the same problem. Who was Midwest Livestock?
A. They're out of Beatrice, Nebraska and they're a builder.
Q. Do you know which one of their customers was having the same problem?
A. No.
Q. Do you know what the nature of that problem was?
A. No.
Q. Do you know -- well, the second paragraph, Mr. Evans refers to being inundated with calls from

Page 136

distributors and customers "informing us of this problem." You see that?
A. **No, I don't see that.**
Q. Okay. In the second full paragraph, second sentence.
A. **Okay, I see it.**
Q. Did you keep a log of all of the persons --
A. **No.**
Q. Do you know if anyone at Double L kept a log of people with complaints about this problem?
A. **I think -- yes.**
Q. Who would have kept such a log?
A. **Probably Jeanne and Bailey.**
Q. It also indicates that one of your best customers, Holden Farms, has two nurseries with the problem. Do you know which of the two Holden Farm nurseries are being referred to?
A. **No.**
Q. Mr. Evans also refers to a farm in Kansas and one farm in Illinois. "Advises us that they are having the same problem." Do you know which farms those are?
A. **No.**
Q. At the bottom of Mr. Evans' memoranda, he states, "Initially, we thought it might be occurring due

Page 137

to support beams deteriorating and expanding where the tabs lock over the supports. However, this theory has proven wrong. The support beams have been in excellent shape with no evidence of deterioration on most of the farms."
Do you recall identifying any source for the flooring buckling problem, other than the support beams?
A. **Go for the question one more time.**
Q. Was Double L ever able to identify any cause for the buckling problem, other than the support beams?
A. **I think we covered it before with the heat, the heat build-up in the building, expansion.**
Q. Was that a problem of a general nature in all of these farms that are reporting problems?
A. **I don't know that.**
Q. Exhibit No. 17 is a memorandum presumably from Daniel Palmer to Jeanne Zittergruen dated June 24, 1999. Have you ever seen this memo before today?
A. **No.**
Q. Are you aware that Mr. Palmer and Ms. Zittergruen were speaking with BCM representatives and Mr. Burge?
A. **Yes, I was aware of that.**
Q. Relative to the Holden Farms nurseries, correct?

Page 138

A. **Yes.**
Q. The last page of the exhibit, there's an e-mail from a Nic Orr to a Dan, I presume Dan Palmer of September 9, 1999, correct?
A. **Right.**
Q. Mr. Orr's with BCM, correct, or was at that time?
A. **Was at that time.**
Q. It states that Mr. Palmer was to send out a directive to all of Double L's dealers "regarding the issue associated with the use of steel support beams. As we discussed today. BCM is not prepared to warranty any product effective immediately which is laid down on steel supports."
Was this directive ever sent out?
A. **I do not know.**
Q. There is that March 1, 2000 letter to the valued customers. Is that the directive to the dealers that is being referred to?
A. **I do not know.**
Q. And in here, the full sentence of the next paragraph says, "Stainless steel or fiberglass beam is the product recommended by BCM." Is that the recommendation that has continued through this day?
A. **Yes, I think so.**

Page 139

Q. Showing you what has been marked as Exhibit No. 18, it's a fax to Nic Orr from Jeanne Zittergruen. Did you have any involvement with this document?
A. **No.**
Q. Were you involved with negotiating the proposal for replacement of the flooring at the Holden Farms sites with the various parties involved? Do you understand what I'm asking?
A. **Was I -- go ahead, repeat it.**
Q. Were you involved in the negotiations relative to replacing flooring at the plaintiffs' facilities?
A. **Yes.**
Q. You were personally involved in that?
A. **Yes.**
Q. And who did you deal with relative to each of the parties? Start with Hog Slat.
A. **Oh, I was not involved. No. Okay. I see your question. I was involved with my people telling me what they were going to do, offering, telling me what to do, and then I said, "Yes, let's pursue it that way."**
Q. You did not have --
A. **I did not do the communication.**
Q. You did not have direct communications with my clients.

Page 140

A. No.
Q. And you did not have direct communications with Mr. Burge.
A. No.
Q. Or anyone else at Hog Slat?
A. No.
Q. Did you talk with anyone at BCM about replacement flooring?
A. I think I would have talked to them about what we were going to do and how we were going to handle it, and then we would agree upon that procedure, yes. But that was not --
Q. Your involvement was mostly internal discussions within Double L.
A. Right.
Q. Exhibit No. 19 again is just a copy of the distributor letter that we previously talked about, correct?
A. Yes.
MR. CROSS: Off the record.
(Brief off-record discussion.)
BY MR. CROSS:
Q. Showing you what has been marked Exhibit No. 20, this is a -- well, what is this, if you know?
MR. LULIC: Well, what kind of

Page 141

description do you need?
BY MR. CROSS:
Q. Well, is it an advertisement, or is it a brochure, or what is it, if you know?
A. It's a Filter-Eeze brochure it looks like.
Q. I notice that the date on it is September 1992 on the lower right-hand corner?
A. Yes.
Q. And this is featuring the Maxima Creep/Nursery Flooring?
A. Uh-huh.
Q. Does that refresh your recollection as to when the Maxima flooring was first introduced?
A. It's helping me a lot.
Q. Would it be about the time this pamphlet was offered?
A. I think it's before. It says "coming soon," doesn't it? It says at the bottom, "Coming soon. New product."
Q. Isn't that talking about Dura-Cast and Filter-Cast?
A. Oh, yeah. Okay. That must be --
Q. I'm just trying to establish a time frame.
A. I am too. This would be close.
Q. Showing you what has been marked Exhibit No.

Page 142

21, do you recognize that?
A. Our mission statement.
Q. Yes. Is that what it is?
A. Yes.
Q. Would you agree with me that this is an accurate reproduction of the contents of your web page, at least as of May 16, 2000?
A. Yes, I would. I said yes. I'm sorry. When was the date on this?
MR. LULIC: It doesn't matter.
BY MR. CROSS:
Q. Date was May 16, 2000.
(WHEREUPON, Borcherding Deposition Exhibit No. 22 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you what has been marked, Mr. Borcherding, as Exhibit No. 22, it's a pamphlet for a Fibertruss fiberglass support beam with the Double L Group logo on the bottom. See that?
A. Yes.
Q. Who manufactures that product?
A. I think that product was manufactured by Advanced Fiber.
Q. When did that product first become available

Page 143

in the market?
A. I would not know the date on that.
Q. Do you know whether or not the product was available as of April 1994?
A. I would not know that.
MR. LULIC: It refers to the Excelerator.
MR. CROSS: Well, I assume that this pamphlet probably came out much later. I was just wondering if the product itself was available.
MR. BRADY: Do you mind if we take a short break? I need to leave and I want to visit very briefly.
MR. CROSS: Sure.
(Mr. Brady left the deposition room.)
(WHEREUPON, Borcherding Deposition Exhibit No. 23 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you what has been marked as Exhibit No. 23, it's a pamphlet for a ValuCast flat high/low sow flooring. Who manufactures that?
A. The company that manufactured it was out of China. We resourced that product from China.
Q. Are you the distributor of this product in

Page 144

the United States?
A. We brought that product in, yes.
Q. On the second page under "Installation," you have five steps there. You see that?
A. Yes.
Q. And you have, "Place first ValuCast slat over the FiberTruss beams." You see that?
A. Yes.
Q. Were you telling people to use FiberTruss beams? Was that what you were doing, telling them to use FiberTruss beams?
A. I think we were showing them how it would go onto fiberglass beams.
Q. And a FiberTruss beam is, in fact, a fiberglass beam, correct?
A. Yes.
Q. Did you begin making that recommendation -- well, strike that. Were these floorings, did they clasp onto the beam in the same way that the Filter-Eeze Maxima flooring would?
A. No.
Q. How did they lay on the support beam?
A. They laid on top of the Filter-Eeze. This was a farrowing floor. This is not a nursery floor.
Q. So why did you recommend fiberglass beams?

Page 145

MR. LULIC: I'll object to the form of the question. It mischaracterizes, his recommendations.
THE WITNESS: This was a system, this was a farrowing -- it was showing how to put this cast iron --
BY MR. CROSS:
Q. But this is a document that was produced by Double L Group, right?
A. Right.
Q. And you don't mention steel beams at all, correct?
A. I do not see them.
(WHEREUPON, Borcherding Deposition Exhibit No. 24 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you, Mr. Borcherding, what has been marked Exhibit No. 24, have you ever seen this document before?
A. Yes, a long time ago.
Q. What was this document used for?
A. It could have been a presentation for a long time ago. I might have used it as a presentation.
Q. Would you have also given this document to Hog Slat?

