JUL 17 2001

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

------------------------------------

Court File No.
00-CV-785 DSD/SRN

Holden Farms, Inc., a Minnesota Corporation; Rod Garness; Eugene C. Ward; Randy Swanson; Rick Anderson d/b/a Circle A Farms; Tim Sanborn; AJ Farms, a Minnesota General Partnership; Dennis Kofstad; Marlin Kruckeberg; and Pork Avenue, LLP, a Minnesota Limited Liability Partnership,

Plaintiffs,

-vs-

Hog Slat, Inc., a North Carolina Corporation; BCM Manufacturing, Ltd., a Canadian Corporation; and Double L Group, Ltd., an Iowa Corporation,

Defendants.

------------------------------------

Deposition of: WARREN HUTCHINGS

Taken at: Dorsey & Whitney
Pillsbury Center South
220 South Sixth Street
Minneapolis, Minnesota

Date: June 27, 2001

Commencing at: 10:00 a.m.

by MARTHA M. RIVARD, COURT REPORTER

12151 Gantry Lane
Apple Valley, Minnesota 55124
800-844-6420 * 612-431-1252

LITIGATION SUPPORT--COLOR VIDEOTAPING SERVICE

EXHIBIT
G

Deposition of WARREN HUTCHINGS, taken pursuant to Notice to Take Oral Deposition, under the Rules of Civil Procedure, for the U.S. District Courts of Minnesota, at Dorsey & Whitney, Pillsbury Center South, 220 South Sixth Street, Minneapolis, Minnesota, commencing at approximately 10:00 a.m., on the 27th day of June, 2001, before Martha M. Rivard, Notary Public, in and for the State of Minnesota.

\- * -

APPEARANCES:

DUSTAN J. CROSS, Esq., of the law firm of Gislason & Hunter, 2700 South Broadway, P. O. Box 458, New Ulm, Minnesota 56073-0458 appeared for and on behalf of Plaintiff.

PAUL R. DIESETH, Esq., of the law firm of Dorsey & Whitney, Pillsbury Center South, 220 South Sixth Street, Minneapolis, Minnesota 55402 appeared for and on behalf of Defendant Hog Slat.

RICHARD W. SOBALVARRO, Esq., of the law firm of Rajkowski Hansmeier, 11 Seventh Avenue North, P. O. Box 1433, St. Cloud, Minnesota 56302-1433 appeared for and on behalf of Defendant BCM.

JOSEPH F. LULIC, Esq., of the law firm of Hanson, Lulic & Krall, 920 Second Avenue South, Suite 500, Minneapolis, Minnesota 55402, appeared for and on behalf of Defendant Double L Group.

\- * -

Examination:
By Mr. Cross . . . . . . . . . . . . . . 4, 168
By Mr. Dieseth . . . . . . . . . . . . 137
By Mr. Lulic . . . . . . . . . . . . . 153

Exhibits:


No. 36 - Minutes . . . . . . . . . . . . . . . . . . 12
No. 37 - Maxima drawings . . . . . . . . . . . . . . 24
No. 38 - Raw material specs. . . . . . . . . . . . . 29
No. 39 - BCM memo to J. Zittergruen. . . . . . . . 30
No. 40 - Double L memo to W. Hutchings . . . . . 34
No. 41 - Double L memo to W. Hutchings . . . . . 35
No. 42 - Price quotation . . . . . . . . . . . . . 36
No. 43 - Invoice . . . . . . . . . . . . . . . . . 36
No. 44 - Maxima brochure . . . . . . . . . . . . . 36
No. 45 - Maxima brochure . . . . . . . . . . . . . 36
No. 46 - PermaBeam brochure. . . . . . . . . . . . 36
No. 47 - Excelerator brochure. . . . . . . . . . . 36
No. 48 - Excelerator brochure. . . . . . . . . . . 36
No. 49 - Maxima parts sold . . . . . . . . . . . . 36
No. 50 - BCM memo to dealers . . . . . . . . . . . 50
No. 51 - BCM memo to N. Borcherding. . . . . . . . 51
No. 52 - Filter-Eeze brochures . . . . . . . . . . 52
No. 53 - BCM fax to Double L . . . . . . . . . . . 54
No. 54 - Flooring proposal from Double L . . . . 56
No. 55 - 3/22/94 letter from BCM to Borcherding 58
No. 56 - BCM memo to J. Zittergruen . . . . . . . 60
No. 57 - BCM fax to Sullivan . . . . . . . . . . . 68
No. 58 - BCM fax to Sullivan (cartons) . . . . . 70
No. 59 - BCM memo to J. Zittergruen . . . . . . . 74
No. 60 - BCM memo to J. Zittergruen (warranty) . 75
No. 61 - BCM product info. . . . . . . . . . . . . 75
No. 62 - Filter-Eeze manual. . . . . . . . . . . . 77
No. 63 - 7/11/94 fax from Double L to BCM . . . 89
No. 64 - Double L order . . . . . . . . . . . . . 89
No. 65 - Juniper Creek Farm letter to B. Evans . 97
No. 66 - BBZ memo to Slessor . . . . . . . . . . . 99
No. 67 - 8/23/98 memo from Evans to Zittergruen 103
No. 68 - BCM letter to Mr. Miller. . . . . . . . 106
No. 69 - BCM letter to B. Evans. . . . . . . . . 110
No. 70 - BBZ letter to "Contact" . . . . . . . . 113
No. 71 - BCM/Double L sales meetings minutes . . 116
No. 72 - Technical bulletin . . . . . . . . . . . 118
No. 73 - 7/20/99 memo from BBZ to Zittergruen. . 120
No. 74 - BCM letter to Holden. . . . . . . . . . 121
No. 75 - BCM letter to Zittergruen . . . . . . . 127
No. 76 - Orr e-mail to Palmer. . . . . . . . . . 130
No. 77 - Orr e-mail to Orr . . . . . . . . . . . 133
No. 78 - Technical bulletin. . . . . . . . . . . 136
No. 79 - BCM fax to Beta Engineering . . . . . . 144
No. 80 - BCM fax to Sullivan . . . . . . . . . . 152
No. 81 - BCM letter to Holden. . . . . . . . . . 153

WARREN HUTCHINGS,
called as a witness,
having been duly sworn,
was examined and testified as follows:
EXAMINATION
BY MR. CROSS:
Q. Good morning, Mr. Hutchings. My name is Dustan Cross. We've been introduced previously. I'm the attorney representing the plaintiffs in this case. It's my understanding Mr. Sobalvarro has explained to you the general rules of a deposition and how we try to conduct ourselves, correct?
A. **Yes.**
Q. Could you please, just very briefly, identify for me when you first became involved with BCM Manufacturing?
A. **It would have been in September of 1991.**
Q. BCM currently operates under a new name?
A. **Yes, correct.**
Q. What is that name?
A. **Agri Flooring International.**
Q. And is that a change of legal name or is that just a trade name?
A. **It's a change of legal name.**
Q. How long, if you know, was BCM in existence



prior to your involvement? When was it started?
A. **It was started in 1978, I believe.**
Q. Was that by Mr. Pierre A. Moreau, M-o-r-e-a-u?
A. **Yes, correct.**
Q. Who currently are the principals of BCM? Who owns it?
A. **That is my son, Darrell Hutchings and myself.**
Q. And for convenient's sake, Mr. Hutchings, is it fine if I refer to the company as BCM, recognizing that it has since changed its name?
A. **Yes.**
Q. If you know, in 1978 when Mr. Moreau formed BCM, was that when he first developed plastic flooring for hog confinement facilities?
A. **Very shortly after then, I believe, yes.**
Q. Again, all of these questions are if you know. If you don't know, that's fine.
A. **Yeah.**
Q. Prior to 1978, was plastic flooring used within the hog industry?
A. **Yes, I believe to some extent. From what I have been told, the first flooring was probably used in Germany.**



Q. Do you know what time frame it was first introduced?
A. **Not exactly, but I would expect not much more than a year earlier than that time.**
Q. From some of the documents, I get the impression that BCM was sort of the first manufacturer of plastic flooring in North America. Would that be correct?
A. **That's my understanding.**
Q. What types of plastic flooring, livestock plastic flooring were first developed and sold by BCM, again, if you know?
A. **Well, it was polypropylene flooring just in a different configuration than the current models that we're selling.**
Q. Was that for poultry facilities or hog facilities or was it for both?
A. **It was for hog originally, and I believe the first poultry flooring BCM made was around 1982.**
Q. Now, as to hog facilities, you indicate that it was a different configuration than the types being sold today or were developed over time; is that correct?
A. **Yes.**
Q. What type of configuration was originally developed back in 1978?



