the ladders or feet of the ladders were not in good condition, they would cut through the floor and end up breaking it.
So I know that, you know, certainly photos like that we would have discussed and had some input in.
Q. Did BCM direct Double L on how to install Maxima flooring?
A. I would say no.
Q. Do you know who at Double L was responsible for developing the installation instructions?
A. No.
Q. Would all of the information that's contained in the installation instructions come from BCM?
A. No.
Q. Mr. Hutchings, did you know in April 1994 that a presentation was made to Holden Farms by Norb Borcherding of Double L and Wendell Burge of Hog Slat at the time that it was done?
MR. SOBALVARRO: To whom?
BY MR. CROSS:
Q. To Holden Farms.
A. No, I don't know as I did on a specific date or anything. It may have been talked about that they were going to previously. But I was not aware of it at



the time.
MR. CROSS: Would you show Mr. Hutchings Exhibit No. 4?
BY MR. CROSS:
Q. Showing you what has been marked as Exhibit No. 4, Mr. Hutchings, prior to the commencement of this litigation, this lawsuit, did you ever see that document before?
A. No, I did not.
Q. Turning to the second page of Exhibit No. 4, it's a graph with some language on it.
A. Uh-huh. Yes.
Q. Who prepared that?
A. I don't know.
Q. Was that prepared by BCM?
A. Not that I'm aware of. It may have been prior to the time I bought the business, but I'm not aware of it.
Q. Turning to the third page of Exhibit No. 4, who prepared that, if you know?
A. I don't know.
Q. Was it prepared by BCM?
A. No.
Q. Looking at the upper left-hand corner box it says, "Filter-Eeze Maxima nursery grower flooring." You



see that?
A. Yes.
Q. Are there any of those points in that box that you would disagree with?
A. Other than the fact that they mention grower flooring, which, you know, is a bit of a stretch. That's a much heavier pig, and this flooring was never designed for grower flooring, and Double L was notified of that a few times. The 20-year proven record of performance, I assume they're referring to Filter-Eeze flooring rather than specifically Maxima, because Maxima wasn't on the market for 20 years at that point.
Q. Turning to the next page of the exhibit, is this page -- was this prepared by BCM?
A. No.
Q. Do you know who prepared it?
A. No.
Q. Looking again at the four points at the top box of the page, is there anything in there that you would disagree with? You mention a 15 to 20 year life expectancy -- I'm sorry. No. Strike that. Under two, "Peace of Mind," it says, "Filter-Eeze is the original plastic flooring 20 years on the market proven and tested." That would be true as to Filter-Eeze as a generic, right?



A. Yes.
Q. But it would not be true as far as Maxima specifically.
A. Correct.
Q. I'll withdraw the other question. Looking at the bottom drawing, was that a drawing that was prepared by BCM?
A. No.
Q. In the lower right hand corner, there is a little box that is entitled "support data load factors"?
A. Right.
Q. Who provided that information, if you know?
A. I do not know.
Q. Would that have been information that came from BCM?
A. No.
Q. And turning to the next page of Exhibit No. 4, it's a two-page letter from Norm Borcherding addressed to gentlemen. Prior to this lawsuit, Mr. Hutchings, had you seen this letter before?
A. No, I had not.
Q. On the second page of the letter, the third-to-the-last paragraph, there's a reference to Hog Slat's exclusive affiliation with Filter-Eeze plastic flooring. Are you aware of any exclusive affiliation

Page 88

between Hog Slat and Filter-Eeze plastic flooring in 1994?

A. I am not.

Q. The paragraph immediately preceding that paragraph, it says that, "BCM introduced Filter-Eeze products gradually by evaluating on-farm installations with both independent corporate producers and participating with academic institutions and research studies." And then it refers to, "Dozens of university or college research studies with Filter-Eeze plastic floorings." See that?

A. Yes.

Q. Do those studies -- well, first of all, do those studies exist?

A. Not that BCM conducted, as far as I know.

Q. Are you aware of any university or college studies having been conducted at the request of Double L?

A. No.

Q. Are you aware of any studies having been conducted relative to the Maxima flooring product?

A. None, other than the -- if Norb was referring to his own test barn here, test site that they have for flooring and ventilation, et cetera, et cetera, et cetera.

Page 89

Q. Turning your attention to Exhibit No. 5 real quickly, it's a contract between Holden Farms and Hog Slat. Prior to this lawsuit, have you ever seen one of those before?

A. No, I didn't.

(WHEREUPON, Hutchings Deposition Exhibits No. 63 and 64 marked for identification by the Reporter.)

BY MR. CROSS:

Q. Showing you, Mr. Hutchings, what is marked as Exhibits No. 63 and 64, they relate to the orders of Maxima flooring for the first five barns of my clients. Exhibit No. 64 is a memo from Joleen at Double L Group to Darrell dated may 3, 1994 and only references Maxima without specifying Maxima 1 or 2, but in looking at Exhibit No. 63, is it correct to say that the first five barns at these Holden Farm sites were installed with Maxima 1?

A. It seems from these documents, yes, that that is the case.

Q. Do you know what was originally installed in the last five barns of my clients as far as BCM flooring? If you don't know, that's fine?

A. Yeah, I don't know for certain.

Q. Showing you, Mr. Hutchings, what has been

Page 90

marked as Exhibit No. 35 previously, do you recall having seen this document before today?

A. Yes. I recall seeing it when reviewing documents.

Q. And it appears that it was faxed to BCM on December 4, 1995 in anticipation of a meeting to be held on December 7, 1995?

A. Yes.

Q. Do you remember having received the document about that time?

A. Yes.

Q. And this meeting of December 7th, was that actually held? Did you actually have a meeting on December 7th?

A. I don't recall exactly, but I assume we did.

Q. Since you don't recall exactly, you may not recall where the meeting was held, if it was held. Would that be fair?

A. Yes, that would be fair.

Q. Typically, your meetings would be down in Dubuque, Iowa?

A. Yes. At other times we did meet in Chicago on a couple of occasions I believe.

Q. If you look on page BCM 3295, there's a reference to a problem with one of the barns of my

Page 91

clients. You see that?

A. Yes.

Q. Do you recall that problem from 1995?

A. Yes, I recall that.

Q. There was a proposed solution that Hog Slats would share in the labor costs for removing Maxima 1 and replacing it with Maxima 2.

A. Yes.

Q. Do you know if that was ultimately done?

A. I believe it was, because I recall that we supplied Maxima 2 product for those aisles. My recollection is that their feed carts were breaking the aisles, the plastic flooring and the complaint was that the installation was poor or something, as is stated here. But I didn't visit at that time.

Q. I was going to ask, did anyone from BCM visit the Dennis Ward farm?

A. No.

Q. Item two on page 3295 is a reference to the Marvin Evans farm. Do you recall that problem?

A. I remember the name. The specific problem I don't recall just at this point.

Q. On the next page, 3296, there's kind of a summary of some information provided by, I think a John Thompson. I'm interested in item number one. It says,

Page 92

"The straps we used were a quarter-inch thick at installation. Now they're only approximately two-thirds this thickness." Are you familiar with the problem that he's referring to?
A. No, I'm not. That would not appear to make sense to me.
Q. Well, that's my thought as well, but I was just --
A. Yeah, if there's much scale build-up --
Q. Okay. You're not familiar with any kind of phenomenon being described here anyway.
A. No.
Q. If you turn to the next page, there's a reference number three to Hog Slat research farm. You see that?
A. Yes.
Q. Were you aware of a Hog Slat research farm?
A. No, I was not.
Q. Have you ever been there, either before or since or ever?
A. No.
Q. Do you recall this problem being discussed between BCM and Double L at any time?
A. Yes. I don't recall that complaint.
Q. Who is Brian Eilers? Do you know him?

Page 93

A. That's a gentleman that worked for Norb Borcherding, and possibly still does I believe.
Q. He was an employee of Double L's then?
A. Yes.
Q. There's a reference to him observing support straps lifted three inches to five inches above the aisle floor. Have you ever observed a phenomenon such as that?
A. No, I haven't.
Q. As they took up the floor, they noticed the rusting of the quarter-inch support strap where the locking tabs on the Maxima overlap the straps. Did you ever see that phenomenon?
A. Not until the Holden Farm job that I visited in September of '99.
Q. Mr. Garness' farm?
A. Mr. Garness' farm, yes. Correct. And it isn't just, you know, where the Maxima overlapped the strap. It's completely on the four-inch bar from bottom to top.
Q. Do you recall, Mr. Hutchings, discussing any of these three problems that were listed in this document at a meeting held on December 7, 1995?
A. I remember discussing one problem at a meeting, and I can't recall if it was in 1995, when

Page 94

Brian was out at a job site the very day we were meeting, and he had phoned in and said there was a problem, and we asked him to check the floor from one end of the room to the other, and he checked in a couple of spots in the nursery room, first of all at the entrance where the fans brought in fresh air to the room, and there was no rusting and no lifting of the floor, and then he checked the center of the room and there was no lifting or rusting of the beams, but when he came to the exhaust end of the room, there was severe rusting. Double L assumed that as they moved fresh air across the room, then they couldn't exhaust it fast enough and it was causing a severe moisture build-up at the exhaust end of the room.
Now, whether that one was the one that was in 1995, I don't know.
Q. You're not able to recollect specifically when that conversation was?
A. No.
Q. Was that a discussion that was had before the problems with my clients' barns were identified?
A. Quite likely.
Q. But you're not sure?
A. I'm not sure.
Q. That's fine. If you look at BCM 3297, Mr.

