AUG 1 0 2001



UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

---

Court File No. 00-CV-785 DSD/SRN

Holden Farms, Inc., a Minnesota Corporation; Rod Garness; Eugene C. Ward; Randy Swanson; Rick Anderson d/b/a Circle A Farms; Tim Sanborn; AJ Farms, a Minnesota General Partnership; Dennis Kofstad; Marlin Kruckeberg; and Pork Avenue, LLP, a Minnesota Limited Liability Partnership,

Plaintiffs,

-vs-

Hog Slat, Inc., a North Carolina Corporation; BCM Manufacturing, Ltd., a Canadian Corporation; and Double L Group, Ltd., an Iowa Corporation,

Defendants.

---

Deposition of: KENT HOLDEN

Taken at: Holden Farms
401 Division Street
Northfield, Minnesota

Date: July 23, 2001

Commencing at: 10:00 a.m.

by MARTHA M. RIVARD, COURT REPORTER

12151 Gantry Lane
Apple Valley, Minnesota 55124
800-844-6420 * 952-431-1252

LITIGATION SUPPORT--COLOR VIDEOTAPING SERVICE

EXHIBIT I

Deposition of KENT HOLDEN, taken pursuant to Notice to Take Oral Deposition, under the Rules of Civil Procedure, for the U.S. District Courts of Minnesota, at Hanson Farms, 401 Division Street, Northfield, Minnesota, commencing at approximately 10:00 a.m., on the 23rd day of July, 2001, before Martha M. Rivard, Notary Public, in and for the State of Minnesota.

\- * -

APPEARANCES:

DUSTAN J. CROSS, Esq., of the law firm of Gislason & Hunter, 2700 South Broadway, P. O. Box 458, New Ulm, Minnesota 56073-0458 appeared for and on behalf of Plaintiff.

PAUL R. DIESETH, Esq., of the law firm of Dorsey & Whitney, Pillsbury Center South, 220 South Sixth Street, Minneapolis, Minnesota 55402 appeared for and on behalf of Defendant Hog Slat.

RICHARD W. SOBALVARRO, Esq., of the law firm of Rajkowski Hansmeier, 11 Seventh Avenue North, P. O. Box 1433, St. Cloud, Minnesota 56302-1433 appeared for and on behalf of Defendant BCM.

JOSEPH F. LULIC, Esq., of the law firm of Hanson, Lulic & Krall, 920 Second Avenue South, Suite 500, Minneapolis, Minnesota 55402, appeared for and on behalf of Defendant Double L Group.

Also present, Barry Holden.

\- * -

Examination:

By Mr. Dieseth . . . . . . . . . . . . 3, 149
By Mr. Lulic . . . . . . . . . . . . . 86, 155
By Mr. Sobalvarro . . . . . . . . . . 124

Exhibits:

No. 82 - 7/14/99 Fax from Burge to K.Holden . . 72
No. 83 - Pliff. Ansers to Hog Slat Interr. . . 74
No. 84 -Affidavit of K.Holden . . . . . . . . . 83
No. 85 - Calculations . . . . . . . . . . . . . . . 113
No. 86 - Southwest Agri-Plastics letter . . . . 129
No. 87 - Contract . . . . . . . . . . . . . . . . 153
No. 88 - Contract Assign. Holden Farms/Hog Slat 154

KENT HOLDEN,
called as a witness,
having been duly sworn,
was examined and testified as follows:

EXAMINATION

BY MR. DIESETH:
Q. Mr. Holden, my name is Paul Dieseth. I'm an attorney with Dorsey & Whitney in Minneapolis. I represent Hog Slat in this lawsuit. I'm going to be asking you some questions that have arisen as a result of this lawsuit. Have you ever been deposed before?
A. No.
Q. Let me give you some ground rules that hopefully we can abide by to make this go fairly smoothly. I'm going to try to state my questions as clearly as possible. If at anytime you don't understand a question that I ask or if you are uncertain about what I'm meaning, let me know and I will try to rephrase my question and make it clearer for you. If you don't say anything, I'll assume you understood my question. Is that okay?
A. Sure.
Q. Let me finish my question before you answer, and I'll extend you the same courtesy. I'll let you answer before I ask my next question. That will help



the court reporter who will find it difficult to try to transcribe something when two people are talking at the same time.
Please don't speculate. If you don't know an answer to a question, just say so and I'll move on. If you want to answer a question with a yes or no, try to say yes or no audibly as opposed to uh-huh or huh-uh or a shake of the head. Again, that's just simply to allow the court reporter to transcribe what you're saying clearly and so that when somebody reads this back, they can see that you said yes or no as opposed to something else that is difficult to transcribe.
If at anytime you want to take a break, let me know or let your counsel know and we'll do that. Are you under any medical or other disability that would prevent you from giving clear and accurate testimony today?
A. No.
Q. Did you review any documents in preparation for today's deposition?
A. Yes.
Q. Did any of those refresh your recollection?
A. Yes, they did.
Q. Can you tell me what those were?
A. I read the depositions of Norb Borcherding



and I skimmed through the other two we had.
Q. Do you recall anything in particular that refreshed your recollection?
A. No, just general terms that refresh my recollection.
Q. Let me just briefly get your background before we get into the substance of the lawsuit. Can you give me your educational background?
A. I graduated from the University of Minnesota in 1969 and as far as formal education, that's all I have.
Q. What degree did you receive?
A. Bachelor of Science in agriculture and economics.
Q. Your interrogatory responses said you had begun hog farming in 1966; is that right?
A. I don't recollect what --
Q. You don't remember when you started?
A. Well, I started even earlier than that, because we had hogs and turkeys through my childhood and through high school.
Q. What did you do after you graduated from the University?
A. Went to Brazil, U.S. Peace Corps, for about two-and-a-half years. I came back in, let's see, early



'72.
Q. What did you do then?
A. After I got back?
Q. Yes.
A. Then I went to work for my uncle in a turkey business for approximately three months, and then after -- in April of, let's see, then I came back to the family farm after that and worked with Holden Farms from then on.
Q. Who started Holden Farms as a company?
A. It was a family business run by my father.
Q. Did he start the company?
A. It was incorporated in 1970 under Holden Farms and just before that there was no formal name.
Q. Right. Who are the current shareholders of Holden Farms?
A. By brother Barry Holden and myself.
Q. What are the percentages of ownership?
A. Fifty percent each.
Q. When did that ownership structure start?
A. The ownership started, I believe, in 1974.
Q. You and Barry?
A. Yes.
Q. So from 1974 you and Barry have owned half of Holden Farms?



MARTHA M. RIVARD
952-431-1252 * 800-844-6420

Page 7

A. Actually in '74 -- in the fall of '73, our father passed away and the ownership was in his and my mother's names prior to his death, and in 1974 I believe it was, to the best of my recollection, then we split it between -- they are four brothers, each 25 percent ownership.
Q. When did you and Barry become the sole owners?
A. Then we became sole owners in 1991.
Q. And at that time you each had 50 percent ownership?
A. Yes.
Q. Your interrogatory responses again state that your current annual hog sales are about 40 million; is that right?
A. Yes, approximately 40, 50 million.
Q. Do you know what that production was back in 1994?
A. What the sales dollars were?
Q. Yes.
A. I don't recollect exactly, no. Approximately half of that.
Q. So it's gone up about twice since then?
A. Yeah. Yes.
Q. How many growers do you have under contract

Page 8

now?
A. Approximately 100.
Q. Do you recall how many you had back in the early '90s?
A. How many growers we had?
Q. Yes, under contract.
A. I'm going to estimate 40.
MR. CROSS: Since 1994?
THE WITNESS: Yeah. He said early '90s. I'm assuming '90, '91 we had about 40 growers.
BY MR. DIESETH:
Q. Would that have changed before 1994? Would it have been slightly more than that in '94?
A. Slightly more in '94.
Q. So basically, it's been slow and steady growth with respect to the number of contractors you have?
A. Yes.
Q. And similarly, with respect to the annual hog sales, it's been slow and steady growth?
A. Yes.
Q. Where does Holden Farms rank sort of nationally with respect to hog production? Do you have any idea?
A. Approximately 30 as far as the Successful

Page 9

Farming issue that comes out every fall, the ranking. I don't remember exactly, but someplace in there.
Q. Are there any rankings that look at it regionally in the Upper Midwest for example?
A. Not that I'm aware of.
Q. In Minnesota?
A. Not that I'm aware of.
Q. Do you know where you rank within Minnesota?
A. Not exactly, no. Everything has changed so much in the last few years.
Q. All right.
(Barry Holden entered the deposition room.)
BY MR. DIESETH:
Q. Do you belong, or does Holden Farms belong to any associations or business groups that relate to the hog farming business?
A. We're members of the National Pork Producers Council, the Minnesota Pork Producers Association.
Q. I'm sorry. What was the second one?
A. The Minnesota Pork Producers Association.
Q. How long have you been members of those two organizations?
A. Since 1965 when the check off in the programs first started. Approximately 1965.

