THE WITNESS: I can scratch it. We do have documentation on all the barns as far as hogs.
MR. DIESETH: I assume you produced all of that, haven't you, Dustan?
MR. CROSS: Well --
BY MR. DIESETH:
Q. Let me ask you this. Have you produced to your attorneys all of the documentation relating to the cost of replacing the flooring?
A. No.
MR. CROSS: Not the most recent.
THE WITNESS: Not the most recent ones.
MR. DIESETH: I assume you'll supplement your production.
MR. CROSS: We're in the process of doing that.
BY MR. DIESETH:
Q. What has been provided to you, Mr. Holden, is a document that has been marked as Exhibit No. 83. That consists of Plaintiffs' Answers to Defendant Hog Slat, Inc.'s Interrogatories to the Plaintiff's Set One. And actually, it's signed by Barry Holden, so perhaps you're not the guy to ask, but let me ask a few things of you about this particular document. Have you ever seen it before?



A. Not to my recollection.
Q. Let me ask you to turn to a couple of places in the document and see if you know anything at all about the answer that is there. Could you first turn to page six. Page six has on it a question that is labeled number eight. Do you see that? Do you see the number eight?
A. Right here?
Q. Yes, on that page.
A. Yes.
Q. It's a question that Hog Slat posed to Holden Farms. It asked Holden Farms to identify the nursery buildings that each plaintiff has ever used for raising nursery pigs, in addition to the ten that are the subject of the action. And then it asks, for each of those buildings, to give some information, a) through g), about each of the buildings. Okay?
A. Okay.
Q. I just want you to become familiar with the question, because I'm going to turn now to the answer, so you sort of know what it is that you're answering.
Could you turn to the next page, and the very top relates to the three Holden Farms nurseries.
A. Yes.
Q. There is a reference under paragraph (b),



the second paragraph from the top of the page --
A. Yes.
Q. -- about the TriAgra and the Spring Hill Nurseries, and it says for those nurseries the materials were purchased from Hog Slat.
A. Yes, I see that.
Q. Were you aware of that?
A. Yes, and the Spring Hill farm, I believe all of it was purchased from Hog Slat, and TriAgra, some of it was purchased from Hog Slat.
Q. Now, are you talking about the equipment or are you talking about the building?
A. In the case of TriAgra, the buildings were purchased by somebody else and some of the equipment only was purchased from Hog Slat for the TriAgra building. Spring Hill I believe was all Hog Slat.
Q. So it would have been Lester Building Systems that would have sold the barn?
A. Yes.
Q. The interior, the equipment, some of that would have been purchased from Hog Slat?
A. At our TriAgra location, yes.
Q. Can you go down to the next building. It talks about the Tom Haugen nursery used by Holden Farms?
A. Yes.



Q. Are you aware of that building?
A. Yes.
Q. Subparagraph (b) underneath that heading indicated that Hog Slat supplied the building and Truman Farmers Elevator constructed the building. You see that?
A. Yes.
Q. Who's Truman Farmers Elevator? What is that? Is that --
A. I believe it's a co-op elevator at Truman, Minnesota that is in various parts, has different businesses, and one was a construction business.
Q. And it said that Hog Slat -- do you know, was this a Lester Building Systems building or something else?
A. Yes, I believe it was Lester.
Q. And you said Hog Slat supplied the building in that answer. You see that?
A. Yes.
Q. So Hog Slat sold the building to Holden Farms and then it was actually erected?
A. No, they did not sell it to Holden Farms.
Q. I'm sorry. They sold it to Tom Haugen?
A. Yes.
Q. And then Truman Farmers Elevator erected

Page 79

the building.
A. Yes.
Q. At the very bottom of this page seven it talks about the Mike Jewison nurseries?
A. Yes.
Q. And then the following paragraph that continues on to the next page indicates that there was a west barn, an east barn and an Erickson nursery?
A. Yes.
Q. Subparagraph (d) talks about the west nursery and it indicated in that west nursery there was -- it used Everclean plastic flooring and galvanized steel beams.
A. Yes.
Q. Were you involved in the selection of that plastic flooring in that steel support structure?
A. No.
Q. Who was?
A. As far as I know, Mike Jewison.
Q. So the grower in that instance would have decided what flooring to use?
A. Yes. Furthermore, we weren't using the barns. We hadn't contracted with him when these barns were built.
Q. So that would explain why you would not have

Page 80

been involved in the construction or selection of the flooring.
A. Right.
Q. Could you turn now to the very next building? It talks about the Kasper nursery?
A. Yes.
Q. Is that the nursery building you and I had talked about earlier in your deposition?
A. Yes.
Q. Is there a grower agreement between Holden Farms and George Kasper for the use of that particular building?
A. Yes.
Q. The answer, the various answers with respect to that Kasper nursery building indicate that under subparagraph (d), the flooring that was used in that building was Excelerator flooring and fiberglass beams?
A. Yes.
Q. Underneath that it indicates that Double L supplied the flooring and the flooring support and the construction was done by Mr. Kasper himself. You see that?
A. Yes.
Q. Who would have made the decision with respect to the Kasper nursery to choose the Double L

Page 81

flooring? Was the Mr. Kasper?
A. Mr. Kasper.
Q. Were you or Barry Holden involved in that selection?
A. Other than just to confirm his decision.
Q. Now, Excelerator flooring was manufactured by BCM?
A. I assume so. I don't know.
Q. Do you know why Mr. Kasper chose to use fiberglass support beams with the Excelerator flooring?
A. Excuse me.
Q. Sure.
A. The first one, he has two different barns here, one that he bought in, I don't know what year it was exactly. In the early '90s, he bought an existing nursery farm and house and then he built the other one in '96, '97. So the second Kasper nursery, that's referring to the older one then. Okay. So I thought you were talking about the new one here first.
Q. Yes.
A. Okay. All right.
Q. Okay.
A. I just wanted to make sure we had the second one there.
Q. Do you know why Mr. Kasper chose to use

Page 82

Excelerator flooring with fiberglass beams?
A. No, other than we thought the plastic flooring itself was what we were primarily concerned with and we were familiar with that and felt that would be a good flooring.
Q. But you didn't have any discussions with Mr. Kasper about using the fiberglass beams?
A. No.
Q. And then the other nursery that George Kasper had was built apparently in 1991 or 1992?
A. I don't know.
Q. You were not involved at all in the construction of that building?
A. No.
Q. Would you turn to page 15. At the very bottom of that page, there is a paragraph that begins with the words, "In 1996, Randy Swanson had Hog Slat" -- see that paragraph?
A. Yes.
Q. Why don't you read that through to yourself. Have you had a chance to look at that paragraph?
A. Yes.
Q. Do you have any personal knowledge about the communications that are described there between Randy Swanson and Kirk Brinks?

Page 83

A. No.
Q. Have you ever talked to Mr. Swanson about those communications?
A. Not to my recollection.
Q. Before reading this paragraph, had you known about any of the facts that are stated there?
A. No, not to my recollection.
Q. You can put that away.
(WHEREUPON, K. Holden Deposition Exhibit No. 84 was marked for identification by the Reporter.)
THE WITNESS: After seeing this last document, I forget what the exhibit number is, but I have seen that before.
MR. CROSS: You're referring to Exhibit No. 83?
THE WITNESS: Exhibit No. 83.
BY MR. DIESETH:
Q. You recall seeing those interrogatory answers before?
A. I remember glancing through it.
Q. Could you take a look at 84. Do you recognize that document as an affidavit that you signed in this case?
A. Yes, I signed it.

Page 84

Q. So on page four, that's your signature?
A. Yes.
Q. Could you turn to page three, paragraph five which, at the very top of that page, concerns the meeting in June 1999. I've heard it described as the World Pork Expo and whatever, it doesn't matter. It's the same meeting we're referring to, correct?
A. Yes.
Q. In Des Moines, and at the very bottom of that paragraph there are three or four lines that describe what was discussed at that meeting. Can you just review that for a second?
A. Here?
Q. Yes. That paragraph contains the sentence that, "Mr. Borcherding said he would take care of the problem." You see that?
A. Yes.
Q. Does that refresh your recollection at all as to what Mr. Borcherding may have said during that World Pork Expo meeting?
A. I can't remember exactly at this point in time.
Q. Do you remember him saying something to that effect?
A. Yes.

