UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

Holden Farms, Inc., a Minnesota Corporation; Rod Garness; Eugene C. Ward; Randy Swanson; Rick Anderson d/b/a Circle A Farms; Tim Sanborn; AJ Farms, a Minnesota General Partnership; Dennis Kofstad; Marlin Kruckeberg; and Pork Avenue, LLP, a Minnesota Limited Liability Partnership,
Plaintiffs,

Court File No. 00-CV-785 DSD|SRN

**ORAL ARGUMENT REQUESTED**

vs.

Hog Slat Inc., a North Carolina Corporation; BCM Manufacturing, Ltd., a Canadian Corporation; and Double L Group Ltd., an Iowa Corporation,
Defendants.

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DOUBLE L GROUP'S MOTION FOR SUMMARY JUDGMENT**

---

## I. INTRODUCTION

Plaintiffs submit this Memorandum of Law in Opposition to Defendant Double L Group, Ltd.'s (hereinafter "Double L") Motion for Summary Judgment. Because the evidence is sufficient to make out a *prima facie* case of breach of warranty against Double L, its motion for summary judgment must be denied.

Plaintiffs commenced this action in March 2000 against Defendants Hog Slat, Inc. ("Hog Slat"), BCM Manufacturing, Ltd. ("BCM"), and Double L with claims of breach of contract, breach of express warranty, negligent design and negligent misrepresentation against Hog Slat,

SCANNED
JUL 1 4 2004
U.S. DISTRICT COURT MPLS

breach of express warranty and negligent misrepresentation against Double L, and breach of express warranty, negligent design, and negligent misrepresentation against BCM. This Court ordered the dismissal of all claims against Hog Slat, except as to the loss of hogs, pursuant to Orders dated March 2, and April 26, 2002, respectively. On April 26, 2002, this Court also granted BCM and Double L's respective motions for summary judgment, leaving only Plaintiffs' claims concerning the loss of hogs. On June 3, 2002, this Court dismissed the remaining claims and entered final judgment. On July 9, 2002, Plaintiffs' filed their Notice of Appeal.

With its October 28, 2003 decision, the Eighth Circuit Court of Appeals affirmed the dismissal of all claims against Hog Slat, and also affirmed the dismissal of the negligent misrepresentation claims against BCM and Double L. However, the Eighth Circuit reversed this Court's grant of summary judgment as to Double L and BCM on the breach of warranty claims, and further reversed as to BCM on the negligent design claim. Double L is now moving for summary judgment on the breach of warranty claims, on alternative grounds not considered by the Eighth Circuit.

## II. RELEVANT FACTS

This action arises from the failure of plastic flooring manufactured by Defendant BCM Manufacturing, Ltd. (hereinafter "BCM"), sold by Defendant Double L Group Ltd. (hereinafter "Double L"), and installed by now dismissed Defendant Hog Slat, Inc. ("Hog Slat"), as part of Hog Slat's construction of ten nursery facilities on behalf of the Plaintiffs. Three barns were constructed in 1994, 2 barns were constructed in 1995, 3 barns were constructed in 1996, and 2 barns were constructed in 1997; all of the barns originally included BCM's "Maxima" flooring installed on steel beams provided by Hog Slat.

**A. Development of the Maxima Flooring**

BCM was the first manufacturer of polypropylene flooring in North America, beginning production of hog flooring in 1978. Hutchings depo., pages 5-6.[1] All of the plastic flooring for hog facilities produced by BCM, including the Maxima I and Maxima II used in the Plaintiffs' barns, was and is marketed under the generic trade name "Filter-Eeze." Hutchings depo., page 9. Originally, however, the BCM flooring was designed to simply rest on the underlying support beam; BCM's plastic flooring prior to the introduction of the Maxima flooring was not attached to the support beam. Hutchings depo., page 7. In 1991, BCM began designing a new line of Filter-Eeze plastic flooring known as Maxima. Hutchings depo., page 8; Borcherding depo., page 67. Maxima was similar in design to another Filter-Eeze product designed in late 1990 or early 1991 for the European market known as Ultima. Hutchings depo., page 10. Unlike the previous Filter-Eeze products, however, Ultima and Maxima had a hanging bracket that attached the flooring to the underlying support beam. Hutchings depo., pages 10-11; Borcherding depo., page 64. Prior to the Maxima flooring, BCM's Filter Eeze flooring simply sat on the beam as a self-supporting product. Borcherding depo., page 64. BCM apparently undertook this design change because it would reduce the cost of support beams by reducing the total number of beams to support the entire flooring structure. Borcherding depo., page 72.

Despite the fact that Maxima had not been separately tested or marketed until the 1990s, various BCM and Double L promotional literature materials claimed that the Maxima flooring

[1] This extensive factual background was presented to the District Court in November 2001. All of the citations to the Record, except pleadings already filed with this Court, are to either deposition transcripts or deposition exhibits, all of which are attached to the November 21, 2001 Affidavit of Dustan J. Cross. For ease of reference, these citations are to the deponent's name in the case of citations to deposition testimony, or to the Deposition Exhibit Number in the case of Exhibits, rather than to the identifying exhibit letter from Mr. Cross' Affidavit.

had a 15-20 year life expectancy. *See, e.g.,* Deposition Exhibit 62 (**BCM3274**) (BCM advertising literature that Warren Hutchings testified was prepared by Double L, Hutchings depo., pages 79-80); Deposition Exhibit 4 (promotional brochure given to Plaintiffs prepared by Double L).