Page 146

A. No, I don't think so.
Q. I'll represent to you that the document identification number at the bottom is HS, an indication in this lawsuit that this was a document produced by Hog Slat. Do you know how this document came into their possession?
A. Maybe in a presentation then that I gave them. No, I don't know.
MR. LULIC: What about it?
MR. CROSS: Well, do you mind if I just kind of work my way through the document?
MR. LULIC: Then let's do it.
BY MR. CROSS:
Q. Okay. Well, my point is, since your attorney is quizzically asking me why I'm presenting this to you, Mr. Borcherding, this is one of the only documents that I see from Hog Slat that relates to the performance of the Filter-Eeze products and mentions a warranty of BCM products in any way. All right? And the only thing I see is on page HS 00583 where it's stated, "Full 10-year non-prorated warranty with 15 to 20 years service life. "Did you ever provide Hog Slat with anything that would contradict that kind of statement?
MR. LULIC: I'll object to the form of

Page 147

the question.
MR. SOBALVARRO: Object as vague as to which product this even relates to.
MR. CROSS: Filter-Eeze products.
MR. LULIC: You can go back to Exhibit No. 4. I don't know why you're doing this.
THE WITNESS: Ask the question again.
BY MR. CROSS:
Q. Did you give to Hog Slat any limitation or exclusion of warranty that would limit the warranty that is set forth on HS 005833?
A. Not to my -- I do not know. I do not remember, or I do not know.
(WHEREUPON, Borcherding Deposition Exhibit No. 25 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you what's been marked as Exhibit No. 25, Mr. Borcherding, have you seen this document before?
A. Yes, I have seen it.
Q. What is it?
A. Well, it's a --
MR. LULIC: Well, it's a whole bunch of different stuff, obviously.

Page 148

THE WITNESS: It's a bunch of drawings.
BY MR. CROSS:
Q. Well, it appears to me to be installation instructions for Maxima flooring, and then later on there's the cast iron sow flooring Schonlau. Relative to the installation instructions, the first part of Exhibit No. 25, having reviewed that document, would you now agree with me that, in fact, Double L did give installation instructions to its customers?
MR. LULIC: Well, I'll object to the form of the question.
BY MR. CROSS:
Q. Well, you previously testified you never gave installation instructions --
A. **I never said never. That's a word I think you come up with. I said I do not remember. I do not recall. But I never said never.**
Q. Having reviewed this document, would you agree that you have provided installation instructions?
MR. LULIC: Him personally?
BY MR. CROSS:
Q. Double L Group, Limited.
A. **I do not know that.**
MR. LULIC: He doesn't do that part of the deal. Can't you get that from his testimony so far?

Page 149

We've been at this quite a bit, and he's told you he doesn't know the way the paper tracks, he doesn't know where the warranty tracks. He doesn't know about this stuff. He doesn't hand out literature to people. That's not his deal.
BY MR. CROSS:
Q. Mr. Borcherding, do you have knowledge that this was a document that was developed by your company, the Maxima polypropylene nursery hog flooring installation instructions?
A. **I think this is a document that could have been developed by our company in conjunction with other companies or with other deals. I mean, there's things from articles in there from magazines that -- I did not write these articles. I did not write the article from -- the pig regulations of Germany protesting the right. I did not do that. I made a copy of that and our -- we did not do that. Double L did not do that test.**
Q. Looking at pages HS 5861 through HS 5868, okay, the first --
A. **Them do have our logo on it, yes.**
Q. So those were documents that were produced by Double L Group.
A. **I think. I think. I would say yes, I think, but it has Double L Group, it has our 800 number**

Page 150

**and it has our fax number on it. I looks to me like that is.**
Q. If you turn to the next page --
MR. LULIC: What's the next page?
BY MR. CROSS:
Q. HS 5862.
A. **Yes.**
Q. What is it telling the customer to do with the mount plates and support beams? What is step one?
MR. LULIC: Did you want him to read it out loud to you?
MR. CROSS: Yes.
MR. LULIC: He doesn't have to do that.
BY MR. CROSS:
Q. Does it say, "fasten mount plates to the steel beams"?
MR. LULIC: If you want to know what that means, that's fine.
THE WITNESS: Pardon?
BY MR. CROSS:
Q. Does it say "fasten mount plates to the steel beams"?
A. **No, it says step one.**
Q. "Fasten mount plates to the steel beams."
A. **Yes.**

Page 151

MR. LULIC: What's your question. He's not going to --
MR. CROSS: I'm just getting a little tired of this. I mean, I'm asking him questions and you're interrupting continually.
MR. LULIC: You're not asking him questions.
MR. CROSS: I am asking him questions.
MR. LULIC: You're asking him to agree with you as to what something says in a document. That's inappropriate for a deposition.
MR. CROSS: Well, are you --
MR. LULIC: It's not a reading contest.
BY MR. CROSS:
Q. Did Double L ever instruct its customers to use steel beams with a Maxima flooring?
MR. SOBALVARRO: Objection, vague.
MR. LULIC: It's been asked and answered.
MR. CROSS: At a time when he said he didn't recall. Now I'm providing him with a document to refresh his recollection, see if maybe that does refresh his recollection.
MR. LULIC: He's also said they passed along BCM's instructions relative to the installation.

Page 152

MR. CROSS: And he put his company's logo on it.

MR. SOBALVARRO: I'm going to object. He didn't say he's gotten any of these from BCM.

BY MR. CROSS:

Q. Did you ever instruct any customers -- did Double L Group ever instruct any customers to install Maxima flooring on steel beams?

MR. LULIC: Independent of the manufacturer's suggestion. Is that what you mean?

MR. CROSS: Not independent. Did you ever do it?

MR. SOBALVARRO: Objection, vague.

MR. LULIC: I'll join in that.

MR. CROSS: Fine.

MR. LULIC: Independent of the manufacturer. Is that what your question is?

MR. CROSS: No, it isn't.

MR. LULIC: Okay.

MR. CROSS: Read my question back, please.

(WHEREUPON, the reporter read from the record as requested.)

MR. SOBALVARRO: Objection, vague.

MR. LULIC: Join. Go ahead and answer,

Page 153

if you can.

THE WITNESS: It was an option. I mean, it was an option. Did I instruct them and say, "You put it on steel or, damn it, I'm going to get mad at you and put a gun at your head," no, I didn't say that. But did I say steel, and this is steel here, it says fasten on steel beams. This was a visual concept drawing. There's no dimensions, there's no nothing here. It does not even tell what weight load that that would even carry. This is a conceptual drawing showing a person what it would look like.

BY MR. CROSS:

Q. So the answer to my question is no?

MR. LULIC: I think the answer is what he says it is.

BY MR. CROSS:

Q. Well, you're referring to this document. I'm asking more globally.

A. **It's fastening a mount plate to a steel beam. What is the thickness of the steel? What is the thickness of that? This is a conceptual drawing.**

Q. Did Double L Group ever instruct a customer--

MR. LULIC: He's answered that.

MR. CROSS: Then what is the answer?

Page 154

MR. LULIC: Well, he's answered already. He's told you that he offers it as an option, or the company offers it as an option and doesn't stick a gun to somebody's head and say, "You must do it this way."

MR. CROSS: So the answer is no.

MR. LULIC: The answer is what it is.

THE WITNESS: You tell me what the answer is. You answer the question for me.

BY MR. CROSS:

Q. No, that's fine. So installation instructions do not mean installation instructions.

MR. LULIC: Okay. That's enough. Now, if you want to go this route, we're done. Okay? Now, if you want to get information, that's fine. If you want to argue with him, that's a whole different issue.

BY MR. CROSS:

Q. Who provided the conceptual drawings that are on HS 586? Who drew those?

A. **Carey Kann.**

Q. Who was that?

A. **He was a draftsman, I think, and I'm not a hundred percent sure, he was a conceptual artist that worked for Double L.**

Q. How do you spell his name?

Page 155

A. **K-a-n-n. Carey, C-a-r-e-y.**

Q. Did you provide -- strike that. Did Double L provide installation instructions to mount Maxima flooring on fiberglass beams in 1994?

A. **I do not recall if we did. For farrowing flooring maybe.**

Q. For nursery flooring.

A. **I do not recall.**

Q. Was there a document similar to HS 5861 through HS 5868 created for fiberglass beams?

MR. LULIC: As of '94.

BY MR. CROSS:

Q. As of 1994.

A. **I do not know that.**

Q. Do you know if such a document was created at any point through the present?

MR. LULIC: For nursery farms?

BY MR. CROSS:

Q. For nurseries?

A. **Probably. I would say probably.**

Q. You don't know?

A. **I don't know for sure.**

Q. Who would know?

A. **Someone in our company. Annette Hager or the sales people would probably know that.**

(WHEREUPON, Borcherding Deposition Exhibit No. 26 was marked for identification by the Reporter.)

BY MR. CROSS:

Q. Showing you, Mr. Borcherding, what has been marked Exhibit No. 26, have you ever seen that document before?

**A. I remember something about this, the do's and don'ts.**

Q. Do you know when you saw that document?

**A. No, I do not know that.**

Q. Do you know when it was produced?

**A. No, I don't. There's no date on it and I can't remember.**

Q. Do you know who created it?

**A. Probably within our house, in our --**

Q. Probably by Double L?

MR. LULIC: Don't speculate.