A. **Generally speaking, they were a heavier, thicker-walled material. Basically, the same grade of polypropylene material, of raw material, but just generally real, real sturdy material, and they were designed to rest on concrete beams, and in some cases, wooden treated beams or on metal beams.**
Q. How were they -- when you say they rested on the concrete beams, what do you mean by rested on? How were they --
A. **They simply just laid across the top. The beams would support a pit across -- or span a pit, and then the flooring laid on the beams, and they were pinned together with nylon pins.**
Q. Are you an engineer, Mr. Hutchings?
A. **No.**
Q. Prior to 1991, your involvement with BCM, what did you do?
A. **I have been in plastics manufacturing practically all my life.**
Q. In what types of businesses?
A. **In extrusion of plastics.**
Q. What were the plastics used for? What was the line of business?
A. **It was originally custom plastics extrusion and they would be things like weather stripping for**

Page 8

windows and doors, and then eventually we got into the manufacturing of vinyl window frames. That sort of became popular in the early '80s.
Q. Did you have any involvement with the hog confinement industry prior to 1991, either as a farmer or in your work history as a plastics person?
A. Not directly, although in the early '70s, we extruded some, I'll call it PVC t-bar that was used for flooring in hog barns.
Q. Now, in 1991, did you become associated with BCM as an employee or were you purchasing the company at that point?
A. I purchased the company at that time.
Q. And Mr. Moreau stayed on for a period of time.
A. Right. A couple of years, approximately.
Q. At the time that you purchased BCM, was the Maxima flooring either in design or available? We're talking about Maxima 1 now.
A. It was basically in design stages at that point. There were rough drawing concepts around the office.
Q. Who was responsible for preparing the design drawing concepts for the Maxima 1?
A. That was contracted out to a company in

Page 9

Calgary called AmTech Manufacturing.
Q. Now, as I understand it, Mr. Hutchings, there's a generic product name called Filter-Eeze.
A. Yes.
Q. And that is a broad name that covers a number of product lines; is that correct?
A. Yes.
Q. Was that product name, Filter-Eeze, used since 1978, if you know?
A. I don't know for certain, but I assume it was used, certainly from 1979 or '80 onward, to the best of my --
MR. SOBALVARRO: You said '78.
MR. CROSS: Wasn't the previous testimony that the company was formed in '78?
THE WITNESS: It was formed in '78, but it was originally involved in custom injection molding and I don't think the flooring was developed until into '79.
BY MR. CROSS:
Q. Has Filter-Eeze been the generic product name for all hog-related floorings?
A. Yes. And then to expand on that, coupled behind that there are specific model names, but yes, they are all Filter-Eeze.

Page 10

Q. Now, prior to the development of the Maxima 1 flooring, was there other Filter-Eeze product lines that had a similar attachment to the support beam system that Maxima 1 had?
A. Yes.
Q. What was that?
A. A product called Ultima. It was a metric size product that was developed for the European market, basically.
Q. When was Ultima developed?
A. I would say it was -- development went on, probably it started in late 1990, and tooling was completed, I would say, in early '91, prior to my arrival.
Q. What you do mean by tooling?
A. The actual injection mold that makes the part.
Q. And would it be available on the market, then, shortly after that point?
A. Yes.
Q. Other than the Ultima, were there any other Filter-Eeze products that had a similar attachment to the support beam system as Maxima 1?
A. No.
Q. Prior to --

Page 11

MR. SOBALVARRO: And by "attachment," you mean the hanging bracket that sat on the support beam.
MR. CROSS: Yes.
BY MR. CROSS:
Q. Are you aware of what testing was done on the Ultima Filter-Eeze product, prior to its introduction into the European market?
MR. SOBALVARRO: I'll object as vague.
THE WITNESS: I'm not aware.
BY MR. CROSS:
Q. Who was responsible for the development and design of the Ultima Filter-Eeze product?
A. I believe that that would have been a combination of people. Certainly Pierre Moreau would have had some input, and although I can't say for certain, but I assume that AmTech also had input, as they also built the injection mold.
Q. As to the Maxima 1 flooring system, that was a non-metric --
A. Imperial size.
Q. Imperial size flooring used, or intended for the North American market?
A. Yes.
Q. Who was responsible for the design and

Page 12

development -- well, you've already answered that.
Do you know what testing was done on the Maxima 1 flooring during the design stage?
MR. SOBALVARRO: Object, vague.
THE WITNESS: Other than we did pressure testing, static load testing, sizing as it's produced from the injection molding machine. You know, you're constantly taking measurements and checking shrinkages and making certain that it fits, you know, onto fiberglass beam, et cetera.
BY MR. CROSS:
Q. Would the Maxima 1 flooring be used at a test farm site with actual pigs as part of its development before it was made available in the market?
A. **It may have been, but I don't recall exactly.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 36 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Showing you what has been marked as Exhibit No. 36, do you recognize this document?
A. **Yes, I recall seeing it in the correspondence file that I recently reviewed.**
Q. Do you know who prepared these minutes?

Page 13

A. **Not exactly certain, but I expect it would have been either Carol Groth or Jeanne Zittergruen.**
Q. Approximately the sixth paragraph down refers to new Maxima mold drawings. Do you see that?
A. **Yes.**
Q. Was this the Maxima 2 line or was this in reference to Maxima 1, if you know?
A. **I believe this would be the Maxima 2.**
Q. When was Maxima 1 first made available in the United States?
A. **That was, I believe, in the spring of '93.**
Q. And at that time, was Double L the exclusive distributor of Maxima products in the United States?
A. **Yes.**
Q. Prior to the introduction of the Maxima 1 flooring into the United States, do you recall any discussions with Double L representatives about how to market this particular product?
A. **Not specifically.**
Q. There was a company, I believe it was called Agri Southwest?
A. **Southwest Agri Products, yes.**
Q. Southwest Agri products that ultimately developed a similar product to BCM.
A. **Right.**

Page 14

Q. To the Maxima flooring, correct?
A. **Yes.**
Q. When did that come on the market, if you recall?
A. **I would estimate in 1995, '96. In that time frame.**
Q. When Maxima was first introduced in the United States, were there concerns about the relative cost of the flooring as compared to other types of flooring systems?
MR. SOBALVARRO: Object as vague. Concerns by whom?
BY MR. CROSS:
Q. Concerns by yourself or by Double L representatives.
MR. SOBALVARRO: Object on foundation.
THE WITNESS: I think generally speaking that cost is always a factor, but I don't recall, you know, anything specific that we were competing against other direct competitors.
BY MR. CROSS:
Q. After the Maxima 1 flooring system was introduced in the United States in 1993, how much of that product was sold in that year, if you recall?

Page 15

A. **I do not recall.**
Q. Was the Maxima 1 flooring intended to replace the older designs, ultimately, or was it going to be an alternative and the older designs were going to continue to be offered?
A. **Yes, it was designed as an alternative product, and certainly, the previous products that were sold for the same application are still being sold today to some degree, although not in the same quantities.**
Q. What was the difference between the Maxima 1 flooring and the Maxima 2 flooring?
A. **Maxima 2 was basically strengthened at the sides where there's an interlocking tab. On the original product, we found that the tab was probably mounted a bit too high on the product, and when severe pressure was placed on, particularly at the ends of the product, you could burst out the surface of the flooring. So larger tabs, interlocking tabs were added at the sides and lowered for extra strength, and the two end tabs that I refer to as male and female interlocking tabs were located more toward the center of the product, again for extra strength.**
Q. As far as the hanger assembly, the portions of the Maxima 1 product that attached to the support beams, was there any change in that portion of the

Page 16

design between Maxima 1 and Maxima 2?
A. Very, very slightly. There was nothing that was designed in there as a change. When the product was finally fitted, there were slight adjustments that were required to make it fit securely together.
Q. When you say "slight adjustments," what particular type of adjustments do you mean?
A. Just tightening ribs, which are also used in the molding process as, they're called injector pins, to remove the plastic product from the injection mold.
Q. It appears from this memorandum that it was intended that the Maxima 2 design would become available sometime later in that year?
A. Yes.
Q. Did you meet that schedule, do you recall?
A. As I recall, we did, yes.
Q. At the time that the Maxima 1 product was made available in the United States, do you recall any discussions with Double L as to the type of support beam that would be used with the Maxima 1 product?
A. The promotion at that time was always for our fiberglass beam, the Eezy beam, and as well as stainless steel or galvanized steel.
Q. And we're talking about 1993, correct?
A. Right. Late '93.

Page 17

Q. When Maxima 1 was first made available.
A. Yes.
Q. BCM would recommend the use of its Eezy beam fiberglass beam?
A. We were recommending that because at that time, it was under development, and that was going to be the beam of choice.
Q. After the fiberglass beam, you would then recommend stainless steel?
A. Correct. Yes.
Q. And then after stainless steel, you would recommend galvanized steel?
A. Yes.
Q. And last would come untreated steel or painted steel?
A. Yes, although that was not recommended and people were advised that, you know, that that type of beam would not last for the same length of time in a pig barn environment as would the fiberglass or stainless.
Q. You said people were advised. Who were the people that were advised?
A. All of our customers that we were talking to.
Q. And in the case of the United States, that would be Double L?