Page 95

Hutchings, there is a paragraph marked B Maxima II. Do you see that?
A. Yes.
Q. Do you recall any discussions with anyone at Double L about possibly limiting the warranty in 1995 in light of some of the problems that were identified?
A. This was no doubt around the same time that all of the discussion was taking place about various warranties and length of warranties and competition, et cetera.
Q. If you turn to the next page, BCM 3298, there's a Roman numeral II, "Discuss and finalize support structure recommendations"?
A. Yes.
Q. Do you recall any discussions about this time frame with anyone at Double L about support structure recommendations?
A. Could you repeat the question again?
Q. Sure. Do you recall any discussions with Double L in this 1995 time frame regarding support structure recommendations?
A. None other than the one I had had with Bailey Evans.
Q. That you testified to previously?
A. That I testified to earlier, that I can

Page 96

recall.
Q. Under 2 (b), the section galvanized steel, it says, "This is the product Ikadan has also recommended. We chose to promote the use of a painted or non-painted steel in order to be more competitive since we required 50 percent more straps per installation." You see that?
A. Yes.
Q. First of all, the 50 percent more straps per installation, was that because the Ikadan product was wider?
A. **Yes, it was a wider span, but I don't think that they're correct on 50 percent. I think it's more like 30 percent.**
Q. Do you remember any discussion with Double L about them having chosen to promote the use of a painted or non-painted steel?
MR. SOBALVARRO: You mean other than previously described?
BY MR. CROSS:
Q. Other than previously described?
A. No.
Q. Do you recall this listing of support structure recommendations being discussed at this -- well, strike that.

Page 97

Do you recall having responded to this memorandum, either verbally or in writing, with anyone at Double L?
A. **I don't recall.**
Q. There's a reference to Fibertruss under section C?
A. **Right.**
Q. Does that refer to your product or the Double L product, if you know?
A. **I think that is the earlier 1990 vintage Fibertruss that Double L had developed.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 65 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Showing you, Mr. Hutchings, what has been marked as Exhibit No. 65, it's a fax from June 17, 1996 from Bailey Evans to you and Mr. Slessor. Attached is a letter from Marvin Evans of Juniper Creek Farm dated June 12, 1996. Do you recall having received this letter?
MR. SOBALVARRO: The question is does he recall receiving it?
MR. CROSS: Yes.
THE WITNESS: I recall seeing it when I

Page 98

reviewed the documents, but specifically at the time do I recall receiving the letter back in '96? No, I don't.
BY MR. CROSS:
Q. Do you recall that you were aware of the problems associated with Mr. Evans' operation back in 1996?
A. **Yes, I recall a problem with the Evans barn.**
MR. CROSS: Why don't we take a break.
(A brief recess took place.)
BY MR. CROSS:
Q. During the break, Mr. Hutchings, did you have a chance to read through the letter attached to Exhibit No. 65?
A. Yes.
Q. There's a reference in Mr. Evans' letter to Bailey Evans about the black plastic is separating and popping up. You see that?
A. Yes.
Q. When was the first time you ever were aware that there was a problem with Maxima flooring popping up on some of the barns in which it was installed?
A. **First of all, I believe this problem in this barn wasn't one of rusting steel beams that were destroying the plastic floor, but I believe, if my memory serves me correctly, that this was an**

Page 99

**installation where it appeared that there had not been any expansion joints left in the rooms and when the rooms were heated up to operating temperature, then the plastic expanded and, of course, if it couldn't force any movement at the end of the room, then it buckled. I'm quite sure that's what happened here. And probably, I don't know, I think, really, the first time that we could attribute it to rusting I think was in 1998, which was a little different circumstance than this one.**
Q. When did BCM begin recommending the use of expansion joints as part of the installation of Maxima?
A. **That was in our original instruction manual, product manual that was generated in late '94, I believe.**
Q. There's a reference in paragraph two to lifetime warranty. "I have the black plastic with the lifetime warranty in buildings one and two." Are you aware of any lifetime warranty having been given --
A. No.
Q. -- relative to BCM product?
A. No.
**(WHEREUPON, Hutchings Deposition Exhibit No. 66 was marked for identification by the Reporter.)**
BY MR. CROSS:

Page 100

Q. Looking at Exhibit No. 66, Mr. Hutchings, it's a memorandum from Bailey Evans to Mr. Slessor and yourself dated June 27, 1998?
A. **Yes.**
Q. Would you take a moment to read through that?
A. **Okay. I've read it.**
Q. Do you recall receiving this document back a few years ago?
A. **Yes, I'm sure I read it before.**
Q. Is this the first time you became aware of a general problem that may be associated with Maxima flooring?
MR. SOBALVARRO: Object to the form of the question.
THE WITNESS: Other than as stated here, you know, the Norris farm was earlier here, back in '96, and if this was the same problem. We note here that Bailey is saying that this is not caused by the supports, that they're in good shape. In a number of these cases, what we had noticed is that the installation was not done correctly, and rather than allowing the plastic floor and the beams to float in the room, some installers would secure the beams to the wall, and in some cases they would build a wall over the

Page 101

floor, so as temperatures changed in the room, the floor could not move. So if it wanted to expand, it had nowhere to expand to, or if it cooled off and wanted to -- was forced to contract, then with a wall setting on it it couldn't contract and it would separate the tabs on the flooring.
So there were a number of issues that caused some of these problems.
BY MR. CROSS:
Q. Do you recall if the Ricky Norris farm was -- what the cause of the Ricky Norris expansion problem was?
A. **I believe that one was the fact it had been installed too tight. There was no room for expansion. And also, he did have some, you know, the breaking of the tabs that were breaking at the corners on the Maxima 1 product that we revised at a later date on the Maxima 2 product.**
Q. And the Marvin and Lucy Evans farm, that's the --
A. **Yes.**
Q. -- problem we've alluded to before?
A. **Yes, similar situation. Yes.**
Q. The Marty Blizzard farm, do you recall what the problem was with that farm?

Page 102

A. **No, I don't recall that one.**
Q. The Midwest Livestock problem, do you recall what that problem was?
A. **Midwest Livestock was a dealer of Double L's and as to what they're referring to here, I'm not certain, but I do know that in some cases some of their installations were not correct. Bob Slessor visited some of their installations, and I believe it was later than '98, wasn't it, in the fall of '98 that Bob visited those farms and identified different problems sort of in every barn.**
Q. Do you recall if Mr. Slessor identified one overall problem with all of the barns?
A. **In most cases, I would say that rusting beams were destroying the floor as a general complaint or cause. As I stated earlier, each barn sort of had its own set of problems, and some more severe than others.**
Q. After you received Mr. Evans' facsimile, did BCM develop some type of action plan to investigate and resolve these problems?
A. **Yes. Shortly thereafter, that was when Bob Slessor and the representative from the company that we were purchasing copolymer polypropylene from, and Bailey Evans, I believe, visited a number of farms throughout**

Page 103

**the United States.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 67 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Showing you Exhibit No. 67, Mr. Hutchings, it's a facsimile to you from Mr. Evans dated August 23, 1998 attached to the memorandum he prepared and sent to Double L regarding the farm inspections?
A. **Yes.**
Q. Is it Lowell Huovinen?
A. **Huovinen.**
Q. H-u-o-v-i-n-e-n.
A. **Yes.**
Q. He's the representative of the plastics company?
A. **Yes. Correct.**
Q. Did you have a discussion with Mr. Slessor regarding the three farms that he visited with Mr. Evans and Mr. Huovinen?
A. **Yes. As well as, I believe, he wrote a report after the visits to the farms.**
Q. Mr. Evans draws a number of conclusions from his visits and observations, including the problem is being created by the deterioration of the steel support

Page 104

beams. "Although we saw ways the installations could have been improved, which would have resulted in delaying the problem, it would have inevitably occurred at some point." Do you know whether are not Mr. Slessor agreed with that conclusion of Mr. Evans'?

A. I would say he probably generally agreed with that statement.

Q. On page two of his memorandum, Mr. Evans refers to some difference in design between the Maxima 1 and Maxima 2 product. Do you see that?

A. Yes.

Q. Do you agree with the conclusion of Mr. Evans relative to the impact of the differences in design between Maxima 1 and Maxima 2?

A. No.

Q. Why not?

A. In my opinion, it does not make any difference. Ten other manufacturers or 12 other manufacturers out there with the very same or very similar tab design, they have all experienced problems on steel supports.

Q. Based on the information you know today, is there any difference in the problems that are associated with Maxima 1 as compared to Maxima 2 products when they are both using similar steel support beams.

Page 105

MR. SOBALVARRO: Argumentative. Assumes there's a problem with the Maxima, problem with supports concerning the Maxima. You can answer if you can.

THE WITNESS: Could you repeat, please?

BY MR. CROSS:

Q. Sure. Have you noticed any difference in the result of placing Maxima 1 as opposed to Maxima 2 on steel support beams using a similar type of steel?

A. No, I have not noticed any difference.

Q. Whether over the course of three years, five years or seven years?

A. Yes.

Q. There's a reference to ridges on the inside of the overlap for Maxima 2. Is it your opinion that that would not affect the performance of Maxima 2 as it relates to Maxima 1?

A. No, it will not.

Q. Did you talk with Mr. Evans about the conclusions that he had reached in his memo after you received it?

A. I'm sure that we did. I'm not exactly sure if we responded in written form or not, but I know we would have responded to this letter.

Q. Did you advise Mr. Evans that you disagreed

Page 106

with the conclusions that he had drawn?