Page 10

Q. For both of them?
A. Yes.
Q. What kind of information do you receive from the association? Do you get periodic literature?
A. Periodic literature, yeah, bi-weekly, monthly magazines and literature.
Q. Do you attend any conferences?
A. I have in the past, occasionally.
Q. How often, do you think?
A. Last five years, I really haven't done much, and prior to that, I probably was quite active in the early '90s and earlier. So that was eight, ten meetings a year.
Q. Do you go to any other conferences relating to the hog business?
A. Yes, I do.
Q. What are those?
A. The National Pork Producers have another group that meets once or twice a year with larger producers, and then there's another group called 21st Century Pork that meets two or three times a year at different locations throughout the U.S., different people involved in the hog industry.
Q. Do you go to both?
A. Yes.

Page 11

Q. What was the second one? 21st Century --
A. 21st Century Pork Club.
Q. What is the objective of all of these organizations? Is it simply to share information among hog producers?
A. Share information, to listen to outside speakers representing other segments of our industry.
Q. Do you participate in these organizations, other than just going to the meetings and listening to these presentations?
A. No.
Q. Do you receive, other than the literature -- well, do you get any literature from the 21st Century Pork Club?
A. No, no literature from that organization.
Q. Just the conferences?
A. Yes.
Q. Do you receive any literature, other than what we've described relating to hog farms?
A. Just periodicals from the hog industry.
Q. What kind? Do you know the names of any of them?
A. Feed Stuffs, which is an industry or feed industry-related magazine, National Hog Farmer, Pork U.S.A. or something, Pork Ag. There are other ones, but

Page 12

I can't remember the names.
Q. Would those all have been available in '94?
A. I don't know.
Q. How many hog nursery buildings do you currently own?
A. We own none.
Q. All contracted out?
A. Yes.
Q. Is that the same for farrowing barns?
A. No, we own some of our production on the sow farms, some of our facilities.
Q. How many do you own?
A. I don't know exactly. Seven sow facilities.
Q. How about finishing barns? Do you own any of them?
A. No.
Q. Did you begin to contract out the nursery and finishing work in about 1980?
A. Well, we started contract finishing in 1980. Contract nursery we didn't start, I believe, until '94.
Q. At what point did you completely eliminate any Holden Farms finishing work? You started subcontracting that work out in 1980. At what point did you get out of that business entirely and leave it all to your subcontractors?

Page 13

A. On the finishing side?
Q. Yes.
A. That would be in 1976 -- excuse me. 1987 we eliminated our last owned finishing facility.
Q. How about nursery barns? At what point did you get out of that business?
A. We eliminated the last one there in '95 or '96.
Q. Do you remember how many nursery barns Holden Farms would have owned back in '94?
A. Not exactly. At that point, until we discontinued our nurseries, they were all part of the sow farm. They were sow farm and nursery on the same site.
Q. So you don't know how many?
A. I believe it would be four farms.
Q. Do you know how many farrowing barns you would have had in '94?
A. Company-owned?
Q. Yes, company-owned.
A. Four. Four farms.
Q. Over the course of your work in hog production, how many hog barns have you built, either had built for you or built yourself?
A. Either company-owned or contract?

Page 14

Q. Yes.
A. How many barns we had built?
Q. Yes.
A. That's a good question. I don't know. I mean, I would only be guessing.
Q. More than 50?
A. Yes.
Q. More than a hundred?
A. Yes.
Q. More than 200?
A. I don't know.
Q. At that point, you don't know?
A. (Witness shook head in the negative.)
Q. As of 1994, do you think you would have built more than 50?
A. Up until 1994?
Q. Yes. '94 previously.
A. I don't know.
Q. As of '94, including all of your contract growers, do you know how many nursery barns you've had in your operation?
A. How many contract nursery barns?
Q. Yes. I guess that would have had to be all contract barns -- well, no. I guess you had four barns or so in '94.

Page 15

A. **Right.**
Q. Nurseries.
A. **Yes, company-owned nurseries, yes.**
Q. How many did you have that were being operated by contract growers?
A. **In '94, I believe we only had one that we started in '93, a smaller nursery. I believe that was 1993.**
Q. So in 1994 -- and I pick that year, of course, because that's when the first contract was signed with Hog Slat. In 1994 you would have had the one nursery that was being operated by a contract grower.
A. **Yes.**
Q. Plus the four nurseries that you would have had being operated under your company.
A. **Yes.**
MR. CROSS: Paul, you understand that those were not nurseries solely, they were a combined farrowing-nurseries, those four.
BY MR. DIESETH:
Q. I didn't realize. Was that true the buildings --
A. **The company-owned ones were combined breeding, farrowing and nursery on the same site. The**

Page 16

**independent contractor was a nursery standing alone.**
Q. All right. Do you know what kind of flooring you had in each of those nurseries?
A. **In our company-owned nurseries?**
Q. Yes, we'll start with that.
A. **Primarily wire flooring and also another material called tri-bar.**
Q. What is tri-bar?
A. **Tri-bar is a triangular piece of galvanized metal flooring over a subfloor or a substructure.**
Q. The wire flooring that you talk about, was that --
A. **That was just a wire mesh floor laid on top of the steel frame, iron frame.**
Q. Would it have just been painted steel frame?
A. **Both painted and unpainted.**
Q. But it wouldn't have been galvanized.
A. **No.**
Q. And the tri-bar, what supported the tri-bar?
A. **That had a superstructure underneath the framework that an entire -- it's altogether in one piece. The flooring and the substructure frame was all one piece and was all galvanized.**
Q. Who made the decision to install the tri-bar flooring? Let me back up a second. How many barns had

Page 17

the tri-bar flooring?
A. **I don't know.**
Q. Who made the decision as to what flooring to install?
A. **Holden Farms.**
Q. Who within Holden Farms?
A. **Myself and Barry Holden and George Kasper.**
Q. Why did you decide to use tri-bar on some of those sites?
A. **We were sold mainly on the idea that it was an easier cleaning floor and that it was more comfortable to the pigs versus wire. Comfort was a big reason.**
Q. Did the fact that it was galvanized steel make a difference to you?
A. **We had no prior experience with any galvanized material as far as flooring, and so that was not a huge part of the decision. We thought it would be an added benefit, but that wasn't really a big part of the decision-making process.**
Q. What position does George Kasper hold in your company?
A. **He's the supervisor of what we call our physical plant crew, which is in charge of repairs, maintenance and building within Holden Farms.**