Page 85

Q. But you recall nothing else?
A. Yes, I do remember now that he did say something to this effect, yes, I do. Now I remember.
Q. You don't remember anything else he would have said?
A. I remember him saying he would take care of the problem, that he would not -- his reputation was at stake and whatever, in so many words, and it was important for him to resolve this, and he would take care of it.
Q. Then the very last sentence in this paragraph says, "It is my understanding that Mr. Herring and Mr. Borcherding had some earlier contact regarding this matter." What facts would have led you to believe they would have had that earlier contact?
A. Because Mr. Herring, I remember now, made some comments before we went to the Double L booth and met with these people that he had already had some previous dealings, and I knew he was already at odds or had some previous problems that he couldn't resolve with Mr. Borcherding.
Q. Do you know what those previous problems were?
A. No, I don't. I don't even know if they were related to the flooring issue or not. I think it might

Page 86

have been some other equipment issues. But I had forgotten about that. But I remember this now.
Q. You can put that one away. I might want to ask you about some contracts, but while I'm debating that, let me turn the questioning over to one of the other attorneys here who have some additional questions for you.
MR. LULIC: That's fine.
EXAMINATION
BY MR. LULIC:
Q. Mr. Holden, we've been introduced. I'm Joe Lulic and I represent Double L. I just have a few questions for you. I would like to start with what has been referred to as the April '94 meeting that was attended by a number of people representing Holden and some people representing Hog Slat and some people representing Double L, and particularly Norb Borcherding. You remember that meeting?
A. Yes.
Q. During that meeting, was there anything else discussed, other than what the flooring would consist of? And by that, I mean the actual floor that the hogs ate, slept, stood and slept on. Do you know what I'm talking about?
A. You mean anything beyond the flooring?

Page 87

Q. Yes.
A. As far as any other components to the building?
Q. Yes.
A. I don't recollect anything other than that.
Q. Whatever flooring was going to be used, and as of the April 1994 meeting, it hadn't been decided yet, correct?
A. No, it hadn't been decided.
Q. Whatever flooring was going to be used, was it already decided it was going on painted steel support?
A. Prior to the April meeting?
Q. Yes.
A. Yes, we'd already decided to use woven wire flooring supported by painted steel.
Q. And the only issue for you at that meeting was whether or not you were going to stick with the woven wire on painted steel or you were going to change to Filter-Eeze on painted steel; is that correct?
A. Yes.
Q. And you understood that Mr. Borcherding was not selling you or trying to sell you or trying to influence you to buy a support system. He was trying to influence you to buy a floor system, correct?

Page 88

A. Yes. If I could just add as far as clarification, when we understood flooring system, we understood the whole -- not only the plastic flooring or woven wire, but also including the support system. We considered that one component.
Q. Well, we just talked about how you knew Mr. Borcherding was going to sell you what the pig stood on, correct? You knew that he wasn't going to sell you the support system, correct?
A. We knew he wouldn't sell the support system, correct.
Q. Okay. The support system for the floor, correct?
A. Yeah.
Q. Just so we're sure on that, the problems that you're having, or have had, I should say, with the floor, you talked about them earlier, and I just want to make sure we're clear on this. They stem from the rusting of the support system, correct?
A. Yes.
Q. And we probably shouldn't be using all these different terms, but that's the same as the beams, okay?
A. Yes.
Q. So we talked about steel beams and we talked about support system, and I want to make sure it's what

Page 89

the Filter-Eeze sits on, correct?
A. Yes.
Q. And you've also talked about this ten year warranty that was presented to you by Mr. Borcherding and Double L at the meeting. You understood that that warranty related to just the flooring and not the support system, correct?
MR. CROSS: Objection, foundation.
THE WITNESS: No.
BY MR. LULIC:
Q. Well, how could you understand anything else?
A. Because we considered the flooring system to be the entire structure or whatever support system was used, because in the past, we had bought flooring, for example, some of the tri-bar that we talked about earlier today was one component, including the structure and the flooring was all welded together as one piece.
Q. Well, this wasn't though, was it?
A. No, it wasn't.
Q. I'm sorry. I didn't mean to cut you off. I thought you were done, and I do apologize.
A. No, what we were buying from Hog Slat were two separate components, but for our purposes, what we looked at as far as hog production, I looked at it as

Page 90

one in the same.
Q. Regardless of how you looked at it, the material you were given you understood related to what they stood on, slept on, et cetera, correct?
A. From my perspective, again, it included the substructure as well.
Q. From your perspective. I don't understand what you mean. What is there in there -- what was there at the meeting that indicated to you that tjeu were talking about the support system at that time?
MR. CROSS: Which question are you asking him?
BY MR. LULIC:
Q. Either way. We've already established that the April 1994 meeting was about the floor and not about the support system, and that the material given to you at the April 1994 meeting was given to you relative to that. Tell me how you considered it an integrated system.
MR. CROSS: Objection, you haven't established that. Do you want him to go through Exhibit No. 4 and tell you what's in there about the steel support system?
MR. LULIC: I want him to answer my question.

MR. CROSS: That is the question.
THE WITNESS: It has not been established, no, what you just said.
MR. LULIC: You want me to go back and we can read back what your previous testimony is?
MR. CROSS: Sure.
MR. LULIC: Just read back the first question.
(WHEREUPON, the reporter read from the record as requested.)
BY MR. LULIC:
Q. Can you answer the question?
MR. CROSS: Do you understand the question, first of all?
MR. LULIC: No, wait a second. If he doesn't understand the question, he can tell me.
THE WITNESS: Restate the question, please.
BY MR. LULIC:
Q. She just read it back two times to you. What was there about the meeting with Norb Borcherding that talked about the support system, especially in light of all of the testimony we just read back, where you indicated that the support system was already set, it was just a question of whether or not it was going to



be wire woven or Filter-Eeze.
MR. CROSS: Objection, form.
BY MR. LULIC:
Q. Answer that question for me.
A. **The answer to that question that I would give is that the support system, right in the pamphlet, right here, shows that the support data load factors: span under eight feet, three inch by one-quarter inch steel beam. Span eight foot and over, four inch by one-quarter inch steel beam. Steel beam, that's what we referred to when we talked about this whole thing in that April '94 meeting.**
Q. Is that your answer?
A. **Yes.**
Q. Now, did you know who the manufacturer of the steel beam was going to be?
A. **Yes.**
Q. Who?
A. **Hog Slat.**
Q. Hog Slat manufactured it; is that correct?
A. **That's what I was assuming.**
Q. You knew it wasn't BCM, correct?
A. **Yes.**
Q. And you knew it wasn't Double L, correct?
A. **I only assumed that Hog Slat -- that's all I**



**can answer. I assume Hog Slat was going to provide the steel underneath.**
Q. Okay. What is there about the flooring itself, I'm talking about the Filter-Eeze, the plastic stuff, not the painted steel, that is a problem in these installations?
A. **Rusting.**
Q. Just a second now. The plastic is rusting?
A. **I'm sorry.**
Q. That's okay. You're not a professional witness. What is it about the plastic flooring itself that's causing any problems, as far as you know, if any, relative to these installations which are subject to this litigation?
MR. CROSS: Objection, foundation.
BY MR. LULIC:
Q. Go ahead.
A. **You're right. I'm not a professional as far as metallurgy or plastic, however, my perspective in using woven wire on top of regular steel framework and other applications, and having not experienced this problem, now, after what we've seen, we think that there's an interaction between the plastic and the steel framework underneath it. For some reason it creates more of a problem than it would in other applications.**



Q. Whatever, but, I mean, the flooring itself, the plastic flooring itself, it's not cracking or separating or -- there's nothing wrong with it in and of itself, is there, that you're aware of?
MR. CROSS: Objection, form.
THE WITNESS: I don't know.
BY MR. LULIC:
Q. That you're aware of.
A. **I don't know.**
Q. In the barns that you used the Filter-Eeze plastic flooring over the steel beams, were the dimensions of those barns similar to other types of hog barns that you constructed in the past?
A. **You're asking about other nursery barns or other finishing barns or what are you asking about?**
Q. Same application. I don't care. I'm not going to refine it down to that. But the same types of barns that you used, whether they be combination nurseries or finishing, nurseries or finishing, were they the same types of dimensions? Have you ever had barns that were same or similar dimensions as to those that are subject to this litigation, is the simplest way to ask this question.
A. **No.**
Q. Are these barns much bigger?