**B. Relationship Between BCM and Double L**

Norb Borcherding and his wife Donna are the sole shareholders of Double L. Borcherding depo., page 7. On January 14, 1980, Double L and BCM entered into a Distributor Agreement providing that Double L would become "the exclusive distributor of BCM to promote and to sell [BCM's products] in the agricultural industry in the United States" with the exception of four states. Exhibit 1.[2] The Distributor Agreement provided that Double L would indemnify and hold BCM harmless "from any and all claims, actions, suits … arising out of or connected with any claim under BCM's product warranty, as more particularly referred to in Paragraph IX." Exhibit 1, page 4, Para. III(5). Paragraph IX, entitled "Warranties of BCM", provided in relevant part as follows:

> [Double L] understands and agrees that BCM extends only a specific and limited warranty in connection with its hog flooring system, and which may be changed from time to time by BCM. In the event [Double L] or its dealers extend any additional warranty such as by enlarging the scope or period of warranty or not encompassed expressly within BCM warranty, then in such case BCM shall not be responsible therefor and [Double L] and its dealers shall on such instance have no recourse against BCM with respect thereto, and additionally shall indemnify and hold BCM harmless from any and all costs and liabilities relating thereto.

---

[2] The four state exception in the Distributor Agreement was later removed by agreement on Sept. 6, 1994, and Double L was the exclusive distributor of BCM products within the United States during 1994-1997. Exhibit 1, pages 13-15.

Exhibit 1, page 6, Para. IX. Double L claims that it was not authorized to extend an additional warranty over and above what BCM provided, and also that it had also never in fact ever done so. Borcherding depo., pages 13-14. When Double L began marketing BCM's "Filter Eeze" plastic flooring, it received installation instructions from BCM, which apparently included instructions that the BCM flooring could be installed on steel support beams. Borcherding depo., page 16.

In response to interrogatories, Double L produced a number of various documents regarding warranties on the Filter-Eeze products that had been provided to it by BCM from time to time. *See* Exhibit 10. Norb Borcherding could not identify when these various warranties were in effect, in what areas they were in effect, and the terms under which they were offered. Borcherding depo., page 93. He was not aware, however, of any of these warranties having been given to either Hog Slat or the Plaintiffs at any time. Borcherding depo., pages 97-98.

Prior to forming Double L, Mr. Borcherding had been sheet metal engineer for Quaker Oats, and through that experience was generally familiar with the various kinds and treatments of steel. Borcherding depo., page 19. Mr. Borcherding recognized that galvanized steel is used in "environmental circumstances" where there is the potential of rusting, although stainless steel is preferred. Borcherding depo., page 20. When Double L was marketing the older varieties of Filter-Eeze in the 1980s, the support beams would include stainless steel, galvanized steel, a high-carbon steel product known as "sucker rod" and even wood. Borcherding depo., pages 23-24.

**C. Recommendations by Double L and BCM for Support System**

The Maxima I product was first sold commercially in the United States in the spring of 1993. Hutchings depo., page 13; *see also* Borcherding depo., page 64 (estimating in 1993 or

1994). At that time, and throughout the construction of the Plaintiffs' nurseries, Double L was the exclusive distributor of Maxima products in the United States. Hutchings depo., page 13. According to Mr. Hutchings, upon introducing the Maxima product for sale, it immediately recommended to its distributors that fiberglass support beams be used with the Maxima flooring. Hutchings depo., page 17. BCM claims that it told Double L that untreated or simply painted steel support beams was not recommended with the Maxima flooring "and people were advised that, you know, that that type of beam would not last for the same length of time in a pig barn environment as would the fiberglass or stainless." Hutchings depo., page 17. Double L claims, however, that it simply followed "whatever the recommendations we had from BCM." Borcherding depo., page 25. According to Mr. Borcherding, BCM always recommended steel for use with its Filter Eeze products. Borcherding depo., pages 26-27.

Warren Hutchings testified that he had a conversation with Bailey Evans, a marketing director hired by Double L to oversee its marketing of BCM products in the United States, in either late 1993 or early 1994 regarding Double L's quotation of Maxima flooring with only painted steel beams:

> Specifically, I can recall at one point speaking with Bailey Evans and advising him that --- again, I think this conversation came up about a cost issue against people such as Ikadan that were actively trying to sell flooring in the U.S., and when I spoke to Bailey, I asked, you know, what he was using or what he was comparing it to and what Ikadan was using for their support beams, and they were using a three-sixteenths beams compared to our quarter-inch beam, and I believe Bailey was having difficulty competing on beams. And so the conversation led to the fact that, you know, I asked Bailey what he was quoting and he said, "Oh, we're quoting plain or painted steel," and I said, "Well, you do not want to use that because, you know, it's going to rust and the farmer will be unhappy," and Bailey's reply was, "We'll worry about that later."

Hutchings depo, pages 18-19.[3] BCM did not conduct any tests on the durability of the Maxima flooring when used with a steel support structure, "[b]ecause again, it was intended in our use that we would be using it with fiberglass beam." Hutchings depo., page 20. BCM, however, did not identify its preference for fiberglass beams in the installation manual it had prepared to accompany the Maxima flooring in 1994, and BCM owner Warren Hutchings could not identify any writing prior to 1997 expressing BCM's supposed preference for fiberglass over steel for use with its Maxima flooring Hutchings depo., page 112.

BCM did have available on the market a fiberglass beam for use with its flooring systems possibly as early as 1990 and certainly available by March, 1994, before Double L made its sales pitch to Holden Farms. Hutchings depo., pages 21-22; *see also* Deposition Exhibit 36 (**BCM3355**) (Minutes of March 3-4, 1994, meeting, in which it was noted that "BCM Mfg. is coming out with a new ¼" fiberglass beam and mount plate for the Maxima slat."). In fact, Double L had its own fiberglass beam prior to March, 1994. Hutchings depo., page 22. Double L and BCM developed these fiberglass beams to make the Maxima flooring more competitive without having to promote the use of either stainless steel or galvanized steel, which Mr. Hutchings claimed were "very expensive." Hutchings depo., page 22. Apparently, however, Double L chose to forego recommending or even advising its potential customers of the availability of these fiberglass beams because the fiberglass beam was more expensive than painted or untreated steel. Hutchings depo., page 22.