THE WITNESS: I don't know.

BY MR. CROSS:

Q. Again, you cannot recall the time frame this document was created?

**A. No.**



(WHEREUPON, Borcherding Deposition Exhibit No. 27 was marked for identification by the Reporter.)

BY MR. CROSS:

Q. Showing you, Mr. Borcherding, what's marked as Exhibit No. 27, have you ever seen this document before?

**A. It's a brochure. Yes, I have seen it. I don't have a time, but I have seen it.**

Q. To whom was it distributed, if anyone?

**A. I would not know that.**

Q. On the last page of the exhibit, there is a sheet called "Filter-Eeze Maxima Flooring Installation Instructions." See that?

**A. Yes.**

Q. Where did the information come -- who developed this information? Was that done internally at Double L or was it done by someone outside of Double L?

MR. LULIC: Object to the form of the question. Develop the information or develop the brochure? There's two --

MR. CROSS: The information on this page.

MR. LULIC: In other words, where did the ideas for this come from?



MR. CROSS: Right.

MR. LULIC: Okay. Go ahead.

THE WITNESS: It came from BCM. It was BCM and then we would develop instructions. The question -- we did it in-house, but under the direction of these criteria are examples that would pertain to BCM.

BY MR. CROSS:

Q. Okay. The drawings, was that done in-house by one of your draftsmen?

**A. Yes, conceptual.**

Q. You had indicated or testified earlier, Mr. Borcherding, that you didn't hold a gun to anyones head or make them use steel beams. Is that a fair restatement of your testimony, or recharacterization?

**A. Primary is we sold flooring. We sold flooring.**

Q. You didn't make anyone use steel beams, right?

**A. We did not make anyone use steel beams.**

Q. In any of this instructions, did you say that an alternative would be fiberglass beams in 1994?

**A. When this was done, there probably was no alternative to it.**

Q. Are you aware of whether or not the



installation instructions, either the ones we have here or the ones we've looked at, ever specified the nature of the steel that should be used, or did it always just say "steel"?

**A. They always -- I think the word from BCM was steel. There was never --**

Q. Would you run -- or would Double L send this, a document like this to BCM for approval prior to distribution?

**A. That was our procedure always is to not misrepresent the product. A lot of this was checked to see if it would be verified if we were making a statement, yes.**

Q. Was there someone within Double L who was assigned the task of kind of preparing brochures or this kind of information such as Exhibit No. 27? Is there someone that was primarily responsible for doing that?

**A. Some of these brochures were developed in conjunction with BCM.**

Q. But who at Double L was responsible for developing them in the 1994 time frame?

MR. LULIC: You're talking about making these drawings?

BY MR. CROSS:

Q. Coming up with the brochure. If there was

Page 160

more than one person, one person was responsible for drafting it, I don't care who the draftsman was, but presumably you had somebody at Double L that prepared Exhibit No. 27.

MR. LULIC: Somebody put this together. Is that your question?

BY MR. CROSS:

Q. Somebody put it together, yeah. Who did it?

A. **I'm not sure, but I assume it was someone in our advertising department, which would be Annette.**

Q. Do you know who at BCM was the contact person for getting approval for information like this or running information like this by them?

A. **That probably would have been Warren, or it would have been Slessor, Bob Slessor.**

**(WHEREUPON, Borcherding Deposition Exhibit No. 28 was marked for identification by the Reporter.)**

BY MR. CROSS:

Q. Showing you, Mr. Borcherding, what has been marked as Exhibit No. 28, this is a document entitled "Steel Support Systems." Have you ever seen that before?

A. **Yes, I have.**

Q. What is it?

Page 161

A. **It's a steel support system.**

Q. Are these diagrams or instructions relative to installing a steel support system into a nursery floor frame?

A. **Yes.**

Q. Actually, at the very end there's a farrowing floor frame as well.

A. **Uh-huh.**

Q. On the second page, HS 5848, there is a date of 7-27-92, and then drawn by MB. Who is MB?

A. **I don't know.**

MR. LULIC: Dustan, this isn't for Maxima.

MR. CROSS: What is it for?

THE WITNESS: It's the 14760.

MR. SOBALVARRO: The same as true with the previous exhibit. Just for the record, Dustan, anytime you see something that says, "four plastic locking pins," the flag should go up that it's not for Maxima.

MR. LULIC: Just so you know that.

MR. CROSS: Okay. I appreciate that.

BY MR. CROSS:

Q. Do you know if any document similar to Exhibit No. 28 was created for steel support systems for

Page 162

Maxima products?

A. **I don't know.**

Q. Not that you're aware of?

A. **Not that I'm aware of.**

Q. Who is J.B. Pries, John Brian Pries?

A. **He worked at Double L.**

Q. When did he work there?

A. **I don't know. Approximately '97 to 2000.**

Q. Is he no longer employed by Double L?

A. **No. Yes, he's no longer employed by Double L.**

MR. LULIC: I'm not going to go past five.

MR. CROSS: I'll be done well before five.

MR. LULIC: I know you will, but for you guys' sake.

MR. SOBALVARRO: Can we go off the record for a second?

MR. LULIC: Yes.

(Brief off-record discussion.)

(WHEREUPON, Borcherding Deposition Exhibit No. 29 was marked for identification by the Reporter.)

BY MR. CROSS:

Page 163

Q. Showing you, Mr. Borcherding, what has been marked as Exhibit No. 29, do you recall that you signed answers to interrogatories on behalf of Double L Group in this litigation? Would you look at the second to the last page, or third to the last page?

MR. LULIC: It's got his signature. What about it?

MR. CROSS: I want him to acknowledge it.

THE WITNESS: Yes, I acknowledge it.

BY MR. CROSS:

Q. Page two, you identified a group of individuals that provided information to these interrogatories. I just want to know who they are, what their current position is and whether they're currently employed by Double L. Norb Borcherding is yourself; Donna Borcherding is your wife, right?

A. **So far, so good.**

Q. What is her position?

A. **She's CFO**

Q. Jeanne Zittergruen, what's her current position?

A. **Sales.**

Q. Carol Groth?

A. **She no longer works with the company.**

Q. When did she leave?
A. **Probably a year ago.**
Q. What did she do before she left?
A. **She worked sales.**
Q. Do you know where she lives now?
A. **In Garnavillo, Iowa.**
Q. Brian Eilers?
A. **He presently works with the company.**
Q. In what capacity?
A. **He's running one of our shops.**
Q. Where at?
A. **Garnavillo, Iowa.**
Q. Linda Berns?
A. **Bookkeeper, Garnavillo, Iowa.**
Q. Annette Chaapel?
A. **Garnavillo, Iowa. Works advertising.**
Q. Dan Palmer?
A. **No longer with the company. Dyersville, Iowa.**
Q. What was his job before he left?
A. **General manager.**
Q. Bailey Evans. He obviously was never an employee.
A. **Never an employee.**
Q. And his consulting agreement has been



terminated?
A. **Yes.**
Q. As best you know, he's still in North Carolina somewhere?
A. **I think. I'm not --**
Q. You don't know?
A. **I don't know.**
Q. Nigel Leucas?
A. **Never employed for the company; lives in Dubuque, Iowa.**
Q. What was his involvement with --
A. **He visited me when I was at -- he was along with me when I made me presentation.**
Q. He was the person who accompanied you on the April 1994 presentation?
A. **Right, and I think he visited Holden Farms sites also.**
Q. Where does he live again?
A. **Dubuque.**
**(WHEREUPON, Borcherding Deposition Exhibit No. 30 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Showing you, Mr. Borcherding, what is marked as Exhibit No. 30, I will represent to you that is a



series of photographs that were produced by Hog Slat in this litigation. Have you ever seen or been inside a nursery facility that has had Maxima flooring in it for more than five years?
A. **No.**
Q. Have you ever been shown any steel beams that have been removed from a nursery in which Maxima flooring has been installed?
MR. SOBALVARRO: Objection, vague.
MR. LULIC: You're talking about floor beams?
MR. CROSS: Yes, steel support beams
THE WITNESS: Yes, I think I have had some of our people bring back samples of it.
BY MR. CROSS:
Q. What did those samples look like?
MR. LULIC: Support beams.
THE WITNESS: Rust.
BY MR. CROSS:
Q. Did you do any testing on them?
A. **No.**
Q. Have you done anything with them, other than look at them?
A. **I think we showed them to BCM. When BCM was down, I think we showed it to them, we had samples of**



**it. No, I did not test the beams.**
Q. When you say "BCM was down" --
A. **In meetings and stuff. Like when we would meet, maybe we would bring them back and show them that or if we had samples of a product that would go bad, we would send it to them. I don't know what the procedures were on that.**
Q. Do you still have some of the steel support beams?
A. **I don't know if we would or not.**
Q. Have you seen, personally, not your company, but personally, any of the Filter-Eeze product that has been removed from any of the plaintiffs' barns?
MR. SOBALVARRO: Objection, vague. Do you mean Maxima specifically, or any of the other Filter-Eeze products that he's testified to during the course of the day.
MR. CROSS: Any of them.
THE WITNESS: From the plaintiffs', no, I don't think I have.
BY MR. CROSS:
Q. Did you observe on the steel beams that you saw that the beams had, I think you testified that they were rusted, right?
A. **The beams that came back? Is that what you**

Page 168

just asked me about just a little bit ago?
Q. Yes.
A. **I said some beams came back with rust on, some beams came back with paint on.**
Q. And were those beams that came from one of the plaintiffs' barns, or are they from another completely different facility?
A. **Probably a different facility. I don't remember retrieving anything from the plaintiffs.**
Q. As to the beams that you did observe, the ones that had rust on them, did you observe the width of the beam?
A. **I think that we talked about it, yes.**
Q. Did the beams that you saw show expansion of the beam due to rusting?
A. **Yes.**
Q. How much expansion?
A. **It varied.**
Q. What was the most expansion you observed?
MR. LULIC: He didn't measure it, so what are you asking him for?
MR. CROSS: How do you know he didn't measure it?
THE WITNESS: I did not measure it. I don't know. It just -- two millimeters. I don't know.