Page 18

A. Yes.
Q. Who, specifically, at Double L did you advise that?
A. I would think normally the people that we had contact with.
MR. LULIC: Object on foundation.
BY MR. CROSS:
Q. Do you recall talking with anyone at Double L in 1993 about the type of beam that was to be used with Maxima 1 flooring?
MR. SOBALVARRO: One point of clarification. Does Double L include BBZ in your question?
MR. CROSS: It does now.
THE WITNESS:
BY MR. CROSS:
Q. Or BBZ?
MR. LULIC: I don't know why it would. But --
THE WITNESS: Specifically, I can recall at one point speaking with Bailey Evans and advising him that -- again, I think this conversation came up about a cost issue against people such as Ikadan that were actively trying to sell flooring in the U.S., and when I spoke to Bailey, I asked, you know, what he

Page 19

was using or what he was comparing it to and what Ikadan was using for their support beams, and they were using a three-sixteenths beam compared to our quarter-inch beam, and I believe Bailey was having difficulty in competing on beams. And so the conversation led to the fact that, you know, I asked Bailey what he was quoting and he said, "Oh, we're quoting plain or painted steel," and I said, "Well, you do not want to use that because, you know, it's going to rust and the farmer will be unhappy," and Bailey's reply was, "We'll worry about that later."
Q. Do you recall when this discussion took place? Or when did this discussion take place?
A. I don't recall exactly, but I'm sure it was in the '93, '94 time frame. I think in that period of time also, I acquired a quote for Bailey for a quarter by three-and-a-quarter by four galvanized beam from an Ontario manufacturing form to see if, because of the lower Canadian dollar, if we could be more competitive. And also in that same time frame, I obtained a quote for him for a galvanized metal end bracket to secure the beams to the concrete pit wall.
Q. Did you speak with Mr. Borcherding about the various types of beams that would be available or could be used with the Maxima 1 product?

Page 20

A. I don't remember specific conversations, but I'm sure that I would have, as well as Mike Sullivan, who was more of the daily contact at Double L at that time, and Norb tended to be more on the sales side and traveling a lot and Mike was the general manager.

Q. How did you become aware that the use of plain or painted steel would not be recommended?

A. Generally, I think it's pretty common knowledge that plain steel rusts severely in a hog barn, you know, if you compare it even to leaving plain steel outside in the environment it rusts quick enough, and if you put it in a hog barn environment, it's going to rust that much faster. And also from the fact of the Ultima product that was being sold in Europe, you know, that we were selling to people, it's my understanding that those customers were putting it on galvanized steel.

Q. Were there any tests conducted by BCM as to the Ultima or Maxima 1 product related to the interaction between the flooring product and the support beam system?

MR. SOBALVARRO: Object as vague.

THE WITNESS: Not that I'm aware of. Because again, it was intended in our use that we would be using it with fiberglass beam.

BY MR. CROSS:

Page 21

Q. Was that the intention of BCM from the time it first introduced the Maxima 1 flooring product?

A. Yes.

Q. Did you communicate that intention to Mr. Borcherding or Mr. Sullivan?

A. Yes. We offered them our Eezy beam product as soon as it was developed and they initially purchased, I believe it was about a thousand feet of product, which I'm not sure what it was used for, samples or testing or whatever, and then it's my understanding that shortly thereafter, they developed their own fiberglass beam. Or I'm sorry. I should say a second fiberglass beam. Because from the early '90s, they already had in existence a six-inch fiberglass beam.

Q. When did fiberglass beams first become used with flooring systems in hog confinement barns, if you know?

A. I don't know for certain, but I would expect 1990 or very shortly thereafter.

Q. On the third page of Exhibit No. 36, Mr. Hutchinson, there is a reference to, "BCM Manufacturing is coming out with a new quarter-inch fiberglass beam and mount plate for the Maxima slat." Do you see that?

A. Yes.

Page 22

Q. Was that fiberglass beam already available as of March 1994 when the Maxima 2 was being designed?

A. Yes.

Q. Was this a redesign, then, of an already existing fiberglass beam that was already available?

A. No, this was a new design of fiberglass beam.

Q. But there was one already available prior to this time?

A. Yes, correct. Double L had their own six-inch beam prior to this. The BCM beam was a new concept to try and be more competitive and compete against the galvanized steel or stainless steel, which, of course, is very expensive, and this was designed to replace that or to offer an alternative.

Q. Could the six-inch beam that Double L already had available be used with the Maxima 1 flooring?

A. Double L evidently said that it could not, but I do not see why it couldn't have been. It was expensive though is my understanding.

Q. On Exhibit No. 36, on the second page, there is a series of dates for completion of the Maxima slat. You see that?

A. Right.

Page 23

Q. Over on the right column, there's "Available for WPE." What does that mean?

A. World Pork Expo, I would expect, which is usually held that first week of June.

Q. In other words, it was intended to have the Maxima 2 available for display purposes at the Expo.

A. Right.

Q. What role, if any, did Double L play in the design of the Maxima flooring?

A. I don't recall exactly. There were numerous telephone calls and correspondence going on. I would expect that they had, you know, some input as to what size it should be, obviously, you know. Again, if we look at this page two, I know for a fact that this was Norb's suggestion that we also needed this six-inch by 24 and six-inch by 18 Maxima, and those tools were never built because we decided, or it was decided later that, you know, we couldn't sell enough of that size to warrant manufacturing the tools.

Q. The Maxima flooring was again for use exclusively within the North American market, or was it also available --

A. It could be used, yes, anywhere.

Q. Roughly, what percentage of the Maxima flooring was sold in the United States as compared to

Page 24

Canada? I realize that's a complete ballpark figure for you.
A. Yes. Probably 75 or 80 percent.
Q. Would be sold in the United States?
A. Yes.
Q. So the majority of Maxima product was sold to Double L and distributed in the United States. Would that be fair?
A. The majority, although Maxima has been sold in England, Denmark, Australia, New Zealand, I believe the Philippines and Canada, of course.
(WHEREUPON, Hutchings Deposition Exhibit No. 37 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. I'm showing you, Mr. Hutchings, what has been marked as Exhibit No. 37. Could you take a moment and look through that quickly?
A. Okay.
Q. Do you recall this document?
A. Now that I have it placed in front of me, I do recall seeing it before, yes.
Q. What is Mr. Sullivan communicating to you by this exhibit?
MR. LULIC: Object to the form of the

Page 25

question.
THE WITNESS: This slat that he's drawn here on page three, and it appears the 48-inch size also that he's referring to, see, this is designed for a farrowing crate operation and you'll notice that they show the cast iron on the upper right-hand side. The Maxima product, its main use was for nursery operations and when you have a farrowing crate setup such as this, depending on the width of the crate, I assume that's why he was talking about a 48 as well, because you could have a six-foot farrowing crate. So at the two-foot mark there would be a pen divider and then you would have two feet of cast and then you'd have another two feet of Maxima on the other side. In this particular application, you'd have this being a 36-inch piece, so you'd have an 18-inch creep area for the little pigs on each side and you'd have a five-and-a-half foot crate.
BY MR. CROSS:
Q. Were these designs ever incorporated into products that were developed by BCM?
A. No. Not as far as I know.
Q. As to the Maxima 2 flooring, were the design drawings sent to Double L prior to production?
A. I don't recall.
Q. As to any of the new models of product that

Page 26

were to be distributed in the United States, did BCM ever send design drawings to Double L prior to production?
A. Yes.
Q. What was the purpose for that?
A. Again, Double L being a major customer of ours, I know -- I'm certain that the Excelerator product which was a later product than Maxima that was designed and brought to the market definitely had some input from Double L.
Q. What types of input?
A. Again, just looking at the drawings and giving us their thoughts, you know, of any input they might have directly from the field.
Q. Who at Double L would provide you that input?
A. I would have expected at that time it would have been Norb and Bailey Evans, and Jeanne likely was involved.
Q. Jeanne is Ms. Zittergruen?
A. Yes.
Q. Relative to the Maxima 1 and Maxima 2 product lines again, Mr. Hutchings, you don't recall whether or not those designs were or were not sent to Double L prior to production.

Page 27

A. I don't recall that they were, although I would certainly expect that they would have been, especially when, you know, you have this document where they're saying that these slots might appear to be better than what, you know, they're already looking at.
So it would appear to me that the drawings of some, you know, a draft form possibly.
Q. Would it be fair to say, Mr. Hutchings, that all product lines before they were introduced into the United States would have the designs sent to Double L prior to production?
MR. LULIC: Object on foundation.
MR. SOBALVARRO: Object to the scope.
THE WITNESS: All products that certainly would pertaining to the North American market. You know, just thinking back about Ultima, I don't believe, as far as I know, that it was ever sent to them.
BY MR. CROSS:
Q. But that was a product not distributed in the United States, correct?
A. It could be, although its primary design was developed for Europe and we have sold it in North America.
Q. Do you recall any products that were

Page 28

designed for sale in the United States that were designed without the designs having been previously sent to Double L?
MR. LULIC: Objection, foundation.
THE WITNESS: Could you repeat that, please?
BY MR. CROSS:
Q. Yes. Do you recall any product lines that were introduced into the United States in which the designs were not sent to Double L prior to production?
MR. LULIC: Object on foundation.
MR. SOBALVARRO: Object as asked and answered. He already told you he does not know for sure, at least as to Maxima.
MR. LULIC: Which is the purpose of the objection.
THE WITNESS: Again, I don't know for certain, but I suspect that anything that was designed for the North American market, again, because Double L was one of our major customers, that --
MR. LULIC: Move the answer be stricken as nonresponsive.
MR. CROSS: Well, why don't you let him complete his answer first?
MR. LULIC: Pardon me?