A. Yes.

Q. What was his response?

A. He was still convinced, as I recall, that the difference in the -- let me rephrase -- the slight difference in the two tab designs would definitely make a difference.

(WHEREUPON, Hutchings Deposition Exhibit No. 68 was marked for identification by the Reporter.)

BY MR. CROSS:

Q. Showing you, Mr. Hutchings, what has been marked as Exhibit No. 68, it's a series of letters from Mr. Slessor to, I believe, the three owners of the barns that he inspected as well as an attachment of a letter from Lowell Huovinen of Spectrum Polymers?

A. Yes.

Q. Did you review and approve these letters before they were sent?

A. I certainly reviewed them. I don't know that we had a policy in place at the time that I would have had to approve them before they went out.

Q. Regarding causative factor one that was identified by Mr. Slessor, I believe, in all three of the letters, could you review, or read through and let

Page 107

me know if you disagree with any of the statements that were made by Mr. Slessor.

MR. SOBALVARRO: Do you want him to review the whole thing?

MR. CROSS: Just number one.

THE WITNESS: Yes. Yes, I would agree with that.

BY MR. CROSS:

Q. And then I think Mr. Slessor goes through, as to each particular farmer, and identifies some specific concerns that might be specific to each particular farm installation-related issues, right?

A. Yes.

Q. And then he moves on to a summary. You see that?

A. Yes.

Q. And I think that's essentially the same for each one, perhaps identifying the particular distributor of Double L definitely, but the first part of the summary says, "We see the corrosion of steel flat bar commonly, especially in cases where the bar is painted or left unpainted."

A. Yes.

Q. Do you know what Mr. Slessor meant by seeing the corrosion of steel flat bar commonly?

Page 108

A. No, I don't.
Q. Mr. Slessor says that, "A normal life expectancy is about five years, but we have seen this reduced as low as three years in certain environments." Have you seen the life expectancy of a painted or unpainted steel bar reduced to as low as three years?
A. **Yes. I haven't personally seen it, but I've had reports of it from various countries.**
Q. When did you receive those reports?
A. **Within the last two to three years in a climate like Philippines as an example where you're in salt air and humid air and so forth.**
Q. Were you aware that the life expectancy of painted or unpainted steel flat bar could be as low as three to five years, prior to 1998?
A. **No, I would say not. I guess one would think that it would last five years or longer, but again, like I said earlier, there's so many things out of our control in ventilation, humidity, feeds, it's impossible to tell.**
Q. Mr. Slessor goes on to say, "We strongly recommend the use of galvanized steel or preferably the fiberglass beams." Prior to Mr. Slessor's letter are you aware of any documentation from BCM to the ultimate end users of the product identifying that BCM strongly

Page 109

recommends the use of galvanized steel or fiberglass beams?
MR. SOBALVARRO: I object as argumentative, assumes contact with the end user by BCM.
MR. LULIC: Was the question written documentation?
BY MR. CROSS:
Q. Written or oral.
A. **Well, certainly from 1994 on, BCM had been promoting the use of fiberglass beams.**
Q. Directly to Double L.
A. **To Double L, to all of our dealers. And we know of dealers in Canada that use galvanized beam.**
Q. But as far as dealers within the United States, from 1994 through 1998 --
A. **Double L would be the only one.**
Q. And all of those recommendations I think you've testified previously were oral?
MR. LULIC: Well, I'll object to the form of the question.
MR. SOBALVARRO: I will, too.
THE WITNESS: I believe there are oral as well as some written documents, and, I mean, Double L themselves purchased some beam from us in 1994.
BY MR. CROSS:

Page 110

Q. Were you aware of a document pre-dating 1998 from BCM to Double L stating that it is preferred to use fiberglass or galvanized steel as a support beam for Maxima products?
MR. SOBALVARRO: I think that's been asked and answered.
THE WITNESS: I think that's in our product manual that we suggest.
BY MR. CROSS:
Q. Other than the product manual, are you aware of any other documents?
A. **I don't recall.**
Q. Mr. Slessor in his letter refers to observing expansion from a quarter-inch to .26 to .2975 and at one point to .3015. You see that?
A. Yes.
Q. What would you expect to be the effect of that type of expansion of the steel support beam on the Maxima flooring?
A. **From what we know now, it will destroy it.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 69 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Showing you, Mr. Hutchings, what has been

Page 111

marked as Exhibit No. 69, it's a fax from Mr. Slessor dated September 28, 1998 to Bailey Evans attaching copies of two installation bulletins that were sent to all dealers and distributors about two years ago.
A. **Yes.**
Q. Are the installation bulletins that Mr. Slessor is referring to the manual that you have testified to previously, or are these different documents?
A. **These would be additions to the manual.**
Q. Did you produce the manual?
A. **Yes.**
MR. CROSS: Off the record.
(Brief off-record discussion.)
BY MR. CROSS:
Q. Did you discuss with Mr. Slessor why it was necessary to fax to Mr. Evans the two installation bulletins that were sent out about two years ago?
A. **I don't recall exactly, other than I do remember one conversation, and whether it was specific to this or not, that Bailey saying something to the effect that, "Well, I have never seen those installation bulletins," or "I've never seen the manual." And we reminded him that there would be one at the Double L office.**

Page 112

Q. And I believe that the technical bulletins relate to the temperature at installation and the expansion problem that you've alluded to, correct?
A. Yes, correct.
Q. Mr. Slessor, in the third paragraph of his cover fax, notes that, "The recent difficulties that we saw on the farm visits were not related to the expansion of the plastic, but rather the corrosion and scaling of the steel flat bar and some other factors."
A. Yes.
Q. So the topics that are covered by the installation manual do not address the issue that was being, or the problem that was being recognized in 1998.
A. That's correct.
Q. Would the installation bulletins be sent only to Double L or would it be sent to Double L's distributors and dealers?
A. Only to Double L. In many cases, we did not know who those dealers were.
Q. Would there be anything that would be sent -- for a product that was sold in the United States that was subject to the exclusive distributorship agreement with Double L, would there be anything sent directly to the contractor or the ultimate owner of the facility?
A. Not that I'm aware of, unless it was ordered

Page 113

by Double L and they asked us to deliver it to the end user.
Q. November 1998 Mr. Evans apparently terminated his relationship with Double L; is that right?
A. Yes.
Q. What caused that, if you know?
A. I don't know.
(WHEREUPON, Hutchings Deposition Exhibit No. 70 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Have you had a chance to review Exhibit No. 70?
A. Yes.
Q. It's apparently a draft of a letter that was in your files from Bailey Evans dated November 23, 1998. In it he refers to repeatedly trying to reach a resolution with the manufacturer of Filter-Eeze flooring regarding the specific problem that has recently developed. What do you recall the discussions were between BCM and either BBZ or Double L about resolving this buckling problem in 1998?
A. As soon as the problem was made known to us, I think the earliest was in June of '98 that, you know,

Page 114

shortly thereafter, we sent Bob out with the Double L Group to find out, you know, what was causing the problems and to find a solution for it, and we had advised Double L that we would do what we could to assist them in correcting the situation, even though it was not the fault of plastic flooring, rather it was the corrosion of beams that were causing the problem that Bailey sold in the first place. And we would work with them to provide the Double L customers with a replacement warranty program, or replacement upgrade program, I should say, in order to, I suppose, promote goodwill for both Double L and ourselves and a way of doing some advertising, I guess, to let the customers know that we stood behind the product, and this letter was simply self-serving for Bailey, because he knew at the time he wrote this letter that he was going to work for the competition. So he wanted to make Filter-Eeze look bad so he could walk in and sell Matrix plastic flooring to the customers, I assume.
Q. Do you recall having discussions with people at Double L, not including Mr. Evans, but people at Double L about the recommendations that BCM had made earlier for fiberglass or galvanized steel in 1998?
MR. LULIC: Object to the form of the question.

Page 115

THE WITNESS: Could you repeat again for me?
BY MR. CROSS:
Q. Sure. In 1998, after June when this problem came to the fore, did you have a discussion with Mr. Borcherding or anyone else at Double L about reminding him that you had previously advised the use of galvanized or fiberglass beams with the Maxima flooring?
MR. LULIC: I'll object to the form of the question.
THE WITNESS: Well, we certainly would have, because, I mean, it was also mentioned in the manual that they received in '96 as well, but, you know, as we were going through all of this and trying to determine what was going on, there were recommendations made to, again, remind them, not to use painted or plain steel.
BY MR. CROSS:
Q. What did Double L persons say in response to that reminder?
MR. LULIC: Object on foundation.
THE WITNESS: I don't really recall the exact reply. I mean, there were a number of conversations, and in one -- at one point at a given time when I had passed on some information, I don't know

whether for certain it was in regards to this instance or not, but Mr. Borcherding had said to me that this was America and we do things different. And so --
BY MR. CROSS:
Q. Did Mr. Borcherding ever claim that BCM had not recommended galvanized steel or fiberglass beams?
A. **Not that I'm aware of.**
Q. Are you aware of anyone from Double L having made that claim?
A. **That we had not recommended galvanized steel?**
Q. Right.
A. **I do not recall anybody saying that.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 71 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Mr. Hutchings, I'm showing you what is a fax of November 27, 1998 from Mr. Slessor to Mr. Borcherding and Ms. Zittergruen of Double L Group with 15 pages of attachments. I'm interested in the minutes of meeting from November 26, 1998 that are at page 3138.
Now, as to the buckling of flooring, after this meeting it was decided to offer Maxima flooring under warranty to replace any broken pieces that



occurred as a result of the buckling?
A. **Yes.**
Q. And also a special price for the Excelerator flooring for anyone who chose to replace the Maxima flooring with Excelerator, correct?
A. **Yes.**
Q. It also says that Double L will offer fiberglass beams to any affected customer at a special price. Cost of labor to be borne by the farmer and/or the dealer, correct?
A. **Yes.**
Q. Was that the correct summary of the agreement that would have been reached between BCM and Double L on November 26, 1998?
A. **Yes. This was later referred to as our replacement upgrade program.**
Q. There also is a technical bulletin dated November 26, 1998? You see that?
A. **Yes.**
Q. Who prepared that?
A. **That was from Double L Group.**
Q. On page 3146 and 3147, there are photographs of some buckling in the nursery pen?
A. **Yes.**
Q. Do you know who took those photographs?