Page 18

Q. Has he always held that position?
A. **Essentially he's held that within the last 20 years, yes.**
Q. Now, in general, your relationship with the contract farmers is governed by a separate contract that you enter into with each one?
A. **Yes.**
Q. And that would include the ten, nine farmers who are the plaintiffs in this action, in addition to Holden Farms?
A. **Yes.**
Q. Let me ask you a little about your relationship with Hog Slat. Now, prior to entering into the contracts that govern the buildings that are at issue in this lawsuit, you had had prior dealings with Hog Slat?
A. **Yes.**
Q. Can you describe those?
A. **Yes. In fact, I believe Holden Farms was one of the first customers of Hog Slat in Minnesota, if not the first, and our ongoing relationship -- that dated back to, let's see, about 1989, I believe, when we first started -- '87, actually, we started buying some material from Hog Slat, to my recollection, and our relationship with Hog Slat and Tommy Herring has been a**

Page 19

totally upstanding and very solid relationship. Couldn't have asked for much better, actually.
Q. What kind of materials have you bought from Hog Slat?
A. We bought all the way from individual building components of flooring and concrete slats to equipment farrowing crates, gestation crates and including all the way through full turn-key buildings.
Q. And when you refer to full turn-key buildings, are you thinking of the facilities that are at issue in this lawsuit?
A. Yes, we've done that as well.
Q. Have you done that in other instances?
A. Yes.
Q. Where?
A. Finishing barns.
Q. When did you buy those from Hog Slat?
A. Finishing barns were bought primarily through the '90s.
Q. Do you know how many you bought?
A. No.
Q. Were those prefabricated?
A. In what sense? I don't understand you.
Q. Well, in terms of were they Lester Building Systems?

Page 20

A. Some were Lester Building, the actual shell of the building were Lester's, and later other manufacturers provided the building, actual walls and roof and support.
Q. Was that installed by Hog Slat?
A. Yes, contracted through Hog Slat to put the building together.
Q. What led Holden Farms to decide to build an additional ten nurseries through its various contract growers?
A. In the mid '90s, part of it was caused by improved technology. The industry believed that we needed to move from nurseries on sow farm sites to moving them separate so you'd have a separate breeding-farrowing on one farm, nursery on the second farm and a finishing on the third site for health reasons. Also, we wanted to do some expansion to coincide with this kind of thinking. We thought this would be a good opportunity to accomplish both.
Q. Did you consider vendors, other than Hog Slat?
A. I'm sure we talked to other people, but Hog Slat was really the only ones we seriously considered.
Q. Why?
A. Because of the prior experience and history

Page 21

we had with them.
Q. Do you remember the names of any of the other vendors whom you thought about?
A. No, I don't right offhand.
Q. When did you first approach Hog Slat about the possibility of purchasing these ten nursery barns?
A. To the best of my recollection, in '93 or early '94.
Q. What did you say to them?
A. We explained what we were trying to accomplish, and based on how many pigs we wanted to produce per week, what kind of size of building would be needed to accomplish that. And we ordered the first three, and then over the next couple years then we had a sense of where we were going production-wise and that we would eventually need ten nurseries.
Q. Who did you talk to at Hog Slat about these buildings?
A. I can't remember.
Q. Wendell Burge was one of them?
A. Yes.
Q. You don't remember anybody else?
A. Salesmen that we dealt with are Scott Bach, Kirk Brinks. I believe Wendell was there at that time when we first started. He was their main connection.

Page 22

And occasionally we would talk to Tommy Herring.
Q. Do you remember ever telling Wendell Burge that you recognized that Hog Slat's primary reason for selling the nursery barns at issue was to sell the Hog Slat products that were installed in the building?
A. Could you say that one more time, please?
Q. Do you remember ever telling Wendell Burge that you recognized that Hog Slat's primary reason for selling nursery barns to Holden Farms was to make sure that -- was to sell the Hog Slat equipment that was installed in those buildings?
A. No, I don't remember saying that.
Q. Now, in connection with the decision to build these nursery barns, did you bring to Hog Slat's attention the possibility of using plastic flooring?
A. No.
Q. Who brought that -- who first raised that as a possibility?
A. Wendell Burge.
Q. Do you remember what he said about that?
A. We had our building designed and pretty much all specified as far as what we wanted to use throughout all different components of the building prior to April of 1994. In April of '94, Wendell said he wanted to meet with us along with Norm Borcherding from Double L,

Page 23

and he wanted to have us look at this plastic flooring.
Q. And then you agreed to that meeting?
A. Agreed to having the meeting, yes. Yes.
Q. So the first written documents that related to this proposed barn did not have plastic flooring speced out; is that correct?
A. That's correct.
Q. And then that ultimately, of course, was changed.
A. Yes.
Q. Had you independently looked at other flooring manufacturers, other than the BCM Manufacturing who made the Filter-Eeze Maxima flooring?
A. Did we look for other plastic flooring manufacturers?
Q. Yes.
A. No.
Q. So in connection with these ten buildings at issue, the only plastic flooring manufacturer that you considered or looked at was BCM and the Filter-Eeze Maxima flooring?
A. Yes. We looked at Hog Slat as being in the lead position when we had to put our faith and trust in Hog Slat to recommend what they thought was best, and that happened to be BCM. If they had recommended some

Page 24

other material, we would have looked at that.
Q. So you didn't independently look at any other flooring manufacturer?
A. Not to my recollection.
Q. When did you first hear about Filter-Eeze Maxima flooring? Was it at the April '94 meeting?
A. Yes.
Q. Had you heard about Filter-Eeze Maxima before that meeting in any connection?
A. I don't remember.
Q. Had you heard about plastic flooring for hog nurseries before that?
A. Yes.
Q. And you knew about that because of your experience in the industry?
A. Through literature and contacts, yes.
Q. Do you remember what literature you would have seen?
A. No.
Q. Would it have been advertisements?
A. Yes.
Q. Would you have gotten literature from plastic flooring manufacturers?
A. I don't know.
Q. Who participated in the April 1994 meeting?

Page 25

A. Wendell Burge, Norb Borcherding, Barry Holden, George Kasper, Darwin Tilstra and myself. To my recollection, that was all that was there.
Q. Was that -- had you met anybody from Double L before that meeting?
A. Not to my recollection.
Q. How about BCM?
A. No.
Q. What do you recall about the meeting?
A. I recall that they proposed using the Filter-Eeze plastic flooring in place of the wire flooring that we already had bid out from Hog Slat, and they promoted that and provided us with the literature explaining the advantages of using their flooring.
Q. Do you remember who spoke?
A. I think all of us spoke.
Q. Do you remember anything that Wendell Burge said in particular?
A. No.
Q. Do you remember anything Norb Borcherding said in particular?
A. Not other than what was -- whatever was stated in the literature was restated and explained.
Q. Why don't we take a look at that brochure. It would be Exhibit No. 4.

Page 26

Have you had a chance to take a look at Exhibit No. 4?
A. Yes.
Q. Is that the document that was presented to you at the April '94 meeting?
A. Yes.
Q. Who presented it? Do you remember?
A. Wendell Burge and Norb Borcherding.
Q. Okay. Do you remember which one of those people handed it to you?
A. No.
Q. So you got the brochure at the meeting. You didn't get it before.
A. To the best of my recollection, we received it at the meeting.
Q. Did you read it at the meeting?
A. Yes.
Q. After the meeting took place, I assume you took that brochure with you?
A. Yes.
Q. What did you do with it?
A. I put it in my nursery file with the new building -- the nursery building file.
Q. Did you make any copies of it?
A. I don't remember. They handed out

Page 27

brochures. It was in brochure form, as I remember, and each of us got one or more copies.
Q. When you say "brochure form," is that a different form than what you see --
A. **Well, I can't remember. I think all of us received copies of this in some form or another. I can't remember what form it was in.**
Q. Do you know if you gave a copy to anybody?
A. **No, I don't remember.**
Q. Do you know if any of the -- for ease of reference throughout the deposition, I'm going to refer to the individual farmers, who are also plaintiffs in this lawsuit in addition to Holden Farms, as the plaintiff farmers. You'll recognize what I mean when I say that?
A. **Yes.**
Q. Do you know if any of the plaintiff farmers received a copy of that brochure?
A. **I don't know for sure.**
Q. Do you remember whether during the April '94 meeting anything was said about the support system that would be underneath the plastic flooring?
A. **I don't remember talking about that at all.**
Q. Have you ever spoken to any of the plaintiff farmers about the meeting?