Page 95

A. Compared to other nurseries we built in the past, yes, they were bigger.
Q. What percent?
A. What percent bigger?
Q. Yes. Half again?
A. They're a totally different design. As far as overall dimensions, from outside dimensions they were approximately the same, but prior nurseries were subdivided into smaller rooms. There was different ventilation, different feeding systems, different grouping of pigs.
Q. Have you ever had problems with steel support beams for the flooring rusting before?
A. No problems, no. We've seen rusting, but not a problem because of that.
Q. Have you replaced flooring systems before you started to replace these?
A. What do you mean by "flooring systems"?
Q. In barns consisting of, whether it be woven wire or whatever.
MR. CROSS: You mean the support system or the woven wire on top of it?
BY MR. LULIC:
Q. Both.
A. We've had to replace woven wire on top of

Page 96

steel beams or support systems.
Q. And were those steel beams just regular painted steel?
A. Painted and unpainted.
Q. Have you ever had to replace the support system before?
A. No.
Q. How about segments of it?
A. Not to my recollection.
Q. Would the environment be the same in those previous applications with the woven floor system as with the new applications that we're talking about here which is the subject of this litigation?
A. Yes.
Q. I would like to ask you now about your production loss damages. Well, first, let me ask you about your replacement cost damages. Did you make any type of a reduction at all for when you calculated your replacement damages for the floor system for your upgrade or higher cost for the support system, fiberglass support system?
A. I didn't understand the question.
Q. You replaced a flat steel support system with fiberglass, correct?
A. Yes.

Page 97

Q. And that was more expensive, correct?
A. Yes.
Q. And that would have been more expensive back in 1993 and '94 when all this started, correct?
A. I assume so.
Q. Did you make any type of allowance for that in your calculations?
A. When we replaced the bad steel?
Q. Yes.
A. Make allowances in what sense?
Q. Well, for replacing a --
A. I'm not following what you're asking.
Q. I understand. You assumed the expense is higher for fiberglass than flat steel, correct?
A. Yes.
Q. And you're replacing flat steel with fiberglass, correct?
A. Yes.
Q. Did you make any allowance for the difference in that?
A. We just made our calculations based on an initial letter from BCM and what the first three nurseries would cost, and we used that as our base cost and added on our other costs beyond that.
Q. What is the useful life for a total facility

Page 98

for the barn itself?
A. We believe 20 years or more.
Q. What happens after 20 years?
A. As far as the building itself or the equipment?
Q. Both.
A. The equipment we think has a lifetime of ten to 20 years and the building should last 20 years or more than that.
Q. Assuming it's 20 years, I mean, my house is 40 years old. Why does your building only last 20 years?
A. We don't know for sure how long it's going to last. We've got buildings that are 30 and 35 years old. We had to do some remodeling and some repair on those buildings to maintain those. The buildings we bought in the last ten, 12 years, these panel buildings we think should last longer with little maintenance, other than some painting. But we don't know that because we haven't had any that long.
Q. You haven't had a building long enough for it to wear out?
A. No.
Q. Okay. Did you replace old equipment with new equipment?

Page 99

A. Yes.
Q. That was the right question. When you redid your barns?
A. **When we redid the nursery barns?**
Q. When you redid the barns that are subject of this litigation.
A. **We didn't replace anything other than the flooring.**
Q. So you took the old equipment out and put it back in.
A. Yes.
Q. Did you clean or condition or do any maintenance on the old equipment?
A. No.
Q. Did you add any new equipment to these buildings at that time when you redid them?
A. **Not to my knowledge, no.**
Q. On the production costs, then, is it your claim that you had to sell hogs, livestock, for less and that's what the production costs are?
MR. CROSS: Objection, form.
THE WITNESS: It was mainly in weight gain was the major loss that we had.
BY MR. LULIC:
Q. Wouldn't that affect the price?

Page 100

A. **Not necessarily.**
MR. CROSS: You mean price per pound?
THE WITNESS: Price per pound?
BY MR. LULIC:
Q. Price for the pig.
A. **Total dollars for the pigs, yes, it would reduce that.**
Q. As I understand it, what you had to do was Barn A, whichever one that might have been, needed the floor replaced so you sold the livestock in that barn?
A. **No. What we did, when we decided we were going to replace the floors in those first three barns, we had to make a decision on how we were going to go about doing the whole process. We estimated that two-and-a-half weeks it would take us from the time we emptied the barn until we replaced it and put new pigs back in the barn. That's the only way we could go about it. We didn't know how long, exactly, it was going to take.**
Q. What did you do with the pigs?
A. **We had to move the pigs out at a lighter weight out of the nursery, and they were going to take the place of finishing pigs that were out in our contract. We had to sell those early to make room for the feeder pigs.**

Page 101

MR. CROSS: Sell the finishing pigs.
THE WITNESS: Sell the finishers.
BY MR. LULIC:
Q. So you did sell them.
MR. CROSS: Not the nursery pigs.
THE WITNESS: Not the nurseries. We don't sell them. We just transferred the nursery pigs. They were transferred at a lighter weight.
BY MR. LULIC:
Q. Let's just go back and take the first barn, for example. You had a barn full of pigs, correct?
A. **That's correct.**
Q. And less any that may have drowned as a result of the floor buckling. What did you do with those pigs?
A. **Moved those finishers.**
Q. Where?
A. **Well, there's locations on the maps over here. I don't know exactly what farms they went to.**
Q. Did you sell any of those early?
A. **No.**
Q. What would be your loss there, then, other than the cost to transport them?
A. **We did not sell any of the nursery pigs.**

Page 102

**The feeder pigs we transferred from nursery to finisher, we did not sell any of those. We sold early by approximately two-and-a-half weeks the finishing pigs that we needed to open up space for the nursery pigs coming in. So we sold those early, the finishing pigs.**
Q. So you didn't have a place for them; is that correct?
A. **That's correct.**
Q. And whatever you saved for selling them early, you recalculated that.
A. Yes.
Q. And the loss would be X pounds of pork instead of Y pounds of pork.
A. Yes.
Q. I understand that. Where did you come up with the pound, if you will, or weight expected versus actual?
A. **Based on our research farm results and our overall farm performance records that we keep, and using those calculations, we based it on how much the feed conversion should be during that time of their life and also the average daily weight gain. That's how I based my calculations on that.**
Q. So let's say it was ten pigs, just pick a number out of the air. You sold ten pigs that weighed

Page 103

X, correct, and you expect them to weigh something else, correct?
A. Yeah. I didn't -- I don't --
Q. If you wouldn't have had to replace the floor, they would have weighed more when you sold them. It's as simple as that, correct?
A. Yeah.
Q. And you deducted from whatever it would have cost you for that period of days.
A. Yes, I figured the weight gained in those days, calculating how many days they'd be sold early, times the average weight gain per day, figure out the pounds that we sold them later at.
Q. Did you deduct feed cost from that claim?
A. Yes.
Q. What else did you deduct?
A. I used one of those two calculations.
Q. You didn't use any other facility costs that you saved?
A. I can't remember if I used the grower feed in there or not.
MR. LULIC: Off the record.
(Brief off-record discussion.)
BY MR. LULIC:
Q. Now, in your calculations and in your

Page 104

testimony you talked about days earlier. Where do you get that from?
A. Explain that question.
Q. You've testified that you sold them early.
A. Yes.
Q. And you've used different -- ten days, five days, six days, whatever. Whatever, you have used the term "days early" in your testimony and in your calculations that you presented to us. Now, where does that come from?
A. How did I make those calculations you're asking?
Q. No. Here. Barn A, it doesn't matter which one, we'll take the first one, for example. You said you had to sell some finishers, right?
A. Correct.
Q. And you had to sell them early, correct?
A. Yes.
Q. Early from when?
A. From their targeted market age and weight.
Q. So it's not a question of days; it's a question of age and weight.
A. Doesn't weight reflect days?
Q. Not necessarily. Are you saying that if you would have waited 12 days, you would have had no loss on

Page 105

selling those pigs?
A. I would assume they would have gained what our records showed to be their average daily weight gain, so we would have captured those additional pounds to market, and therefore, each hog would have weighed more. We would have had more feed cost, but they would have weighed more.
Q. When do you decide to sell a finishing hog, a finisher?
A. Based on what the processor is asking for, what weight.
Q. Let me do it this way. We'll take one pig and one barn. Okay? A pig's going to live for so long, he's going to eat for so long, he's going to gain so much weight for so long, correct?
A. Correct.
Q. Now, whether I sell that pig on day one or day 2,000, I'm going to get a price for it, correct? It's based on its weight; is that right?
A. No.
MR. CROSS: It's based on a lot of things, isn't it?
MR. LULIC: Hey, we'll get the testimony from this witness.
MR. CROSS: Well, you're not getting

Page 106

the testimony. You're wasting a lot of time trying to have him explain to you an integrated livestock production facility. That's pure background that he's explained about five ways.
MR. LULIC: I don't think I'm wasting time, I think maybe you are.
MR. CROSS: Well --
BY MR. LULIC:
Q. The hog is going to be sold at a given point in time, correct?
A. Correct.
Q. Now, is there a point in time when the hog gains its maximum weight?
A. I don't know.
Q. When do you decide to sell a pig?
A. Again, as I explained earlier, based on what the processor is asking for a target weight for us, we are required to sell at certain weights, and secondly, based on our facility availability.
Q. So you have to move pigs at a certain time just to make room for others.
A. Correct.
Q. Whatever they weigh, they weigh, you've got to sell them, right?
A. To a certain point. We have minimum weight