---

[3] In 1993, Double L retained Mr. Evans of BBZ Marketing to be in charge of its sales, specifically its flooring division. Double L's Sales Coordinators reported to Mr. Evans. Zittergruen depo., page 6. BBZ Marketing terminated its contract with Double L in 1998 as a result of Double L's and BCM's refusal to address the flooring issues arising from its marketing and sales of the BCM Maxima flooring. *See* Deposition Exhibit 70.

Double L was certainly aware of the availability of fiberglass beams, as shown by a May 13, 1994, fax request to BCM requesting that BCM fax Double L "the clearspan limits of the 3" and 4" fiberglass Eezy-Beam." Deposition Exhibit 40. BCM's fiberglass Eezy-Beam was available for commercial sale at the time that Plaintiffs' nurseries were constructed and at the time the first contracts between Hog Slat and Plaintiffs were entered into. Hutchings depo., pages 34-35; 43. BCM had designed its "Filter-Eeze" fiberglass beam in the latter part of 1993, and had forwarded test samples of these beams to Double L in July of 1994. Hutchings depo., pages 36-39; Deposition Exhibits 42 – 43. Warren Hutchings acknowledged that the fiberglass beam was preferred over steel beams because of the former's "longevity". Hutchings depo., page 47. A fiberglass beam has an expected useful life of at least 10-15 years. Hutchings depo., page 47. A galvanized steel beam has a life expectancy of 10-12 years, but an untreated steel beam has a life expectancy of only between 3-5 years depending on climate, feeds, and ventilation. Hutchings depo., pages 47-48.

According to BCM President Warren Hutchings, Double L would independently prepare and distribute advertising brochures and pamphlets regarding its sale of BCM products; typically without first sending the materials to BCM for review prior to distribution. Hutchings depo., pages 40-41. However, a September 12, 1994, Fax from Double L to BCM requesting BCM's approval on proposed advertising copy to be included in Double L's newsletter belies that claim, and is in the record as Exhibit 6. The third page of Exhibit 6 is a fax of the copy back from BCM with 2 typographical corrections. Significantly, this was apparently an advertisement by BCM in Double L's newsletter, and the advertisement (approved by BCM) contains the statement that it is designed for a "low cost steel support system" and that the Maxima flooring comes with a "full 10 year non-prorated warranty." Warren Hutchings personally made these corrections and

responded by fax thanking Double L "for your help in putting this together for us." Exhibit 6, page 4. There were no corrections or changes to the Double L copy concerning (1) the terms or scope of the warranty being offered to customers of the Maxima product; or (2) the recommendation that the Maxima flooring should be installed on a "low cost steel support system."

Despite Double L's claims to the contrary, it was involved in the design of the Maxima I, Maxima II, and Excelerator floorings manufactured by BCM. *See* Hutchings depo., pages 24-27.[4] Double L requested and obtained the specifications for the raw materials being used in the manufacture of the Maxima floorings. Hutchings depo., pages 29-30; Deposition Exhibit 38. Deposition Exhibit 62 consists of two advertising pieces of literature for the Maxima flooring. The first four pages (**BCM3272-BCM3276**) were prepared by Double L for distribution by BCM to its Canadian distributors. Hutchings depo., pages 77-79. The second set of documents consists of detailed "installation instructions" for the installation of Maxima flooring on steel beams that BCM claims was prepared by Double L. *See* Deposition Exhibit 62 (**BCM3277-BCM3280**); Hutchings depo., page 82. BCM admits that it and Double L discussed the installation instructions in general, but BCM claims it did not direct Double L on how to instruct its customers regarding proper installation of the Maxima flooring. Hutchings depo., pages 83-84. The instructions were for only installation of Maxima flooring on steel beams. *Id.* Ultimately, Double L sent a "couple of guys to come out" to the first of Plaintiffs' nurseries and

---

[4] The Excelerator flooring was a similar plastic flooring manufactured by BCM to its Maxima flooring and was first available in 1994 or 1995. The difference between Excelerator and Maxima was that the former had a 2 foot span, requiring less support beams. Hutchings depo., pages 43-44. Like the Maxima, however, the Excelerator had the same hook-over design for the manner in which the flooring attached to the underlying support. Hutchings depo., page 44.

"help assist and show [Hog Slat] how [the Maxima flooring] was supposed to be installed." Burge depo., page 85.

BCM's claim that it always instructed Double L to recommend only fiberglass or stainless or galvanized steel on its Maxima flooring is contradicted by the record. The contradiction is vividly demonstrated by a meeting held between BCM and Double L on December 7, 1995. Just prior to the meeting, Bailey Evans, on behalf of Double L, faxed an agenda for the meeting to BCM. *See* Deposition Exhibit 35. The second main topic for the meeting was to "Discuss and Finalize Support Structure Recommendations." Deposition Exhibit 35 (**BCM2398**). In his agenda, Mr. Evans states:

> A. Painted Steel – ¼" x 4" x 10' – As a result of the observations made regarding the deterioration of the support straps at the Marvin Evans and Hog Slats installations, we need to determine if we should start suggesting another type strap.
>
> B. Galvanized Steel --- ¼" x 4" x 10' – This is the product Ikadan has always recommended. **We chose to promote the use of a painted or non-painted steel in order to be more competitive** since we required 50% more straps per installation.

Deposition Exhibit 35 (**BCM2398**). BCM's own products literature regarding the Maxima flooring contradicts Mr. Hutchings' claim that BCM recommended fiberglass over steel beams; its "Product Information Sheet" for the Maxima flooring states that the Maxima's "unique hanger system allows the panel to be supported on either flat steel bar or fiberglass support beams at 12 inch intervals." Deposition Exhibit 56, page 3.