Page 169

A **32nd of an inch.**
MR. LULIC: Twenty-four inches, maybe?
THE WITNESS: No, it wasn't that much.
MR. LULIC: Don't guess.
THE WITNESS: I don't know exactly.
BY MR. CROSS:
Q. You recognize though, Mr. Borcherding, that expansion of the support beams could cause a problem, correct?
A. **I recognize that, yes.**
Q. Because they're clasped onto the beam, and if the beam expands, the floor is going to buckle, correct?
A. **The floor will start growing.**
Q. When you say "growing," what do you mean by growing?
A. **It starts pushing.**
Q. And if they're interlocked, which Maxima flooring is interlocked, correct?
A. **Uh-huh.**
Q. If they're interlocked, it could cause it to buckle, correct?
A. **It could cause it to buckle.**
MR. CROSS: That's all the questions I have for you right now. Thanks.

Page 170

(A brief recess took place.)
EXAMINATION
BY MR. DIESETH:
Q. Mr. Borcherding, my name is Paul Dieseth. I'm a lawyer with Dorsey Whitney here in Minneapolis. We represent Hog Slat. I'm going to ask you questions in addition to those that were asked of you by Mr. Cross. I'm going to try not to repeat anything he asked. So I'll move through this as quickly as possible.
The first question is not an indication of how you testified, but I normally ask witnesses, are you taking any medications or are you under any disability that would make it difficult for you to testify accurately and fully today?
A. **I'm on medication, but I don't think that --**
Q. You don't believe it's affected your ability to testify?
A. **I don't think so.**
Q. You don't think it's affecting your memory?
A. **I don't think so.**
Q. Did you review any documents in preparation for today's deposition?
A. **Skimmed.**
Q. Did any of those refresh your recollection?

Page 171

A. **Pardon?**
Q. Did any refresh your recollection?
MR. LULIC: Probably a vague question.
THE WITNESS: No.
BY MR. DIESETH:
Q. Do you have any knowledge, Mr. Borcherding, as to the relative pricing of stainless steel, galvanized steel, regular steel and fiberglass trusses?
MR. LULIC: You mean like beams to support a floor?
MR. DIESETH: Yes.
BY MR. DIESETH:
Q. If you have the same length beam, what costs more of those four items?
A. **A guess. You want me to guess?**
Q. No. Do you know?
A. **No. I don't know. I could assume, but that's --**
Q. That's quite all right. There was Filter-Eeze flooring that was installed in a test farm at a Hog Slat facility. Were you aware of that?
A. **Yes.**
Q. Were you involved in the sale of that product to Hog Slat?
A. **I think it was a gift of that product to Hog**

**Slat.**
Q. Do you know when that occurred?
A. **Not really, but I do -- there is a memory of that.**
Q. It would have been some years prior to the sale of the Maxima flooring to the plaintiffs' in this case?
A. **Yes, I think it would have. And I don't know what flooring it is, either, but if it is the -- I don't know if it's the Maxima or not.**
Q. I didn't say Maxima, but I believe it was Filter-Eeze?
A. **Right.**
Q. Is that your recollection, it was Filter-Eeze?
A. **That's my recollection.**
Q. Do you remember who you spoke with at Hog Slat about that?
A. **No, I don't remember. I could guess again, but I don't remember.**
Q. Stay away from guessing. I just want your recollection. Were you told at all -- well, let me ask this. Do you remember the support structure that was installed underneath that product that was sold to or given to Hog Slat for its test farm?



A. **Uh-huh.**
Q. What was that?
A. **Steel.**
Q. Was it steel slats, as opposed to --
MR. LULIC: Fiberglass?
MR. DIESETH: No. Actually, I'm comparing it to or contrasting it with No. 28, the steel support system discussed in 28.
MR. LULIC: Your question was steel slats?
THE WITNESS: It was something similar to that, but I don't know. A quarter -- it would probably be a quarter by three. I don't --
BY MR. DIESETH:
Q. Do you know if it was a four foot by eight foot steel floor frame?
A. **That could be too. I don't know.**
Q. You don't know. Did you ever see that test facility at Hog Slat?
A. **I did visit it one time.**
Q. After the installation occurred?
A. **Yes.**
Q. Did you ever hear from Hog Slat what conclusions they drew with respect to that facility, that -- let me narrow that down. Did you ever hear from



Hog Slat the conclusions they drew from the installation of that particular product?
A. **I can't recall that. I didn't know the product that was in there. I --**
Q. I understand. You had said that Bailey Evans had asked you to make the presentation to Holden Farms. Did you talk to Mr. Evans at all about his contacts and what led him to ask you to do that?
A. **There was a reason -- I normally did go out and call on the customers, and he was the one that was marketing the flooring for us. And I don't know truthfully why I did that.**
Q. But you don't know of any contacts that Mr. Evans would have had with Holden Farms with Hog Slat?
A. **I think he would have probably had some contact with --**
Q. Again, don't speculate. I'm not asking you to speculate. I'm just asking if you know.
A. **I don't know. I don't know.**
Q. Did you ever talk to anybody at Holden Farms or at Hog Slat about the use of fiberglass beams in connection with the Maxima flooring before 1998 or 1999 when this problem first arose?
A. **No. I don't recall.**
Q. There was one occasion in this deposition



where Mr. Cross was asking you whether you were aware of any instances where the Maxima flooring was installed incorrectly at the plaintiffs' facilities. Do you have any personal knowledge about whether or not the Maxima flooring was installed correctly or incorrectly at plaintiffs' facilities?
A. **I do not know personally. I just know that two people from our company went up to visit it.**
Q. Now, as far as you know -- take a look at Exhibit No. 4. Now, this is the document that was used at the April 1994 presentation of Holden Farms?
A. **Right.**
Q. As far as you know, Mr. Burge had never seen that document before the presentation took place.
A. **I do not know that.**
Q. You would not have supplied it to him prior to the April sales presentation.
A. **I would not personally, no.**
Q. And you were the one who brought the document into the meeting.
A. **Right.**
Q. Do you know whether Mr. Burge had a copy of that with him before you arrived?
A. **I do not know that.**
Q. I think you said -- did you say that Annette

Page 176

Chaapel participated in putting together this document?
A. **I think that would be correct to say that, yes.**
Q. And she works at your home office?
A. **We had other advertising people to do it, but I don't know who -- it's not marked who did that.**
Q. Now, take your time if you want to look at this again, but do you believe all of the statements that are in here with respect to Maxima flooring are all true? Is there any statement in here that you disagree with?
A. **At the time I presented the product, yes, everything I believed.**
Q. And you believe you had reasonable grounds for making all those statements in this document, correct?
A. **Yes.**
**(WHEREUPON, Borcherding Deposition Exhibit No. 31 was marked for identification by the Reporter.)**
BY MR. DIESETH:
Q. Mr. Borcherding what has been marked as Exhibit No. 31 are your company's responses to Hog Slat's interrogatories. I wanted to direct you to page nine. At the very top of that page there's an answer to

Page 177

an interrogatory. The interrogatory actually -- well -- the answer to the interrogatory relates to Exhibit No. 4, and it asks who created it. The answer is, "Annette Chaapel." You see that?
A. **Yes.**
Q. Do you recall this answer to this interrogatory?
MR. LULIC: Is Exhibit A the letter?
MR. SOBALVARRO: Exhibit A's reference here is Exhibit No. 4 to his deposition.
MR. LULIC: All right.
BY MR. DIESETH:
Q. Let me tell you what I'm trying to get at, Mr. Borcherding. I think in your prior testimony you said that Annette Chaapel assisted in creating this. I believe that you also said that Bailey Evans had something to do with creation of Exhibit No. 4. I'm contrasting that with this answer to this interrogatory, and I'm wondering whether you can explain why Mr. Bailey's name isn't included in this answer. If you can't, that's fine.
MR. LULIC: I think he said Bailey created the letter.
THE WITNESS: The letter, part of the letter Bailey created.