Page 29

MR. CROSS: Why don't you let him complete his answer first?
MR. LULIC: Why don't you keep your suggestions to yourself?
MR. CROSS: Well, why don't you quit interrupting the witness?
BY MR. CROSS:
Q. If you could continue, Mr. Hutchings.
MR. SOBALVARRO: If you weren't finished.
THE WITNESS: I'm finished.
(WHEREUPON, Hutchings Deposition Exhibit No. 38 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you what's marked Exhibit No. 38, Mr. Hutchings --
A. **Yes.**
Q. -- do you recognize this document?
A. **Yes.**
Q. What is it?
A. **Norb has obviously been asking for info on the raw material that we would use in Maxima products, other products, other flooring products. And we've simply extracted some info from, no doubt, one of the --**

Page 30

**either a raw materials supplier's specification sheet, or in some cases there will be information like this in the plastics encyclopedia.**
Q. This is information being sent to you from Double L, correct?
A. **No, we're sending this to Double L.**
Q. Okay. And what type of flooring or product was this to be used for? What was this information related to?
A. **It would be raw material that could be used in any of the flooring products that we were manufacturing.**
Q. And do you recall why Double L wanted this information?
A. **No, I do not.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 39 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Mr. Hutchings, showing you what has been marked Exhibit No. 39, it's a facsimile dated March 1, 1995 from Mr., is it Bob Slessor?
A. **Yes.**
Q. To Double L, and a letter that same date from Double L to yourself. Do you recall this

Page 31

correspondence?
A. **If I could just read it over.**
Q. Yes. Absolutely.
A. **I don't recall it exactly, but, you know, it's obviously produced by Bob in response to Jeanne's letter.**
Q. I'm interested in the first point of Mr. Slessor's response where he talks about the break point, the flash and burn points of Maxima slats. You see that?
A. **Yes.**
Q. The first sentence, "We do not have any scientific data on Maxima, but we do have some on Energro, the metric equivalent." Is Energro different than Ultima?
A. **In material?**
Q. No.
A. **It's different in design.**
Q. It's a different product.
A. **Yes. Same raw material.**
Q. What's the difference between Energro and Ultima?
A. **Well, first of all, it's a metric size so it's 40 centimeters by 80 centimeters, and it's mounted on galvanized bars that are on 15-and-three-quarter-inch**

Page 32

centers as compared to 12-inch centers for Maxima.
MR. SOBALVARRO: I think his question was the difference between Energro and Ultima, not Energro and Maxima.
MR. CROSS: That's correct.
MR. SOBALVARRO: So I think what you said to date is nonresponsive.
THE WITNESS: Okay. I'm thinking of Ultima. I'm not so sure, now that I looked at this, that Bob hasn't confused names here.
BY MR. CROSS:
Q. He should have been referring to Ultima you think?
A. I think he should have been referring to Ultima, because Energro is not an equivalent of Maxima. Energro is also a metric-size product, but it's a sow floor, not a nursery floor.
Q. Okay. Was the flash and burn point testing done on Energro or Ultima or both of them?
A. To my knowledge, it wasn't done on either product. We would simply talk to our raw materials supplier and also confer with the plastics encyclopedia and determine the flash point of polypropylene off of a general specification sheet.
Q. Was polypropylene the product used in all of

Page 33

the BCM plastic flooring products in the '90s?
A. Yes.
Q. And were there different grades, or were there differences between the plastics from one product to another? I realize the molds themselves would be different, but was the type of plastic used, the type of polypropylene different?
A. No, the type of polypropylene would all be the same.
Q. When product was shipped into the United States, Mr. Hutchings, who at BCM was responsible for making the arrangements for the shipment?
A. Well, generally speaking, it was our shipper that would have arranged trucks to deliver product to either Double L or the required destination that they asked us for.
Q. Who was that shipper again?
A. We've had a number.
Q. Who were you using in '94 and '95, if you recall?
A. Possibly a gentleman named Don Watson. My son had some involvement in it in contracting with various transport companies to obtain the best possible shipping rates for Double L on their behalf, and then the product was shipped on a collect basis to Double L.

Page 34

Q. And you were aware, as you've indicated, that sometimes the product would be direct shipped to the work site as opposed to Double L's warehouse.
A. Yes.
Q. And some of that product was shipped into the State of Minnesota, correct?
A. Yes.
Q. And you were aware of that?
A. Yes. From their POs.
(WHEREUPON, Hutchings Deposition Exhibit No. 40 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you, Mr. Hutchings, what's been marked as Exhibit No. 40, do you recall this document?
A. Yes, I recall seeing this when I was reviewing various correspondence.
Q. There is a request here for the clear span limits of the three-inch and four-inch fiberglass Eezy beams. What is the clear span limits?
A. Clear span limits would be the span that you could use the three and four-inch Eeze beam for across an open pit, you know, without center support and without obtaining too much deflection across the pit.
Q. Was the fiberglass beam -- or I'm sorry, the

Page 35

Eeze beam available for commercial sale by May of 1994?
A. Yes.
MR. SOBALVARRO: Without interrupting your chain, can we take a quick break?
MR. CROSS: Sure.
(WHEREUPON, Hutchings Deposition Exhibit No. 41 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you what has been marked as Exhibit No. 41, could you look at the final paragraph of this fax from Mike Sullivan to you dated February 11, 1993?
A. I don't recall exactly, but I expect that this is the galvanized bracket that I referred to earlier that I had obtained a quote for them on -- from someone in Canada, and I don't even recall who it was now.
Q. Was February 1993 approximately the time period that BCM began developing its fiberglass beam?
A. Yes, we would have been working on the engineering of it, I believe, around that time.
Q. And do you recall any discussions with Double L representatives about the design for a fiberglass beam in that time frame?
A. No.

Page 36

(WHEREUPON, Hutchings Deposition Exhibits No. 42 - 49 marked for identification by the Reporter.)

MR. CROSS: Just for everybody's information, Exhibit No. 42 is the one that says Price Quotation-Revision 1 and the attached pages.

MR. DIESETH: Would you give Bates numbers?

MR. CROSS: BCM 3335 through BCM 3338.

MR. LULIC: Is Exhibit No. 42?

MR. CROSS: Exhibit No. 43 is BCM 3339, Exhibit No. 44 is BCM 3340 through BCM 3341, Exhibit No. 45 is BCM 3342 through BCM 3345, Exhibit No. 46 is BCM 3346 through BCM 3347, and Exhibit No. 47 is BCM 3348 through BCM 3349, Exhibit No. 48 is BCM 3350 through BCM 3351, Exhibit No. 49 is BCM 3352 through BCM 3354.

BY MR. CROSS:

Q. I'm showing you, Mr. Hutchings, a set of documents, Exhibits No. 42 through No. 49, which where a series of documents just produced today by your attorney, and I'd like to go through those real quickly. What is Exhibit No. 42?

MR. SOBALVARRO: Which page of it?

BY MR. CROSS:

Q. The first page.

Page 37

A. **This is a quotation that we received from Advanced Fiber Products for the cost of tooling as well as a cost of product once tooling was completed for the Fiberglass Eeze beam.**

Q. It refers to a quote based on your drawings dated October 27, 1993?

A. **Right.**

Q. Who would have prepared those drawings?

A. **I believe those were sketches that I had completed based upon the data that I received from Beta Engineering.**

Q. The next two pages are a pair of invoices, one dated February 16, 1994 and the other dated February 24, 1994 for a series of the Eezy beams, both the four-inch, the three-inch and three-quarter-inch, and I'm looking at the February 24, 1994 invoice, BCM 3337. Were these to be test products or what was this order to represent?

A. **This would have been our first production order off of the new tooling, or from the new tooling, and no doubt would have been used, certainly some of it, for testing. It appears that, no doubt, some of it was for a sales order just due to the lengths that are involved here.**

Q. Was any of this product shipped into the

Page 38

United States, do you know?

A. **There was a --**

MR. SOBALVARRO: I'm going to object to the form of the question. By "this product," do you mean the product shown on this invoice or --

BY MR. CROSS:

Q. Yes. I'm sorry. Yes. The product, the Eezy beams, the four-inch and three-inch Eezy beams.

MR. SOBALVARRO: Again, I'm going to object as vague. As shown delivered to BCM from these invoices were these subsequently shipped in?

MR. CROSS: Yes.

MR. SOBALVARRO: Okay.

THE WITNESS: I don't know for certain, but I doubt it.

BY MR. CROSS:

Q. These beams would have been compatible with the Maxima flooring; is that right?

A. **Yes.**

Q. Were they designed for use with the Maxima flooring?

A. **Maxima as well as others, such as Ultima, Energro.**

Q. The Ultima sizing was compatible with the Maxima sizing? In other words, you could use the same

Page 39

support beam for either product?

A. **Yes.**

Q. Looking at Exhibit No. 43, it's an invoice dated July 7, 1994 for shipment of 1,004 Eeze beam products -- or I'm sorry, three-inch Eezy beams to Double L; is that right?

A. **Yes.**

Q. Who paid the invoice for that?

A. **BCM**

Q. Was the product sent to Double L at its request?

A. **Yes.**

Q. Did you have any discussions with Double L representatives as to why they wanted a thousand, or approximately a thousand Eezy beams?

MR. SOBALVARRO: Object. For the record, I think it's a thousand feet, not a though beams.

MR. CROSS: Okay.

MR. SOBALVARRO: Just so it's clear.

MR. CROSS: You're right. A thousand feet.

THE WITNESS: Yes. I do not recall at this point what the purpose of it was. Again, it almost looks like it would be for a sale, because, again, of

Page 40

the lengths that are ordered. You know, 27 pieces, four foot long and 112 pieces at eight feet. Normally if one is ordering samples, you just, you know, order a random size like 16-foot lengths or whatever.

BY MR. CROSS:

Q. To your knowledge, was this the only time that Double L purchased Eezy beams from BCM?

A. **Yes.**

Q. Did you have any discussions with anyone at Double L as to what was ultimately done with these Eezy beams after the delivery?