A. **I believe these were the pictures that were taken by Bob Slessor when he was in on his visits to those three farms.**
Q. Ultimately, you visited the Garness barn in 1999 I believe?
A. **Yes.**
Q. And did you observe problems that were similar to the problems depicted in these photographs?
A. **Yes.**
Q. Having observed this buckling or heaving in a nursery pen such as was depicted on page 3146, were you able to -- would the Maxima flooring be able to be reused, if it's to this point?
A. **No.**
**(WHEREUPON, Hutchings Deposition Exhibit No. 72 was marked for identification by the Reporter.)**
BY MR. CROSS:
Q. Showing you what's been marked as Exhibit No. 72, that's a facsimile from Mr. Slessor to Double L Group of December 3, 1998. Attached is a technical bulletin. Do you recall the preparation of this technical bulletin?
A. **Yes.**
Q. Were you involved in its preparation?



A. **No, this was completed by Bob.**
Q. Did you review it before it was sent to --
A. **Yes.**
Q. Now, the first technical -- there actually are three technical bulletins --
A. **Uh-huh.**
Q. -- that are attached with this fax. When was the first one, when I say "first one," I'm talking about pages 3137 to 3130. Was that prepared in the late fall of 1998?
A. **Yes.**
Q. The next one that begins on 3131, that's an earlier installation bulletin, correct, that we reviewed before?
A. **Yes.**
Q. And the same is true for the last installation bulletin 3132 through 3134, correct?
A. **That's correct.**
Q. Are there any other installation bulletins related to the Maxima flooring that existed on or before December 3, 1998, other than the three that Mr. Slessor sent to Double L Group, Exhibit No. 72?
A. **Other than the one that we reviewed earlier that Double L had put together on installation. I don't recall of any other ones we sent.**

Q. That was the document marked "Installation Instructions"?
A. Right.
(WHEREUPON, Hutchings Deposition Exhibit No. 73 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Exhibit No. 73 is a facsimile with some handwritten notations on it from Al Visser to the Double L Group. Did Mr. Visser replace Mr. Evans, if you know?
A. No, I believe he worked for Mr. Evans.
Q. Do you recall the various buckling problems that were identified in this facsimile from the Cannady farm and the Hardee farm?
A. I don't remember the Cannady farm so much. I remember the Matt Hardee farm.
Q. What do you recall of that?
A. Just that, you know, he had this same problem with rusting beams and also probably it was exaggerated by the fact that when the initial flooring was put down that he didn't have enough expansion joints and he has since replaced his flooring with our upgrade program.
Q. As of today, Mr. Hutchings, how many barns in the United States had a problem with rusting steel



support beams and buckling of the Maxima flooring or Excelerator flooring?
A. I don't know that I can accurately answer that, but an estimate would be a dozen.
Q. Well, I represent ten of them.
A. Well, I'm considering that as one claim or whatever. So probably a dozen other than yours.
Q. And of those dozen others, have the other persons participated in the upgrade program?
A. Most have.
Q. Have there been any other lawsuits in which BCM is a defendant related to this Maxima flooring, if you know?
A. There is another one that is named, but it's-- I don't know.
Q. Where is that venued? Where is that lawsuit, what state?
A. Iowa, I believe.
(WHEREUPON, Hutchings Deposition Exhibit No. 74 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Showing you what is marked as Exhibit No. 74, it's a letter to Kent Holden from you dated July 22, 1999 regarding replacement of three flooring systems at



my clients' barns.
A. Yes.
Q. That sale was completed, correct?
A. Yes.
Q. Did you, then, personally or did you have an opportunity to personally observe the replacement work being done at the first barn?
A. Yes, I did.
Q. And that occurred in September of 1999?
A. Yes.
Q. Would you agree that the condition of that facility required replacement of the flooring?
A. Yes.
Q. Was there anything about the installation of the support beam system or the barns themselves that you believe contributed to the condition of the flooring?
MR. SOBALVARRO: I'm going to object as lack of foundation as it relates to the section of the question related to the barns themselves. Mr. Hutchings is not an engineer and may not be qualified as to all of the other factors.
MR. DIESETH: I'm uncertain. Are you talking only about the Garness barn or all of them?
MR. CROSS: The Garness barn. The one he saw.



THE WITNESS: Could you repeat the question, please?
BY MR. CROSS:
Q. Sure. You've identified, I think, Mr. Hutchings, things such as the steel beams being flush against the wall, the steel beams being attached to the walls and other factors that have had an impact on the condition of the flooring at some of the other sites, correct?
A. Yes.
Q. And I'm just wondering what you saw or observed at the Garness farm when you personally observed it. Was there anything about the installation, except the rusting of the steel support beams, that you believe may have contributed to the condition of the flooring?
MR. SOBALVARRO: Same objection. You can go ahead and answer.
THE WITNESS: Well, I believe I'm at a bit of a disadvantage here, because I didn't visit the barn in 1994 when it was built, but the steel beams that they were taking out of the barn and removing flooring, the beams were wedged in very tight. Now, whether that came about from rusting or whatever, you know, I don't know five years after the fact.

Page 124

My belief is that most of the damage -- all of the damage to the flooring was caused by the rusting beams.
BY MR. CROSS:
Q. Prior to this letter, Exhibit No. 74, you attended the World Pork Expo in Des Moines, Iowa?
A. Yes.
Q. At that Expo, you met with Mr. Kent Holden and as well as Mr. Borcherding?
A. Yes.
Q. As well as Tommy Herring?
A. Yes.
Q. As well as perhaps some others from the various entities, correct?
A. Right. Yes.
Q. What was discussed at that meeting?
A. Well, basically, Mr. Holden brought this situation, certainly, to our attention, and I gathered from that that he had been talking to Bailey and Double L for some time prior. And basically, he was interested in knowing what the warranty was and, you know, who was going to replace his floor.
Q. Who, if anyone, responded to Mr. Holden's queries?
A. As I recall, I think Tommy Herring did quite

Page 125

a bit of the talking, as well as did Norb.
Q. What did Mr. Herring say?
A. I believe that someone had suggested that maybe the problem had come from inferior steel and Mr. Herring replied that, you know, he knew steel and had been in the steel business 22 years, and that wasn't the problem. And I think Norb was somewhat noncommittal, other than that we'd try and find a way to help them in some manner, and as I recall, there also was some discussion about ventilation problems, I believe.
Q. Was there discussion with Mr. Herring about the use of fiberglass beams instead of steel?
A. There would have been a discussion in regards to that would be the way to correct the problem is to replace it with fiberglass.
Q. Did Mr. Herring make any statements to Mr. Holden about Hog Slat's participation in correcting the problem?
A. Not that I recall at that meeting.
Q. Was this the first time you had met Mr. Herring?
A. No, I had met him maybe a couple of years prior, also at the World Pork Expo.
Q. Was this meeting held at the Double L booth?
A. Yes.

Page 126

Q. How long did it last?
A. Half an hour, approximately.
Q. At the conclusion of the meeting, were there any decisions reached as to how the situation would be addressed from anyone?
A. I don't recall that there was.
Q. Did anyone leave the meeting promising to get back to Mr. Holden with some type of response?
A. I think generally that's the way it was left, that each person would review the situation and someone would get back to him. I can't recall who was designated as the person to get back to them, but probably it would have been Tommy, since he was the contractor.
Q. On page two of your letter to Mr. Holden, you indicate that you would be able to put him in touch with two or three fiberglass beam manufacturers for consultation if he wished.
A. Yes.
Q. Which beam manufacturers did you have in mind?
A. The one I mentioned earlier.
Q. Mr. Strongwell?
A. Strongwell would be one, Advanced Fiberglass -- or I'm sorry. Advanced Fiber Product, and Faroex or

Page 127

Polygrate is the Canadian one.
Q. Strongwell is the manufacturer of the Eezy beam?
A. No, they're the manufacturer of Double L's PermaBeam.
Q. Advanced Fiber Products, they manufacture your --
A. Eeze beam, yes.

(WHEREUPON, Hutchings Deposition Exhibit No. 75 was marked for identification by the Reporter.)