Page 28

A. **Yes.**
Q. When?
A. **I don't remember.**
Q. Would it have been after the lawsuit started?
A. **Yes.**
Q. Do you remember talking to any of the plaintiff farmers about the meeting before the lawsuit started?
A. **In preparation for the lawsuit we discussed.**
Q. Let me take a different time line. Do you remember talking to any of the plaintiff farmers about the April '94 meeting before you first recognized that there were problems with the flooring?
A. **No.**
Q. Now, after the 1994 meeting, this April '94 meeting, did you hear anything else, either from Hog Slat or Double L or anybody else, about Filter-Eeze Maxima flooring before you signed the contracts.
A. **Before this April '94 meeting you're asking?**
Q. I'm sort of going between the April '94 meeting and the time you first signed a contract relating to the nursery barns, did you hear anything about the Filter-Eeze Maxima flooring?
A. **Other than what was provided by Hog Slat,**

Page 29

**no.**
MR. LULIC: By that you mean a brochure?
BY MR. DIESETH:
Q. You mean Exhibit No. 4, this brochure?
A. **Yes, it was in there.**
MR. LULIC: I didn't mean to interrupt you.
MR. DIESETH: No, that's okay.
BY MR. DIESETH:
Q. Did you ever see any literature, other than that brochure, Exhibit No. 4, that related to Filter-Eeze Maxima flooring before you signed the contracts?
A. **Not to my recollection.**
Q. Who made the decision to use Filter-Eeze Maxima flooring?
A. **The people that were at the meeting in April of '94.**
Q. So yourself, Barry Holden, Darwin Tilstra and George Kasper?
A. **Yes.**
Q. Did you discuss that amongst yourselves whether to use the Filter-Eeze Maxima?
A. **During the meeting we did, yes.**

Page 30

Q. And you're talking about the April '94 meeting?
A. **The April '94 meeting, yes.**
Q. Do you remember any of the discussion you would have had about the flooring?
A. **Only what we reviewed in the information provided at the meeting. We went through all of that and discussed what was in the literature.**
Q. Was a decision made --
MR. LULIC: He's done this twice now. He's nodded at the document and touched it, and we're not getting it identified. Would you mind when you touch it or refer to it calling it Exhibit No. 4, please.
THE WITNESS: Exhibit No. 4. No problem.
MR. LULIC: Okay. Just for the record.
BY MR. DIESETH:
Q. So when you've been talking about literature in these past answers, you were referring to Exhibit No. 4.
A. **Yes.**
Q. Was a decision made during the April '94 meeting --
A. **I don't remember.**

Page 31

Q. You've got to wait for me to finish the question.
A. I knew you were going to say that.
Q. Was the decision made at the April '94 meeting to go with the Filter-Eeze Maxima flooring?
A. I don't remember.
Q. Did you compare prices in making the decision to go with the Filter-Eeze Maxima flooring?
A. Yes.
Q. Can you remember what your results were when you did that comparison?
A. No, I don't remember the differences.
Q. Do you remember if Filter-Eeze Maxima flooring was cheaper than the alternatives?
A. I believe it was more expensive.
MR. CROSS: Just for clarification, Mr. Dieseth, when you say the alternatives, what alternatives are you talking about?
BY MR. DIESETH:
Q. Well, let me ask you. What other alternatives did you consider?
A. Only woven wire.
Q. Do you remember how much more expensive --
A. I don't remember.
Q. You have to let me finish. Do you know how

Page 32

much more expensive the Filter-Eeze Maxima flooring was than the wire flooring?
A. No. I already answered that once.
MR. LULIC: Sustained.
BY MR. DIESETH:
Q. Do you remember why you decided to choose the Filter-Eeze Maxima flooring over the wire flooring, even though the Filter-Eeze flooring was more expensive?
A. Yes. Because we were looking at comfort of the pigs as a first consideration, easier cleaning versus wire and longer life of plastic versus woven wire.
Q. When you were making this decision, what expectation did you have with respect to how long the woven wire would last?
A. Ten years or more.
Q. Can you remember how long you expected the Filter-Eeze Maxima flooring to last?
A. Based on the literature, we expected it to last 15 to 20 years.
Q. Who made the decision to place the Filter-Eeze Maxima flooring on painted steel supports as opposed to galvanized or fiberglass?
A. Hog Slat.
Q. Why do you say that?

Page 33

A. Because, we had total confidence and faith in that they were making the right recommendation and we just followed their recommendation.
Q. So you're saying that they had recommended to you that you use the painted steel supports?
A. Yes.
Q. Do you remember who made that recommendation?
A. Wendell Burge.
Q. Would he have made that at the April 1994 meeting?
A. I don't know.
Q. Do you remember discussing with Wendell Burge or anybody at Hog Slat, or even Double L, the option of using fiberglass or galvanized steel supports--
A. That discussion never took place, other options.
Q. You've got to wait until I'm done. Do you remember ever discussing the options of using fiberglass or galvanized steel supports as opposed to painted steel in connection with the Filter-Eeze Maxima flooring?
A. We never discussed other options.
Q. Did you consult with the plaintiff farmers before making the decision to use the Filter-Eeze Maxima

Page 34

flooring?
A. I don't remember that.
Q. Do you remember any discussions with the plaintiff farmers about the nursery barns before you --
A. Oh, yes.
Q. -- executed the contract with Hog Slat?
A. Yes.
Q. What kind of discussions did you have?
A. The discussions, ur plans as far as sizing nurseries, how we were intending to build them and material and equipment we were going to use.
Q. Were you asking their permission or were you simply just advising them that those were the decisions you were making?
A. When we would first meet with a potential contract grower nursery or finishing, we would discuss not only the building aspects of how it was going to be designed and built, but also our contract with him and what our contract read and what the expectations on our side would be and what the grower's side would be, so we would fully understand on both sides of the agreement who was to do what.
Q. Do you remember talking to the plaintiff farmers about the type of support that would be used in the Filter-Eeze Maxima flooring?

Page 35

A. No.
Q. Now, do you recall any communications with Hog Slat after the April 1994 meeting but before you signed the first contracts regarding the Filter-Eeze Maxima flooring or the supports?
A. **Could you say that again?**
Q. Between the April '94 meeting and the time you signed the first contract for the nursery barns, do you recall any communications with Hog Slat about either the Filter-Eeze flooring or the supports?
MR. LULIC: As to the Filter-Eeze flooring, it's been asked and answered.
MR. CROSS: I guess I object to form, and I'm not sure, Paul, how much time has passed between those two meetings.
MR. DIESETH: Between the April '94 meeting and the first contract.
MR. CROSS: Right.
BY MR. DIESETH:
Q. Well, do you remember anything in particular?
A. No.
Q. Before you signed the first contracts, other than your communications that we've talked about with Hog Slat, do you remember any communications with

Page 36

anybody concerning the type of support to use with the fiberglass -- with the Filter-Eeze flooring?
A. **I don't remember anything.**
Q. When you signed the contracts, they provided that the Filter-Eeze flooring was going to be installed on painted steel supports?
A. Yes.
Q. Did you have any expectation as to how long those supports would last?
A. **Yes, I did.**
Q. What was that?
A. **I thought they would -- based on woven wire flooring that we put on steel frames on other locations for nursery barns, that they would last a minimum of ten years. And in fact, the major concern we had was with the actual flooring in the case of wire, the wire would always rust away before any framework. We never had any problems with steel framing in other locations. In fact, we just laid new wire on top of frames and replaced the wire only.**
Q. But you knew that eventually the support would rust, the steel supports.
A. **I knew it would rust.**
Q. And you expected it to last about ten years?
A. **Minimum. We had other locations with ten**

Page 37

**years or more that --**
Q. Now, let me move forward in time. From the time that you first signed a contract for one of these ten nursery barns to the time when you first experienced problems with the flooring, did you ever talk to anybody about the use of support beams, other than painted steel support beams?
A. **Not to my recollection.**
Q. What kind of arrangement did you have with the plaintiff farmers regarding these nursery barns?
A. **Through our contract?**
Q. Yes. Well, with respect to any arrangements that you had.
A. **Well, we had a grower agreement, we had a grower contract with each of the nursery owners. We had a management form that they were to follow per our recommendations. We have service people that visit weekly to the nurseries, they'll manage the farms.**
Q. Did you have any separate arrangement with the farmers with respect to how these buildings were going to be paid for?
A. **Yes. That varied from case to case.**
Q. Were these arrangements negotiated separately from their grower agreements?
A. Yes.