Page 107

we can only go to, and then the packer won't accept them.
Q. Well, I mean, if you're over that minimum weight, you sell them when you need to sell them to make room for others, correct?
A. Correct.
Q. So you don't always get the maximum you'd like to see in your pigs, correct?
A. No. Normally, we achieve what our target weights are. We have that pretty well set. That's why we had to deviate in this situation.
Q. So none of the pigs that you sold had reached their target weight.
A. Correct.
Q. None of them, not one.
A. I don't know.
Q. Okay. Why did you decide to sell them when you did?
A. I don't understand the question.
Q. Why did you decide to sell the pigs?
A. Which pigs?
Q. The pigs that you sold in this case that you claim damages for.
A. The ones we had to sell early you mean?
Q. No, no. Why did you sell them -- why did

Page 108

you decide to sell them when you did?
A. The pigs that we had to move to make room for the nursery pigs coming out, is that what you're asking?
Q. Sure. Why did you decide to sell them -- what did it have to do with the floor replacement, I guess, is a better question?
A. Because, we had to simply make room. We had no other room available for finishing pigs, so we either -- I don't know what we would have done with the feeder pigs if we hadn't been able to move them to a finishing barn. We had to sell early to provide space for the feeder pigs coming in from the nursery.
Q. Why did you decide to do it when you did, then?
MR. CROSS: Objection, asked and answered.
MR. LULIC: No, it's not. It has not been.
MR. CROSS: It has been. It's been answered five times.
MR. LULIC: You don't understand my questions.
MR. CROSS: I don't think anybody here does. He's answered it five times.

Page 109

BY MR. LULIC:
Q. Why did you decide to sell these pigs when you sold them?
A. To make room for the nursery pigs.
Q. Why did you need to make room for them at that point in time?
A. To give us adequate time to do the repair on the replacement of the flooring in the nurseries.
Q. And you would have had to sell these pigs eventually anyway, correct? That's what you do, right?
A. That was the plan. That's our business.
Q. That's what you do, right?
A. That's a good point.
Q. Okay. And your decision to do the floor when you needed to do the floor, when you thought you needed to do the floor, triggered when you sold pigs, then. Is that what you're saying?
A. Yes.
Q. Pardon me?
A. Yes.
Q. So the 12 days is a figure that's used -- or that's backed up.
A. If I could explain that. When we made initial calculations, we got some of the initial costs based on the replacement costs of the nursery. When I

Page 110

made the decision that we were going to do this project, we had to say, "How much time is this going to take to empty out the barn, take out the old floor, replace the new floor and put the gates back in?" what we talked about earlier. We allowed two-and-a-half weeks in our calculations.
Q. I heard that. I understand that.
A. Okay. So what are you asking me?
MR. CROSS: Can I just -- I'm just trying to help. I actually am.
MR. LULIC: We can go off the record and you can try to help, but first I want to get a little more coffee.
MR. CROSS: You're going at it wrong.
(A brief recess took place.)
BY MR. LULIC:
Q. Back on the record. I understand, Mr. Holden, that your business involves a rotation of livestock, okay, and the selling of that livestock to make room for others, et cetera. Okay?
A. Okay.
Q. Now, what I want to know is, did the decisions that you made relative to when you do this flooring or how long it would take affect your decision as to when you sold livestock? And if the answer to

Page 111

that is yes, then I'm going to ask you how.
A. I don't know how to answer that. Say that again.
Q. Sure.
A. Say it one more time.
Q. Did the decisions you made relative to doing the flooring in these facilities affect when you sold livestock?
A. Yes.
Q. Tell me how.
A. Again, to make room all the way back to our farrowing farms, our sow farms. We have a pig flow daily that is just like a pipe, you have to move one here to get to the next one in place.
Q. But you do that anyway, right? You do that anyway. You do that every day. Well, not literally, but virtually.
A. But then we didn't have the space available to hold all those to the best weight we could sell at. We had to sell early, lower than the maximum weight or the best weight.
Q. What do you mean by "best weight"?
A. Again, the weight that is dictated by our facility availability and what the packer is asking us to sell at.

Page 112

Q. And you're basing that on the gross weight of the hogs sold versus the gross weight of the hogs expected?
A. Gross minimum weight, yes. What we could achieve if we had left them in there for the additional days.
Q. Did you have projections from time to time as to what the hogs, whether they be finishing hogs or not, would reach before you sold them?
A. Yes.
Q. Where were those projections kept?
A. Through our records system.
Q. Do you still have those?
A. Yes.
Q. And is it your claim that every projection that you didn't meet was the result of the replacement of the flooring?
A. Could you rephrase that?
Q. Is it your claim that the projections weren't met because of the replacement of the floor?
A. In this situation, yes.
Q. Do you ever not meet your projections?
A. Yes.
Q. For the reasons that we've discussed, you don't have room, you've got to sell, right? Whether

Page 113

you're redoing floors or not, correct?
A. If the hog dies --
Q. Correct?
A. Or there's a lot of other reasons. For example, if the hog dies, we're not going to sell it.
Q. You're going to have shrinkage, right? You're going to have some shrinkage.
A. Well, that's mortality.
Q. Correct. All right. What are the 12 days based on, then?
A. Which 12 days?
Q. The 12 days you used in your calculations.
A. Could I see the calculations?
Q. Sure.
(WHEREUPON, K. Holden Deposition Exhibit No. 85 was marked for identification by the Reporter.)
BY MR. LULIC:
Q. First of all, is Exhibit No. 85 your handwriting?
A. Yes.
Q. Do you see where it says "nursery" there, number one?
A. Yes.
Q. 18,056 nursery pigs moved, 12 days early.

Page 114

A. Yes.
Q. Where do you get that from?
A. That's based on my projection, based on what we were going to need for time down to do the replacement of the flooring. So we had to move the pigs so many days early to allow adequate time for this work to take place. We had to get them out of there. We couldn't do the work when the pigs are in the barn.
Q. When you say "moved," do you mean sold or moved?
A. Moved. Trucked to the finishing site.
Q. So the moving of them 12 days early doesn't cause any problems for you, except what it might cost to transport them extra over and above, correct?
A. No, that's not correct. That's not the ideal weight to move those pigs. We had them projected to move out at approximately 50 pounds weight and these were moved out earlier than that.
Q. Well, wait a second now. Here. I've got ten pigs that weigh 50 pounds each, and that's their maximum weight, right? Correct? Now, how long --
A. Maximum --
Q. Wait. That's a hypothetical.
A. No, that's not correct.
Q. How long it takes me to do that floor isn't

going to affect the weight of the pig, is it?
A. **You said the maximum weight was 50 pounds. I don't understand.**
Q. I'm just giving you a hypothetical. If I've got five pigs sitting here and they all weigh 50 pounds, that's their maximum weight, what difference does it make how long it takes me to do a floor if you're selling them at their maximum weight? I don't understand that.
A. **I guess I'm not following what you're asking me. I don't understand. I'll sure help you.**
Q. The 12 days comes from the time it takes you to do the floor, correct?
A. **Yes.**
Q. So however long it takes you to do the facility, that's how many days you moved those pigs early, sold them early? I don't get it.
MR. CROSS: It's because the nurseries have to be ready for the next load of pigs coming in.
THE WITNESS: I'd sure like to help, but I don't know how to answer any different than I have.
BY MR. LULIC:
Q. Okay. Let's go to the next calculation. It says "finishing." It says 18,056 finishing pigs moved



12 days early and it says, is it ADG?
A. **Average daily gain.**
Q. One pound 67 ounces?
A. **No. 1.67 pounds per day.**
Q. And it says barn cost, ten cents a day.
A. **That's what we pay the grower, approximately, his grower payment of ten cents per day per hog.**
Q. And feed cost is $85?
A. **At that time, it was $85 a ton.**
Q. And what is FC?
A. **Feed conversion ratio.**
Q. What's that?
A. **It's feed conversion ratio. It's 3.3 pounds of feed to put on one pound of raising a hog.**
Q. And the market price is the price per pound?
A. **The market price is the price per pound that we got at the market, yeah.**
Q. And was that price constant throughout this period?
A. **No.**
Q. What if you sold earlier at a lower weight but a higher market price, then, 12 days later? Did you take that into account?
A. **The lower weight would automatically mean**



**lesser weight per value per pound.**
Q. Is the value per pound of hogs based on weight or based on market?
A. **Both.**
Q. Okay. So price per hog, or per pound of hog, can change based on market, correct?
A. **Correct.**
Q. Did you ever sell "early," as you've described it, at a higher per pound rate than if you would have waited 12 days?
A. **Probably. I don't know for sure.**
Q. You haven't calculated that. Is that right, you haven't calculated that?
MR. CROSS: You haven't looked at the market changes.
THE WITNESS: I haven't looked at the market changes.
MR. LULIC: You know, I don't want you answering the questions for him anymore.
MR. CROSS: Well, you were answering questions for Mr. Borcherding all day long when I asked him questions.
MR. LULIC: What is this? Na-na-na-na-na-na time for you? Don't answer the questions for the witnesses.