BCM acknowledges that on its flooring in 1993 and 1994, it "offered to Double L a 10-year warranty for our plastic flooring products at that time," and that Double L was in the

business of reselling the BCM plastic flooring to construction companies and others, rather than using the plastic flooring itself. Hutchings depo., pages 57-58.

**D. Plaintiffs' Operation and Expansion**

In 1993, Holden Farms decided to expand their operation and to modernize their production to provide for nurseries separate from the breeding-farrowing sites by arranging for the construction of 10 nursery facilities; the nurseries would be owned by individual, independent farmers and raise nursery pigs from weaning to a feeder pig weight of approximately 55 pounds. Kent Holden depo., page 20; Barry Holden depo., pages 18-19. Prior to this time, Holden Farms had owned four combined breeding-farrowing-nursery facilities, and had a contract with one other independently owned nursery. Kent Holden depo., pages 15-16. These combined facilities used either a wire mesh flooring laid on top of a steel frame or a material called tri-bar, which is a triangular piece of galvanized metal flooring over a subfloor or a substructure. Kent Holden depo., page 16.

Holden Farms was one of the first companies to do business with Hog Slat in Minnesota. Kent Holden depo., page18. Beginning in 1989, Holden Farms purchased various hog facility materials from Hog Slat such as concrete slats and equipment farrowing crates. Kent Holden depo., pages 18-19. Wendell Burge, who at the time was Sales and Construction Manager for Hog Slat's Midwest Division, met with them on several occasions to discuss the general overall design parameters for these nurseries. Burge depo., page 17. Originally, Holden Farms (who was acting on behalf of its independent growers) intended to use a metal Delta Deck flooring. Burge depo., page 17; Kent Holden depo., page 22.

According to the Holdens, Wendell Burge then approached them about the possibility of using plastic flooring as a substitute. Kent Holden depo., page 22; Barry Holden depo., pages

20-21. Mr. Burge approached Holden Farms in the spring of 1994 and said "he had a good product and that it was something we should look at and he'd like to get a meeting together" for Holden Farms to consider plastic flooring. Barry Holden depo., pages 22-23.

**E. April 1994, Sales Presentation to Plaintiffs.**

As a result of Mr. Burge's recommendation, Holden Farms agreed to host a sales presentation by Mr. Burge and Mr. Borcherding of Double L regarding BCM's Maxima flooring. Burge depo., page 24. The purpose of the meeting was to provide information to Holden Farms on plastic flooring and make a sales presentation regarding plastic flooring. Burge depo., page 24.

Mr. Borcherding provided Holden Farms with a cover letter either at or immediately before this meeting. Borcherding depo., page 56. The letter states that Mr. Borcherding was a "representative of BCM Manufacturing" and that the "Filter-eeze Ten-year non-prorated warranty is proven! There is simply no comparable product on the global market which has more than a two year performance history." Deposition Exhibit 4, pages 5-6.[5] The letter went on to claim that the BCM Filter-Eeze products had been the subject of "dozens of University, or College, research studies with Filter-Eeze plastic floorings, demonstrating the value and benefits of our products." *Id.* Mr. Borcherding, the author of the letter, signed it as "Representing BCM Manufacturing Filter-Eeze Flooring." Mr. Hutchings, however, claims never to have seen this letter before and is not aware of any studies on BCM products having been done at either its or Double L's request. Hutchings depo., page 88.

[5] In fact, both Mr. Barry Holden and Mr. Kasper of Holden Farms recall that they were orally told by Norb Borcherding of Double L at this meeting that the warranty was in fact a 10-year non-prorated warranty with a second, prorated ten-year warranty following that, or a total warranty period of 20 years. Kasper depo., pages 5, 23; Barry Holden depo., page 29.

At this meeting, Mr. Borcherding and Mr. Burge of Hog Slat presented Holden Farms with a document entitled "Filter-Eeze Maxima Nursery / Grower Flooring." Deposition Exhibit 4 (hereinafter "Presentation Document"); *see* Kent Holden depo., page 26. The Presentation Document was drafted with Hog Slat's corporate logo on the front page, and describes the supposed benefits of BCM's Filter-Eeze flooring over more traditional, metal flooring slats. Mr. Borcherding admits, however, that despite Hog Slat's logo, the Presentation Document was actually drafted by Double L. Borcherding depo., page 36. The Presentation Document specifically stated that the Filter-Eeze flooring comes with a "full 10 year non-prorated" warranty; that it has a "20 year proven record of performance" and that its "longer life increases product value over other floorings." Presentation Document, page 3. On page 4 of the Presentation Document, there is a section which states "FILTER-EEZE HAS MAJOR ADVANTAGES OVER TRADITIONAL FLOORS" including "20 years on the market – proven and tested" with a "15-20 year life expectancy" and a "10 year non-prorated warranty" that "increases value of product". On that same page, there is a section entitled "Filter-Eeze Maxima Flooring Supported with Steel Beams" which includes diagrams of the slats attached to the steel support beams. The Presentation Document specifies the dimensions of the steel beams necessary.

No one wants to take credit for preparing the Presentation Document. Mr. Burge claims that he never saw the Presentation Document either in draft or in final form until immediately before the meeting with Holden Farms. Burge depo., page 25. He claims not to have known who drafted it, why his name and Hog Slat's logo were placed on the document, and that he doesn't remember if he ever told any Holden Farms representatives that, despite the logo and his name, that he had not prepared the Presentation Document. Burge depo., page 26. Mr. Burge

claims that he cannot remember whether or not he had ever seen any of the information that makes up the contents of the Presentation Document before the meeting with Holden Farms. Burge Depo., page 26.