Page 178

BY MR. DIESETH:
Q. Oh, that's at the end of Exhibit No. 4.
A. **Yes.**
MR. LULIC: Exhibit No. 4 consisted of the brochure and a letter.
BY MR. DIESETH:
Q. So you believe Mr. Evans did not participate in the creation of the brochure.
A. **I think -- I don't know that. I don't know that.**
Q. While we're on the exhibit, actually, let me ask you another question about it. At the bottom of page three and continuing to the top of page four, there is an answer that discusses a statement that's attributed to Tom Herring. Why don't you take a moment and read that.
A. **I read it.**
Q. Do you recall, or are you aware of the statements that were attributed to Tom Herring?
A. **Yes.**
Q. Were you there at that moment?
A. **Yes.**
Q. Do you remember anything more about what Mr. Herring would have said, in addition to what is in this interrogatory answer?

Page 179

A. **It was at the World Pork Show, and I think the pork show was in June. I don't recall the whole situation. I do recall the statement, you know, that was made, and what context that statement come into, I don't know where that all came from. BCM was at the meeting, I was at the meeting, it was in our booth at a pork show, and there was a lot of people walking around. Mr. Holden was at the booth. So, I mean, it was just -- but I do remember the statement.**
Q. Do you recall anything else that was said at that meeting?
A. **I did not take notes of the meeting, no.**
Q. Was there discussion about the grade of steel that was used in the steel support beams?
A. **That could have -- I think that was mentioned, and I don't -- I can't be a hundred percent sure that I can answer that thing and just say this is what happened, but I don't really --**
Q. I don't mean to belabor this, and if you don't recall, simply say "I don't recall" and we'll quickly move on. But do you recall any conversation at that time about the types of steel that were acceptable as a support system for the flooring?
A. **There was something said, and I don't remember what was said. So, you know, if a certain**


MARTHA M. RIVARD
612-431-1252 * 800-844-6420

Page 180

grade of steel was used or something like that and then Tommy said, "Don't tell me about steel," or something, I don't know how that all went.
Q. Do you know if there was an accusation or an allegation or even a suggestion that Hog Slat did not use a good enough grade of steel for the steel slats?
A. I could not make that -- I did not say that. I didn't even make an allegation to that. I just know this was said at this meeting. This is one thing that was said.
Q. "This" being what's in the interrogatory answer.
A. Right.
Q. Did Double L ever make it's own fiberglass product?
A. No.
Q. You were also marketing somebody else's product.
A. Marketing somebody else's product or somebody else manufactured the product.
Q. Right. Had your company had any involvement with Holden Farms or any of the plaintiffs' before 1994?
A. Not to my knowledge.
Q. What do you recall about what was done to address the problems that Holden Farms was complaining

Page 181

of once you became aware of them? What was your involvement?
A. We sent people up to look at it, and I think they tried to do a solution to the problem of what they thought the problem was, and I don't recall that whole thing or what the gist was of the report that they brought back.
Q. Do you know or do you recall whether any expansion joints were attempted to be used in any of the plaintiffs' facilities to see if that would remedy the problem?
A. I think there were some fixes we tried. I think there were fixes. I think initially there was another problem where some certain beams weren't put together down straight or something, and we tried to rectify that. But that was not -- I mean, that was one -- there was another problem that was associated with it, but I don't really recall in detail what it was.
Q. Do you recall any proposals made to the plaintiffs' in response to the problems that they were complaining of?
A. I think at that meeting at the pork show, I think there was a proposal on the table that someone would take care of the labor, someone would do this, someone would do that. I think that was a proposal.

Page 182

Q. Do you recall that proposal being made to the plaintiffs?
A. At the pork show.
Q. Do you recall what their reaction was?
A. No, I do not recall.
Q. Did Double L sell product to the plaintiffs to replace the original Maxima flooring?
A. I don't know if Double L sold it or if BCM sold it.
Q. Was Double L involved -- so you don't know if Double L was involved in any of those particular transactions?
A. In the retrofit?
Q. Yes.
A. We didn't want to. We wanted BCM to take it. They sold the product. I think we might have supplied the beam, but I think the replacement program was sold directly to them. I think. I think. I just -- I feel sometimes stupid I can't answer your questions.
Q. Don't feel stupid. Does Ms. Zittergruen know more precisely about that?
A. Yeah.
Q. Unfortunately, she'll be asked those questions tomorrow. Would you turn to Exhibit No. 3.

Page 183

Let me ask you to turn to the page marked LL 0871. I think that's the third page. Do you remember sending that letter to Tommy Herring?
A. I remember partially, yes.
Q. So you sent that letter?
A. Yes.
Q. There are four paragraphs that are labeled A, B, C and D. You see that?
A. Yes.
Q. Now, at the time you sent that letter to Mr. Herring, those were all true in your mind, right?
A. Yes.
Q. And you wanted Mr. Herring to rely on those in deciding whether or not to enter into this proposed agreement with Double L?
A. Yes.
Q. And you thought if he relied on it, it would be reasonable, right?
A. Yes, I --
Q. Do you know why, and if you don't know, that's fine, do you know why there was never an agreement between Hog Slat and Double L with respect to this kind of arrangement?
A. I don't know.
Q. Did you ever talk to Tommy Herring

personally about that arrangement?
A. **We made a presentation.**
Q. Did you go to North Carolina?
A. **Yes.**
Q. Would you have said the types of things that are on this page that we were looking at?
A. **Yes.**
Q. Who accompanied -- did Bailey Evans accompany you?
A. **I think it was Mike Sullivan, our general manager at that time.**
Q. Would this have been September 22, 1993?
A. **It would have been right in there.**
Q. Do you remember having spoken to Mr. Herring or anybody at Hog Slat before that time about Maxima flooring?
A. **I don't recall.**
MR. DIESETH: I'm done.
EXAMINATION
BY MR. SOBALVARRO:
Q. My name is Rich Sobalvarro and I represent BCM. I, too, will try not to be redundant of anything that has been previously asked. There's been discussion about fiberglass beam that was sold by BCM -- or excuse me, by Double L. That was a beam that was manufactured



by someone else that you sold, correct?
A. **Someone else manufactured the beam, yes.**
Q. But it was a beam that, essentially, you sold as Double L beam. It wasn't -- in other words, the company manufactured it, manufactured it for you, correct?
A. **Yes.**
**(WHEREUPON, Borcherding Deposition Exhibit No. 32 was marked for identification by the Reporter.)**
BY MR. SOBALVARRO:
Q. Would you take a look at that for me, Mr. Borcherding?
A. **Yes.**
Q. Do you recognize this document?
A. **Yes.**
Q. Can you tell me how you recognize it?
A. **It was our farrowing floor beam.**
Q. Is it similar to the fiberglass beam that you sold throughout the '90s?
A. **No, this was a product that was designed primarily for farrowing.**
Q. The last page of the document, date of August 18, 1989 on the bottom of it. See that date?
A. **Yes.**



Q. Is this beam that is drawn here, or support, how ever you want to describe it, a support beam, is that the same fiberglass beam that Double L sold throughout the '90s?
A. **No.**
Q. Could this beam, as drawn, have been used with the Maxima flooring?
A. **No, not to my knowledge.**
Q. Right. And that's all I'm asking. When you arrived at the April 1994 meeting, if I understand your testimony correctly, your understanding of why you were there was to sell flooring, correct?
A. **Right.**
Q. Did you have a discussion with Bailey Evans about, "Okay. I'm covering this meeting instead of you. What is it I'm doing there?" Did you have any discussion like that with him?
A. **He set up the -- no, not that I can remember. I don't know what the discussion was. I just knew I was filling in and I was going to take the sales call.**
Q. Prior to you going to that April '94 meeting, did you tell anyone at BCM, "Hey, I'm covering a meeting that we're going to try to sell flooring to Holden Farms"?



A. **Bailey was doing all of the communications between BCM and Double L. He was Double L's contact.**
Q. So you have no idea, as you sit here today, whether anyone at BCM knew about this April '94 meeting before it occurred or not.
A. **I could assume, but I'm guessing.**
Q. So you don't have any actual knowledge.
A. **No.**
Q. In your testimony, then, in your answers to interrogatories Mr. Dieseth asked you about, there's no indication that anyone from BCM helped prepare the brochure that was presented, correct?
MR. LULIC: Well --
BY MR. SOBALVARRO:
Q. At the April '94 meeting.
MR. LULIC: Object to the form.
THE WITNESS: I don't know.
BY MR. SOBALVARRO:
Q. To the best of your knowledge.
A. **I do not know -- to the best of my knowledge I do not know if they talked to him and what was -- I do not know that answer.**
Q. So similarly, you would have no information whether anyone at BCM actually reviewed that brochure and approved it before the April '94 meeting, correct?