A. **I don't recall that I did.**

Q. Just so we go in order, looking at Exhibit No. 44, what is this document, if you know?

A. **This appears to be a piece of advertising material that was generated by Double L simply introducing the new light-colored product, which is a light gray or bone color. And prior to that, all of the product had been generally produced in black.**

Q. When was the new light color product introduced?

A. **I believe it was in early '98.**

Q. So this document dates from approximately 1998?

A. **Right.**

Page 41

Q. Would advertisements such as Exhibit No. 48 be sent to BCM for review prior to distribution?

A. **Such as No. 44?**

Q. No. 44. I'm sorry. Thank you.

A. **Not usually.**

Q. Looking at Exhibit No. 45, do you recognize this document?

A. **Well, I recall seeing it, again, when I was reviewing the correspondence in the file, but as to, you know, specifically being able to pinpoint it, no, it's not that familiar.**

Q. There's a reference on the bottom of the first page of the exhibit to a PermaBeam?

A. **Yes.**

Q. What is PermaBeam?

A. **That's the fiberglass beam that was developed by Double L.**

Q. That is not a product that is sold by BCM.

A. **No.**

Q. Looking at Exhibit No. 46, do you recognize that document?

A. **Yes. Again, I have seen it in reviewing the correspondence in the file.**

Q. Is there any way that you can date this document? Do you know when this PermaBeam became -- strike that. When, if you know, did Double L begin selling the PermaBeam?

Page 42

MR. LULIC: Object on foundation.

THE WITNESS: My best guess would be in 1998.

MR. SOBALVARRO: Object to the answer as speculation.

BY MR. CROSS:

Q. Was the PermaBeam available during the construction of any clients' hog barns?

MR. SOBALVARRO: Object, lack of foundation. Calls for speculation.

MR. LULIC: He just said his best guess was 1998. Was that during the construction of your clients' hog barns?

MR. SOBALVARRO: I don't want you to guess, Warren. If you know, you know. If you don't, you don't.

THE WITNESS: This particular beam was not available at the beginning of the Holden construction.

MR. SOBALVARRO: For the record, you're looking at Exhibit No. 46, correct?

THE WITNESS: Yes.

BY MR. CROSS:

Page 43

Q. Was the Eezy beam available at the time of the construction of my clients' hog barns?

A. **Yes.**

Q. Looking at Exhibit No. 47, do you recognize that document?

A. **Yes. Again, seeing this document when reviewing the material.**

Q. And this is an advertisement that was prepared by Double L for Excelerator?

A. **Yes.**

Q. When did Excelerator first come on the market?

A. **1994, 1995. In that time frame.**

Q. What is the difference between the Maxima 2 and the Excelerator flooring?

A. **The Excelerator flooring mounts on, again, Eeze beam but spans two feet instead of a one foot spacing and was designed for nursery floors. It has a wider opening, the slots, or open space is wider than Maxima so it provides better filtration for the animals, keeps them cleaner and drier, is faster to clean with pressure washers, and it was generally designed to reduce the beam cost.**

Q. And the benefit of the two-foot span as opposed to the one foot span is you require fewer beams.

Page 44

A. Correct.
Q. The hook-over design, the way in which the Excelerator flooring attaches to the support beam, is that any different than the Maxima 2 design?
A. Generally, no. The only thing with Excelerator is that the complete product is designed to be somewhat thinner in wall thickness throughout the product to allow for faster manufacturing. And, you know, obviously, again, due to a cost issue. The more parts we can produce per hour, the less cost it is.
Q. On page two of Exhibit No. 47, there is a reference to a one year warranty on the Excelerator.
A. Yes.
Q. When was the one year warranty implemented for Excelerator flooring?
MR. SOBALVARRO: Objection, form of the question. It assumes --
BY MR. CROSS:
Q. Was there a one year warranty for Excelerator flooring from BCM?
A. No.
Q. What was the warranty for Excelerator flooring from BCM?
A. Five year warranty.
Q. Were you aware that Double L had prepared a

Page 45

document in which it stated that there was a one year warranty?
A. Yes, when I reviewed the correspondence, and obviously, back whenever this was generated, that, you know, no doubt I had a copy. It was in the file. It's my guess that this may have been a piece of prototype literature.
Q. You're not aware, then, of this document having been distributed to customers?
A. I don't know for sure.
Q. Looking at Exhibit No. 48, what is that?
A. Again, this one is literature that was developed when we brought out the new light gray or bone-colored product.
Q. When would that have been approximately? Same time as the Maxima?
A. Same, correct.
Q. And looking at Exhibit No. 49, what is that?
A. This is just a listing of the number of parts of each particular product that are sold during the year. This volume doesn't necessarily -- you know, this is total product sold, so it could be anywhere in the world.
Q. The designations show that in 1997, of the Maxima product, most of the product that was sold was

Page 46

the Maxima N24-2. You see that?
A. Yes.
Q. Is the -2 designation Maxima 2 or what does the designation mean?
A. Yes, that would have been Maxima 2. What it is is if you notice that there's a 2 and a 2A, and we had two molds, two separate molds that produced two pieces in each mold at one time, and the B after the nursery 24-2 means black and the G means gray out of the number two mold. And then there was another identical mold that we identified as 2A again, black, and I'm not certain what that AP, what that designation was.
Q. The 24, the N24, what does that refer to?
A. Just nursery 24, 24-inch long.
Q. That refers to the size of the flooring piece, correct?
A. Correct.
Q. As to fiberglass beams, Mr. Hutchings, what is the benefit of fiberglass over galvanized steel in conjunction with the use as a support system for the Maxima flooring?
MR. SOBALVARRO: Well, wait a second. I'm going to object to the form of the question. Are you basing that on what he knows now, or what he knew then, what he knew at what point in time? I think there

Page 47

are multiple questions encompassed there and his answer may not be responsive to any one of them.
BY MR. CROSS:
Q. Let's take back when Maxima first came on the market in 1993. What were the advantages of fiberglass beams that you knew of over steel, galvanized steel beams?
A. Longevity would be the main plus for that I would say.
Q. What is the anticipated life expectancy of a fiberglass beam used in a hog nursery with Maxima flooring?
A. The estimates that we're providing are 10 to 15 years, and that is based on some information that we've gathered from other fiberglass beam manufacturers that claim that they've had fiberglass beams out in the market for approximately 15 years without failure.
Q. Who are those other fiberglass beam manufacturers?
A. Main one would be Polygrate out of Manitoba.
Q. Is there anyone else?
A. That's the only one.
Q. What is the anticipated life expectancy of galvanized steel used as a support beam for Maxima products?

Page 48

A. It varies by climate and feeds and ventilation, but it is likely in the 10 to 12 year range.
Q. How about for stainless steel?
A. Maybe infinity. I don't know. I can't really say that I know of anybody that's used it, just due to cost.
Q. How about untreated steel?
A. Again, due to climates and feeds and ventilation, it appears, from what we're finding in the market in the past four or five years, that generally speaking, it's somewhere between three and five years.
Q. Do you have an understanding, Mr. Hutchings -- let me rephrase that. Did you have an understanding, Mr. Hutchings, back in 1993 and 1994 as to the relative costs of the various types of beams that we've just discussed?
A. A general knowledge, yes.
Q. What was the relative cost of fiberglass compared to galvanized compared to untreated steel?
A. My estimate would be that fiberglass was in the range of 20 percent more than galvanized. And probably there's another 20 percent drop to go to painted steel.
Q. And is stainless steel more expensive than

Page 49

fiberglass?
A. Yes.
Q. Other than the longevity of the beam, it's life expectancy within the hog confinement area, are there any other benefits or differences between the different types of beams?
A. Well, obviously --
Q. And the cost.
A. Yeah. The longevity, the fact that you do not have any possible chance of rust or corrosion.
Q. Which is related to the longevity?
A. Yes.
Q. Any differences in weight bearing capacity?
A. Yes, I would say the fiberglass tends to be not quite as strong. As far as spans are concerned, from a torque or twist standpoint, the fiberglass is stronger.
Q. Were there any concerns by BCM about the weight bearing capacity of the fiberglass beam, or has there ever been?
MR. SOBALVARRO: Of their own fiberglass beam?
BY MR. CROSS:
Q. Of their own fiberglass beam.
A. Oh, yes. It was tested initially with

Page 50

varying weight loads to ascertain how much deflection we would obtain based on various spans.
Q. And were those test results within acceptable limits?
A. Yes.
(WHEREUPON, Hutchings Deposition Exhibit No. 50 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you, Mr. Hutchings, what has been marked as Exhibit No. 50, do you recall this document?
A. Yes, this is a copy of a document that was sent out to dealers and distributors for insertion into the product manual.
Q. This relates to the Eeze beam product?
A. Yes.
Q. So this is additional or new information over and above what had previously been provided?
A. Right. And this was also at the time of the development of the late kit that you see on the second-to-the-last page. We were generally finding that the spans of beams that farmers were asking for were getting longer and longer, and the beam, by trying to span, you know, too great a distance, then would have too much deflection and the floor would appear soft to

Page 51

spongy, so then we developed this EZ Leg kit to act as a center support.
Some people will, if they have a wide pit, they'll use a type of structure that we call a pony wall in the center and the beam rests on the center and then maybe spans another six feet. Another application was, if you look at the last page, you'll notice that the ends where the beam rests on a lip on the concrete, there have been installations where the farmer wants to get away from that ledge there because it collects manure, so one way would be to then put in four of these EZ Leg kits and have the beam completely freestanding. So it served a dual purpose.
Q. And the leg kit became available in 1996; is that right?
A. Yes.
(WHEREUPON, Hutchings Deposition Exhibit No. 51 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you, Mr. Hutchings, what has been marked as Exhibit No. 51, it appears to be a facsimile of November 13, 1997 from Slessor to Norb; is that right?
A. Yes.