BY MR. CROSS:
Q. Showing you Exhibit No. 75, it's a letter from Nic Orr, vice president of sales, BCM, dated July 27, 1999. When was Mr. Orr hired?
A. Mr. Orr was hired -- he was an agent for us from approximately April '99 through maybe November of '99.
Q. What is an agent?
A. He was contracted -- he wasn't a direct employee. His company was contracted by BCM to represent our sales.
Q. A consultant, essentially?
A. Whatever, yes.
Q. And then November 19 -- so was he ever an

Page 128

employee of BCM?
A. No, he was never a direct employee.
Q. Did he office out of your facility or not?
A. He did for a very short period of time. We gave him an office for, I don't know, a month or two and then he was working out of his home.
Q. And then did his work with BCM end in November 1999?
A. Yes.
Q. Mr. Orr references, in the second-to-the-last paragraph that BCM is going to switch over to the same fiberglass beam and supplier over to Strongwell. Did that ever happen?
A. No.
Q. Why not?
A. Strongwell required a purchase order for a minimum of 20,000 feet of beam each production run, and in Canada, that's not practical for us to sell 20,000 feet at any given time, and with this beam, it's, you know, Murphy gets involved when you have beam in stock. If you have 20-foot lengths, the customer needs 20-foot-three. So we just decided that -- the only place we have used the Strongwell beam is in the United States here on the warranty upgrade program. Anybody that's replacing Maxima flooring is using the Strongwell

Page 129

beam.
Q. Since 1999, BCM continues to sell product in the United States, right?
A. Yes.
Q. Is Double L still the exclusive distributor of product for BCM?
A. No.
Q. When did that end?
A. Norb had phoned us about a year ago now, I believe, and advised us that he didn't feel that their direction was going to be, you know, totally committed to the flooring market anymore and that we should look for other dealers, and, you know, they would still sell some flooring on a non-exclusive basis, and they didn't plan to take on anybody else's flooring, but he also stated he didn't want to keep us out of the market.
Q. So today how many distributors in the United States does BCM have?
A. Not enough. I believe we're currently dealing with four people and talking to a couple of others.
Q. Does the product that is being sold today, does that include the Maxima?
A. Yes.
Q. Both 1 and 2, or has Maxima 1 been

Page 130

discontinued?
A. Maxima 2 only now, yes.
Q. The Excelerator?
A. Yes.
Q. As to those two product brands, do the cartons today contain any type of reference to the type of support beam that should be used on them? I guess you're not using cartons, are you.
A. No, we don't use cartons, but there's nothing on the packs that refer to, you know, any instructions like that. We do advise each of the new dealers that come on board that we have fiberglass beam available that they should use, and that at the very least, they should not use anything less than galvanized steel.
Q. At one point did BCM advise Double L that any product placed on steel support beams would void BCM's warranty?
A. Yes.
Q. Is that still the policy today?
A. Yes.
(WHEREUPON, Hutchings Deposition Exhibit No. 76 was marked for identification by the Reporter.)
BY MR. CROSS:

Page 131

Q. This is an e-mail from Nic Orr to Dan Palmer at Double L dated September 9, 1999 in which Mr. Orr says that BCM is not prepared to warrant any product effective immediately which is laid down on steel supports. You see that?
A. Yes.
Q. Is that a correct statement of BCM's policy September 9, 1999?
A. Yes.
Q. He then says, "Stainless steel or fiberglass beam is the product recommended by BCM." Is that correct?
A. Yes. And also in some cases, we have allowed certain customers to install on galvanized beam, but they have also been advised that they should not expect to see the longevity of that beam and flooring with that installation.
Q. When you say "some customers," Mr. Hutchings, today are you referring to this group of five or --
A. Yes.
Q. In other words, you're not having direct communications with the contractor.
A. No, it would be the dealers. Again, we wouldn't know in most cases, practically all cases, who

Page 132

their customers are, and they don't care to tell us.

Q. Mr. Orr refers to his ongoing attempts to purchase stainless steel off shore at a reasonable price. My recollection is that you had testified previously that stainless is prohibitively expensive?

A. It is certainly in North America. We had heard that a lesser grade of stainless steel could be purchased in Poland, and we were trying to ascertain if that was true or not and never were able to come up with a cost.

Q. That project fell through.

A. Yes.

Q. Mr. Orr requests a copy of this directive to your dealers, referring to Double L dealers, for his records once it has been sent out. Do you know whether or not he ever received a copy of that?

A. We did not receive that.

Q. Did you ever follow up with Double L in asking them?

A. Yes, I've asked him on a couple of occasions and asked Dan Palmer once while he was still employed by Double L, and we have not received that to date.

Q. Did they ever provide you with any reasons why?

A. No.

Page 133

(WHEREUPON, Hutchings Deposition Exhibit No. 77 was marked for identification by the Reporter.)

BY MR. CROSS:

Q. Showing you, Mr. Hutchings, what has been marked as Exhibit No. 77, it's an e-mail dated the same day, September 9, 1999 from Nic Orr to Nic Orr referring to the discontinuation of the expansion joint program?

A. Yes.

Q. What was the problem with -- and apparently there was a mistake regarding the model number.

A. Yes.

Q. It was the L-3742?

A. That's the correct number, yes.

Q. Now, as I understand it, that number is a reference to an earlier version of the Filter-Eeze product.

A. Correct.

Q. It does not refer to the Maxima product?

A. No.

Q. But in fact, there's a reference here to Holdens barn?

A. Yes.

Q. Do you know why there was L-3742 product at the Holden farm?

Page 134

A. Initially when the buckling problem was discovered, it was felt that we could, in fact, provide an expansion joint that would alleviate the problem, at least for the short term. In other words, where the farmer had a complete floor of Maxima in, you would go into the area where severe buckling was taking place and you'd remove one row of flooring, and this L-3742 product is 18 inches wide, and then you would lay this product over the top of that opening, thereby giving the Maxima flooring on each side of it a chance to float under that open space.

Granted, this is one-inch deep, so you had a one-inch step there, and then people would J-bolt this 3742 product down only on one side so that you had this floating effect, and we just found out after a very short period of time that that wasn't working, so we discontinued it. And I think this came about from the fact when I was at the Holden barn, and we had supplied them, I don't know, a skid or two of product at no charge, to try and alleviate their immediate problem, and it was laying in the back with the grass growing through it, and I said, "Well, that's a bit of a waste."

Q. But it wouldn't have helped even if it had been installed?

A. It would have helped initially, but it was

Page 135

only a band-aid.

Q. The expansion joint corrective measure that this program is being referred to would have helped if the problem had been that the flooring was flush against the walls.

A. Right.

Q. Or if the beams were not free-flowing.

A. Correct.

Q. But because the beams were expanding, this program wouldn't have helped that.

A. It wouldn't have helped that.

Q. Mr. Orr refers to, "The buckling floor problem only to be resolved with the placement of the rusting steel beam with our fiberglass beam. Would you please insure this information is passed on to the appropriate individuals within your organization."

Do you recall after September 9, 1999 discussing with Mr. Borcherding the requirement that Maxima flooring be used only with fiberglass beams or galvanized or stainless steel beams?

A. Oh, I'm sure we did. I don't know on what specific date, but, yes, we would have definitely discussed it.

Q. What was his response to that topic, if you recall?

A. As I recall, he agreed with it.
Q. Lastly, Mr. Orr refers to "Putting together for you your own BCM product manual which addresses all of the issues related to BCM products and their installations."
A. Yes. I think what he's referring to there is an updated product manual. And we'd had a change of address and so forth in the meantime.
Q. But you did have a product manual prior to that.
A. Yes.
(WHEREUPON, Hutchings Deposition Exhibit No. 78 was marked for identification by the Reporter.)
BY MR. CROSS:
Q. Exhibit No. 78 is a technical bulletin dated January 3, 2000 referencing rusting of steel support beams. Do you recall the preparation of this document?
A. Yes.
Q. And who wrote it?
A. I believe I wrote this one.
Q. Who was it sent to?
A. This was mailed out to, or faxed to all current dealers and distributors of record on January 3rd or 4th.



Q. Again, that would be the group, at least in the United States, the group of four or five persons?
A. Those people, as well as our Canadian dealers, et cetera, yes.
MR. CROSS: I really don't have anymore questions for you, with the exception that I would like, and I don't know if one of you have it, I would like to know what the product manual was that you referred to a number of times and that I don't have. I don't know if you can pull the pile of documents and we can have Mr. Hutchings identify it and have that entered into the record, but with that exception, I'm done.
MR. DIESETH: Off the record a second.
(Brief off-record discussion.)
EXAMINATION
BY MR. DIESETH:
Q. Mr. Hutchings, my name is Paul Dieseth. I'm a lawyer with Dorsey Whitney and we represent Hog Slat in this case. I'm going to ask you a couple of questions. I hope not to repeat anything that Mr. Cross has asked you, but if I do, I apologize in advance.
Am I correct in understanding that the only warranties that you can recall giving to Double L concerning not using flat or unpainted -- or painted or unpainted steel were the product manual --



A. Yes.
Q. -- and the conversation you had with Bailey Evans that you testified about?
A. Yes.
MR. LULIC: I'll object to the form of the question.
BY MR. DIESETH:
Q. When you had first talked about this conversation that you had had with Mr. Evans, you thought that it would have occurred in, I believe it was '93 or '94 is what you said.
A. Yes, I believe so.
Q. And so that conversation you had had with Mr. Evans did not coincide with your receipt of Exhibit No. 35 from BCM, or did it? Take a look at Exhibit No. 35.
MR. LULIC: You said "from BCM."
BY MR. DIESETH:
Q. I'm sorry. From Bailey Evans. Exhibit No. 35 is the agenda from Mr. Evans.
A. Yes.
Q. And then on page 3298 there is a statement that they had been -- Mr. Evans had been suggesting and had been promoting the use of painted or non-painted steel. You see that?