Page 38

Q. Were these written agreements with the farmers?
A. **The contract agreement we had?**
Q. No, I'm now focusing on the agreements you would have had with the plaintiff farmers related to the payment for these nursery barns at issue. Were they written?
A. **Yes.**
Q. Would you have signed them?
A. **Myself or my brother Barry Holden.**
MR. CROSS: Not to interrupt, but I think we're talking about two different things. Are we talking about the financing for the construction of the facilities? Is that what you're asking about?
MR. DIESETH: Well, I was asking about any financial arrangement with plaintiff farmers as to who was going to be paying for these nursery barns.
MR. CROSS: Who provided the financing for the construction?
THE WITNESS: We provided part and other lenders would provide some of the financing.
MR. CROSS: And that would vary from --
THE WITNESS: Vary from nursery owner to nursery owner.
BY MR. DIESETH:


MARTHA M. RIVARD
952-431-1252 * 800-844-6420

Page 39

so when you were answering my question about these separate written agreements with the farmers, you were thinking of financial paper?
A. **Yes.**
Q. Would, ultimately, the farmers pay the whole amount of the cost of the buildings?
A. **Yes.**
Q. And the Holden Farms on occasion provided some financing for that?
A. **Yes.**
Q. Let me ask you a general question, Mr. Holden, about the contracts and arrangement that you had with the plaintiff farmers. Now, many of these contracts are signed between Holden Farms -- the contracts for the buildings themselves, many were signed between Hog Slat and Holden Farms, not between Hog Slat and the individual plaintiff farmers. Do you recall that?
A. **Yes. Some of those, yes.**
Q. Had you made arrangements with the individual plaintiff farmers about their assuming the contracts prior to your signing those?
A. **The financial arrangement that we had with each farmer? Is that what you're asking?**
Q. Or the agreement that they would have a barn

Page 40

built on their property that would have been intended for use of nursery pigs that ultimately were under contract with you. I mean, it just seemed odd to me that you would have this contract where you agreed to purchase this nursery barn from Hog Slat without having a prior agreement in place with, you know, Mr. Garness or AJ Farms or your individual growers so they knew that there was going to be a barn that was going to be built.
A. **We had prior written agreements under contract with Holden Farms and the growers.**
Q. What would that contract say? Would it just relate to the financing?
A. **The financial obligations and how that was going to take place.**
MR. DIESETH: I haven't seen any of those, Dustan. It may be that you produced them and I just haven't seen them, but do you know if those have been produced?
THE WITNESS: No.
MR. DIESETH: They have not been or you don't know?
MR. CROSS: If you've given them to me, I've given them to you. Do you know what he's saying? Have those contracts been produced separate from the contractor agreements between the producers and Holden

Page 41

Farms?
THE WITNESS: Yes, those have, the grower agreements.
BY MR. DIESETH:
Q. The grower agreements have. I have seen those. What I'm asking about are those separate documents between Holden and the plaintiff farmers relating to the buildings.
MR. BARRY HOLDEN: I'm not supposed to say anything right now, but they don't exist. I was responsible for doing those and there were no agreements. I don't think he understood exactly what you were talking about. So, excuse me.
MR. DIESETH: That's okay. For the record, that was Barry Holden.
MR. CROSS: Just so we're clear, I know on the contract for, I believe, the Garness Barn-1, there is a number of associated documents that were attached as exhibits to the Complaint. There was a thought that there was an assignment under the contract.
MR. BARRY HOLDEN: The first two, because there was different financing.
MR. CROSS: But what you're saying is that, other than what's attached to the Complaint, there's nothing there?

Page 42

MR. BARRY HOLDEN: You have it all.
BY MR. DIESETH:
Q. Okay. Would it be fair to say, Mr. Holden, that your brother Barry Holden would have more knowledge about the arrangements with the individual plaintiff farmers than you?
A. **In regard to --**
Q. The arrangement with respect to the building of these ten barns.
A. **In the financing aspect, yes.**
Q. And what aspects do you have more knowledge than Barry?
A. **Production.**
Q. Production. In terms of their actually raising the pigs?
A. **Yes.**
Q. To your knowledge, Mr. Holden, has Holden Farms had any ownership interest in these ten barns?
A. **No.**
Q. Those were always owned by the individual plaintiffs?
A. **Yes.**
Q. Do you know whether the first five buildings, the first five nursery barns that were sold by Hog Slat to Holden Farms were Lester Farm System

Page 43

buildings?
A. I don't remember.
Q. One of the issues in the case, Mr. Holden, revolves around George Kasper's nursery barn that he built during the winter of '96-'97. Do you remember him building a nursery barn in that period?
A. I don't know exact years, but he built an addition to his nursery barn that he had there before.
Q. Do you know what flooring he used in this building?
A. He used plastic flooring.
Q. And to support that flooring, he used fiberglass runners?
A. I do not know. I believe, yes, he did. He used fiberglass framework.
Q. Do you know who sold that flooring to him?
A. No.
Q. Do you know who sold the fiberglass runners to him?
A. No.
Q. Other than you being simply aware that he had done that additional work, did you have any involvement in Mr. Kasper's project?
A. Other than the overall design and capacity of the facility, we didn't have much involvement.

Page 44

Q. So you didn't participate in the selection of the flooring at all for that building?
A. We just -- not in the actual structure, no.
Q. Between '94 and '98, did Holden Farms contract for any buildings, the construction of any hog buildings that had plastic flooring, other than the ones at issue in this lawsuit?
A. No. Excuse me. Other than George Kasper. We had a contract with George Kasper. But that's not involved in the lawsuit. I'm not clear on your question.
Q. Well, I'll ask about that. What was the contract with George Kasper?
A. We have a grower agreement contract with George Kasper for production of pigs as well.
Q. And when I asked whether there were any buildings built in that '94 to '98 time frame with plastic flooring and you mentioned George Kasper, were you referring to the nursery building that you and I were just speaking of a moment ago?
A. Owned by George Kasper, yes.
Q. Other than that, there were no buildings built in that time frame that used plastic flooring?
A. No.
Q. Now, the last two of these ten buildings

Page 45

would have been built in the summer and early fall of '97.
A. Yes.
Q. Before that, before those two barns were built, had Hog Slat come to you and informed you that there might be problems with the installation of the Filter-Eeze flooring on steel runners?
A. No.
Q. I may have asked you this question, if I have, forgive me. Before you began experiencing problems with the Filter-Eeze Maxima flooring, had you spoken to anybody from Hog Slat, Double L or BCM about the types of support that you should -- the types of supports that you should use with the Filter-Eeze flooring?
MR. LULIC: I just have an objection to the form of the question.
THE WITNESS: Not to my recollection.
BY MR. DIESETH:
Q. When did you first become aware of a problem with the flooring?
A. To the best of my recollection, we experienced some buckling of the floors in '98.
Q. Do you remember which farms experienced the problem?