MR. CROSS: Well, you've been going around and around in circles here.
MR. LULIC: No, no, no. You have. You're the one that's going around in circles, pal, not me.
MR. CROSS: No, I'm about to stop this, because I think we've gone over this five times.
MR. LULIC: Well, okay. Well, we haven't gone over it enough yet, because this is very, very sketchy.
BY MR. LULIC:
Q. Go to 2 a) where it says sales. You see that?
A. **Yes.**
Q. What's the calculation? Twenty something?
A. **First you start at part a) sales, 12 days --**
Q. I've got that.
A. **-- times 1.67 pounds average gain equals 20 pounds of live weight less what we'd be selling those hogs at versus our targeted weight. Twenty pounds per--**
Q. Is that per what?
A. **Per hog. Twenty pounds per hog. It's not maybe copied on that. It just says sold per hog.**
Q. What does that mean?
A. **Twenty -- a hog weighs, for example, the**

Page 119

targeted weight was 270, we sold them 20 pounds lighter and they weighed only 250.
Q. Did you keep track of the gross number of hogs you sold?
A. During this time period you mean?
Q. Yes.
A. Yes, we have records of that.
Q. Then it's 20 pounds times what?
A. Thirty-eight cent market price per pound.
Q. Where does that come from?
A. That's what I picked on that particular day, I assume, October 21, 1999 was the market price we would have gotten.
Q. You would have gotten or did get?
A. Well, if we sold hogs that day, we would have gotten that.
Q. Do you know if you sold hogs that day?
A. No.
Q. Why did you pick that day?
A. Because, that's the day I did this calculation.
Q. Next is costs, 2 b). And you go 12 days, we know where that comes from, times $10 a day, we know where that comes from.
MR. SOBALVARRO: It's ten cents.

Page 120

BY MR. LULIC:
Q. Ten cents a day. I'm sorry. We know where that comes from. Is this the cost that you "saved"?
A. Yes.
Q. And it's --
A. Actually --
Q. I'm sorry. Or is that --
A. That's not correct.
Q. What is it?
A. Because actually, that cost is incurred whether we have pigs in the barn or not. That's a guaranteed payment of approximately ten cents per day whether the pigs are there or not. So that's really an additional cost.
Q. Guaranteed payment to whom?
A. The grower that owns the building. So that cost really shouldn't be in there. That should be deducted off the total, in reality.
Q. The next is a summary and sales are $7.60 per hog. What is that? What does that represent?
A. Excuse me. Which one?
Q. Summary, c).
A. Yeah.
Q. Sales are $7.60 per hog, correct?
A. Right.

Page 121

Q. What does that represent?
A. That's the additional sales. Going to part a) under sales there, that's $7.60 less revenue per hog is calculated. And again, that cost is really miscalculated. That should be $4.00 plus 41.20 or $2.80. It should be $7.60 minus $2.80. So it should be--
Q. Where do you get the $2.80 from?
A. Because, that 12, the grower payment of ten cents per day is really going to be paid regardless if the pigs are there or not. That's a constant that we have to pay. We didn't gain any advantage or disadvantage by selling the hogs early or later, whatever. We just pay that. So that calculation shouldn't even be in there. That's my point. So the cost therefore should not be $4.00, it should be $2.80.
Q. And the $2.80 is just for feed?
A. Yes.
Q. Actually, $2.81, or don't you have that? Am I misreading that?
A. Yep. 2.81.
Q. $2.81, correct?
A. Yes.
Q. Now, were there any other facilities operation costs that were figured in there?

Page 122

A. No, not in this calculation.
Q. Okay. And then we go to the net which is $3.60 and you multiply that times the amount of hogs moved?
A. No, in this case the number of hogs that were sold early.
Q. Does pigs moved early mean the same as sold early? Because we've been over that.
A. No.
Q. Okay. The number is the same, though, Mr. Holden.
A. I just assumed for this practical calculation it would be the same.
Q. That all that were moved were sold.
A. No. Again, what I said before, in the nursery, going in the first part up here, we had to move 18,000. We didn't sell them, we just transferred or trucked them or moved them to the finishing facility.
Q. 18,056.
A. Yes.
Q. And again, that's an actual figure that you know.
A. Divided by three is the actual inventory of our nurseries. 6,018 or whatever it is. That's about what I used as an average number.


MARTHA M. RIVARD
952-431-1252 * 800-844-6420

Page 123

Q. So this is an average number multiplied by three facilities?
A. **Yes.**
Q. So it's not an actual count.
A. **No, it's an estimate.**
Q. And the 18,056 moved means, down the summary, 18,056 sold, correct?
A. **Yes.**
Q. Do you know if you sold all of the ones you moved early?
A. **I assume we did.**
Q. Well, what does that mean?
A. **I don't know.**
Q. Is there any way to find out?
MR. CROSS: It's not based on the calculation, the ones that were moved early.
THE WITNESS: Is there a way to find out?
BY MR. LULIC:
Q. Yes.
A. **I would have to go back to the records and try to calculate it out and see.**
Q. Okay. Are there any other calculations that you did to determine your loss of income or loss of profit?

Page 124

A. **Anything beyond this here?**
Q. Yes.
A. **No.**
MR. LULIC: That's all I have.
EXAMINATION
BY MR. SOBALVARRO:
Q. I'll pick up where Mr. Lulic left off, Mr. Holden. You can keep looking at that exhibit. My name is Rich Sobalvarro. You and I actually didn't meet before we started. I represent BCM. What is the target weight you had for the hogs that you sell?
A. **That varies, and in this particular instance, I don't remember what it was.**
Q. So you have no idea what -- you're not saying -- this calculation doesn't say, "We're selling those hogs when they get to be 120 pounds" or something. I mean, you don't have an "at this weight we're selling these hogs."
A. **Not in this calculation, no.**
Q. At the time you drafted this on October 21, 1999, did Holden Farms, Inc. as a business have a set target weight that we will move hogs out of the finishing facilities at this weight?
A. **We had a target weight in conjunction with what the packer was asking us to sell at, yes.**

Page 125

Q. What was that target weight?
A. **I'd have to go back and look. It's changed from time to time depending on market conditions and so forth.**
Q. So if the market conditions change, the target weight may increase and you may hold hogs in those finishing barns a little longer?
A. **No. Based on a daily market fluctuation. Our target weight at this time, I'm estimating, was about 260 pounds.**
Q. This calculation is drawn up on October 21, 1999. By "this calculation," I'm referring to Exhibit No. 85. Did anything actually occur on October 21, 1999? Did you literally sell 18,056 hogs on October 21, 1999?
MR. LULIC: No.
THE WITNESS: Is that the answer? You're giving an answer?
BY MR. SOBALVARRO:
Q. Well, Mr. Holden, I'm asking you. I understand you're pointing to Mr. Lulic.
MR. CROSS: That's fair. I think you should be answering the questions. Mr. Lulic doesn't need to answer for you.
BY MR. SOBALVARRO:

Page 126

Q. Do you remember my question, Mr. Holden?
A. **If we literally sold 18,000 pigs that particular date?**
Q. Yes.
A. **No, I'm sure we didn't.**
Q. That was my next question. You don't know if you sold a single pig on that date.
A. **I would have to check. I assume we did.**
Q. But you don't know for sure, as you sit here.
A. **(Witness shook head in the negative.)**
Q. Okay. So this Exhibit No. 85 is nothing more than your best estimate as you sat down on October 21, 1999.
A. **Yes.**
Q. It's not based on actual numbers that were incurred by Holden Farms.
A. **Actual production numbers? Feed conversion, daily gain you mean or what?**
Q. No, I understand your average daily gain is a long term calculation, your feed conversion is a long term calculation. But you've got a market price of 38 cents a pound, and obviously you just picked that on October 21st, right?
A. **Yes.**