Mr. Borcherding acknowledges that Double L prepared the Presentation Document and placed Hog Slat's logo throughout it, but claims that all of the information in the Presentation Document came directly from BCM. Borcherding Depo., page 39. Mr. Hutchings, on the other hand, claims that BCM did not prepare the document, and claims that BCM never provided any of the information for the graphs or charts that were included in the document. Hutchings depo., page 85. When he reviewed the box on page 3 which states "Filter-Eeze Maxima Nursery / Grower flooring ... [has] 20 year proven record of performance," Mr. Hutchings stated that "I assume they're referring to Filter-Eeze flooring rather than specifically Maxima, because Maxima wasn't on the market for 20 years at that point." Hutchings depo., page 86. Double L admitted that it did not have a 20-year proven record of performance with plastic flooring that clasped onto the support beam such as Maxima flooring. Borcherding depo., page 65. According to Mr. Hutchings, BCM provided neither the text nor the graphics on page 4 of the Presentation Document, which contains a schematic for installation of the Maxima flooring on steel beams. Hutchings depo., page 87.

Mr. Borcherding acknowledged that during this presentation, he recommended putting the Maxima flooring on steel support beams. Borcherding depo., page 43. The Holdens recall that Wendell Burge of Hog Slat also recommended that the Maxima flooring be placed on painted steel supports rather than galvanized steel or fiberglass beams. Kent Holden depo., pages 32-33. Both gentlemen discussed how the steel beam would be attached to support the flooring. Kasper depo., page 22. No other options for the support beams were ever made to

Holden Farms or the other Plaintiffs by any of the Defendants. Kent Holden depo., page 33; Barry Holden depo., pages 44-45. Mr. Borcherding testified that the information claiming that the Maxima flooring had a "15-20" year life expectancy was given to him by BCM and based upon University studies. Borcherding depo., pages 48-49. Mr. Borcherding acknowledged, however, that none of these alleged studies related to a product that clasped onto a support beam, such as Maxima, and related only to the lower heat loss rates for the materials that made up all of the Filter Eeze products. Borcherding depo., pages 65-66. Mr. Borcherding was not aware of any studies that related to product that clasped onto the support beam. Borcherding depo., page 66.

As noted above, at the time of this presentation, fiberglass support beams were available for use with Filter Eeze products. Borcherding depo., page 60. In fact, Double L had sold fiberglass support beams prior to April, 1994. Borcherding depo., page 62. Mr. Borcherding does not recall that there was, however, any discussion at this meeting regarding the availability of fiberglass support beams as opposed to steel support beams. Borcherding depo., page 61. Holden Farms was not told and did not know that there were alternatives to painted steel for use with the Maxima plastic flooring. Barry Holden depo., pages 89-90; Kasper depo., page 22, 28.

The BCM plastic flooring was more expensive than the woven wire flooring that Holden Farms had been considering. Kent Holden depo., page 32; Barry Holden depo., page 24. Holden Farms opted for the Maxima flooring based on the representations made by Mr. Borcherding and Mr. Burge at the meeting, specifically that the plastic Maxima flooring was more comfortable, easier to clean and had a longer life expectancy and warranty than the woven wire. Kent Holden depo., page 32.

**F. Plaintiffs' Prior Experience with Steel Support Beams**

Based upon their experience in the hog industry since the 1970s, the Holdens expected that a woven wire flooring that they had been considering before this sales presentation could expect to last 10 years or more. Kent Holden depo., page 32; Barry Holden depo., page 31. However, they believed the Maxima flooring would last 15-20 years based upon what they were told and what was contained in the Presentation Document. Kent Holden depo., page 32. This was of particular interest to Holden Farms, which had 12 year grower contracts with each of the individual producers, and were interested in providing their growers with a flooring that would not need to be replaced during the term of those contracts. Barry Holden depo., page 30.

Holden Farms had had prior experience with woven wire flooring placed on top of (but not attached to) steel support beams in their history within the hog industry. Kent Holden depo., pages 36, 95; Barry Holden depo., pages 31-32. That experience led them to the expectation that both the woven wire and the underlying steel support beams could last 10 years or more. Kent Holden depo., page 36. Prior to the construction of these 10 nurseries, it had been Holden Farms' experience that the woven wiring lying on top of the steel support beams would rust through before the underlying beams, and typically, Holden Farms would ultimately have to replace the woven wiring but would still be able to use the underlying steel support structure. Kent Holden depo., page 36; Barry Holden depo., page 31. These earlier facilities with the steel support structure would last approximately 20 years or more, and Holden Farms had never had the steel support structure in these older facilities rust to the point where the support beams had to be replaced. Kent Holden depo., page 96; Barry Holden depo., page 31. The environment in these older structures was similar to the environment in the 10 nurseries. Kent Holden depo., page 96.

## G. Construction of the 10 Nurseries

Each of the contracts for the construction of the nursery barns were drafted by Hog Slat. Attached to each contract as Exhibit A is a document entitled "Project Specifications," which states that the floor for each nursery has the following specification: "Maxi Floor w/ ¼" x 4" x 11'8" painted support." and stated that there was a quantity of 2 for each nursery (each nursery had 2 rooms). The reference to "Maxi Floor" is to BCM's Filter-Eeze "Maxima" flooring; "painted support" is a reference to the steel support beams which were to be 11 feet 8 inches in length. Burge depo., page 47. Mr. Burge of Hog Slat recalls no specific discussion between Hog Slat and Holden Farms regarding the inclusion of this specification into the contracts. Burge depo., page 47.

The Maxima flooring was delivered by BCM to the Plaintiffs' work sites directly. The flooring would be shipped in either pallets or in cartons containing information set forth on **BCM301** of Deposition Exhibit 58. None of the BCM cartons containing its flooring from 1993 through 1998 contained any information about or limitation on warranties. Hutchings depo., page 72. In fact, very early on, BCM discontinued shipping its Maxima flooring in cartons, and simply delivered them in bulk pallets. Hutchings depo., page 72. BCM would send some instructions to accompany the flooring relative to the temperature of the product for proper installation, but those instructions did not contain any limitations or exclusions of any applicable warranty. Hutchings depo., page 73.