Page 188

A. **That would be a correct statement.**
Q. Did you personally talk to anyone at BCM after the April 1994 meeting?
MR. LULIC: About --
BY MR. SOBALVARRO:
Q. And say, "I just had this meeting and this is what went on."
A. **I don't recall**
Q. Did anyone at that April '94 meeting ask you for your recommendation about what support beams should be used?
MR. LULIC: Object to the form of the question.
THE WITNESS: I don't -- to say to me that did I say, "You recommended doing this," no, I --
BY MR. SOBALVARRO:
Q. No, let me turn it around the other way. Not, "You recommended that we use spaghetti noodles for support straps," rather do you have any recollection of anyone looking at you and saying, "Mr. Borcherding, what's your recommendations for what we put under this Maxima flooring?"
A. **I was in no position to represent anything. I was selling the flooring and they were going to put the beams down. I was under the assumption that steel**

Page 189

**was going down.**
Q. What was the basis of that assumption?
A. **We didn't -- we were coming in with a quote on, not a support system, but on flooring.**
Q. You weren't asked for a quote of support systems, correct?
A. **I do not think we were asked that. And I -- to my knowledge, I do not know if we had -- if we even had a bid on the support system. I don't think so.**
Q. Is it your recollection that at the time of the April '94 meeting, a decision to use steel support beams of some type had already been made?
A. **That would be -- that would be my recollection that they were -- that was pretty much --**
Q. Do you have any recollection at all of any discussion about the type of steel support beams that were going to be used?
A. **I would say -- ask me the question again.**
Q. Sure. Do you have any recollection of any discussion at that April '94 meeting about the type of steel to be used for the support beams? In other words, do you recall a conversation -- maybe I can be better with the --
A. **You better do better than that.**
Q. That's what I'm going to do. Do you recall

Page 190

anything about the meeting where there was a discussion about, "Should we use stainless steel or should we use galvanized?"
A. **I don't recall anything.**
Q. The term "steel" is a very generic term, correct?
A. **Yes.**
Q. It could mean plain steel, or galvanized steel, or stainless steel, correct?
A. **Hard steel, mild steel.**
Q. All of those.
A. **Yes.**
Q. Is that right?
A. **Yes.**
Q. Is it fair to say it's pretty common knowledge in the hog industry that hog confinement barns are a fairly corrosive environment?
A. **That would be safe.**
Q. In fact, you walk into a hog facility and you see a lot of stainless steel, correct?
A. **Yes.**
Q. And fair to say that stainless steel is present because of the corrosive nature of hog barns, right?
A. **That would be fair.**

Page 191

Q. Is it equally fair to say that everybody from experienced producers through to the people in the business of building hog barns know that hog barns are a corrosive environment?
A. **That would be fair.**
Q. Now, the supports that were used in the Holden facilities, Double L didn't sell them to Hog Slat, did they?
A. **No.**
Q. Neither did BCM, correct?
A. **Correct.**
Q. You didn't manufacture those beams, Double L didn't.
A. **No.**
Q. Did you design those beams?
A. **No.**
Q. Did you specify those beams?
A. **No.**
Q. Other than describing the dimensions, did you describe any of the quality or characteristics of the beams?
A. **No.**
Q. Frequently I think in the documents today, we've seen the term "flat steel." Does flat steel describe anything to you about the type of steel?

Page 192

A. No.
Q. You frequently said you were passing along recommendations that you would have received from BCM. Are you aware of any document that indicates that Maxima should be put on plain steel beams?
MR. LULIC: Object to the form of the question.
BY MR. SOBALVARRO:
Q. And by plain steel I can maybe define it for you and cure Mr. Lulic's concerns. Non-galvanized non-stainless steel.
A. The question one more time.
Q. Are you aware of any document that says BCM recommends mounting Maxima on non-galvanized, non-stainless steel steel beams.
A. I'm not aware of any document.
Q. And are you aware of any Double L document that would make such a statement?
A. No.
Q. Are you aware, did any other person come in and pitch a flooring system, just flooring, to the Holden Farms people for these barns?
A. I think they did.
Q. What do you base that belief on?
A. I think, and I can't remember, but I think

Page 193

there was other flooring in the office when we made the presentation, and I think. They -- their knowledge, they asked questions about different types of flooring.
Q. By the flooring, you mean exemplars in the office, they had an example of somebody else's flooring?
A. I think, and I make a lot of sales calls, and I can't assume that they all have the different samples of all of the different products in there. But I think that, and I probably should answer no to that, but I probably would say --
Q. It's too late, Mr. Borcherding. Do you have any recollection, and I know your memory on this point seems rather vague, but do you have a recollection as to other plastic flooring or other metal flooring, anything like that?
A. Not -- I'm going to say no.
Q. Are you familiar with the other manufacturers of plastic flooring?
A. Yes.
Q. Mr. Cross has asked you questions, I think he used the phrase "clasp," but in fact, it's kind of a bracket on the edge of the plastic slats that fits over the beam, correct?
A. Uh-huh.
Q. Is that a yes?

Page 194

A. Yes. I'm sorry.
Q. And that's true whether it's a fiberglass beam or a stainless steel beam, correct?
A. Right.
Q. Are you familiar with the products manufactured by Ikadan, I-k-a-d-a-n, Southwest Agri-Flooring Plastics or MIK, M-I-K?
A. Yes.
Q. Do those products also use that same design of a hanger bracket?
A. Yes.
Q. Is it fair to say that that hanger bracket is the current state-of-the-art for plastic flooring?
MR. CROSS: Objection, foundation.
MR. LULIC: You can answer. Do you know what he means?
BY MR. SOBALVARRO:
Q. Do you know what I mean?
A. Yes, it's the state-of-the-art.
MR. LULIC: You know what state-of-the-art means?
THE WITNESS: Yes. That is primarily most of the people are doing it.
BY MR SOBALVARRO:
Q. Have you seen the brochures used by those

Page 195

other manufacturers?
A. Yes.
Q. What do those other manufacturers reference for support beams underneath their flooring products?
MR. LULIC: When? Now?
BY MR. SOBALVARRO:
Q. During the '90s.
A. Steel.
Q. The generic term steel.
A. Right.
Q. You said you had Nigel Leucas with you at this meeting in April of '94.
A. Uh-huh.
Q. He was never an employee of Double L; is that correct?
A. Yes.
Q. Who is Mr. Leucas?
A. He was associated with an English company that manufactures feed, nutritional items, and he was riding along with me.
Q. Is that company somebody else that Double L was looking to do business with or had some common interest?
A. Common interest that we -- he also was using our test farm. He was supplying feed to the test farm

Page 196

and it was a combination of feed and environment that we were --
Q. Do you know where we'd find Mr. Leucas today?
A. Dubuque, Iowa.
MR. CROSS: Asked and answered.
MR. SOBALVARRO: You already asked him that? Sorry. I knew I'd do it sooner or later.
BY MR. SOBALVARRO:
Q. You were asked questions about the two distributorship agreements that were marked someplace in here.
MR. LULIC: One, I think. Actually, there were three.
MR. CROSS: One was a proposal.
BY MR. SOBALVARRO:
Q. Mr. Borcherding, are there any other distributor agreements, other than these?
A. Not that I am aware of.
Q. Okay.
A. We had a major fire and pretty much lost everything.
Q. Would you say that those distributorship agreements control the relationship between Double L and BCM as a corporation?

Page 197

MR. LULIC: I'll object to the form of the question.
BY MR SOBALVARRO:
Q. Those spell out the way the two of you do business.
MR. LULIC: Object to the form of the question.
THE WITNESS: It's a guideline for the way we do business.
BY MR. SOBALVARRO:
Q. Okay. Have either of those -- well, let me do it this way. Has either corporate entity, Double L or BCM, ever terminated a distributorship agreement with the other?
A. No.
Q. As I understand your business, and maybe we can do it this way, it will be quicker, you are the distributor for a number of different manufacturers. Is that fair?
A. Yes.
Q. In addition, you also manufacture some products, or have them manufactured for you.
A. Yes.
Q. Do you both manufacture your own products and have other companies manufacture some for you?