Q. You see the second page is "Recommended Fiberglass EZ beam sizes"?
A. **Yes.**
Q. Do you recall when that document was prepared? Is that about the same time as the legs were first developed in '96 or was it a different time?
A. **I would expect it was about the same time as '96.**
Q. Well, do you recall any discussions with Mr. Borcherding about this particular request November of 1997?
A. **No, I don't --**
Q. Mr. Slessor notes on page one of the exhibit "This is all of the material we have on beams and supports." You see that?
A. **Yes.**
Q. Are you aware, in reviewing this document, whether there is -- whether that statement is accurate? In other words, was there additional information relative to the BCM Eeze beam available, other than what is included in Exhibit No. 51?
A. **Not that I can recall.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 52 was marked for identification by the Reporter.)**



BY MR. CROSS:
Q. Showing you what has been marked as Exhibit No. 52, Mr. Hutchings, who is Jill Walsh?
A. **She was a receptionist that was with us from roughly -- I guess in 1991 she worked part-time and then worked full-time from '92 to '95, approximately.**
Q. In 1994 was there a person at BCM responsible for advertisement?
A. **Starting sometime in '94, Bob Slessor would have had some involvement.**
Q. Prior to 1994, who was responsible for preparing advertising?
A. **It was a combination of my son Darrell and myself.**
Q. And I think you've answered this before, but just to make sure, Mr. Hutchings, was there a practice between Double L and BCM about BCM's review of advertising of BCM products prior to its distribution?
MR. SOBALVARRO: I'm going to object as vague.
BY MR. CROSS:
Q. Would BCM review Double L advertisement of BCM products before it was distributed?
MR. SOBALVARRO: Before the product was distributed or before the advertising was distributed?



BY MR. CROSS:
Q. Before the advertising was distributed.
A. **Not normally.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 53 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Exhibit No. 53 is a facsimile from you to Mike Sullivan dated August 17, 1993?
A. **Yes.**
Q. It provides a quote regarding galvanized metal support brackets.
A. **Yes.**
Q. Were those support brackets that you had referenced previously?
A. **Yes.**
Q. Did you ever provide a price quote to Double L for galvanized steel support beams?
A. **Yes, I believe I did.**
Q. Do you recall when that was?
A. **I don't recall exactly, but I suspect it would have been around the same time frame as this or slightly later.**
Q. Other than providing that quotation, do you remember any other discussions with Double L about the



use of a galvanized steel support beam?
MR. SOBALVARRO: Other than the one he's previously described?
BY MR. CROSS:
Q. Other than the ones previously testified to.
A. **That's the only one I recall is the one previously referred to.**
Q. Do you recall any response from Double L after you provided a price quotation to them on galvanized steel?
A. **I don't recall.**
Q. Do you recall having a discussion with Double L in September of 1993 about an arrangement to be reached with Hog Slat on the purchase of Filter-Eeze products?
A. **I can't say as I recall the conversation specifically.**
Q. Do you recall a proposal being made to Hog Slat from Double L by which Hog Slat would purchase a certain amount of product at a reduced price?
A. **I recall a conversation about that, but that was a yearly event at the World Pork Expo.**
Q. Do you recall if any arrangement was ever made between Hog Slat and either BCM or Double L for the minimum purchase of product at a reduced price?

Page 56

A. I know there were quotes that went out regarding volume pricing, but I don't recall at this point whether any specific contract was signed.
(WHEREUPON, Hutchings Deposition Exhibit No. 54 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you what has been marked Exhibit No. 54, Mr. Hutchings, would you take a moment to review that?
A. I don't recall this exact proposal, but obviously, you know, it was in our file, as I'm sure there are probably others in later years.
Q. The facsimile is dated September 20, 1993 and refers to a proposal that will be presented to Hog Slat two days later.
A. Yes.
Q. Do you recall having reviewed and approved the proposal that was sent to you by Ms. Groth?
MR. SOBALVARRO: I object, lack of foundation. The witness just said he doesn't remember.
THE WITNESS: No, I don't recall.
BY MR. CROSS:
Q. On page two of the exhibit there is a reference in point B to a 10-year non-prorated warranty.

Page 57

Do you see that, page two of the exhibit?
A. Yes, I see that.
Q. Do you know what the term 10-year non-prorated -- what does the term 10-year non-prorated warranty mean to you?
A. It means that it was the warranty offered to Double L on our plastic flooring slats. Non-prorated simply meant that some other people in the industry, say after a five year period, they might only grant 80 percent of the value of the flooring if it broke or whatever.
Q. Was there a 10-year non-prorated warranty in effect for Maxima 1 and Maxima 2 flooring in 1993 and 1994?
MR. SOBALVARRO: To whom?
MR. DIESETH: And from whom.
MR. SOBALVARRO: Object as vague.
MR. DIESETH: Same objection.
THE WITNESS: BCM offered to Double L a 10-year warranty for our plastic flooring products at that time.
BY MR. CROSS:
Q. Was that a warranty that you understood to be available to the end users of the product as well?
MR. LULIC: Object on foundation.

Page 58

MR. SOBALVARRO: Yeah.
THE WITNESS: I would have assumed Double L would have passed it on again on the plastic flooring.
BY MR. CROSS:
Q. You understood that Double L was in the business of reselling this product --
A. Yes.
Q. -- to construction companies or others, correct?
A. Yes.
Q. And it did not build its own facilities, or did not operate hog barns itself.
A. Other than their own test site, yes.
(WHEREUPON, Hutchings Deposition Exhibit No. 55 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you, Mr. Hutchings, what has been marked as Exhibit No. 55, it's a series of letters. Do you recall this series of correspondence?
A. I recall seeing these again when I reviewed the correspondence in the files some time ago.
Q. Prior to March of 1994, had you met Tommy Herring?

Page 59

A. No.
Q. Had you met anyone from Hog Slat?
A. No.
Q. Neither at a trade show or --
A. No, not that I'm aware of.
Q. Having reviewed these letters, do you know whether or not Hog Slat received the preferred pricing that Mr. Borcherding offered them as shown in Exhibit No. 54?
A. I don't recall at this point. I mean, generally, we were not made aware of what prices were finally agreed to between Double L and their customers. In this particular case, I think because it had the potential of being such a huge amount, that, you know, there was more discussion than normally what went on, like, you know, just in regards to pricing, and it would appear that we were being pressured from Norb and probably Bailey to lower our prices to attract this contract.
Q. Do you recall what the pricing was for the Maxima 12 by 24 nursery slats sold to Hog Slat in 1994?
A. No, I do not.
MR. LULIC: It's five after 12. Is this a good point?
MR. CROSS: Yes.

(A brief recess took place.)
(WHEREUPON, Hutchings Deposition Exhibit No. 56 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Mr. Hutchings, I'm showing you what has been marked as Exhibit No. 56. It's a fax from BCM to Double L dated March 5, 1996. Do you recognize the handwriting on the front of the page?
A. **Yes, I would say it's Bob Slessor's.**
Q. If you turn to the third page of the exhibit, it's a document entitled "Product Information." Do you see that?
A. **Yes.**
Q. What is that? Is it just a general description of the sizes and specifications of the product?
A. **Yes, it's only meant as an information sheet that, again, is in our product manual.**
Q. Would a sheet such as this be prepared for every type or model of product flooring produced by BCM?
A. **I believe most of them are. Some of the older, earlier products that we have do not have the drawing that goes with it.**



Q. If you look on the miscellaneous section, it says, "Maxima nursery is the new generation of plastic swine flooring and is considered to be self-supporting." Before I get to that, when would this product information sheet have been prepared?
A. **This was probably in 1995 or '96.**
Q. And I notice colors available, there's black and also gray or white?
A. **Right.**
Q. As you understood it, at some point more colors other than black became available?
A. **Well, I don't think that this product was ever produced in any color other than black and gray. Certainly white would have been available, and as it states, for special pricing. But generally speaking, black has been the color for most recent years.**
Q. In the miscellaneous section, again, it says, "Its unique hanger system allows the panel to be supported on either flat steel bar or fiberglass support beams at 12-inch intervals." You see that?
A. **Yes.**
Q. Would your product information have anything in writing from this time period, 1995 or 1996, which indicated a preference for fiberglass beams over flat steel support beams?