A. Yes.
Q. Now, the conversation you recall that you had had with Mr. Evans came before your receipt of this agenda?
A. Yes.
Q. All right. Do you recall what caused you to have that conversation with Mr. Evans?
A. Yeah, that was, again, over a competitive price issue.
Q. Did Mr. Evans raise that issue with you?
A. Yes, he was, I believe, having trouble competing against the Ikadan flooring and beam system.
Q. Without recommending the use of a painted or unpainted steel support beam?
A. Right. And he had said that Ikadan had used a three-sixteenths by three or four-inch galvanized steel, and, you know, the cost was such and such, and then he explained the cost of the beam that Bailey was recommending, and I had said, you know that, "Well, first of all, you shouldn't be using painted or unpainted steel, because it's going to rust and eventually the floor is going to fall in the pit." And that's when he replied that he would worry about that later.
Q. So your concern at that point was that the

Page 140

whole steel beam would lose its integrity as opposed to something that involved the tabs.

A. Right.

Q. Prior to this June 1999 World Pork Expo meeting in which you had some conversations with Tommy Herring of Hog Slat --

A. Yes.

Q. -- had you ever, prior to that time, told Hog Slat that Hog Slat should be using galvanized steel or fiberglass instead of painted or unpainted steel with the Maxima flooring?

A. No, I had not. Again, that would be a customer of Double L's and I wouldn't normally get involved there.

Q. Now, after you had talked with Mr. Evans, going back to the '93, '94 conversation you had with Mr. Evans, during that conversation, I assume you became aware that Double L was recommending or suggesting the use of unpainted or painted steel support beams.

A. I suppose I was, although they also had a fiberglass beam that they were selling a lot of as well, and I was never privy to how much beam they were selling, because they never bought mine. They did design and buy a beam from the same manufacturer, Advanced Fiber. And so I had no way of knowing exactly

Page 141

what they were recommending, although, you know, I did ask on a number of -- again, I guess, you know, Double L was in the business of selling flooring, and selling beams wasn't really their focus. Their flooring, as I understood it, would go out to a dealer like Midwest Livestock that was mentioned, and that dealer would then supply the beams.

Q. In Exhibit No. 35 we had mentioned again at that point in the agenda Mr. Evans had indicated to you that they had been recommending or promoting painted or unpainted steel support beams. Had you heard that before then?

A. Yes, only back in the original conversation in '93, '94.

Q. So you learned that in '93, '94. You heard it again when you got Exhibit No. 35 from Mr. Evans. Had you heard that at any other time from Double L or from Mr. Evans?

A. I don't recall that I did.

Q. Did you talk to Mr. Evans or anybody at Double L again after receiving Exhibit No. 35 about their practice of recommending or suggesting, or promoting or suggesting the use of painted or unpainted steel support beams?

A. I don't exactly recall how this, like this

Page 142

was the agenda for discussion at the meeting and I don't recall now how this ended up, you know, after this meeting on the 7th.

Q. So you don't recall taking any steps after learning of this in 1995?

A. No, other than, as I stated earlier, on a couple of occasions that when suggestions were made, things were said like, "We do it differently."

Q. Did you ever recall seeing ads that Double L had published in which it referred to the use of steel support beams with Maxima flooring?

A. Yes.

Q. Did you see those, other than after this lawsuit was initiated? Did you see them at or about the time that they were published?

A. Yes. Again, that's a generic term that everybody uses in the industry, and it didn't really raise a flag with me that it was, in fact, just plain or painted steel.

Q. So you felt that it might be referring to galvanized steel?

A. It could be galvanized, could be -- you know, I guess how technical does one have to be these days. There's hot dipped galvanized, there's cold dipped galvanized, there's galvanized that's painted

Page 143

black. You can go on and on. But there's probably a dozen other manufacturers that do use the term steel bar or steel supports.

Q. Are there any products that BCM sells where it does not have any objection to the use of painted or non-painted steel support beams?

A. No.

Q. Do you know whether any Maxima -- well, I may not have been listening to this when you testified previously. Are you still selling Maxima 2 floors?

A. Yes. Maxima 2, yes.

Q. Do you know of any installations within the last, say, six months where the user has used painted or unpainted steel support beams?

A. No.

Q. Do you know whether that's still being done, whether users or contractors are using Maxima flooring with unpainted or painted steel support beams?

A. I would hope not, because we're very specific in telling them to -- in most cases, in Canada, for instance, we would sell the fiberglass beam pretty well with each flooring order that we sell to a dealer. Our distributor, for instance, in Quebec, they are a steel manufacturer and everything that they manufacture, including cell crates, is galvanized steel.

Page 144

Q. Was there a time, Mr. Hutchings, when you were selling product and were not discouraging the use of painted or unpainted steel support beams?
A. Not that I'm aware of.
(WHEREUPON, Hutchings Deposition Exhibit No. 79 was marked for identification by the Reporter.)
BY MR. DIESETH:
Q. Have you had a chance to review Exhibit No. 79?
A. Yes.
Q. At the bottom of the page, there's a reference to galvanized or unpainted -- I'm sorry. Galvanized or painted steel. You see that?
A. Yes.
Q. Is that painted galvanized steel or is it just painted regular steel?
A. From 1993, I'm not sure.
Q. Do you know why you're providing this kind of a quote?
A. This was information just being provided to Beta Engineering for this whole concept of designing a beam that would be competitive with galvanized steel and coming up with a design costing and strength to compete against the steel. For instance, none of these three

Page 145

examples above were ever built. This was just concepts, you know, for them to look at, and I believe I had spoken with Advanced Fiber to get these approximate prices and said, you know, then to Beta, "Here's a guideline. If we had quarter-inch by three flat, for instance, in fiberglass, it would be $1.35 a foot Canadian, and if we had the Y-shaped one here, the inverted Y, it would be $1.65. Now, can you use any of these models in your computer program to generate a beam with the strength of quarter-inch by three steel and quarter-inch by four steel?"
Q. Why did you give them prices on the steel? Do you remember?
A. Just as a comparison to -- so that when you went to the marketplace you're not going to be three times the price of steel or whatever.
Q. Let me switch topics on you. You had talked about the upgrade program that you had implemented along with Double L.
A. Yes.
Q. Do you know how many end users ultimately took advantage of that program?
A. I would say there are probably eight or 10 to date.
Q. Is it still in effect?

Page 146

A. Yes.
Q. I was unsure of this other lawsuit that you had spoken of briefly in Iowa. Do you have a firm recollection that there is another lawsuit in Iowa or you just think there might be?
A. There was another action started, but I don't know at this point whether it's been discontinued or just where it's at.
Q. Do you know who the other defendants are in that lawsuit?
A. I don't recall.
Q. Do you know who the plaintiff is?
A. Oak Pork rings a bell.
Q. Is Double L involved?
A. I believe so.
Q. And that's the only other lawsuit you know of that involves the use of Maxima flooring and the problems that we've been talking about?
A. Yes.
Q. Do you know where in Iowa it is?
A. No, I don't recall.
Q. Do you know when it was initiated, when it was filed?
A. A year ago.
Q. Other than BCM and Double L, are there any

Page 147

other defendants?
A. I don't recall exactly. I would have to review the documents.
Q. Have you been deposed in that case?
A. No.
Q. Do you know if anybody has been deposed in that case?
A. I don't know.
Q. You said you had -- switching topics again on you -- you said you met Tommy Herring at a World Pork Expo several years prior to the '99 meeting you talked about.
A. Right.
Q. Is that the first time you had met him?
A. Yes, I believe so.
Q. Had you met any other people from Hog Slat before then?
A. I don't believe so.
Q. Have you ever met anybody or talked to anybody -- well, have you ever met anybody in person at Hog Slat, other than the meetings you've had at the World Pork Expo?
A. At that same meeting I believe Wendell Burge was there. But other than that, I don't recall. Like I might have met some of their salesmen on the floor or

Page 148

something at the show just to pass the time of day with or whatever, but that's all.
Q. What do you recall saying at that World Pork Expo meeting in June of '99 about the plaintiffs' problems?
A. Either myself or Nic Orr, I believe, mentioned that we suspected that, you know, the rusting could be coming from acidified diet, ventilation, poor steel, whatever.
Q. Did you accept any responsibility for the problem?
A. I don't believe that we did at the time. I think everybody left with the idea that, you know, we'd go away and rethink the situation and then someone would get back to Mr. Holden.
Q. So you don't recall anybody saying they would be taking care of the problem?
A. I don't recall that.
Q. You said you remember Mr. Herring, again, sticking with that same June of '99 meeting, you said that somebody had suggested that there was inferior steel used at the Holden farms installations. Do you remember who said that?
A. I believe it was Nic, that it was a possibility that it was, you know, second-grade steel or

Page 149

whatever term he used.
Q. Are you aware of any facts to suggest that that is, in fact, true?
A. No.
Q. Do you remember Mr. Herring saying, "Let me worry about the steel"?
A. Yes.
Q. What was the context in which he said that? Was it in this context of, was there inferior quality steel?
A. I think that's where it came up when that had been suggested, that Tommy said, you know, "Let me take care of the steel."
Q. And he was saying that in the context of this wasn't -- I mean, it was his belief it wasn't inferior quality steel.
A. That's right. Yeah.
Q. Do you believe that Hog Slat is responsible or in any way at fault for the problems that the plaintiffs have experienced with the flooring?
A. Well, it is the steel that destroyed the floor. Now, whether you can say that Hog Slat is responsible or the steel manufacturer is responsible or the person that painted it or whoever, or, you know, is it the manure pit? Who is responsible?