Page 46

A. Rod Garness Nursery-1 and Denny Ward, I believe, to my recollection are the two that occurred first.
Q. Did you go out there and look at the barns?
A. Yes.
Q. What did you see?
A. I saw the buckling of the plastic flooring coming together with the pressure moving upwards, buckling.
Q. What did you do when you became aware of this?
A. I believe we contacted Hog Slat, who in turn contacted Double L, and then they came out to look at it, and that was when expansion joints were first suggested, that we try that.
Q. Who suggested that?
A. I believe Hog Slat and Double L, to my recollection.
Q. And expansion joints were installed?
A. Yes, they were.
Q. Which barns?
A. I believe in the Garness Barn-1 and the Denny Ward barn.
Q. Did they help?
A. No.

Page 47

Q. What steps did you take -- did you take any steps, other than contacting Hog Slat, to determine what was causing the problem?
A. No.
Q. What did you do after you discovered or felt that the expansion joints were not solving the buckling issue?
A. The next action that we took was I had a meeting at Pork Expo in June of '99 in Des Moines, Iowa and I met with Tommy Herring first and explained the problem directly to Tommy.
Q. So you met first with him alone?
A. Yes.
Q. You and him?
A. Yes.
Q. Anybody else at that first meeting?
A. My son Nick was with me. I believe it was -- I think I took him along on that trip.
Q. What do you recall about that meeting?
A. Tommy, to my best recollection, was aware of what was happening with the flooring and he said, "We have" -- in so many words, not word for word, but he said, "We have to figure out what to do, and representatives from both BCM and Double L have booths close by here, let's go visit with them." So we all got

Page 48

together and discussed the situation.
Q. So everybody got together, representatives of Hog Slat and Double L and BCM and Holden Farms got together at that expo and talked about the issue?
A. Yes.
Q. Can you remember everybody who was there?
A. From Double L, Norm Borcherding and Jeanne--
Q. Zittergruen?
A. I believe she was there. And then I think Nic Orr was there. I don't think Warren Hutchings was there, but I cannot remember.
Q. And from Hog Slat?
A. Tommy Herring.
Q. How about from your side?
A. Just myself and my son Nick Holden.
Q. What can you recall about that more general meeting?
A. That we just asked what was happening in our nurseries in regard to the buckling. And then Tommy said that he would -- I could go and they would meet independent of myself, the three companies, and decide what they could do to resolve the situation.
Q. You said in general, before you left the meeting, people were discussing what was happening. Do you remember any particulars about that discussion?

Page 49

A. No, not other than what -- just the actual buckling of the floor. Nothing other than that.
Q. Do you remember anything in particular that Mr. Herring would have said during that general meeting?
A. Yes. He said that he was -- we could discuss the steel framework and its relationship to the problem, and he said that he was an expert in steel and no one should be telling him anything about the steel business, in so many words.
Q. Did he say that in connection with a discussion about the possibility that the steel that was used was an inferior quality?
A. That's what I remember, yes.
Q. And so -- and I've heard other people say that it was representatives from BCM who said that the steel was perhaps of inferior quality. Do you recall that?
A. No, I don't remember that specifically.
Q. But you do recall, generally, that that topic had come up?
A. Yes.
Q. And then Tommy Herring said in response to that, I can't remember the words you said, but whatever words you attributed to Mr. Herring, he would have said that in response to that particular issue?

Page 50

A. That's what I remember.
Q. Have you ever thought yourself that the steel that was used to support the Filter-Eeze Maxima flooring was an inferior quality?
MR. CROSS: Objection, foundation.
THE WITNESS: No, that was never an issue.
BY MR. DIESETH:
Q. Had you ever told Hog Slat at anytime that Hog Slat had given a one-year warranty on the flooring and if plaintiffs wanted to claim that the flooring was subject to a greater warranty, they would have to pursue Double L or BCM?
A. Would you rephrase that, please?
Q. Okay. I'm asking about whether you may recall making a statement to somebody at Hog Slat.
A. That I made a statement?
Q. That you personally made a statement, and the statement I'm asking about is you saying that Hog Slat had given plaintiffs, you, a one-year warranty, and that if you wanted to pursue claims that there had been a longer warranty, you would have to go against BCM and Double L, not Hog Slat?
A. That I made that statement?
Q. Yes. Do you recall making that statement?

Page 51

A. No.
Q. After this June of '99 meeting at the World Pork Expo, you had the initial conversation, Tommy Herring said, "Let's talk about this among ourselves and then we'll get back to you." Did he say, "We'll get back to you"?
A. Yes. And I don't remember exactly who said that, but I assume it was Tommy Herring, because he was our main contact person for these buildings and this flooring, so, yes.
Q. Did you have any further contacts with Hog Slat or Double L or BCM at the World Pork Expo?
A. No.
Q. What is the next contact you had with any of those three companies after the expo?
A. That's where I'm a little unclear, but then, basically, that Tommy Herring said that he called back and said that they were willing to offer $5,000 per barn, assuming no responsibility on his part, just to help out the situation, and that was the best that they could do. And then --
Q. How did you respond to that?
A. I said, "That isn't going to make it work. We have to do something more than that."
Q. What happened next?

Page 52

A. Then the next step, he got angry at me during that conversation and basically hung up the phone on me, and at that point, we knew that the floors were in dire straits, we had to do something urgently, so I believe we contacted BCM directly ourselves and made arrangements to buy -- for the first three nurseries built, replace the flooring in those three.
Q. Who made the contact with BCM?
A. I did. Myself and George Kasper made the initial calls. I can't remember if he called first or if I did.
Q. Do you remember who you talked to at BCM?
A. Warren Hutchings.
Q. So you struck a deal with Mr. Hutchings about buying replacement flooring and replacement supports for the first three barns?
A. Yes.
Q. Did you get a discount on the pricing?
A. Yes.
Q. Do you remember what that was?
A. I don't remember what the pricing was. He said he would sell it to us at his cost.
Q. Who did the installation?
A. We did ourselves, Holden Farms.
Q. What did you do with respect to the other

Page 53

seven barns?
A. Well, then we made arrangements for the next two or three nurseries due the next year. That would be three the following year and then two just this past June.
Q. Are there two that remain with the original flooring or have those been replaced?
A. All have been replaced.
Q. When did the last get replaced?
A. In June of this year, 2001. One that was replaced last year, Dennis Kofstad, he wanted to use a different flooring. He put in his own flooring.
Q. Other than the Kofstad farm, did all of the -- was the flooring that was replaced -- strike that. Other than the Kofstad farm, did you use flooring from BCM to replace the old flooring?
A. Yes. To the best of my recollection, yes.
Q. Did you use support beams that had been supplied by BCM for all but the Kofstad barn?
A. In the first three, we worked through BCM on the fiberglass beams. They actually came from a separate company out in Chatfield, Minnesota, I believe. And after that, I do not remember exactly how the beams were purchased. I believe we bought the rest of them through the same company out of Chatfield.

Page 54

Q. But you went directly through them as opposed to BCM?
A. Yes.
Q. Do you remember the name of the manufacturer who made the fiberglass beams?
A. Strongwell, I believe. I can't remember if all of the nurseries -- if we used the same -- I think we might have used different beams on these last two that were replaced this year.
Q. Throughout the time you were working on replacing the flooring and you worked with BCM, did you ever have any contact with Double L about that?
A. Initially, we had contact with Double L, but then we realized they were not in a position to help us or were unwilling to help us.
Q. What do you recall about those conversations?
A. I don't recall exactly what happened.
Q. Do you know who you would have talked to at Double L?
A. We talked to Norb Borcherding and Jeanne Zittergruen.
Q. Zittergruen?
A. Zittergruen.
Q. It's not an easy name.