Page 127

Q. What I'm getting at is this Exhibit No. 85 doesn't actually reflect an actual loss that occurred on October 21, 1999, does it?
A. **(Witness shook head in the negative.)**
Q. I'm sorry?
A. **No.**
Q. Mr. Dieseth was asking you questions about changing flooring. You didn't actually change all the flooring in the barns. You reused the flooring in five of the ten barns, correct?
A. **Yes.**
Q. You took the Maxima flooring up, you took out the rusted steel beams, put in fiberglass beams and put the Maxima flooring right back down, correct?
A. **Yes. We replaced some of the flooring.**
Q. If you had a broken piece here or there or something like that, you would replace that, correct?
A. **Yes.**
Q. But as a general statement, you reused the same Maxima flooring, right?
A. **Yeah, in the last nurseries. I can't tell you how many that was even. It varied from nursery to nursery.**
Q. Certainly the first three you replaced, based on the letter we've seen that is Exhibit --

Page 128

A. **Yes.**
Q. Do you know, of those last seven, did you reuse the Maxima in all seven of those?
A. **We reused some of the Maxima. We reused some of the Maxima in the last seven, yes. What percent, I do not know.**
Q. You don't know which one of those seven barns.
A. **Well, in each one. It varied from barn to barn how much we reused. Does that answer your question?**
Q. It's my understanding that, and either you or Dustan feel free to correct me, that in the last five barns you simply picked up all the Maxima that was there, removed the rusted steel beams, replaced them with fiberglass beams and put the Maxima flooring that had been installed in that barn back down, with the exception of if you had a broken piece or something in between, then you would replace it with a new piece of Maxima, but you used Maxima again, right?
A. **Yes.**
Q. And then are you saying that -- so that accounts for eight of the barns: the first three we know you put Excelerator in, right?
A. **(Witness nodded head in the affirmative.)**

Page 129

Q. You're nodding your head. She needs a verbal answer.
A. **Yes.**
Q. And then the last five we know you picked up the Maxima, replaced the beams, put the Maxima back down. That leaves two barns. Are you saying in those two barns you did a combination of replacing with Excelerator and reusing Maxima that was there?
A. **One of the barns we didn't do. The Kofstad barn, again, was done by himself. He decided he wanted to do his own flooring, which we worked out an arrangement there. In these last ones, we reused the existing Maxima flooring, Excelerator flooring, and replaced what was broken or what was needed to be replaced.**

**(WHEREUPON, K. Holden Deposition Exhibit No. 86 was marked for identification by the Reporter.)**

BY MR. SOBALVARRO:
Q. Mr. Holden, I realize in looking at Exhibit No. 86, I realize this is a letter drafted to your brother Barry. Have you ever seen it before?
A. **I don't recall.**
Q. Looking at the date, November 16, 1999, what was going on November 16, 1999 that your brother would

Page 130

have gotten a letter like this, trying to sell Southwest Agri-Plastics plastic flooring to you guys on the 19th?
A. **It would be best that you ask him that.**
Q. As you read it, that doesn't spark any memory?
A. **Not offhand it doesn't spark a memory.**
Q. Okay. Earlier you said you built literally hundreds of -- it was more than a hundred but you didn't know if it was more than 200 barns.
A. **Correct.**
Q. Sounds like most of those barns have been constructed in the last several years, meaning post 1995; is that correct?
A. **Most. You mean majority?**
Q. Sure.
A. **I would assume that the majority had been built after that. For sure after 1990.**
Q. Are you continuing to use plastic flooring in the barns that you erected since then?
A. **Yes. We're actually building -- having another one built this summer and he's going to use plastic flooring.**
Q. What company is --
A. **Farmweld.**
Q. What kind of beams?

A. I believe those are fiberglass.
Q. Of the other plastic flooring that you've used, not just the ones we just talked about, but going back to the other barns, can you think of anybody else's brand of plastic flooring that you've used?
A. No, I can't. We've used some in the sow barns, but I can't remember the manufacturer. Some was BCM, some other ones.
Q. Early on you were asked questions about tri-bar. If I understand correctly, you said tri-bar has an incorporated support system for it. Am I following that?
A. Yes. It's all welded together, all of the components, all the substructure and all the flooring.
Q. And as I understand it, you said that that is a completely galvanized product.
A. Yes.
Q. And I think you indicated -- I tried to write your words down as best I could as you were talking. I think you indicated that galvanized was, and this is the quote I wrote down, "Would be an added benefit." Is that --
A. I don't know if I said that.
Q. But you certainly understand what galvanized is.



A. Yes.
Q. What is the benefit of having galvanized steel in a hog barn?
A. I think the number one thing we were looking at at that time was cleanliness, the ability to clean and go through the slats. Galvanized, we assumed, would give us longer life, but --
Q. Why is that?
A. Because of the galvanized process, we thought that would last longer than a painted or plain unpainted steel.
Q. And that's because galvanized doesn't rust, correct?
A. Supposedly. We found out otherwise since then.
Q. But certainly galvanized is rust-resistant so to speak. Is that a good way to phrase it?
A. That's not been our experience, no.
Q. How long does galvanized last, in your experience?
A. We were replacing flooring this year that was -- so it would be, I believe, like 14 years old, 13 years old, some galvanized flooring.
Q. And is that the tri-bar material?
A. Yes.



Q. What about the tri-bar material --
A. I don't know the exact name. That's the generic name, tri-bar. We bought some tri-bar from Hog Slat and we bought -- this stuff that we're replacing now is Eastern Iowa Pork I believe is the name.
Q. The tri-bar that you're replacing, what's wrong with it that you're replacing it?
A. It's rusted.
Q. Where has it rusted?
A. It's rusted -- first of all, what has happened, a lot of the welding joints when they originally were put together, the joints broke so we'd have to come in and weld over the years. As soon as you weld galvanizing, it starts rusting, breaking the galvanizing, and it causes it to rust after that.
Q. It rusts at the weld site?
A. Yeah.
Q. The tri-bar, using the generic term for it, that you bought from Hog Slat, was that manufactured by Hog Slat?
A. I don't know.
Q. Certainly, you understand hog barns are a corrosive environment, fair to say?
A. Yes, fair.
Q. Lots and lots of stainless material inside



of a hog barn, correct?
A. Well, I don't know about lots and lots. Depending which barn you might go to. But we, there is some used.
Q. And that's because stainless avoids corrosion, correct?
A. Correct.
Q. I noticed in some of the contracts that, in fact, the equipment section lists painted or galvanized. Do you remember that?
A. No.
Q. If the contracts, I'm just looking at the one marked as Exhibit No. 5, it just says painted. If some of the contracts under the "Equipment" heading had painted or galvanized, would you have any recollection as to why that would be in the contract?
A. No. What components were they listing, specifically?
Q. It just says under "Equipment".
MR. CROSS: What page are you looking at?
MR. SOBALVARRO: I'm looking at page 16 of Exhibit No. 5.
BY MR. SOBALVARRO:
Q. That one just says painted under "Finish."

Page 135

I'll represent to you that at least a portion of the contracts say painted or galvanized under "Finish." Do you see where I'm -- part number three under "Equipment"?
A. **Okay. Yep, painted.**
Q. I'll represent to you that at least a portion of the contracts say painted or galvanized. Do you have any recollection of that?
A. **In our contracts?**
Q. Yes, sir.
A. **I don't have any recollection of that, no.**
Q. Do you recall any conversation about painted versus galvanized for the equipment?
A. **No.**
Q. You said Mr. Kasper purchased an existing facility, I think it's the second barn listed in the interrogatory answers. And you said that barn was already in existence that Mr. Kasper bought.
A. **Yes.**
Q. It's not the one he built, right?
A. **Correct.**
Q. I know the interrogatory answer indicates that it has polygrid form on fiberglass beams.
A. **On the old barn?**
Q. Yes.

Page 136

A. **That could be. I don't know.**
Q. That one indicates it was built in 1991 or 1992.
A. **I don't know.**
Q. Mr. Kasper would know.
A. **Yes.**
Q. I think from the sum of all of your comments, and I'm not sure if you've answered this question, if you have, I apologize, but other than that meeting in April of 1994, prior to that time, you had had no contact with anyone from Double L regarding Maxima flooring; is that correct?
A. **My recollection, that's correct.**
Q. Similarly, prior to that time, you hadn't had any contact from anybody from BCM at all, have you?
A. **That's correct, I believe.**
Q. In fact, you didn't have any direct contact with anyone from BCM until well after the nursery barns involved in this litigation --
A. **That's correct.**
Q. Prior to the purchase, or I should say the signing of the contracts with Hog Slat, the only documents you received regarding Maxima flooring was Exhibit No. 4, the brochure from the April meeting; is that correct?