Hog Slat either constructed the steel support beams itself or obtained and treated them after purchase from a third party. Burge depo., page 43. The steel beams were dipped and then painted. Burge depo., page 43. All of the BCM flooring used in Plaintiffs' barns, despite being directly shipped from BCM's production facility in Alberta, Canada, to the work sites, was

purchased by Double L as the distributor and then sold by Double L to Hog Slat for installation into Plaintiffs' nurseries. Borcherding depo., page 89.

**H. Corrosion of the Steel Supports and Buckling of the Maxima Flooring.**

In the summer of 1998, Holden Farms and its contract growers began to notice that the flooring was buckling on the three barns constructed in 1994. Kent Holden depo., page 46; Barry Holden depo., page 49. Prior to this time, none of the Defendants had advised any of the Plaintiffs that there were any problems associated with the Maxima flooring. Kent Holden depo., page 45. This buckling gradually increased, leading to gaps and irregularities in the flooring, causing the nursery pigs to catch their feet in the gaps and to use their snouts to lift up the exposed slats caused by the buckling. Kent Holden depo., pages 69-70. In approximately 50 instances, the pigs were able to remove a slat entirely causing them to fall into the manure basin underneath the slats and die. Kent Holden depo., pages 69-70.

BCM and Double L, at least, were already aware of these problems. BCM President Warren Hutchings admits that by 1998, BCM had been seeing "rusting beams [that] were destroying the floor as a general complaint or cause." Hutchings depo., page 102. On August 23, 1998, Bailey Evans, Double L's marketing representative, prepared a Memo memorializing three site inspections he and Bob Slessor of BCM had taken, concluding that "[t]he problem is being created by the deterioration of the steel support beams. Although we saw ways the installations could have been improved which would have resulted in delaying the problem, it would have inevitably occurred at some point," and recognizing that "[t]he potential for this problem exists for any installation using steel support beams." Deposition Exhibit 67 (**BCM2416**) (emphasis in original). BCM agreed with the conclusions of Mr. Evans in this Memorandum regarding the causes of this reported "expansion which was causing severe

bulging." Hutchings depo., page 104. BCM is not aware of any performance differences between the Maxima I flooring (which was used in Plaintiffs' first five nurseries) and the Maxima II flooring (used in the last five nurseries) vis à vis steel support beams. Hutchings depo., page 105.[6]

Following these site inspections, Robert Slessor of BCM sent three letters to the producers concluding that the buckling and expansion being experienced by these producers was caused by "the corrosion of the steel flat bar supports." Deposition Exhibit 68. Mr. Slessor noted that he had taken measurements of the support beams at each of the sites, and had observed rust expansion of the ¼" beams from 0.26" to 0.2975" and at one point, to 0.3015". Deposition Exhibit 68. As Mr. Slessor recognized, "this represents anywhere from 7% to almost 21% over the 0.25 inches required," and resulted in the following effect:

> As the steel corrodes and iron oxide scale builds up, it begins to force the hangers apart, having a spreading effect. This spreading force is exerted on pieces next to each other. When the continuous spreading finally reaches a point of resistance, the result is for the force to change its direction upward, which is the only direction it can go without resistance. The upheaval of the floor or buckling results....

Deposition Exhibit 68 (**BCM2994-BCM2995**). In his letters, Mr. Slessor stated that BCM "see[s] the corrosion of steel flat bar commonly, especially in cases where the bar is painted or left unpainted," and that "a normal life expectancy [for the steel beams] is about 5 years, but we have seen this reduced as low as 3 years in certain environments. [BCM] strongly recommend[s] the use of galvanized steel, or preferably the fiberglass beams." Deposition Exhibit 68 (**BCM2996**). Mr. Hutchings, the President of BCM, acknowledged that the type of rust

[6] In his August 23, 1998, letter, Mr. Evans concluded that the Maxima I flooring accelerated the deterioration of the steel support beams because its overlapping tab resulted in "flush contact of the plastic against the steel support." Deposition Exhibit 67 (**BCM2417**).

expansion observed by Mr. Slessor "will destroy" BCM's Maxima flooring. Hutchings depo., page 110.

Two months after Mr. Slessor's letters to the three sites he had inspected, Double L sent a "Technical Bulletin" to "All Double L Dealers" on November 26, 1998, noting the corrosion and expansion of the steel support beams, and stating that the "corrosion of the steel flatbar is a natural process which is sped up by the amount of moisture and gases lingering above the pit" and recommending that the dealer "consider using fiberglass beams" as a first choice, "galvanized steel or stainless steel" as a second alternative, and "at the very least paint the steel supports with a good quality epoxy paint to prolong the life of the steel." Deposition Exhibit 71 **(BCM3143-BCM3144)**. However, there is no evidence that this technical bulletin was ever provided to the Plaintiffs.

On September 9, 1999, Nic Orr of BCM notified Double L via e-mail that Double L needed to "send out a directive to all your dealers regarding the issue associated with the use of steel support beams as we discussed today. BCM is not prepared to warranty any product effective immediately which is laid down on steel supports. Stainless steel or fiberglass beam is the products recommended by BCM." Deposition Exhibit 76. This remains BCM's policy, although BCM does allow certain customers to install galvanized beams, but those customers are advised that they should not expect to see the longevity of that beam and flooring with that installation. Hutchings depo., page 131. Similarly, Hog Slat apparently made the same decision, and sent a Memorandum to its field representatives stating that the company "was seeing rusting problems and no longer wanted to utilize steel, unless the customer specifically wanted to continue to use steel under plastic flooring." Burge depo., page 88.