Page 198

A. In one case, we have, in our feeder division. Nothing to do with this flooring.
Q. Right. And I'm just talking very general.
A. Very general. We do have a company that does build some stuff for Double L that Double L builds and also subs out to another company.
Q. And included in the materials that you have manufactured for you are items for use in hog confinement buildings.
A. No. It would be the feed -- it would be bale feeder and stuff like that.
Q. I understood you to say that the feeding equipment, feeder equipment, were things that you manufactured yourself and sold.
A. Right.
Q. Now, my question is, are there products that you have manufactured by someone else that you sell for the hog side of the business?
A. Not the hog side of the business. That's what I said. For the feeder side of the business.
Q. Okay. Obviously, in addition to the plastic flooring, hog flooring you sell at BCM, there is a reference to, how do you say that cast iron?
A. Schonlau.
Q. Do you sell any other hog flooring, other

Page 199

than BCM and Schonlau?
A. We had some association with a cast iron that was manufactured in China that he brought up, and we brought some of that into the United States. But the only -- no other plastic flooring, other than BCM.
Q. So the two cast iron manufacturers and BCM.
A. Yes.
Q. As I understand it, your sales territory is essentially the United States.
A. Yes.
Q. Does BCM set the price at which you can resell their flooring to someone else?
A. No.
Q. You have a set price agreement, I'm assuming, with BCM: is that correct?
A. Sometimes they would make a special order, if there was a quote for a bigger order, would there be any concessions we can pass on to the consumer. I mean, there was guidelines, but not in concrete. Do you know what I mean? It was not in concrete. We could be --
Q. If you had a bigger deal going, you could call BCM --
A. Right.
Q. -- and say, "Can we get a little better deal on X thousand square feet?"

Page 200

A. Exactly.
Q. As a general rule, though, was there a set price that Excelerator is going to cost us this much a foot, Maxima is going to cost us that much a foot?
A. Yes.
Q. And then it was your business how you resold that, correct?
A. Yes.
Q. BCM didn't dictate to whom you could sell the product, did they?
A. No.
Q. And I think one of the exhibits, Exhibit No. 9, is a series of the invoices for the sale of the product to Holden Farms. If you look at that, I'm just looking at LL 807.
A. Exhibit No. 9.
Q. Yes.
A. Yes.
Q. That invoice, it's a BCM invoice, correct?
MR. LULIC: First page.
BY M.R SOBALVARRO:
Q. I'm sorry. LL 0807.
A. Yes.
Q. And it indicates, "Sold to Double L Group," correct, top left?

Page 201

A. Yes.
Q. I'll represent to you that I looked at the BCM invoices. Best of my knowledge, every invoice says, "Sold to Double L Group." Is that the standard form that these appear as?
A. To my knowledge, yes.
Q. Because I think you answered a question for Mr. Cross that the chain of sales is, BCM sells to you, you sell to a dealer and that -- or builder, and that entity, then, sells to the final end user.
A. Right.
Q. There are instances like this one where BCM ships the actual product to the end user, correct?
A. Yes.
Q. And is that more a situation that it's an inventory issue for you, you don't carry inventory, so you can say, "Please ship it to"?
A. It's more of a cost savings deal that we don't have to handle it as a direct shipment.
Q. It's a cost savings for everyone, correct?
A. Yes.
Q. BCM, of course, in that sales transaction, is paid by you. They're not paid by the end user, right?
A. That's correct.

Page 202

Q. So essentially, you're a buyer and a reseller of the product, right?
A. Yes.
Q. And that's true not just for BCM, but for the other company that you sell their products as well.
A. Right.
Q. I know you mentioned a couple times Annette Chaapel does advertising for Double L.
A. Uh-huh.
Q. Is that a yes?
A. Yes. I'm sorry.
Q. That's okay. Are there other people, other than Ms. Chaapel, whose job is advertising for Double L?
A. Yes.
Q. It's my understanding that you advertise for all of the manufacturers that you sell their product; is that correct?
A. Right.
Q. So that would include -- you place ads that reference BCM products or Schonlau products or others, right?
A. That's correct.
Q. You don't have every ad that you run approved by the manufacturer of that product, do you?
A. I don't know on that, what the procedures

Page 203

are. Most of them, they're advertising support, everything we do should have approval from that we do not make a claim.
Q. Where you advertise, though, and to the extent you advertise is controlled by Double L, correct?
A. Unless we sit down with a supplier and do a joint marketing campaign.
Q. Did you do that with BCM?
A. I think somewhere along the line we did do some joint marketing together, working shows together, putting brochures together, yes.
Q. I notice in Exhibit No. 4, the letter that Bailey Evans drafted, it does say, I believe at the end it says something like representing BCM. By representing, you meant simply you're there selling a BCM product; is that correct?
A. Right.
Q. You've never been an employee of BCM, have you?
A. No.
Q. You and BCM. Double L and BCM have never had joint employees, have they?
A. No.
Q. Mr. Hutchings doesn't sit on your board of directors or anything like that, does he?

Page 204

A. No.
Q. Similarly, you're not involved with BCM in any type of formal business capacity, correct?
A. **Correct.**
MR. CROSS: Well, I think the distributorship agreement is probably a formal business capacity.
BY MR. SOBALVARRO:
Q. You're not an officer or a board member of BCM, correct?
A. **Correct.**
Q. You've never gotten a payroll check from BCM, right?
A. **No.**
Q. Do you currently sell fiberglass beam that can be used with the Maxima flooring?
A. **Yes.**
Q. BCM also has one manufactured for them that can be used with the Maxima flooring, correct?
A. **Yes.**
Q. You don't sell BCM's fiberglass beam, do you?
A. **No.**
Q. Was there ever a written contract with BBZ Marketing?

Page 205

A. **I think there was. I think. I'm not sure.**
MR. SOBALVARRO: Joe, do you know? I haven't seen one produced. Have you ever seen one?
MR. LULIC: No, I'm not aware of one.
MR. SOBALVARRO: Do you want a formal request or can you just look and see if there is one?
MR. LULIC: I would have to have a formal request, because I'd pass it on to one of these people. I've given everybody all of the documents that I've gotten relative to this case.
MR. SOBALVARRO: I'll just send out a request and then you can pass it around, or if you can find one, Mr. Borcherding, and give it to Mr. Lulic, he can send it out.
BY MR. SOBALVARRO:
Q. You indicated that BBZ Marketing and Mr. Evans were compensated on a commission basis; is that correct?
A. **Yes.**
Q. Can you describe what that commission basis was?
A. **It was just that he would have a percentage of all of the sales sold in the United States on hog flooring, excluding what we maybe put in our building department.**

Page 206

Q. Did that include the Schonlau and the Chinese?
A. **No.**
Q. Just the BCM product.
A. **Yes. That's my -- I'm not sure. I'm not a hundred percent sure.**
Q. Was that commission based on square footage or dollars?
A. **Dollars, I think.**
Q. So total dollars of the sale.
A. **Total dollars, yes.**
Q. Do you remember what percentage he got?
A. **I'm not a hundred percent sure, but I think -- can I give you numbers again?**
Q. If you're not a hundred percent sure, I don't want you to guess.
A. **I'm not sure.**
Q. You just don't remember for sure?
A. **I'm not sure.**
Q. Do you know, was Mr. Evans ever asked for a recommendation by customers and dealers, you know, what kind of support system to put under BCM flooring?
A. **I do not know.**
Q. Did you ever give him instructions, "This is the support system we want underneath this flooring"?

Page 207

A. **I did not give him instructions. He would take the instructions from BCM on that.**
Q. Did you have actual knowledge of that, or are you assuming he took instructions from BCM?
A. **He was in charge of all communications between BCM and Double L.**
Q. Okay.
A. **So he would talk to them on a basis, I think he even set up visits with them and they would go through this stuff.**
Q. My question is, though, do you have any knowledge, do you know, was there ever a conversation between Mr. Evans and someone at BCM that says --
A. **I don't know.**
Q. You don't know?
A. **No, I don't know.**
Q. What kind of control did Double L have over BBZ's marketing efforts?
A. **He would call in and report to me on what the sales were, what direction we were heading, where our target markets were going to be, who was building. And then we would work that out together. And then he would report to BCM and try to inform BCM what was going on. That was kind of his job description, and he was in charge of the sales of plastic flooring, hog flooring**

Page 208

for BCM in the United States.
Q. Essentially, he became a sales manager so to speak.
A. Exactly. I would say that would be a good--
Q. Did BCM ever have any sort of contract with BBZ Marketing?
A. Not to my knowledge. I don't know.
Q. Several of the exhibits, we covered this in kind of a general discussion, but several of the exhibits shown to you by Mr. Cross reference plastic slats locked in place by pins. That is not the Maxima flooring, correct?
A. Yes.
Q. That is a previous Filter-Eeze type of flooring?
A. Previous generation.
Q. Could you find Exhibit No. 16, Mr. Borcherding? There, Mr. Borcherding, the last paragraph -- well, first off, 0952 appears to be a two-page document, correct?
A. Yes.
Q. Do you have any recollection of the second page?
A. Of this document?
Q. Yes.