A. **I don't know that it would be in writing, but certainly that's what we were certainly promoting was the fact of using the fiberglass beams, because that's a product that we sold. And there was nothing to be gained by selling steel bar.**
Q. Are you aware of any document that was produced by BCM prior to 1998 that recommended in writing that fiberglass support beams be used instead of steel support beams?
A. **I believe on some of the literature for Excelerator it would have been developed at about this time. It specifically states that you use Eeze beam, fiberglass Eeze beam.**
Q. Are you aware of anything in writing prior to 1998 that recommended fiberglass beams rather than steel beams for the Maxima product?
A. **Again, other than conversations that we had with people such as Bailey Evans recommending that he not use steel and rather should promote fiberglass or at the very least galvanized steel. As far as specific documents, I don't know. There may be some. This is five, six years ago now. I'm sure there probably are.**
Q. And you reviewed a number of documents in preparation for your deposition today; is that correct?
A. **Yes.**



Q. Did you observe any documents, or do you recall seeing any documents that made the recommendation of fiberglass beams over steel beams for Maxima flooring that are dated prior to 1998 in that document review?
A. **There's documents, as I recall, in our product manual that specifically recommend using fiberglass beams.**
Q. When was that product manual prepared?
A. **It started in 1994.**
Q. Did the recommendation for the use of fiberglass beams, was that included in the 1994 recommendations or version of the product manual?
A. **Yes.**
Q. Is that a product manual provided to Double L?
A. **Yes.**
Q. Was it provided to Double L in 1994?
A. **Yes. Sometime during the year of '94 I'm sure it was.**
MR. CROSS: Rich, could you show him Exhibits No. 10 and 11?
BY MR. CROSS:
Q. Mr. Hutchings, I'm showing you what has been marked previously as --
MR. SOBALVARRO: You have the chance to

Page 64

look through them to the extent you need to.
BY MR. CROSS:
Q. You have in front of you what have been pre-marked as Exhibits No. 10 and 11. There are a series of documents that have various warranties or purport to be warranties, and the question I have for you in looking through Exhibits No. 10 and 11, can you identify what warranty was in place in 1994 relative to the Maxima products sold to Double L?
A. **I believe it was the warranty, the second page in tab number 10. Because that's the warranty that was in place from the existent contract, as far as I know.**
Q. And you're looking at the second page of Exhibit No. 10 with document entitled Filter-Eeze limited warranty, correct?
A. **Right.**
Q. Now, that warranty says it's for five years.
A. **Yes.**
Q. Is that the length of time the warranty you understand was being provided to Double L was in place in '94?
A. **No. I believe at that time it was a 10-year warranty, but I don't know whether it was never changed or --**

Page 65

Q. If you could, Mr. Hutchings, turn to Exhibit No. 11 and LL 0827. It's a facsimile of June 26, 1989 to Norb Borcherding from Pierre Moreau?
A. **Uh-huh.**
Q. And if you see in this fax cover page, the very last sentence on the page, it says, "We will apply a five year warranty against breaking beginning August 1 of this year on all our products and a 10-year warranty February 1, 1990."
A. **Okay.**
Q. I guess I want to make clear that, as of 1994, the warranty that was made available to Double L was a 10-year warranty.
MR. LULIC: It's been asked and answered.
BY MR. CROSS:
Q. Is that right?
A. **Yes.**
MR. CROSS: He wanted to see if he didn't -- well --
THE WITNESS: Yes, that is the case, and if Double L had chosen to supply a lesser warranty, we did not have a problem with that. But if they -- you know, certainly we would have objected if they had applied any greater warranty.

Page 66

BY MR. CROSS:
Q. Turning to the limited warranty that is the second page of Exhibit No. 10, was this a document provided to Double L?
A. **This page?**
Q. The one entitled Filter-Eeze limited warranty.
A. **Uh-huh.**
Q. Was that provided to Double L in 1994?
MR. SOBALVARRO: The document or the warranty?
BY MR. CROSS:
Q. Let's say the document?
A. **I don't believe it was in 1994, because initially, that warranty started out at the, you know, covering the 10 years and then at a later date, the warranty was dropped to a five year period. And I suspect that this warranty was probably issued in '97.**
Q. Turning to the next -- your best recollection Mr. Hutchings, is that this was a document prepared approximately in 1997?
A. **Yes.**
Q. Turning to the next page of Exhibit No. 10, it's another document that says Five Year Warranty on it?

Page 67

A. **Yes.**
Q. Do you know when that document was prepared?
A. **This was one that was prepared by Mr. Moreau and only can I assume, from the address on the letterhead, that it's probably a 1979 or 1980 document.**
Q. Turning to the next page, it's a document, Filter-Eeze Warranty, it has Double L Group's Ltd., letterhead on it. Is that a document you've seen before?
A. **Yes, I noticed it when reviewing correspondence.**
Q. But prior to this litigation or preparing for this litigation, had you reviewed that document before?
A. **I don't recall that I had.**
Q. Turning to the next page, Exhibit No. 10, it's a document entitled Five Year Warranty over BCM letterhead. Can you date this document?
A. **Again, I would assume 1979 or '80.**
MR. SOBALVARRO: Is that again based on the address?
THE WITNESS: Yes, based on the address.
BY MR. CROSS:
Q. You changed your business address at some

Page 68

point.
A. Yes. I never owned the business at this address.
Q. Is it your understanding -- well, would BCM warranty product to the, what I will call the ultimate user of the product, in other words, the person who purchased the product from Double L or was the warranty only made available to Double L?
A. Only made available to Double L who was our customer.
(WHEREUPON, Hutchings Deposition Exhibit No. 57 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Mr. Hutchings, prior to reviewing Exhibit No. 57, are you aware of whether or not BCM has ever denied a warranty claim on the basis that the product was purchased by someone other than Double L?
A. Could you repeat that, please?
Q. I'll strike that and ask a different question. You've had warranty claims submitted over the years, correct?
A. Yes.
Q. Those warranty claims came from whom?
A. Various dealers and distributors throughout

Page 69

Canada, United States, the world.
Q. As to those claims that arose from the United States, would you receive claims directly from the end user of the product?
A. Normally, it's always Double L. They are our United States distributor and any claims that come in go through Double L, and then either Double L deals with them or a combination of Double L and BCM deal with them.
Q. Looking at Exhibit No. 57, this is a fax of November 1992 from Pierre Moreau to Mike Sullivan of the Double L Group. This was after you had purchased the business, correct?
A. Yes.
Q. Mr. Moreau on page BCM 338 in paragraph three references the extent of the warranty from five years to 10 years. Do you see that?
A. Yes.
Q. Was there ever any discussion with Double L prior to 1998 regarding the scope of the warranty that was to be given by Double L to its customers? Was that ever a topic of discussion?
A. Yes, it has been. I believe at a number of annual meetings that we would gather to review product and sales, et cetera, and as more and more pressure was

Page 70

exerted upon us for reduced prices, that, as we saw earlier, even that draft agreement of the one document where it stated the one year warranty, that one year, two year, three year warranties were discussed. Even in some cases Norb would suggest, "Well, maybe we should just sell it really cheap and have no warranty."
Q. Prior to 1998 was there ever a situation where Double L had offered, or you believe Double L offered a warranty that was beyond the warranty that BCM had offered to Double L?
MR. SOBALVARRO: Objected to as vague. Go ahead and answer if you understand the question.
THE WITNESS: I believe I saw somewhere in the files prior to my involvement with the business that Double L, on their own, had agreed to extend the warranty when Pierre owned the business. I'm not certain, but I believe there was something.
BY MR. CROSS:
Q. As to the time period you owned the company, do you recall that ever happening?
A. No, I don't recall that ever happening.
(WHEREUPON, Hutchings Deposition Exhibit No. 58 was marked for identification by the Reporter.)
BY MR. CROSS:

Page 71

Q. Showing you, Mr. Hutchings, what has been marked as Exhibit No. 58, it's a facsimile from your son Darrell Hutchings to Mike Sullivan dated January 22, 1993?
A. Yes.
Q. Attached to this facsimile -- well, are the carton markings that were placed on the Maxima flooring cartons attached to this facsimile?
A. That is not Maxima. The second sheet, that does not pertain to Maxima.
Q. Are you looking at page what? BCM 301?
A. It's 300.
Q. Which product does BCM 300 relate to?
A. It could be a number of products, but certainly one would be the L-3760 series, which was, again, an earlier style nursery floor. It could be a cell floor, could be a creep floor. They all were basically attached together with the nylon Eeze fasteners.
Q. And turning to BCM 301 in that exhibit, is that what was on the cartons of Maxima product in 1993?
A. Yes, that was the carton that I believe was used initially for the Maxima 1 version and then there was correspondence we looked at earlier where this was revised, and you'll notice it previously said something

Page 72

about taking out the wording for the center bar and so forth. I think this was the same carton they were referring to.

Q. Do you recall whether between 1993 when this version of the carton markings was used and 1998, was there anything related to warranties set forth on the cartons?

A. Not that I'm aware of. The cartons were actually discontinued very early on. You know, it turned out that what we felt was a waste.

Q. After the cartons were discontinued, the product would be shipped on pallets?

A. Yes. In this case it was a quantity of 16, so they would be simply bundled and strapped with nylon straps and heat-sealed together to hold them in a bundle and then stacked on skids.

Q. If the product was to be shipped directly to the work site, was any documentation -- did any documentation accompany that product relative to installation of the Maxima flooring?

MR. SOBALVARRO: You mean instructions.

BY MR. CROSS:

Q. Yes. I realize there's bills of lading and things like that.

A. At one time we used polyethylene sheets on a

Page 73

number of products, and I don't recall whether they were ever used on Maxima or not, but there was roughly a two-foot square plastic sheet that was printed with red and black ink and it was advising people to make sure that they allowed the product to warm up before installing to combat this expansion-contraction problem in cold weather, et cetera. But I don't recall whether that was on Maxima or not. I know of a couple of others that it was on. It didn't specifically refer to, as far as I can recall, like a five-year warranty or a three-year warranty or a 10-year warranty or whatever. It was simply more of a caution of installation instructions.