Page 150

Q. You don't know.
A. I don't know.
Q. And I believe you testified that you don't think that there was any problem associated with installation that caused the problem that the plaintiffs experience; is that right.
MR. SOBALVARRO: Specific to the Garness barn which was the only one he saw.
BY MR. DIESETH:
Q. I'll take that into two questions, then. You do not believe, do you, that any installation issues or problems caused the buckling that you saw at the Garness barn; is that correct?
A. That's correct.
Q. Do you have any facts to suggest, or do you know of any facts to suggest that installation issues caused problems at any of the other plaintiffs' barns?
MR. SOBALVARRO: Object, lack of foundation.
THE WITNESS: I have no facts to suggest that. I guess if I could add to that as well. When I went to the Garness barn, as an example, you know, I'm mainly there examining my flooring. I don't pretend to be an engineer or to inspect all areas of the barn. You know, you go in there with the thought that

Page 151

you're looking to see, and your main thrust is simply looking at flooring.
Q. No, I understand that, but you would have talked to other people about this problem,
A. Yes.
Q. And you would have looked at some documents that concerned this problem.
A. Yes.
Q. And the only reason I ask the question is to see whether in any of those conversations or anything that you've tried to become familiar with as a result of this lawsuit that you have become aware of facts that would suggest that there were installation problems that were at the root of all this.
A. I'm not aware of any.
Q. Did you ask the plaintiffs to waive their claims against BCM in exchange for their participation in this upgrade program?
A. Yes.
Q. What was their response?
A. No response.
Q. You sent them a waiver form?
A. Right.
Q. And they simply did not respond to that?
A. They initially said that they would, but

Page 152

then I guess after we offered it, then they decided they wouldn't sign it.

Q. Who said they would?

A. I believe it was Mr. Kent Holden, and he had said that he was instructed by his lawyer or someone that they couldn't sign it, for whatever reason. I believe there was some reason, state law or whatever, that they couldn't sign it.

Q. Those lawyers.

A. Oh, yeah, terrible.

(WHEREUPON, Hutchings Deposition Exhibit No. 80 was marked for identification by the Reporter.)

BY MR. DIESETH:

Q. I'm handing you what's been marked as Exhibit No. 80.

A. Okay. I've read it over.

Q. Do you know what the blue Hog Slat samples, what that refers to at the bottom of this page?

A. I believe we produced some Maxima slats simply in the blue coloring rather than black coloring, which blue was their corporate color.

Q. So you gave blue Maxima samples to Double L. Did you think that that was to be used in trying to work with Hog Slat to get Hog Slat as a dealer?

Page 153

A. Right.

Q. Thank you.

(WHEREUPON, Hutchings Deposition Exhibit No. 81 was marked for identification by the Reporter.)

BY MR. DIESETH:

Q. I think earlier, Mr. Hutchings, Mr. Cross had marked as an exhibit a July letter, very similar to this.

A. Yes.

Q. But this is the one that was countersigned by Mr. Holden.

A. Yes.

Q. And as far as you know, that is Mr. Holden's signature?

A. Yes.

Q. And that's your signature?

A. Yes.

Q. All right. That's all I wanted to know on that one.

MR. DIESETH: I don't have any other questions.

EXAMINATION

BY MR. LULIC:

Q. I just have a few. Mr. Hutchings, I'm Joe

Page 154

Lulic and I represent Double L in this case. I just want to clarify a couple of things with you as far as documentation goes. You've looked at Exhibit No. 52 which is part of a product brochure.

A. Yes.

Q. And on the Maxima nursery hog flooring, it states that it's got positive interlocking and it's simplified, an economical support system using the quarter-inch flat steel. See that?

A. Yes.

Q. There's nothing about the use of any type of plastic support system in that brochure -- or what is part of a brochure that's Exhibit No. 52, correct?

MR. SOBALVARRO: By plastic you mean fiberglass?

MR. LULIC: Fiberglass I meant. But fiberglass is a form of --

MR. SOBALVARRO: I would agree.

BY MR. LULIC:

Q. I mean, it doesn't say anything about fiberglass or plastic beams, correct?

A. No. That's correct.

Q. And that's because we think when this was produced the plastic hadn't been -- or the fiberglass hadn't been developed yet, correct?

Page 155

A. That's correct. That was probably just prior to.

Q. Sure. And in Exhibit No. 58, which the third page contains some labeling, we talk about support with quarter-inch bar, correct?

A. Yes.

Q. That's number two on the label, correct?

A. Yes.

Q. And then in Exhibit No. 62, which again is some product literature and brochure, on the page that is labeled BCM 3276, reference is made to steel or fiberglass support systems, correct?

A. Yes.

Q. So this must have been -- by "this," the page labeled BCM 3276 of Exhibit No. 62, this must have been produced after the fiberglass support system was developed, correct?

A. Yes.

Q. But even after these fiberglass support systems were developed you still gave people the option of using steel, correct?

A. Yes.

Q. So fiberglass was an option that was available to people, but certainly nothing that you required be used, correct?

Page 156

A. We didn't require them, although we promoted that they use it, yes.
Q. When you say you promoted that they use it, and you said it before, but here it says steel or fiberglass.
A. Right.
Q. It doesn't say preferably fiberglass, but you want to use steel if you can. It says steel or fiberglass.
A. Yes.
Q. And in fact, it uses the word steel first, doesn't it?
A. Yes.
Q. So how do you call that promoting fiberglass over steel?
MR. SOBALVARRO: I'm going to object as argumentative. You're telling him that the only way he can promote that is by this document.
MR. LULIC: No, I'm not telling him anything.
BY MR. LULIC:
Q. I just want to know if you said on a document like this -- why are you saying you were promoting fiberglass over steel? Where in any document do you say fiberglass, we want you to use fiberglass

Page 157

instead of steel?
A. Again, this is the generic term of galvanized steel, and at that time, as far as we knew, that is quite acceptable. You notice that in our pictures we do show fiberglass. So we were stating at that point that you could use galvanized steel or you could use fiberglass, but it was obviously our only promotion at BCM, because we did not sell a galvanized steel, that we wanted to sell fiberglass to make some money.
Q. Sure, and I respect that. That's fine. But there isn't anything in any document that I've been able to read, Mr. Hutchings, and I'm not trying to be argumentative with you, that says, "We prefer that you use fiberglass over steel because it will make the customer more satisfied," is there?
A. I believe there were pages in our manual that specifically state that.
Q. What was the date of that manual though?
A. Well, it's '96.
Q. '96.
A. '96, '97, yeah. After that.
Q. And the '96 manual was produced and distributed after this whole deal was sold and installed, correct?

Page 158

A. Yes, although fiberglass was available to Double L in '94. Spring of '94. They even bought --
Q. Now you're arguing with me.
A. I'm just stating a fact.
Q. I really don't want to argue with you.
A. I'm sorry. I'm just stating a fact.
Q. And I want to distinguish between you making things available versus your promoting them over something else, correct? And I also want to distinguish between, you know, what was mischaracterized earlier as a warning. There's no warning in any of these documents that says don't use steel, is there?
A. No. If you use galvanized steel.
Q. Tell me what document you used the word galvanized in, sir. Which document is that?
A. Probably none of those. Just the same as the dozen other manufacturers that we use the generic term.
Q. Before the installation of this project, of these projects, these barns, the Holden barns, was there any document that you sent out to, whether it be the dealers or your exclusive distributors or whatever, where the word galvanized was used?
A. Not that I'm aware of.
Q. And then later on, after the proverbial

Page 159

stuff hit the fan, Mr. Orr sent out a memo or a letter stating that the warranty would not be honored if the Maxima product was placed upon anything but stainless steel.
A. Uh-huh.
Q. Or fiberglass, correct?
A. Uh-huh.
Q. Is that correct?
A. Yes.
Q. Do you know why he didn't use the word galvanized in that letter?
A. Probably an overreaction, because at that point, we became aware that Double L was still allowing flooring to be sold on painted steel.
Q. When you say "allowing," how was Double L going to not allow someone to put the flooring they sell over whatever they choose?
A. Well, that's true.
Q. Why do you use the words "Double L was allowing it"?
A. We just thought it was strange that when all of us had become aware of this problem, that there would be -- you know, with the rusting --
Q. That wasn't until '98, correct?
MR. SOBALVARRO: That's the date of Mr.

Page 160

Orr's e-mail is after '98.
THE WITNESS: It's '99.
MR. SOBALVARRO: He just told you that the e-mail was sent out in response to the knowledge that Double L was still using. He used the word "allowing" and you didn't like it.
THE WITNESS: Yeah.
BY MR. LULIC:
Q. Well, you're aware, are you not, that Double L didn't sell the support beams for the flooring in this case.
A. **Yes.**
Q. And you were also aware back in the time frame of '93, '94, '95, '96, before and during this project, the Holden project, that Double L would sell their flooring to suppliers with little or no knowledge as to what the support system would be, correct?
MR. CROSS: Objection, foundation.
MR. DIESETH: Objection, calls for speculation, calls for facts not in evidence.
BY MR. LULIC:
Q. Are you aware of that?
A. **I have no knowledge of what they told their dealers.**
Q. Nor do you have any knowledge of what they

Page 161

knew regarding what the support system was going to be or who would choose it, correct?
MR. CROSS: Objection, foundation.
THE WITNESS: I don't know what they would know.
BY MR. LULIC:
Q. Okay. Are you aware that Filter-Eeze -- let me back up. What was the Filter-Eeze product called before Maxima, the flooring?
A. **Well, there was a number of different models.**
Q. Yes, I remember them, but what was the latest one?
MR. SOBALVARRO: Are you thinking of the L-3760?
THE WITNESS: Yeah, the L-3760 was sort of the model that was sold for nursery floors.
BY MR. LULIC:
Q. Right. Okay. How about for hog barns?
A. **Yes. Nursery hog barns.**
Q. Okay. Now, are you aware of that product, which did not contain any clips, fasteners, whatever you want to call those things inside, are you aware of that product being used and incorporated with unpainted or untreated or non-galvanized steel?