Page 55

Q. Did anybody from Hog Slat or Double L or BCM acknowledge responsibility for the problem?
A. **No.**
Q. Have you ever come to any opinion as to why the problem occurred?
MR. LULIC: Specifically which -- I'll object to the form of the question.
BY MR. DIESETH:
Q. Why the floor started to buckle?
A. **Only after we realized what the problem was after '99, that's when we first -- I really understood what was the problem.**
Q. What was your understanding?
A. **I went out and looked at the barns myself and I saw the steel beams and they were rusting. I removed the plastic flooring that hooked on the slats and you could see the growth of the rust throughout the entire beam, and you could see how it was pressuring the plastic flooring apart and causing it to buckle.**
**Furthermore, we saw, when I first looked at it, and especially when we started doing the first three nurseries, we saw how weak the beams were, that they wouldn't have survived more than a few more weeks, at best, before they would have totally collapsed.**
Q. Did you examine the support beams in the

Page 56

other buildings, the other seven buildings?
A. **No, not all of those.**
Q. On any of them?
A. **Some of them I did, yes. I looked at most of them. These last two I didn't do.**
Q. What did you observe with respect to the condition of the steel support beams in those other buildings?
A. **The same situation. The rusting.**
Q. The flooring that you purchased from BCM, was that the Excelerator product?
A. **Yes, I believe so.**
Q. Now, you said that the Kofstad farm used a different flooring. What flooring did they use?
A. **I think the company there was Southwest.**
Q. Was it a plastic flooring manufacturer?
A. **Yes.**
Q. Do you know what beams were used to support the plastic flooring?
A. **I believe it was fiberglass, but I'm not sure.**
Q. Now, with respect to the replacement cost, the costs that were incurred in removing the old flooring and purchasing the new flooring and the new support beams and installing all of that, who paid for

Page 57

that?
A. **Holden Farms.**
Q. Did the plaintiff farmers contribute anything at all to that?
A. **Yes. We asked each to contribute $12,000.**
Q. Did each do that?
A. **As far as I know, yes. Or they are in the process of repaying it. We've given them time to pay that.**
Q. Who supervised the replacement of the flooring?
A. **George Kasper.**
Q. With respect to any of these ten barns, did you observe, or did anybody from Holden Farms observe buckling in all of the ten barns?
A. **No.**
Q. How many did not exhibit buckling?
A. **I believe these last couple. I don't know. I can't answer that.**
Q. Let me ask. Personally, did you observe any barns, any of these ten barns where the flooring was replaced before any buckling had been exhibited? Does that make sense?
A. **No.**
Q. Let me start again. Do you know,

Page 58

personally, from personal knowledge, whether the flooring had been replaced on any of the barns, even though no buckling had yet been exhibited at the barns?
A. **If I personally had seen if buckling had occurred in all of these barns? Is that what you're asking?**
Q. Well, the question is whether the flooring has been replaced in a barn, in any of these ten barns, even though there hadn't been buckling. Do you know whether that occurred?
A. **No, I don't know.**
Q. Were you asked -- was Holden Farms asked to waive any claims against BCM in connection with the purchase of this replacement flooring?
A. **Yes.**
Q. What was your response?
A. **Well, we'd already contracted with Dustan Cross and his firm, and based -- we didn't give a response until we talked with them, and they said, "Well, we aren't going to" --**
Q. You aren't going to do that? Are you aware of your damages claims in this case?
A. **Of how much we're saying it cost us?**
Q. Yes.
A. **Yes.**

Page 59

Q. Do you know the various elements that make up that claim?
A. Generally, yes, I do.
Q. Can you tell me what your understanding of that is?
A. Now, are you asking me based on what we presented in the documents or what we think the actual costs are today? How do I answer that?
Q. Well, let's start with the documents, and then if that differs from what you think the costs are today, we'll get to that.
A. Yeah, it's not that dissimilar, but it costs approximately $65,000 average per nursery to supply -- to buy the materials and provide the labor. And then, of course, if we get $12,000 back from each grower, that would be deducted from that. Then we've got a production loss of nearly $300,000, based on that original estimate that I gave two years ago. But that was all contingent on market conditions at that time.
Q. Let's look first at the replacement cost. $65,000 per nursery?
A. Yes.
Q. Who came up with that figure?
A. Well, that was the cost that we incurred after the first nurseries. We saw what it was going to

Page 60

cost us in actual dollars and we tracked all of our costs, including our time that we spent. That's how we arrived at that number.
Q. So this would have been composed of $65,000 per barn.
A. Yes.
Q. It would have been composed of the cost of the Excelerator flooring or in the case of the Kofstad barn, whatever vendor he bought from, right?
A. Yes.
Q. The cost of the fiberglass beams.
A. Yes.
Q. The labor cost incurred in removing the old flooring.
A. Yes.
Q. And that would have been labor that would have been contributed by Holden Farms?
A. Yes.
Q. And then the labor cost of installing the new supports and new flooring?
A. Yes.
Q. Anything else?
A. Miscellaneous parts and bolts and nuts and stainless steel angle iron and other miscellaneous parts. Renting of some power tools. Donuts.

Page 61

MR. LULIC: Coffee?
THE WITNESS: No coffee.
BY MR. DIESETH:
Q. How large were the crews that replaced, or tore out the old flooring and replaced the new flooring?
A. We had approximately 35 to 40 people on the site.
Q. At once?
A. At once.
Q. For each of the ten barns?
A. Yes.
Q. How long did it take to remove the old flooring and replace it with the new flooring?
MR. LULIC: Per barn?
BY MR. DIESETH:
Q. Per barn.
A. Per barn, from the first barns it took approximately ten days and we were down to approximately five to six days on the last few. So average would have been seven to eight days of actual time that we were in working in the barn.
Q. Why did the time period decrease?
A. We learned how to become more efficient was part of it. More the process of utilizing labor more efficiently and each person doing a certain job.

Page 62

Q. So it wasn't that there was really much of a difference between the jobs, it was just that you had done it before and --
A. That was the basic difference.
Q. You've got to wait until I'm done. You had learned how to do it more efficiently.
A. Yes.
Q. Who calculated the production loss?
A. I did.
Q. Now, is this where the difference was between -- you said there might have been a difference between the documentation and what it cost today?
A. No. Oh, are you done?
Q. Well, where did that difference crop up?
A. The difference is really in the building components, because the price changes in material, and that was really what I was referring to. There's a difference in the cost originally from what it ended up now, and there's some variation in there. But it wasn't substantially different from, I think, original.
Q. So the cost of the flooring would have changed from the time you originally put in --
A. The flooring and beam.
Q. You've got to wait. The cost of the flooring would have changed between the time you

originally put the documentation together and the time it was all completed?

A. I believe there are changes in the cost of flooring and also the cost of beams.

Q. Let's talk about the production loss. Did you put together that figure?

A. Yes.

Q. Tell me what you did to put it together.

A. Basic thing was the downtime involved in our nurseries. Normally, we allow four or five days between groups of pigs in and out of the building. And in this case, we had to allow anywhere from an additional week to ten days for extra cleaning and preparing the site and then allowing adequate time to do the actual remodeling. So that's how I came up with -- that forces the sell, because we only have so much capacity to inventory all of our nursery pigs and our finishing pigs that we had to make room for the nursery pigs. So we had to sell, in turn, the finishing pigs earlier by approximately two weeks. So we didn't maximize our weight gain. And that's where I felt where most of the production loss incurred. Offsetting that was less feed consumed during that time, so we deducted that off of the calculation.

Q. Now, when you calculated that particular



production loss, had you assumed that it would take ten days to replace the flooring for each barn?

A. It was -- I believe I used two-and-a-half weeks.

Q. Two-and-a-half weeks for what?

A. From the time beyond what we normally would use of four days to five days.

Q. So two-and-a-half weeks over and above the four to five days?

A. Yes.

Q. And then the two-and-a-half weeks consisted of what? The time, obviously the time it took to tear out and replace the flooring?

A. Yes. First of all, we had to thoroughly clean the barn. We had to spend more time cleaning the barn because we wanted to make sure all of the material in the subfloor was clean so it would be easy to remove. We had to remove the flooring, which is a big job, and then --

Q. You had to replace the flooring then, and then --

A. Replace the flooring.

Q. And then what?

A. And then, well, we had to also unbolt all of the gating that was attached to the old floor, take that



off and move it to another side of the barn, and in some cases, you can take it out of the barn to provide adequate space to work on and then, of course, we had to take out the old floor, replace the new floor and bolt everything back down again.