Page 137

A. **If that was the only information we got about the flooring?**
Q. Yes, the only documents you received was at that --
A. **From my recollection, yes. That's it.**
Q. I think the question may have not been complete. Let me rephrase it and ask it again. Prior to signing the contracts with Hog Slat, the only document you received regarding Maxima flooring is the brochure that's marked as Exhibit No. 4?
A. **As far as I know, that's correct.**
Q. I think you indicated in response to a question from Mr. Lulic that you were not an expert in anything to do with plastics or metal; is that correct?
A. **That's correct.**
Q. So is it fair to assume you're not going to be providing expert opinions on what was the cause of the problems here, you'll rely on the experts Mr. Cross has disclosed; is that correct?
A. **Correct.**
Q. With the barns that you reused the flooring in --
MR. LULIC: The Maxima.
BY MR. SOBALVARRO:
Q. The Maxima, the beam you purchased, you said

Page 138

you may have gotten that from Strongwell and then from another manufacturer; is that correct?
A. **That's correct.**
Q. Do you know, do you have a document someplace that would show exactly how many linear feet of fiberglass beam you purchased from those manufacturers?
A. **Yes.**
Q. And what the cost of that actually was?
A. **Yes.**
Q. And obviously, that would be up through and including the barns that were just replaced in June of 2001.
A. **Correct.**
Q. I think you indicated that, or you gave us several different numbers for the days it takes to replace the flooring. By the time you got down to June of 2001, how quickly were you able to get in and get that flooring removed and pens removed and everything done and the barn ready for new pigs?
A. **I don't know that exactly.**
Q. One of your growers, I believe Mr. Anderson, indicated to an individual that I had looking at the barns that they were going to be able to turn his barn around in three days. Do you think that would be

Page 139

accurate?
A. Yes. We have two Andersons.
Q. I believe Mr. Rick Anderson.
A. Okay.
Q. Does that make sense?
A. That he would say that or --
Q. Yes.
A. Well, we can speculate, but there's a lot of other things we have to do besides moving pens and so forth.
Q. Right. But I'm talking just relating to the floor.
A. My knowledge, we didn't do any of the nurseries that quickly.
Q. You indicated that there was an extra one or two days for cleaning because you were replacing the flooring. Do you remember that testimony?
A. Yes.
Q. What, exactly, did you do in addition to the normal cleaning that you would do between --
A. We would try to clean off the support beams underneath where the flooring sits on, actually, concrete pillars and concrete beams. In the deep pit nurseries, we had to make sure those were cleaned off around the whole perimeter of the building. Where the

Page 140

floors would lay on the concrete walls, we had to make sure that was clean. We had to thoroughly clean anyplace that we thought would come up and be exposed when we removed the old flooring.
So we did -- we tried to do a more thorough job so that wouldn't interfere with our remodeling job.
Q. So basically, you're saying you just insured you did a better cleaning than you would normally do.
A. Yes.
Q. How many weeks do you normally allow in the finishing barn? Once you move them out of the nursery to the finishers, how many weeks are they in the finishing barns?
A. How long are the pigs in there from the time they get placed until the time they get marketed?
Q. Yes.
A. I would have to look at the records again, but we buy -- if somebody has a calculator, you divide 280 -- let's see. 230 by 1.67.
Q. So two-thirty being your target weight?
A. No, 280 pounds our target weight minus 50 pounds that we start the pig at. So you have 230 pounds of gain divided by 1.67 as an average. That's about where we are at.
Q. So again, the time in the finishing barn

Page 141

would vary to get to that 280 pound target weight.
A. Yeah, it varies.
Q. You're claiming there was a reduction in the average daily weight gain because of the flooring buckling?
A. In the nursery?
Q. Yes.
A. No.
Q. What about in the finishing barn? They gained weight in the finishing barn just like they would have no matter what, right?
A. Yes. You mean in relation to the floor in nursery they --
Q. Yes.
A. -- performed poorer or not, no.
Q. You just said something that I wanted to remember. You said deep pits versus shallow pits. Of the ten barns, how many have shallow pits and how many have deep pits?
A. The first five have shallow pits, the second five have deep pits.
Q. And the shallow pits are two feet deep?
A. Approximately two feet deep.
Q. So in one of the interrogatory answers I think, or damage calculations, you're basically talking

Page 142

about $4.00 per pig space in those nurseries; is that right? Is that how much you're paying those contract growers?
A. How much?
Q. $4.00 per pig space?
A. Yeah. I don't remember exactly on that in the nursery. It works out to about $36 per pig space per year.
Q. One of the things that goes into the cost per pig space is the cost of that building, correct?
A. Yes.
Q. So if the building costs more, you, Holden Farms, Inc., the company, would have had a corresponding increase in your payment to the contract grower, correct?
A. No, we have a standard contract and we say we're going to pay this amount and then we basically say this is how the barn needs to be built and it needs this type of equipment, and there's some flexibility within that choice of equipment that the grower can make, but then we pay a standard fee to all growers, the same fee.
Q. So irrespective of whether the grower decides to go with the Cadillac of barns versus the Chevrolet of barns, he's going to get paid the same fee.
A. Yes.

Q. So that might make a grower decide not to enter a contract with you and enter a contract with another producer, correct?
A. That's correct.
Q. Do you know how you compare among the various contract pork producers as to how much you're paying your contract growers? Are you paying those guys more than anybody else in the region or are you on the bottom of the spectrum?
A. We feel we're very competitive, very fair to equal to other people in the Midwest, but I don't know for sure. I don't know exactly what all of the other companies pay.
Q. Have you ever measured the air quality in any of these barns?
A. Air quality in what regard?
Q. Ammonia concentration, humidity.
A. We have on occasion had experts that would help us in measuring that, and I can't remember any findings, but --
Q. Would you have those documents?
A. No.
Q. Which experts have you used to measure?
A. I know we've used the University of Minnesota people on occasion. We generally haven't



looked at that as much as we look at the air exchange and fan capacity. That's what we look at primarily, and based on the recommendations from different universities or whatever that tell us how much air to move.
Q. Do you know what humidity you keep your barns at, the nursery barns at?
A. No.
Q. Would your brother Barry know?
A. No.
Q. Or Mr. Kasper?
A. No.
Q. Would anyone?
A. Yeah.
Q. Who?
A. I could ask our nursery supervisor who might know, or veterinarian. I assume they're around approximately 60 percent or so.
Q. But that's just your assumption.
A. Yes.
Q. You don't really know. Of these more than a hundred barns, other than Hog Slat, who else has built barns for you?
A. No other -- to the best of my knowledge, there really hasn't been any other builders. Some of the farmers have built based on their own local



contractors. That's probably the next biggest source of pig barns built. I don't remember if we had anybody else comparable to Hog Slat building barns for us.
Q. I know from the interrogatories you had TFE build some, Truman Farmers Elevator.
A. Okay.
Q. Other than the one listed there, did they build other barns for you?
A. I don't remember how many, exactly, they built.
Q. Would your brother Barry or Mr. Kasper know?
A. Barry might know.
Q. Do you still have an ongoing relationship with Hog Slat?
A. Yes.
Q. What is that? Are you continuing to build barns with them?
A. We're buying a lot of equipment from them.
Q. By "equipment," what do you mean?
A. Blue steel is the terminology; slats, concrete slats, farrowing -- gestation crates, breeding crates. What else?
Q. Have you bought any more turn-key buildings from them?
A. No.



Q. Any in the works?
A. No.
Q. Is there a separate market for pigs coming out of nurseries at 50 pounds?
A. Yes.
Q. How does that correlate with the finished price? You have a market price of 38 cents a pound.
A. I'd only be speculating if I answer that. That's traditionally the time of year when all prices are lowest, including feeder pig prices are lowest.
MR. LULIC: You mean the October date?
THE WITNESS: October 19th or 21st date, yes.
BY MR. SOBALVARRO:
Q. You were talking about the steel beams that you looked at when you were in the one barn, and you said you described it as being weak. You used the phrase they were so weak they didn't appear to you they would have survived much longer. By "so weak," what do you mean?
A. They were so rusted through, they were just ready to collapse. In fact, some of them, we would take them out and stand on them and I think in one case, somebody took a hammer and knocked it once or twice and it broke in two.