Despite Mr. Slessor's conclusions and the complaints BCM and Double L were receiving from Plaintiffs, BCM and Double L wrote a letter on March 1, 2000, to Double L's customers of BCM products in the United States claiming that "[i]solated cases have been reported by producers that the steel supporting the flooring has been corroding and causing the plastic flooring to buckle and break. **We have only recently become aware of these problems and have not previously experienced any of these problems.**" Exhibit 10, page 6 (emphasis added). Moreover, Mr. Borcherding himself estimated that Double L first became aware of a potential problem with steel supporting the flooring corroding and causing the plastic flooring to buckle and break as early as 1997 or 1998. Borcherding depo., pages 101-102. The letter offered effected purchasers of BCM products the opportunity to purchase BCM's Excelerator flooring and 5" Permabeam, BCM's fiberglass beam, and attached a Limited Warranty that participants in the "Replacement Upgrade Program" had to agree to in order to take advantage of the proposal. *Id.*, pages 6-8. Plaintiffs did not participate in this program.

**I. Plaintiffs' Response to the Problem.**

Holden Farms contacted Hog Slat about remedial measures to address the buckling in the flooring, and Hog Slat in turn contacted Double L. Kent Holden depo., page 46. Hog Slat proposed the use of "expansion joints" to permit the Filter-Eeze slats to expand, but this did not correct the problem. Kent Holden depo., page 46. Hog Slat and Double L, however, did not specifically identify the cause of the buckling. Kent Holden depo., page 47. In June of 1999, Kent Holden of Holden Farms attended the World Pork Expo in Des Moines, Iowa, and discussed the problems with the nurseries, first alone with Tommy Herring, the President of Hog Slat, and then in a meeting with Mr. Herring, Mr. Hutchings of BCM, Norb Borcherding of Double L, and others. Kent Holden depo., pages 47-48. During this meeting, Mr. Herring stated

that he was a steel expert "and no one should be telling him anything about the steel business, in so many words." Kent Holden depo., page 49.

In order to avoid further production losses and damages, Holden Farms replaced the flooring (including the support beams) at all 10 of the nurseries. At the first three sites, Plaintiffs purchased and used the 2' BCM Excelerator flooring rather than the 1' Maxima flooring. Kent Holden depo., pages 52-53; Barry Holden depo., page 55. On the next two barns, one was replaced with the Excelerator flooring and one was replaced with a competitor's similar type of plastic flooring. Barry Holden depo., pages 55-56, For the remaining five barns, Holden Farms were able to recycle the existing Maxima flooring, which was reinstalled after the Plaintiffs had replaced the corroded steel beams with fiberglass supports. Kent Holden depo., pages 52-53; Barry Holden depo., pages 57-58.

**J. Cause of Plaintiffs' Losses.**

The steel beams installed by Hog Slat and in conformity with the limited specifications provided by BCM and Double L to support the Filter-Eeze flooring, corroded to the point where the beams expanded causing the flooring buckling, and to the point where the steel no longer had the weight-bearing capacity necessary to safely use in the nursery operations. Kent Holden depo., page 55. The steel beams at all 3 of the sites constructed in 1994 had shown advanced stages of corrosion, rust, and expansion, leading to substantial buckling problems with the Filter-Eeze flooring at all 3 sites. Kent Holden depo., page 55. Mr. Burge of Hog Slat admitted that the rusting and expansion of the steel beams was the cause of the Plaintiffs' flooring problems in July, 1999. Barry Holden depo., pages 136-37.

Mr. Hutchings of BCM personally visited the Garness barn and observed the conditions in that nursery. Hutchings depo., page 122. He agreed that the condition of the flooring at the

Garness nursery required replacement of the flooring. Hutchings depo., page 122. Mr. Hutchings further agreed that the deterioration and damage to the flooring he observed at the Garness barn was due to the rusting beams, and he could not observe any other installation or other problems that would have contributed to that condition. Hutchings depo., pages 123-124.

Wendell Burge of Hog Slat also observed the conditions in the Garness barn and observed expansion of the steel support beams caused by rusting which caused the plastic flooring to pop up out of place. Burge depo., page 71. In fact, Mr. Burge was in virtually every one of the Plaintiffs' barns, and agrees that, "to some extent", the same rusting and expansion problems were present in every facility. Burge depo., page 72. Mr. Burge cannot identify any management-specific problems of any of the Plaintiffs that would have contributed to the problems he observed. Burge depo., page 81.

Double L and BCM's own experts agree that rusting and expansion of the steel beams was the cause of Plaintiffs' losses. BCM's expert, Dr. Steven Pohl, stated as follows in his report:

> Today I would certainly question, and not recommend, the use of either unpainted or painted steel beams to support floor systems that hook over the top of the beam. That knowledge has come from the recent Holden farm experiences. Given the fact that a quality plastic floor should last over 10 years, I would have recommended galvanized or stainless steel or fiberglass beams for supports.

November 8, 2001, Report of Dr. Steven Pohl, page 3 (attached as Exhibit to Expert Witness Disclosure Pursuant to Rule 26(a)(2)(A) and Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure of Defendant BCM Manufacturing, dated November 19, 2001). Dr. Pohl concluded that the beams at all of the facilities he visited needed to be replaced. *Id.*, page 4. Similarly, Double L's expert, S.N. Bhatt, P.E., opined as follows:

> It is my conclusion to a reasonable degree of engineering certainty that the buckling of the plastic floor panels has occurred in the following manner. The steel support framing in the Hog Slat flooring system was routinely subjected to moisture, animal waste and animal feed products, as would be common in a hog barn. The steel framing corroded as a result of the exposure to this environment, creating corrosion products that had a lower density and larger volume than the steel of the framing members. The mechanical design of the Hog Slat flooring system did not incorporate sufficient means to accommodate the increased volume created by the corrosion products without subjecting the Filter-Eeze plastic floor panels to forces that cause them to buckle and deform.

November 19, 2001, letter from S.N. Bhatt to Joseph Lulic, attached as Exhibit to Double L's Expert Witness Disclosure of November 20, 2001.