Page 209

A. Is this the one about the sales meeting?
Q. No, I'm sorry. LL 0952. It says pages two. Unfortunately, this just appears to be the first page.
MR. CROSS: I apologize for that, counsel. This whole exhibit looks like it's a mish-mash of things.
THE WITNESS: Yeah, I was not -- I knew something, he'd talked to me about somebody, but I don't know --
MR. LULIC: He's asking you --
THE WITNESS: Do I know. I don't know.
MR. LULIC: Listen to the question. He's asking you --
THE WITNESS: I don't know.
MR. LULIC: Do you know where page two is of that?
THE WITNESS: I don't know.
BY MR. SOBALVARRO:
Q. Or do you have any recollection of page two?
A. No, I don't know.
Q. First sentence on the last paragraph, "Initially we thought it might be occurring" -- do you see where I'm reading?
A. Yes.
Q. Do you agree with that sentence? Actually,

Page 210

do you agree with that whole last paragraph? Let's do that.
A. I don't agree.
Q. Okay. Exhibit No. 24. Do you have any idea when this document would have been provided to Hog Slat?
A. No.
Q. Do you have any idea which product, specific product within the Filter-Eeze line it's referencing? If you turn the page -
A. No.
Q. -- what I'm getting at is it just says "Superiority of Filter-Eeze Flooring."
MR. LULIC: You mean is there a specific Filter-Eeze product that this references?
MR. SOBALVARRO: Exactly.
BY MR. SOBALVARRO:
Q. Do you know which one it is?
A. No.
Q. I'm sorry, I didn't hear your answer.
A. No.
Q. There's no way to tell whether this relates to Maxima or some predecessor of Maxima; is that correct?
A. That's correct.
MR. LULIC: Well -- go ahead.

Page 211

BY MR. SOBALVARRO:
Q. You indicated that once you received -- once your relationship with BCM started, that you provided those, in '79 or '80, you provided plastic slats to various universities, and you thought about a dozen, to do studies?
A. Right.
Q. Were those studies in addition to the studies that were performed at the University of Saskatchewan and other Universities in Canada?
A. Yes.
Q. You manufactured at some point, and I don't know if you still do, modular livestock buildings; is that correct?
A. Yes.
Q. Were those hog buildings?
A. Yes.
Q. Did you use Maxima flooring in them?
A. Yes.
Q. How long have you been making those buildings?
A. I don't know, exactly.
Q. Have you always used Maxima flooring in them?
A. No.

Page 212

Q. Do you still make those buildings?
A. **Yes.**
Q. Do you still use Maxima flooring?
A. **I think it's Excelerator.**
Q. Does Excelerator have the same type of locking tab, bracket that hangs on the beam?
A. **Yes.**
Q. What kind of beams are in those buildings?
A. **Fiberglass.**
Q. Have they always been fiberglass?
A. **No.**
Q. Prior to that time, what --
A. **Steel.**
Q. Galvanized steel?
A. **Painted steel.**
Q. Plain painted steel?
A. **Right.**
Q. And in your buildings, have you ever had the kind of problems that the Holdens are complaining of?
A. **Yes.**
Q. When?
A. **After -- there is maybe two years ago, a year ago.**
Q. Recently.
A. **Recently.**

Page 213

Q. And that was with the plain steel beams?
A. **Painted steel beam.**
Q. How old were those buildings?
A. **I don't know that.**
Q. Was it a matter that the beam had corroded and expanded in width?
A. **Yes.**
Q. And that would simply pop the flooring off?
A. **Right.**
MR. SOBALVARRO: I think that's all I have.

EXAMINATION

BY MR. CROSS:
Q. Very, very, vary briefly. Mr. Borcherding, this Exhibit No. 4 that we talked about, this presentation document that was handed out at the April 1994 meeting --
A. **Yes.**
Q. -- did Mr. Burge tell the Holdens that he didn't have anything to do with the preparation of that document?
A. **I do not know that.**
Q. Did you tell them that?
A. **No, I did not tell them.**
MR. LULIC: Tell them what?

Page 214

BY MR. CROSS:
Q. That Mr. Burge didn't have anything to do with the preparation of this document?
A. **I don't know. No, I didn't tell them that.**
Q. I think with Mr. Sobalvarro you testified that the decision to use steel support beams had already been made as of the time of this April 1994 meeting. Do you recall that testimony?
A. **I recall that testimony. Maybe I assumed that the decision was made.**
Q. Sitting here today, do you know whether or not that decision had been made by April 1994?
A. **I do not know that, but --**
Q. Was that assumption based on any facts or recollection that you have?
A. **Off of the presentation or how I presented it, I just went there and -- I do not know if Bailey had talked to Wendell and that they said this is what we wanted to do. I do not know that.**
Q. And that was my next question. Do you know, when you said that the decision had been made, whose decision were you referring to?
A. **I was there to sell plastic flooring.**
Q. So you don't know if a decision had been made to use steel beams or not by April 1994?

Page 215

A. **I assumed that, probably. I assumed.**
Q. Are you aware of any document from BCM that recommended in 1994 or before that non-galvanized, non-stainless steel should not be used with Maxima flooring?
A. **No.**
MR. CROSS: That's all the questions I have.

EXAMINATION

BY MR. DIESETH:
Q. Had you ever met Wendell Burge before the April '94 meeting?
A. **I think at a show one time.**
Q. Briefly ran into him?
A. **Yeah, ran into him at a show.**
Q. Tell me, you had mentioned these modular livestock buildings that Double L sold. When did you start selling those?
A. **Probably 15 years. Ten, 15 years.**
Q. Did they have Maxima flooring in them from the beginning?
A. **No.**
Q. When did you start using -- do you know when you started using Maxima flooring in them?
A. **Probably when they first started coming out.**

Page 216

That's when I probably would have put it in.
Q. Why did you use steel slats, painted steel slats?
**A. We didn't have anything else at the time and we were -- we had put steel in these other drawings that you have in different exhibits. We had steel in at that time.**
Q. So you're referring to some of the exhibits that related to the Maxima flooring.
**A. No.**
Q. When you say --
**A. Exhibits that related back to drawings that you were coming back and saying, "Here, this steel support stuff," this was for different types of flooring that we had before.**
Q. All right. Let's use an example so I know what you're talking about. You're talking about exhibit--
**A. Where you looked at instructions.**
Q. -- No. 28?
**A. This.**
Q. Give me an exhibit number.
**A. Twenty-eight.**
Q. Okay. So the steel support system which is described in Exhibit No. 28 is painted steel?

Page 217

**A. Yes.**
Q. Had you relied on any information that you had gotten from BCM in deciding to put --
**A. I think it's -- okay.**
Q. Just to make sure, you're comfortable with your answer that the steel frame discussed in Exhibit No. 28 is painted steel. It's not galvanized steel; is that correct?
**A. Yes, it was painted.**
Q. Okay. Did you rely on any information you received from BCM in deciding to use the painted steel slats in your modular livestock buildings with Maxima flooring?
**A. That was recommended at that time. That is what we were --**
Q. Take a look at Exhibit No. 25 for example. So is that an example of the type of information you would have received from BCM --
MR. SOBALVARRO: I object as asked and answered.
BY MR. DIESETH:
Q. -- that would have led you to use painted steel in your modular units?
MR. LULIC: Object to the form of the question.

Page 218

MR. SOBALVARRO: Yes. I think he's already testified about where that information came from.
MR. DIESETH: All right.
MR. LULIC: He's also testified regarding what the character and nature of this exhibit is.
MR. DIESETH: All right. I may have to find another exhibit.
MR. LULIC: Well, off the record.
(Brief off-record discussion.)
BY MR. DIESETH:
Q. Can you take a look at Exhibit No. 20?
**A. Okay.**
Q. Is this the type of information supplied by BCM that you relied on in deciding to use painted steel to support the Maxima flooring in your modular units?
**A. Yes.**
MR. DIESETH: Okay. I don't have any further questions.

EXAMINATION

BY MR. SOBALVARRO:
Q. Just a couple. Mr. Borcherding, we're back to this idea that everything simply says "steel," correct?

Page 219

**A. Yes.**
Q. Nothing says painted steel, correct?
**A. Correct.**
Q. Would it surprise you to know that Ikadan, MIK, Southwest Agri-Flooring all use the same term, just steel?
**A. Yes.**
Q. That would surprise you?
**A. No, that would not surprise me, but, yes. They did that.**
MR. LULIC: He's agreeing with you that they did that.
THE WITNESS: I didn't listen to the question again.
MR. DIESETH: Yes, you did.
MR. SOBALVARRO: That's it.
MR. LULIC: You've got a right to read and sign this transcript. I recommend you exercise that right.

Page 220

STATE OF MINNESOTA )
COUNTY OF BLUE EARTH)

BE IT KNOWN that, I took the foregoing deposition of NORBERT BORCHERDING, pursuant to Notice;

That I was then and there a notary public in and for the County of Blue Earth, State of Minnesota;

That said witness before testifying was duly sworn to tell the truth, the whole truth, and nothing but the truth relative to the cause specified in the Notice;

That the witness did not waive the reading and signing of said deposition;

That I am neither attorney nor counsel for, not related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action;

That the testimony was taken down in stenotype by me; then reduced to typewriting under my direction by means of computer-aided transcription, and is a true and correct transcript of my stenotype notes.

Witness my hand and seal this 28th day of May, 2001.

MARTHA M. RIVARD

Page 221