Q. On the cartons that were initially used, was there ever anything printed on those cartons relative to BCM's preference for fiberglass beams?

A. Not that I'm aware of.

Q. This documentation that you testified, Mr. Hutchings, accompanied the pallets, or may have accompanied the pallets, would that have any reference to BCM's preference for fiberglass beams on it?

A. I don't recall that it did. I guess the argument --

MR. SOBALVARRO: There's not a question pending.

Page 74

THE WITNESS: Okay.

(WHEREUPON, Hutchings Deposition Exhibit No. 59 was marked for identification by the Reporter.)

BY MR. CROSS:

Q. Showing you, Mr. Hutchings, what has been marked Exhibit No. 59, it's a facsimile from you to Double L dated November 8, 1993. There's a reference to a cover sheet on bulk packs. You see that?

A. Yes.

Q. Is that the document that you had earlier testified to that may have accompanied bulk shipments of Maxima flooring?

MR. SOBALVARRO: I object as vague. This document clearly does not relate to Maxima 2.

MR. CROSS: Oh, you're right. I don't know that that makes it vague, but I'll agree with you.

BY MR. CROSS:

Q. Exhibit No. 59 does not relate to Maxima flooring, correct?

A. Yes, that's correct.

Q. But the same products would be shipped bulk, right? In other words, the products that this refers to would also be shipped in a bulk fashion like the Maxima flooring.

Page 75

A. Yes.

(WHEREUPON, Hutchings Deposition Exhibit No. 60 was marked for identification by the Reporter.)

BY MR. CROSS:

Q. I'm showing you what's been marked as Exhibit No. 60, Mr. Hutchings. It's a fax from you to Bailey Evans of BBZ Marketing dated January 15, 1997. I'm just showing you this document. Does this help place the time at which the Filter-Eeze limited warranty was prepared and sent to at least Mr. Evans of BBZ Marketing?

A. Yes.

Q. That would have been approximately the time frame that this limited warranty was written up, correct?

A. Yes.

(WHEREUPON, Hutchings Deposition Exhibit No. 61 was marked for identification by the Reporter.)

BY MR. CROSS:

Q. Showing you what has been marked as Exhibit No. 61, again a product information sheet for the Maxima nursery flooring. I'd like to turn your attention to BCM 3271. Do you see at the lower right-hand corner

Page 76

it's dated September 1992. Is this a document that was prepared by BCM?
A. **Yes, I believe it's the back half of the, probably the next page.**
Q. As to BCM 3271, it has a number of points related to the Maxima creep nursery flooring, including positive interlocking on economical quarter-inch flat steel support bars. You see that?
A. **Yes.**
Q. Do you know why BCM would have prepared a document that identified flat steel support bars when it was recommending the use of fiberglass beams in September of '92?
MR. SOBALVARRO: I'm going to object as misstating his prior testimony. His testimony was that he started recommending their fiberglass beam when they got it in February of '94.
THE WITNESS: Right. We --
MR. LULIC: Also object to the form of the question to the use of the word "recommend".
THE WITNESS: If this was produced in September of '92, this was prior to the availability of Feze beam, so we were recommending steel support bars. And the steel support bar is simply a generic term that everybody in the industry uses.

Page 77

BY MR. CROSS:
Q. There is no specification on this document as to the use of galvanized as opposed to other types of steel, correct?
A. **No, there is not.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 62 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Showing you what has been marked as Exhibit No. 62, Mr. Hutchings, do you recognize that document?
A. **Yes.**
Q. What is it?
A. **It seems to be almost two documents together, but it's an advertising piece of literature as well as some instructions on the installation of Maxima.**
Q. When you say it's two documents put together, is the first document BCM 3273 through 3276?
A. **Yes, I think so.**
Q. And then 3277 to the end of the exhibit is a separate document.
A. **I believe that's the case, yes.**
Q. As to the first document, do you know when this was prepared?
MR. LULIC: When you say "the first

Page 78

document" --
MR. SOBALVARRO: 3276?
BY MR. CROSS:
Q. 3273 through 3276.
A. **I don't know exactly, but I would expect '94, '95 time frame.**
Q. Turning your attention to BCM 3274, Mr. Hutchings, it says, "Warranty, full five-year non-prorated"?
A. **Uh-huh.**
Q. Does that assist your recollection in determining when this document may have been prepared?
A. **It doesn't really signify a date to me.**
Q. I guess maybe -- my understanding from your testimony was that in 1997 the warranty period was changed from 10-year to five year.
A. **Right.**
Q. Is that correct? So since this --
A. **For Double L it was.**
Q. But not for --
A. **Necessarily for anybody else.**
Q. Was this a document prepared by BCM?
A. **No.**
Q. It was --
A. **Other than the first page. I know that one**

Page 79

**was. I think the rest of the document, you know, were photos taken by Double L and forwarded to us for incorporation into a Canadian document.**
Q. But the document itself was prepared by Double L or by -- I mean, the text of the document --
A. **The text and pictures were prepared by Double L. The cover page was prepared by BCM, 3273.**
Q. If you turn to 3276, it says, "For more information, contact BCM Manufacturing, Ltd."?
A. **Yes.**
Q. Was this a document that was distributed by BCM?
A. **Yes, we would have distributed this to our Canadian dealers and distributors.**
Q. And as to those Canadian dealers and distributors, they had a five-year non-prorated warranty in 1994?
A. **Yes. Some places of the world had a three year.**
Q. Looking at 3274, it states that, "Maxima plastic flooring is manufactured from copolymer polypropylene and has a five year non-prorated warranty with 15 to 20 year life expectancy"?
A. **Yes.**
Q. What was the basis for the statement that

Page 80

the Maxima flooring had a 15 to 20 year life expectancy?
A. **Based on the use of the copolymer polypropylene that from past history, using the same material on other products, that it had a history of this sort of longevity.**
Q. You did not have a -- BCM did not have a 15 to 20 year history with the Maxima product itself, correct?
A. **No. That's true. This is generally talking about Filter-Eeze products.**
Q. And the type of raw material that was being used.
A. **The type of raw material, right.**
Q. If you look in the upper right-hand corner of 3274, it says, "Slats hook over flat steel or Eezy beam supports"?
A. **Yes.**
Q. Do you know why the term "flat steel" was included in there?
A. **Just that some customers used flat steel. In Canada, I mean, they used galvanized flat steel. In Denmark they used galvanized flat steel, and again, that's a generic term that 10 or 15 manufacturers used in their advertising.**
Q. Is there anything in this document, and I'm

Page 81

talking about 3273 through 3276 that expresses a preference for fiberglass over steel? And I'll direct your attention, so we don't waste time, to 3276.
MR. SOBALVARRO: Is there a question?
BY MR. CROSS:
Q. I'm asking, is there anything in this document that expresses a preference for fiberglass over steel support beams?
MR. SOBALVARRO: Object as vague. You can go ahead and answer.
THE WITNESS: I would say on the right-hand side two-thirds down the page that we're promoting fiberglass for, you know, to last longer than steel and stating that it's stronger than steel, which, you know, it is in some ways.
BY MR. CROSS:
Q. Was that particular language added by BCM or was that provided by Double L?
MR. LULIC: Object on foundation.
THE WITNESS: I would guess that this one is a page that there may have been some text taken from BCM and Double L. Certainly, it appears that the pictures are pictures from Double L. When I see the heading, "Over a decade-and-a-half of proven global performance," I'm sure that's something we would have

Page 82

added, and certainly we added, you know, our name to the bottom. If I recall correctly, this literature came to us on a disk and we simply excluded, you know, Double L's name and inserted our name on here.
BY MR. CROSS:
Q. Turning your attention, Mr. Hutchings, to the second document that is part of Exhibit No. 62, pages 3277 through the end of the document, who prepared that?
A. **This was prepared by Double L and on the last page we inserted our name and phone numbers, et cetera.**
Q. Do you know what the purpose of these -- strike that. Do you know what Double L used these installation instructions for?
MR. LULIC: Object on foundation.
THE WITNESS: I can't say for certain, but I assume, as the heading suggests, that it no doubt was passed on to dealers as instructions on the installation of Maxima.
BY MR. CROSS:
Q. And the text was written by Double L?
A. **To the best of my recollection, yes, it was.**
Q. And in this particular case, you took, "you" being BCM, took the text and the photographs and added

Page 83

the BCM logo at the end of the document.
A. **Right.**
Q. Now, this discusses installation of the Maxima flooring on a steel support system, correct?
A. **Yes.**
Q. Do you know when this document was prepared?
A. **Not exactly, but I would think it would be in the '95, '96 time frame. Probably during '95.**
Q. Is there anything in the document that you are looking at that seems to support that conclusion?
A. **Nothing other than the address and phone number, or particularly the phone numbers that we were using. Those were phone numbers, those numbers and fax numbers were numbers that we had prior to 1997 or August of 1997. It was definitely before that.**
Q. Did Double L obtain or discuss with BCM the contents of the installation instructions?
A. **We discussed the -- in general, yes, the installation instructions as to whether this was the proper method of installing the flooring, and technically, on page 3278, I can recall item number 10 was a continual problem during installation in the United States, that people would use ladders on the flooring while installing the rest of the equipment in the barn and then they would -- sometimes if the legs of**