Page 162

A. **I'm sure it may have been.**
Q. Are you aware of any problems with that product, the predecessor to the Maxima that did not contain the clip, where rusting occurred where unpainted or untreated steel was used and so it, you know, materially shortened the expected life of the support system?
A. **Yes, the steel supports rusted, and with that system, the floor would fall in the pit.**
Q. Are you aware of those?
A. **Yes.**
Q. How many instances are you aware of those?
A. **A few in Canada that I can think of.**
Q. Okay. Well, when?
A. **I remember one specific one where a farmer came in in probably '92 and he needed a few pieces of flooring, I don't remember which model, and he said, "You know, my beams have rusted out and the floor has fallen in the pit and I need to replace a few pieces around the feeder, and I'm going to put the same flooring back down again."**
Q. How long was the beam support system in?
A. **Probably eight, 10 years.**
Q. But the point is that that's a reasonable life expectancy for that, is it not?

Page 163

A. **Yes, it is.**
Q. Okay. I'm talking about are you aware of a problem where the support system failed long before its useful life?
MR. SOBALVARRO: Object as vague.
BY MR. LULIC:
Q. During use or while it was being used with the predecessor to Maxima.
MR. DUSTIN: Objection.
MR. SOBALVARRO: Same objection.
THE WITNESS: I can't say that I'm aware of them.
BY MR. LULIC:
Q. Okay. Is the only product manual that you supplied so for the 1996 product manual?
A. **Yes.**
Q. Was there a predecessor to that?
A. **No. I think it was started in 1994. 1995 is when it originally came out. You know, there have been additions, these technical bulletins and new products added to it as we went along.**
Q. Well, the first technical bulletin that talked about the use of galvanized steel or something better than that was in 1999 or 2000, wasn't it?
A. **I thought there was one in '96.**

Page 164

MR. SOBALVARRO: I think there was one in '98.
MR. LULIC: Not a technical bulletin. I'll look back, but --
THE WITNESS: I think the one in '96 was on expansion, was it?
BY MR. LULIC:
Q. Yes. Everything was on expansion.
MR. SOBALVARRO: I believe there was one attached to Bob Slessor's letter in September of '98.
MR. LULIC: What exhibit is this?
MR. SOBALVARRO: This one is No. 78.
BY MR. LULIC:
Q. Exhibit No. 78 is a technical bulletin, it's the first one that I remember that was --
MR. CROSS: Look at 72.
MR. SOBALVARRO: Joe, that's December 3, 1998, and it follows his letter of September '98 where the same information was provided.
BY MR. LULIC:
Q. Well, these bulletins -- let me ask you the question this way. Exhibit No. 78 which is entitled, "Re: rusting of steel support beams," would you agree that this technical bulletin was a little bit more

Page 165

specific and a little bit more stern about the use of galvanized steel, as a minimum, than any other technical bulletin you sent out?
MR. SOBALVARRO: I'm going to object to the form of the question. It's vague. I mean, you want him to go through every line?
MR. LULIC: No, he knows what I'm talking about.
BY MR. LULIC:
Q. Go ahead.
A. **Yes. As stated, it's a follow-up or a reminder to previous bulletins, and again, we're cautioning to everyone to be very careful. It's in our best interest to have our flooring last as long as possible and create goodwill out there for our future sales.**
Q. The predecessor to the Maxima, how long has it been in existence?
MR. SOBALVARRO: Wait, I'm going to object as vague.
MR. CROSS: Which predecessor?
MR. SOBALVARRO: Because there is no, quote, predecessor, to the Maxima.
BY MR. LULIC:
Q. You helped pioneer the plastic flooring

Page 166

system for animal installations, did you not? Didn't your company help do that?
A. **Yes.**
Q. Before, it was always all steel, correct?
A. **Steel, concrete and wood.**
Q. Right. You pioneered the plastic flooring, you helped -- your company helped pioneer the plastic flooring industry, correct?
A. **BCM did, yes.**
Q. Now, Maxima is a plastic flooring system, is it not?
A. **Yes.**
Q. You started selling plastic floors to farmers in what year? By "you," I don't mean you personally, but your company BCM?
A. **I believe in '79.**
Q. And when Maxima 1 was introduced in 19 --
A. **'93.**
Q. -- 1993, did you discontinue its predecessor, eventually?
A. **No.**
Q. You still sell it.
A. **We still sell some.**
Q. Okay. And as far as you know, you can't think of one single incident where its predecessor or

Page 167

predecessors were involved in a situation such as we're involved with in this lawsuit relative to Holden farms; is that correct?
MR. SOBALVARRO: I'm going to object. It's vague.
MR. LULIC: It's hardly vague.
MR. SOBALVARRO: Sure it is. This situation --
BY MR. LULIC:
Q. You know what the situation is relative to Holden Farms, don't you?
A. **Yes.**
Q. The support beams are rusting, the floor is buckling up. It needs to be replaced, correct?
A. **Yes.**
Q. Are you familiar with any type of situation like that involving Maxima's predecessor or predecessors where the failures have occurred prematurely?
A. **No.**
Q. Do you think that people just started using painted and unpainted steel when Maxima came out?
MR. CROSS: Objection, foundation. Also argumentative.
THE WITNESS: I have no way of knowing what they were using before.

Page 168

MR. LULIC: Okay. That's all I have.
EXAMINATION
BY MR. CROSS:
Q. Very briefly, Mr. Hutchings. Why would this problem be unique to the Maxima flooring?
MR. SOBALVARRO: Objection, argumentative. It assumes it is unique to Maxima flooring.
BY MR. CROSS:
Q. Well, why is it found in the Maxima flooring as opposed to the earlier models of Filter-Eeze? What's the difference between Maxima and its earlier varieties?
A. **The earlier models rested on top of the metal beams and they simply rusted and corroded away and fell in the pit. So, you know, it's a different problem that they had. And this particular problem would not be just related to Maxima flooring, but rather to any flooring that is out there, such as Southwest Agri, Farmweld or whomever that uses this system.**
Q. Any plastic flooring that clasps onto the support system, correct?
A. **Yes.**
Q. Was Maxima the first -- well, and Ultima, the metric variety --
A. **Right.**

Page 169

Q. Those were the first flooring systems that were made of plastic that clasped onto the support system, correct?
MR. SOBALVARRO: That BCM made or anywhere in the word?
BY MR. CROSS:
Q. Anywhere in the world.
MR. SOBALVARRO: I object, lack of foundation.
THE WITNESS: I don't believe that's the case, no. I think there were others prior to that that had the same hanger system.
BY MR. CROSS:
Q. BCM was not the first one in the world to develop the --
A. **The hanger system, no.**
Q. Do you know who was?
A. **I would suspect it was MIK in Germany.**
Q. As far as the North American market goes, was BCM the first to introduce that system?
MR. SOBALVARRO: I'm going to object. Assumes MIK did not sell products in North America. It's argumentative.
MR. CROSS: I don't know that it's argumentative.

Page 170

MR. SOBALVARRO: You said in North America. The question assumes something. The fact that it assumes a fact makes it argumentative.
THE WITNESS: I believe Faroex also had the same system.
BY MR. CROSS:
Q. Faroex?
A. **Faroex in Manitoba. Polygrate, same company. Street name.**
Q. Was the Maxima design developed independently or was it based on a competitor's product?
MR. SOBALVARRO: Object as vague. Independently?
BY MR. CROSS:
Q. Well, was that the design of BCM and its consultants or was it based on another product, existing product?
A. **Well, we would have looked at other products in the field, yes.**
Q. Are you aware of any significance, Mr. Hutchings, to a claim that a flooring system would have a 15 to 20 year life expectancy? Obviously, the longer the life the less often you're going to have to replace it, correct?
A. Yes.

Page 171

Q. Do you know what the life expectancy of a hog confinement facility nursery barn is?
MR. SOBALVARRO: The barn itself?
BY MR. CROSS:
Q. The barn itself.
A. **My guess would be 15 to 20 years.**
Q. In other words, a 15 to 20 year product would not have to be replaced.
A. **Right.**
MR. CROSS: That's all I have. Thank you.
MR. DIESETH: Nothing further.
MR. LULIC: Nothing further.
MR. SOBALVARRO: We'll read and sign.
(Deposition adjourned at 4:30 p.m.)

Page 172

STATE OF MINNESOTA )
)
COUNTY OF BLUE EARTH)

BE IT KNOWN that, I took the foregoing deposition of WARREN HUTCHINGS, pursuant to Notice;

That I was then and there a notary public in and for the County of Blue Earth, State of Minnesota;

That said witness before testifying was duly sworn to tell the truth, the whole truth, and nothing but the truth relative to the cause specified in the Notice;

That the witness did not waive the reading and signing of said deposition;

That I am neither attorney nor counsel for, not related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action;

That the testimony was taken down in stenotype by me; then reduced to typewriting under my direction by means of computer-aided transcription, and is a true and correct transcript of my stenotype notes.

Witness my hand and seal this 9th day of July, 2001.

MARTHA M. RIVARD

Page 173