Q. And then what?

A. And then basically wash down the barn again, disinfect it and then it would be ready for pigs.

Q. How long did it take to clean the barn prior to removal of the old?

A. It would normally take about three to four days.

Q. Is that what it was taking with respect to these ten barns, three to four days?

A. We probably spent an extra day in the front end doing a better job of washing, above and beyond normal cleaning.

Q. All right. Let me make sure I understand. Normally when you empty the nursery barn, you send them to the finishing barn. You normally have a break of between four to five days?

A. Yes.

Q. And that four to five days is occupied primarily with cleaning the facility?

A. Yes.



Q. What you're saying is that with respect to the work done, the cleaning done before you removed the flooring, you would have the four to five days, plus an additional one to two days?

A. Yes.

Q. Now, with respect to the removal of the flooring itself, the tearing out, you said you had to unbolt some of the gating?

A. Yes.

Q. I suppose you had to move equipment, too.

A. We had to move all of the gating and all of the feeders. We had to tie up the feed tubes that went in so they were out of the way for people to work.

Q. Then you had to take the flooring out, put the new runners in and new flooring again?

A. We had to clean out all of the bolts we could out of the pits below, get those out of there because they would drop and cut the gates apart.

Q. And then you would replace it with the new flooring.

A. Yes.

Q. And then put all of the equipment back where it had been and put all of the gating back to where it had been?

A. Yes.

Page 67

Q. Now, all of that work that followed the cleaning, unbolting of the gates and everything that you've just described, would all that have been done within the ten-day period of time that you had talked about previously in terms of how long it took to get these barns installed?

A. **Approximately ten days, yes.**

Q. And that ten days would have covered the unbolting of the gating and the changing, moving equipment, removing the old flooring, putting in the new flooring and everything else that we talked about?

A. **Just to clarify, the first nurseries, the first five nurseries we took close to two weeks to do that, to do that whole process that you described.**

Q. You had said ten days earlier.

A. **I think I said ten to 14 days I believe is what I said.**

Q. Well, what you're saying now is that it took 14 days to do all that?

A. **That's what I believe we took, yes, approximately. That's what we allowed in our production. Before we started any of this, and I can't remember if it exactly took 14 days or 12 days or what it was, but that's what I allowed in our original estimates of the downtime it would take to do this job.**

Page 68

**I can't remember the exact days that it took. It took approximately ten to 14 days to do this whole process in the first nurseries.**

Q. And when you say "the first nurseries" --

A. **The first five nurseries.**

Q. And then you said it would take five to six days to do the process for the last few?

A. **It took about -- we had to use about eight days, eight working days I believe it was.**

MR. CROSS: Is that the total downtime?

THE WITNESS: No. The total downtime would be more than that. That was above and beyond the normal cleaning.

MR. CROSS: So you'd add four to five days for that?

THE WITNESS: Yes.

MR. CROSS: You're asking for two different things here.

MR. DIESETH: No, I don't think so.

BY MR. DIESETH:

Q. I'm only asking you how long it took for this crew of 35 to 40 people to do their work. And now you're saying that you had in your estimate, in your damages calculation, you had allowed for 14 days.

A. Yes.

Page 69

Q. And that with respect to the first five barns, it actually took ten to 14 days.

A. **Yes.**

Q. And that with respect to the last few barns it took, I think you originally said five to six, but now you're saying eight days?

A. **Seven, eight days, yes.**

Q. And then you had said -- how long did it take to wash down and disinfect the barns after the new flooring was installed?

A. **One day. Which is an additional day above and beyond what we normally would do.**

Q. Did you have any options, other options as to where you would have placed the nursery -- the hogs that were coming out of the nursery barns? Did you have any other finishing facilities where you could have placed those?

A. **No.**

Q. So those finishing facilities were fully stocked at that point?

A. **Yes.**

Q. Have there been any pig casualties as a result of the buckling of the flooring?

A. **Yes.**

Q. How many?

Page 70

A. **I don't -- I'd only be guessing. You want me to guess?**

MR. LULIC: Best estimate.

BY MR. DIESETH:

Q. Yes, your best estimate.

A. **Fifty.**

Q. Would these have been the -- I'm sorry. I don't know the names of the small pigs, the baby pigs. Would those have been the ones injured as opposed to the sows?

A. **Yes. The ones that we lost were primarily 40 to 50 pound feeder pigs.**

Q. Did they die?

A. **Yes, they drowned in the pit below.**

Q. Did this happen on a single occasion or over the course of time over several barns?

A. **I don't remember exactly. It occurred over at least a few different times in different incidents.**

Q. How did it happen?

A. **A grower would discover, sometimes in the course of a day, that a part of the floor where it had been buckling would actually be torn out by the pigs and then they would fall in there.**

Q. So there would be a case where the floor was buckling and the pigs would nose around and tear it up?

Page 71

A. Would nose around and tear it up, yes.
Q. And then they would fall in the pit?
A. Yes.
MR. DIESETH: Let's take a break here.
(A brief recess took place.)
BY MR. DIESETH:
Q. Mr. Holden, other than what we've already talked about, do you recall any conversations that you would have had with anybody from Hog Slat about these sow barns and the problems you've experienced with those barns?
A. Not other than what we've talked about, no.
Q. Do you believe that Hog Slat is responsible for the problems at issue here?
A. Yes.
Q. Why?
A. Because, they're a lead -- that's who we had the contracts with and they, in turn, subcontracted with these other suppliers. Yes, I do.
Q. Do you remember the warranty given under the contract?
A. I remember three different warranties that we discussed.
Q. What were they?
A. The one-year warranty under one section of

Page 72

the contract we have with Hog Slat and there's another section that says other obligations of Hog Slat.
Q. What in particular, and this is just -- I don't mean this to be a memory test, but what do you recall about those other obligations that you think apply here?
A. In the other obligation portion of the contract as well as what was presented to us in the April 24th meeting were the ten years non-prorated warranty. That's what we believed we had.
Q. Anything else you can recall?
A. No.
Q. I'm going to mark a few exhibits.
(WHEREUPON, K. Holden Deposition Exhibits No. 82 marked for identification by the Reporter.)
BY MR. DIESETH:
Q. Have you had a chance to review that? Do you remember seeing this document before?
A. Yes.
Q. You would have received it from Mr. Burge?
A. Yes.
Q. Did you discuss with Mr. Burge various options to address the replacement of the flooring?
A. Yes.

Page 73

Q. What do you recall about those conversations?
A. I can't remember exactly what took place in the conversations.
Q. Did you ask for these various options to be presented to you?
A. This was in relationship to our meeting that we had with Tommy Herring and the other people at World Pork Expo in Des Moines, and this was -- I remember now, this is what came out of that meeting.
Q. You said you had had a conversation, I think, with Mr. Herring where he got mad and hung up the phone.
A. Yes.
Q. Would that have happened before you would have received this from Mr. Burge or after or don't you recall?
A. I believe it happened afterwards.
Q. And it was that conversation that you would have had with Mr. Herring that led you then to start dealing with BCM directly?
A. Yes.
Q. Mr. Holden, you are being shown what has been marked previously as Deposition Exhibit 81. Can you take a look at that letter and let me know if you

Page 74

remember that?
Do you recall seeing that letter before?
A. Yes.
Q. Is that your signature on the second page?
A. Yes.
Q. This letter relates to an agreement with respect to the first three barns; is that right?
A. Yes.
Q. Did you sign similar letters of agreement for the remainder barns except, obviously, for the Kofstad barn?
A. Not to my recollection.
Q. You simply used the same pricing mechanism for the remaining barns?
A. No, I don't remember that.
Q. What pricing did you have for the later barns?
A. I don't know.
Q. Was there documentation with respect to that?
A. We have had, yes. I don't know. I don't know.
(WHEREUPON, K. Holden Deposition Exhibit No. 83 was marked for identification by the Reporter.)