Page 147

Q. You mean the entire steel beam disintegrated.
A. **No, it actually broke at the weakest point.**
Q. That's what I meant. And then the whole beam was just -- the beam fell --
A. **After we'd actually removed it from the building. None ever broke inside the building while we had pigs in there.**
Q. Mr. Dieseth asked you a question about Hog Slat having a conversation with you in 1997 about the availability of, or about using something other than painted steel to support the Maxima, and I believe your response was, "I don't recall that." I took that to mean you didn't recall them having that conversation with you personally. Are you aware of any representative from Hog Slat saying that?
A. **When was that date again?**
Q. I believe Mr. Dieseth said prior to the last two barns being built in '97.
A. **And Hog Slat talked to us about using other--**
Q. Supports, other than plain painted steel.
A. **I don't recall that. I don't recall that meeting or hearing that information.**
Q. So you don't recall that information being

Page 148

conveyed to anyone, not just to you specifically.
A. **Not -- no.**
Q. You also indicated that the decision about using painted steel, that that came from Wendell Burge. You didn't say when Mr. Burge made that comment to you that the supports would be plain painted steel. Do you recall when that was?
A. **That was just talked about in general contact through the meetings we had. We had planned to use woven wire on painted steel. The only change we were talking about in that April '94 meeting was to switch the wire to the plastic Maxima flooring. So it was still understood by everyone involved that we would continue to use the painted steel. We didn't talk about any other possible structures.**
Q. Who actually designed and wrote the specifications for the buildings?
A. **George Kasper, myself and our veterinarians of Swine Vet Center.**
Q. 1997, what kind of loss did you take in 1997?
A. **You'll have to ask my brother that one.**
Q. You don't know, as you sit here today?
A. **'97. I can't remember exactly how much, no.**
Q. Safe to say you took a loss in 1997, as a

Page 149

corporation?
MR. CROSS: You can answer that. Whatever you know.
BY MR. SOBALVARRO:
Q. Your recollection. If you don't know, I can ask your brother Barry later on.
A. **It was a profitable year. I can't remember what it was.**
Q. So you showed a profit in '97 in the face of a market crash.
A. **I believe we did.**
Q. That's all I'm asking is your recollection. I can ask your brother. That's your recollection, you believe you did?
A. **(Witness nodded head in the affirmative.) Yes.**
MR. SOBALVARRO; **That's all I have.**

EXAMINATION

BY MR. DIESETH:
Q. I just have a couple of questions to finish up for you, Mr. Holden. Let's go back to the 50 pigs that died that you had talked about earlier. You said that happened over a couple of different occasions?
A. **To my recollection, a couple times. Two or three times. I don't know exactly.**

Page 150

Q. Do you know which barns?
A. **I believe Ward and also Garness barns. Kruckeberg.**
Q. Ward, Kruckeberg and Garness?
A. **Kruckeberg and Ward I'm almost positive on. And Garness I think had some, too.**
Q. Were these situations where they discovered more than one pig in the pit at the same time or was --
A. **Yes.**
Q. -- it multiple pigs? And this would have happened on a couple of occasions?
A. **Yes.**
Q. Are you sure it's 50 or is that an approximate?
A. **Approximation.**
Q. How rough is that approximation?
A. **Well, we knew how many pigs were in a pen approximately and then what was left in the pen after the floor tile was up we subtracted and came up with an answer.**
Q. Do you know if anybody ever kept track of the number of pigs you hauled out of the pits because of this?
A. **No. No, because some of those we couldn't even retrieve out of the pit because of the shallow pits**

Page 151

and danger of going into the pits, so we couldn't go down and get them.
Q. Ultimately, you removed them, I'm assuming.
A. **When we removed the floor, yep.**
Q. It doesn't sound like a place I'd like to be retrieving pig carcasses down in the pits.
Do you know if you ever put together any documentation with respect to the number of pigs that were lost as a result of this?
A. **I haven't done anything on that.**
Q. Have you ever tried to calculate the cost to Holden Farms that occurred as a result of the loss of those pigs?
A. **Of those 50 pigs?**
Q. Yes.
A. **No, I haven't made a calculation.**
Q. How much would a 50-pound feeder pig sell for?
A. **Today?**
Q. Well, let's say in 1999.
A. **That was exactly $47.32. I don't know. Approximation.**
Q. I'm sorry. I missed what you said.
A. **I don't know.**
MR. LULIC: He doesn't know. That's

Page 152

what he's saying.
MR. SOBALVARRO: We can get the Chicago price.
THE WITNESS: Not Chicago. You can get it through South St. Paul and there's different feeder pig suppliers.
BY MR. DIESETH:
Q. Not to beat a dead horse, but to go back to the damage approximations you had done, you had indicated that you had used this 12 day time period in your calculations, right?
A. **Yes.**
Q. And you had talked to me about a two-and-a-half week period of time, approximately, for each barn, right?
A. **Yes.**
Q. And you said you had to move the nursery pigs out early --
A. **Yes.**
Q. -- in order to give yourself time to do this remodeling work.
A. **Yes.**
Q. Did you use that same period of time, that two-and-a-half week block for all ten barns or did it get shorter and shorter as you got to the last barn

Page 153

because you had been increasing your efficiencies?
A. **It varied from site to site. I don't know exact days on each site, how long it took.**
Q. Do you have any documents that would show that?
A. **Maybe.**
Q. I have just two documents that I want to mark that I haven't marked before that I wanted to show you.
(WHEREUPON, K. Holden Deposition Exhibit No. 87 was marked for identification by the Reporter.)
BY MR. DIESETH:
Q. Exhibit No. 87, Mr. Holden, is Exhibit J to the Complaint, actually, and it's one of the ten contracts between Hog Slat and the farmer. This one happens to be with Circle A and I picked that one simply because you signed it. At least I think you did. Why don't you turn to, I think it's page -- this isn't numbered on the bottom, or else it was lost in the copying. Ten or 11, page ten or 11. That's the one. That's your signature on that page?
A. **Yes.**
Q. And if you go back through the contract, there are a number of places where it says "customer

Page 154

initial" and I see a lot of KHes there. Are those your initials?
A. **Prior to that last page?**
Q. Yes, before that last page. Throughout the contract.
A. **Yes, it looks like my initials here.**
Q. That's all I wanted to ask you about that one.
(WHEREUPON, K. Holden Deposition Exhibit No. 88 was marked for identification by the Reporter.)
BY MR. DIESETH:
Q. Exhibit No. 88 is a document labeled "Contract Assignment." It has a place for a signature for Holden Farms and underneath that it looks like the signature of Barry Holden; is that right?
A. **Yes.**
Q. And it's also signed by Eugene Ward, one of the growers. Now, let me represent to you that this is the only contract assignment document that I have seen in the documents that you've presented to Hog Slat in this case. Do you know whether there were contract assignments executed between Holden Farms and any of the other plaintiff farmers in this case?
A. **No, I don't know.**

Page 155

Q. Would Barry know more about that?
A. **Probably.**
Q. All right. I'll ask am.
MR. DIESETH: I have no other questions.
EXAMINATION
BY MR. LULIC:
Q. Is there a payroll record or something we could go to to figure out when you started floor removal at facility A, it doesn't matter which one, and when you completed it? Can you think of a record that I might want to get my hands on to verify that or -- the reason I'm asking you that question is because I think you said you had crews sometimes of 25, 35 people. I don't remember the exact number. It doesn't matter.
A. **Thirty-five, 40 people?**
Q. Yes, and I assume those people were both regular Holden employees and then other people that you just got.
A. **Yes.**
Q. Okay. Would there be a way to look at those records or not?
A. **Possibly. Payroll record we would not have differentiated on our own people and the other people we hired from the outside, we paid them, probably just**

Page 156

**wrote out a check for the time they worked and the date that the check was written. So that could have been. It probably wouldn't really state the time that they worked there.**
Q. Were there time cards?
A. **No.**
Q. How did you keep track of when Joe Blow from--
A. **We just had assigned times to show up at work and took a tally, not a recorded tally or anything, just day-to-day supervisor would watch that. But I don't think we retained any of those.**
Q. Would the supervisor record who was there?
A. **Yes, they'd take a daily check.**
Q. Do you know if that was kept or not?
A. **I don't think it was.**
MR. LULIC: Okay. That's all.
MR. SOBALVARRO: Nothing.
MR. CROSS: We'll exercise our right to read and sign.

Page 157

STATE OF MINNESOTA )
COUNTY OF BLUE EARTH)

BE IT KNOWN that, I took the foregoing deposition of KENT HOLDEN, pursuant to Notice;

That I was then and there a notary public in and for the County of Blue Earth, State of Minnesota;

That said witness before testifying was duly sworn to tell the truth, the whole truth, and nothing but the truth relative to the cause specified in the Notice;

That the witness did not waive the reading and signing of said deposition;

That I am neither attorney nor counsel for, not related to or employed by any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action;

That the testimony was taken down in stenotype by me; then reduced to typewriting under my direction by means of computer-aided transcription, and is a true and correct transcript of my stenotype notes.

Witness my hand and seal this 3rd day of August, 2001.

____________________
MARTHA M. RIVARD

Page 158