Hog Slat's expert, Richard Stehly, also agreed that the "floor movement was caused by the flooring tabs which clipped to the supporting metal beam. The tab creates a crevice corrosion condition which accelerates the corrosion of the support beam. As the corrosion product is of a greater volume than the metal, the tab expands. The tabs occur about every 12" along the length of the building. As a result, considerable floor expansion results and up to 2-1/4" was measured at the Kofstad facility." November 19, 2001, Report of Building Observation, attached to Hog Slat's Rule 26(a)(2)(B) Disclosure.

## III. ANALYSIS

Plaintiffs have made a *prima facie* showing for their breach of warranty claim against Double L sufficient to withstand Double L's Motion for Summary Judgment.

Double L argues that it "merely advised Hog Slat and Plaintiffs about BCM's warranty" and therefore, as a matter of law, cannot be held liable for breach of warranty. Double L Brief, at page 7. In support, Double L predictably cites the rule of law: "[T]he mere sale of the goods together with transmission of a manufacturer's warranty does not bind an agent. The agent must itself adopt the manufacturer's warranty to be bound by its terms." *See, e.g., Pemberton v. Dean*,

88 Minn. 60, 92 N.W. 478 (1902)." *State v. Patten,* 416 N.W.2d 168, 171 (Minn. App. 1987). However, in cases like *Pemberton,* the seller is merely transmitting a warranty prepared by the manufacturer. In this case, there is clearly a material question of fact whether Double L was preparing and distributing its own information on the Maxima product rather than merely serving as a conduit for information being provided to it by BCM.

In *Sorenson v. Safety Flate, Inc.*, 298 Minn. 353, 360-61, 216 N.W.2d 859, 863 (1974), the Minnesota Supreme Court recognized in a different context that the separate preparation and presentation of a manufacturer's warranty by the distributor, in and of itself, is sufficient to create an independent liability on the seller:

> While a written express warranty was prepared and circulated by the distributors in this case, **thereby placing them in a position of some active participation beyond merely selling the product**, it essentially did nothing more than reiterate the guarantees already encompassed within the implied warranties which accompany any product produced by a manufacturer, i.e., that the product is fit for the ordinary purposes for which such goods are to be used.

*Id.* at 360-61, 216 N.W.2d at 863 (emphasis added). In *Sorenson,* the Minnesota Supreme Court recognized that where a distributor or seller participates in the preparation and distribution of a manufacturer's warranty, both the manufacturer and the seller are liable to the purchaser for a breach of warranty, although in such cases the seller may have an indemnity claim back against the manufacturer.

Double L states that it is an "undisputed fact" that the information included in the Presentation Document "and information contained in the letter signed by Norb Borcherding of Double L had been given to Double L by representatives at" BCM. Double L Brief, at page 3. In support of this claim, Double L cites exclusively to limited portions of Mr. Borcherding's deposition testimony. The claim by Mr. Borcherding that the information contained in the

Presentation Document and his letter came from BCM is a disputed fact. Warren Hutchings, the President of BCM, specifically denied that both the format **and the information** contained in these documents came from BCM. *See* Hutchings depo., pages 85 – 88; *see generally* BCM's 2004 Brief (arguing that Double L acted on its own in extending the warranty).

In fact, Mr. Hutchings maintained that BCM always advised Double L since 1993-1994 (when the Maxima flooring first came on the market) to use fiberglass support beams as a first choice, then stainless steel beams, then galvanized beams. Hutchings depo., page 17. Mr. Hutchings claims that BCM always recommended against the use of plain or painted steel with its Maxima flooring, and that Double L **specifically chose to ignore** that recommendation (and instead, quote prices for the flooring on plain steel only) because of price concerns. *Id.*, pages 18-19. BCM now claims that it was BCM's intention to use fiberglass support beams with its Maxima product from the time the Maxima was first introduced on the market. *Id.*, pages 20-21.

Moreover, BCM has claimed that its warranty is not an unlimited, 10 year "full" non-prorated warranty that was stated in the presentation by Mr. Borcherding and set forth in the documents presented to Holden Farms in April, 1994. BCM claims that there were limitations on the warranty that BCM had authorized Double L to distribute. *See* BCM's 2004 Brief at page 6 (arguing that Double L acted on its own in extending the warranty). While there is substantial evidence to question the accuracy of BCM's position, if the jury accepts BCM's claims, then the jury will necessarily find that Double L modified, on its own, the warranty and expanded it beyond what BCM authorized. In such a case, it would be Double L's warranty that was breached. In its original Distributorship Agreement, Double L expressly agreed that, in such an event, it would defend and hold BCM harmless from any and all such claims. Deposition Exhibit 1, page 6.

Throughout its Brief, Double L attempts to justify its conclusion with misstatements of fact. For example, Double L wrongly asserts that "[t]he only warranty Double L could provide was the warranty provided by BCM, the manufacturer of the product." Double L Brief, at page 7. Clearly, Double L, as the seller, *could* offer whatever warranty it liked, and did so. Whether the warranty did or did not exceed the warranty authorized by BCM is a matter for the jury, and an issue between BCM and Double L, but it is not accurate to say that Double L "could" only provide a warranty authorized by BCM. In this very case, BCM is apparently arguing that the warranty Double L gave at the sales presentation did exceed the warranty Double L was authorized to extend on behalf of BCM. Whether that is true or not is for the jury to decide.

## IV. CONCLUSION

For all the reasons set forth above, Plaintiffs respectfully request that Double L's motion for summary judgment be denied in its entirety.

Dated this 14th day of July, 2004.

Dustan J. Cross #248952
Peter D. Favorite #0301036
GISLASON & HUNTER LLP
Attorneys for Plaintiffs
2700 South Broadway
P. O. Box 458
New Ulm, MN 56073-0458
Phone: 507-354-3111

NULIB:175760.1